1

2                     UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS

3

4

UNITED STATES OF AMERICA            )
5                                   )
vs.                                 )  Criminal Action
6                                   )
HERZZON SANDOVAL,                   )  No. 15-10338-FDS
7  EDWIN GUZMAN,                     )
CESAR MARTINEZ,                      )
8  ERICK ARGUETA LARIOS,             )
                    Defendants       )
9

10

BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
11

12

                        JURY TRIAL DAY 5
13

14

                        TESTIMONY ONLY
15

16        John Joseph Moakley United States Courthouse
                       Courtroom No. 2
17                     1 Courthouse Way
                       Boston, MA 02210
18
                       February 5, 2018
19                       9:00 a.m.

20

21

22

23                     Valerie A. O'Hara
                      Official Court Reporter
24      John Joseph Moakley United States Courthouse
                  1 Courthouse Way, Room 3204
25                    Boston, MA 02210
                  E-mail: vaohara@gmail.com

```
 1    APPEARANCES:

 2    For The United States:

 3        United States Attorney's Office, by CHRISTOPHER J. POHL,
      ASSISTANT UNITED STATES ATTORNEY, and KELLY BEGG LAWRENCE,
 4    ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200,
      Boston, Massachusetts 02110;
 5
      For the Defendant Herzzon Sandoval:
 6
          Foley Hoag LLP, by MARTIN F. MURPHY, ESQ. and
 7    MADELEINE K. RODRIGUEZ, ATTORNEY,
      155 Seaport Boulevard, Boston, Massachusetts 02210;
 8
      For the Defendant Edwin Guzman:
 9
          Lawson & Weitzen, by SCOTT P. LOPEZ, ESQ.,
10    88 Black Falcon Avenue, Suite 345, Boston, Massachusetts 02210

11    For the Defendant Erick Argueta Larios:

12        THOMAS J. IOVIENO, ESQ., 345 Neponset Street
      Canton, MA 02021;
13
      For the Defendant Cesar Martinez:
14
          Stanley W. Norkunas, 11 Kearney Square,
15    Howe Building, Suite 202, Lowell, Massachusetts 01852.

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2    WITNESS                    DIRECT  CROSS  REDIRECT  RECROSS
     JEFFREY ELLIOT WOOD, JR.
3
       By Mr. Iovieno                    4
4      By Mr. Norkunas                  11
       By Mr. Murphy                    28
5      By Mr. Lopez                     98
       By Mr. Pohl                                 130
6      By Mr. Murphy                                         144

7

8    EXHIBITS                            FOR I.D.   IN EVIDENCE

9      224                                               9
       225                               70
10     226                                              72

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          TESTIMONY ONLY

2              THE CLERK:  All rise for the jury.

3              (JURORS ENTERED THE COURTROOM.)

4              THE CLERK:  Thank you.  Court is now back in session.

5              THE COURT:  Good morning, ladies and gentlemen.

6    Welcome back.  For the record, it was a very disappointing but

7    exciting game yesterday.

8              I had suggested on Friday that we might go with only

9    one break.  We're going to try sticking with the two break

08:59AM 10   system for a while here and see whether or not we're falling

11   behind.  And just for your planning purposes, Wednesday morning

12   of this week, I have a medical procedure early in the morning

13   that I'm not confident I can be here at 9:00, so we're going to

14   make it 9:30, and we'll take one break that day to make sure

15   we'll get a full day.

16             All right.  You understand you're still under oath?

17             THE WITNESS:  Yes, sir.

18             THE COURT:  Okay.

19                  JEFFREY ELLIOT WOOD, JR., RESUMED

20                         CROSS-EXAMINATION

21   BY MR. IOVIENO:

22   Q.   Good morning, Agent Wood.

23   A.   Good morning, sir.

24   Q.   Let's talk a little bit about the protection details.  I

25   have a few questions on that.  You indicated that this was a

1    tactic used by the investigation?

2    A.    Yes.

3    Q.    And it was CW-1, Pelon, who was the individual who went

4    out and solicited and communicated with the individuals that

5    subsequently became involved in the protection details?

6    A.    Yes, sir.

7    Q.    Okay.  And I think you indicated that you personally

8    conducted the surveillance of the October, 2014 protection

9    detail?

09:00AM 10    A.    I was one of many on surveillance that day, yes, sir.

11    Q.    How many officers or agents were involved with that?

12    A.    You've got two SWAT teams, the State Police SWAT team.  I

13    don't know how many people they brought.  The FBI SWAT team.

14    You had the North Shore Gang Task Force.  You had an FBI

15    airplane up.

16    Q.    So there was constant surveillance over the entire

17    operation?

18    A.    Yes.

19    Q.    And is it fair to say that Mr. Larios was not a member or

09:01AM 20    participated in that October 2014 protection detail?

21    A.    Not in October, no, he was not.

22    Q.    And I think you indicated that you personally went to the

23    evidence room and took out a package?

24    A.    I did, sir, yes.

25    Q.    And when you do that, when you work for the FBI, it's

1    pretty common you have to fill out some documents to do that,

2    you just can't go take evidence and take it out without some

3    kind of documentation?

4    A.    No.  We had a chain of custody form.

5    Q.    And you filled that chain of custody form out?

6    A.    I did.

7    Q.    And you also indicated that you field tested the

8    substance?

9    A.    I did, yes.

09:01AM 10    Q.    And did you also make a report about that field test?

11    A.    Yes, I did.

12    Q.    And did you put down on that report what the brand and how

13    you went about conducting that field test?

14    A.    No, I just say I conducted the field test.

15    Q.    You just concluded that I went and conducted a field test,

16    that was it?

17    A.    Well, I said I conducted a field test testing for the

18    presence of cocaine and the field test tested positive for the

19    presence of cocaine.

09:02AM 20    Q.    And when you did that, you -- I think you testified that

21    you used a knife and you cut into the package and took out some

22    of the substance?

23    A.    I don't use the knife to take the cocaine out.  The test

24    kit has a little device that you go and you take a little bit

25    out, but I had to cut the packaging material to be able to get

```
 1    into it.

 2    Q.    So you cut the material, you just didn't cut into it and

 3    pull out -- you cut into the package and took out some of the

 4    substance and then tested it?

 5    A.    Correct.

 6    Q.    And you didn't weigh the substance?

 7    A.    That I tested or --

 8    Q.    No, you didn't weigh the substance?

 9    A.    Not what I took out of the cocaine package, no.

10    Q.    But you didn't weigh the package either?

11    A.    No, I did.  It's in my report.

12    Q.    Okay, but you said you field tested it, you didn't say you

13    weighed it?

14    A.    I said I tested the cocaine, which I tested.

15    Q.    Right, that's what you field tested?

16    A.    Correct.  You just take a very small amount out.  I'm not

17    going to -- once you take a little bit out, there's -- we're

18    not going to weigh it, because if I weigh it, I'm going to

19    spill it all over the place and make a hazmat.

20    Q.    Okay.  When you test it, when you take a substance out,

21    would you agree with me that the package would weigh a little

22    bit less than it did before you took the substance out?

23    A.    The total kilogram?

24    Q.    Well, you didn't weigh the --

25    A.    I weighed the entire kilogram, and I put that, how much
```

1    that weighed down in the report.

2    Q.    You wrote that in your report?

3    A.    Yes, I did.

4    Q.    Along with the field test?

5         THE COURT:  Hold on.

6    A.    So before I field test it, I weigh it, and then after the

7    field test, I weighed it, and it's in my report.

8    Q.    It's in your report that you weighed it and field tested

9    it or just field tested it?

09:03AM 10    A.    Both.

11    Q.    And when did you write that report?

12    A.    I wrote that either that day or the following day.  I'd

13    have to go and see the report to see the exact dates, but I

14    remember it's on the form.

15    Q.    And with respect to any other drug protection detail, did

16    you personally do a field test and personally weigh the

17    substance on any of those other occasions?

18    A.    On the other two, I was not present, so, no.  I didn't do

19    that.

09:04AM 20    Q.    And you spoke a little bit during your testimony about

21    your agreement, if you will, with CW-1.  Again, that was a

22    written agreement?

23    A.    Yes, Special Agent John Kelley had the informant sign that

24    agreement.

25         MR. IOVIENO:  And if I could have the document camera

1        just for the witness, your Honor.

2        Q.    I'm going to show you a document --

3              MR. IOVIENO:  And I believe, your Honor, there's an

4        agreement that this is a true and accurate copy of that

5        agreement?

6              MR. POHL:  That's correct, your Honor.

7        Q.    And this is a copy of your agreement you had with CW-1?

8        A.    Yes, I remember reviewing that document.  I remember

9        seeing that, yes.

09:04AM 10    Q.    And it details his obligations to the government and your

11       objections to him; is that fair to say?

12       A.    Yes.

13             MR. IOVIENO:  I would offer that, your Honor.

14             THE COURT:  All right.  It needs a number -- what --

15             THE CLERK:  224.

16             THE COURT:  224.  It's admitted, Exhibit 224.

17             (Exhibit No. 224 received into evidence.)

18       Q.    And there is a specific section in this exhibit for the

19       compensation that was going to be paid to CW-1 during this

09:05AM 20    investigation, correct?

21       A.    Yes, that is correct.

22       Q.    And, sir, during your investigation, I assume you were

23       concerned about protecting CW-1?

24       A.    Yes.

25       Q.    All right.  And you were aware of the people that

10

1    surrounded him in his every day life; is that fair to say?

2    A.   I'm not sure what you mean by --

3    Q.   Well, when he was out in the street for the three-year

4    period, if you will, you wanted to make sure that the people he

5    was surrounding -- his inner circle, if you will,

6    girlfriends -- well, he had a girlfriend, correct?

7    A.   He did have a girlfriend, yes.

8    Q.   And her name was Margarita?

9         MR. POHL:  Objection.

09:06AM 10         THE COURT:  Sustained.

11    Q.   He had a girlfriend?

12    A.   He did.

13    Q.   Okay.  Did you know the history of that young woman?

14         MR. POHL:  Objection.

15         THE COURT:  Sustained.

16         MR. IOVIENO:  May I approach, your Honor?

17         THE COURT:  No, put another question.

18    Q.   Were you aware that the individual that was CW-1's

19    girlfriend was Mr. Larios's former girlfriend?

09:06AM 20         MR. POHL:  Objection.

21         THE COURT:  Sustained.

22    Q.   But CW-1 had a girlfriend, correct?

23    A.   Yes.

24    Q.   Did he end up marrying that girlfriend?

25         MR. POHL:  Objection.

1     THE COURT:  Sustained.

2     MR. IOVIENO:  I have no further questions, your Honor.

3     THE COURT:  Okay.  Mr. Norkunas.

4     MR. NORKUNAS:  Thank you, Judge.

5                        CROSS-EXAMINATION

6  BY MR. NORKUNAS:

7  Q.    Good morning, Mr. Wood.

8  A.    Good morning, sir.

9  Q.    I'm Stanley Norkunas, and I represent Cesar Martinez in

09:07AM 10  these proceedings.

11  A.    Yes, sir.

12  Q.    And I have a few questions for you.  If I can see

13  Exhibit 32.1, please.  I'd like to show you, again, the exhibit

14  that was shown by the government to you, 32.1, which was the

15  fight in the garage.

16  A.    The video?

17  Q.    The video, right.  It might be 32.2.

18        (Video was played in Spanish)

19  Q.    Once that was shown the first time, Mr. Pohl had asked you

09:09AM 20  a question, did you see these defendants depicted in that, and

21  you had said yes.  Is it fair to say none of these individuals

22  were shown in that specific exhibit; is that correct?

23  A.    I don't -- when I first watched this video, it was two

24  years ago, and that's when my law enforcement partners pointed

25  out everyone to me.  I haven't reviewed it enough to have it

1    refresh my memory exactly who was where, so I don't know if I

2    can answer that question right now.  I'd have to sit down and

3    review it with my partners again that helped me identify people

4    last time.

5    Q.   As you looked at it here today, it's fair to say you had

6    no recognition of any of those individuals being any of these

7    four individuals here in court, correct, as you just saw it on

8    the screen?

9    A.   No, I thought -- I believe I identified or saw Playa,

09:10AM 10   which is Edwin Guzman in there.  I can't --

11   Q.   But you're not sure?

12   A.   No.

13   Q.   Okay.  And that's the best that you could say, right?

14   A.   Yes.

15   Q.   You may have seen someone, one person.  Now, in relation

16   to --

17           MR. NORKUNAS:  Could I have Exhibit 1.1, please.

18           THE COURT:  I'm sorry.

19           THE CLERK:  What exhibit is this?

09:10AM 20           MR. NORKUNAS:  1.1.

21   Q.   You had indicated that this is a photograph of the garage

22   where you believe the ESLS was holding meetings; is that

23   correct?

24   A.   No, I know this is where they were holding meetings.

25   Q.   At one of the sites, though.  There was also a second

1    site, correct, in Cambridge?

2    A.    Yes.

3    Q.    And that was a parking garage, correct?

4    A.    That is right.

5    Q.    A public parking garage?

6    A.    Yes, that is correct.

7    Q.    And in relation to that particular location in Cambridge,

8    did you do any type of videotaping of the individuals going to

9    that location or coming from that location?

09:11AM 10   A.    When I joined the investigation --

11   Q.    That would be a yes or no answer.

12   A.    Oh, personally, no, I did not.

13   Q.    And in relation to this particular location, this was, in

14   fact, a working garage, right?

15   A.    It was a working garage, yes.

16   Q.    And the -- shown in some of the videos, there's tires on

17   the side, there's tool cases, all of the things, there's lists

18   of cars, correct?

19   A.    Yes, this is a working garage, yes, sir.

09:11AM 20   Q.    Okay.  And in relation, therefore, to the working garage,

21   the individuals who worked in there did not want any disruption

22   to their activities, so any individuals that came in to hold

23   any type of group meeting would have to do it after the garage

24   had closed for the day, correct?

25   A.    Yes, all the meetings I attended and were involved in in

1   surveillance took place after business hours.

2   Q.   And in relation to the individuals that worked there, did

3   you become aware that Mr. Martinez also was doing mechanical

4   work in that garage?

5   A.   Yes.

6   Q.   And additionally he also had a tow truck, right?

7   A.   I wasn't aware of the tow truck, but if you say he had a

8   tow truck, I'll --

9        THE COURT:  Well, hold on.  He's the lawyer, you're

09:12AM 10   the witness.  If you don't know, you don't know.

11       THE WITNESS:  I don't know.

12   Q.   Did you ever see kind of a fancy tow truck pulling up to

13   that garage with "CM Towing" on the side?

14   A.   No.

15   Q.   Did you ever have pole cameras situated outside of that so

16   you could monitor the activity that was coming and going?

17   A.   I don't believe we did.

18   Q.   Now, and in relation to the garage itself, did you ever do

19   any monitoring during what would be considered normal work

09:13AM 20   hours for the garage?

21   A.   I drove by the garage on a couple of occasions during work

22   hours just to get a lay of the garage surveillance on it, but

23   we did not, as far as I know, do any constant surveillance

24   during working business hours.

25   Q.   But, again, you became aware that Mr. Martinez did

1    mechanical work out of that garage?

2    A.    Yes.

3    Q.    And in terms of whether this was 40 hours a week, 80 hours

4    a week, that's not something you had monitored?

5    A.    No, I didn't pay attention to his work hours there.

6    Q.    In relation to the investigation itself, would it be fair

7    to say that one of the principles of conducting any long-term

8    investigation is to find out as much as you can about the

9    people that are under investigation?

09:13AM 10    A.    Yes.

11    Q.    So if Mr. Martinez is a person under investigation, you

12    want to know is he working, right?

13    A.    We knew that the majority of people we were investigating

14    were working.

15    Q.    You'd want to know are they paying taxes, right?

16    A.    I'm not -- in this case, we weren't really paying

17    attention to whether they were paying taxes or not.

18    Q.    Well, you indicated you had a multiplicity of governmental

19    agencies assisting you, right?

09:14AM 20    A.    Yes.

21    Q.    Through those various agencies, through the various

22    procedures that Congress has implemented, you can obtain a

23    great deal of records about someone that is under

24    investigation, correct?

25    A.    Yes.

1    Q.   And if you want to, you can find out -- because ICE was

2    working with you, you could find out through ICE what the

3    person's status is, correct?

4    A.   Yes.

5    Q.   And if you wanted to find out about financial information

6    on people, various things such as the Patriot Act or something

7    else, you can get financial records on people, correct?

8              MR. POHL:  I'm going to object.

9              THE COURT:  Sustained.  You're asking, in part, a

09:15AM 10   legal question.  I guess I'll caution the jury that tax records

11   have elaborate procedures to protect them and law enforcement

12   agencies other than the IRS normally do not have access to

13   those records.  Go ahead.

14   Q.   You can get bank records?

15   A.   I can, yes.

16   Q.   Okay.  Did any of that -- was any of that information

17   collected against Mr. Martinez in this case?

18   A.   I don't think we did, no.

19   Q.   And you also established where he lived and which home in

09:15AM 20   Chelsea, correct?

21   A.   Yes.

22   Q.   And you went over at some point in time and monitored that

23   residence, right?

24   A.   Personally me, no.

25   Q.   Someone from the task force, right?

1    A.    I'm sure we did, yes.

2    Q.    And you found out that he had a daughter living with him,

3    right?

4          MR. POHL:  Objection.

5          THE COURT:  Sustained.

6    Q.    And in the context of doing that as part of the

7    investigation, did you determine if there was anyone else

8    living there with him?

9    A.    I don't remember what we determined, who was living there

09:16AM 10    besides him.

11    Q.    Now, I mentioned a moment ago about the types of

12    investigative tools that you could use and are available to

13    you.  In this particular case relative to the phone calls or

14    phone records, you did implement some procedures, correct?  You

15    had toll records and you had pen registers, right?

16    A.    We did have toll records, we had pen registers, yes.

17    Q.    And when I say "we," I'm talking about the task force as a

18    whole, correct?

19    A.    Yes.

09:16AM 20    Q.    And if you needed to, there was also the availability of

21    GPS monitoring for cars, correct?

22    A.    Yes.

23    Q.    And what that does for you, if you want to know where a

24    car goes, how often it goes, you can monitor it through that

25    system, correct?

1    A.    Yes.

2    Q.    And, again, you didn't use pole cameras, but that would

3    have been available to you, correct?

4    A.    Yes.

5    Q.    In terms of what was available to you, in 2013 I believe

6    is when you said CW-1 was brought up to the United States, is

7    that correct, or was it the end of 2012?

8    A.    It was either the end of 2012 or early 2013.  I wasn't the

9    case agent at that point, so I wasn't as familiar with the CWs

09:17AM 10    comings and goings at that point.

11    Q.    Would it be fair to say that from your knowledge as a

12    special agent of the FBI and in terms of the other gang

13    investigations you had done, there was quite an availability of

14    sophisticated electronic equipment available if you wanted to

15    monitor something, like a meeting?

16    A.    It depends.  That's a very hard question to fully answer

17    because --

18    Q.    Let me see if I can give you something a little bit

19    easier.  2012, there are things, micro miniature cameras, I

09:18AM 20    think some of them are called "Go Cameras," correct?

21    A.    I don't know Go Cameras.  I know our recording equipment.

22    Q.    Ultimately with CW-1, you end up having him use a small

23    camera that's placed on the bill of a baseball cap, correct?

24    A.    I don't think we used the baseball hat with him.  I know

25    we used different recording equipment, so I don't remember

1    every place we hid the recording equipment.  We had many

2    different locations that we hid the recording equipment.

3    Q.    But you don't -- your position was you don't believe you

4    had the sophisticated enough equipment to place on him until

5    some time in 2014 to go into these meetings, correct?

6    A.    That is correct, yes.

7    Q.    Now, once the meetings were done, there was -- CW-1

8    himself is not carrying -- or is he, he's not carrying a

9    monitor so that he would have the recorded information on his

09:19AM 10    body, correct?  He's transmitting it outside to someone else?

11    A.    No, that's incorrect.

12    Q.    Whatever he was wearing would actually record both audio

13    and video?

14    A.    Sometimes just audio, sometimes audio and video.

15    Q.    But the equipment was on his body that was doing it or

16    clothing he's wearing as well, right?

17    A.    That is correct.

18    Q.    So once that comes out, you now have to take that, do

19    something with it so that it becomes some sort of a usable

09:19AM 20    product for you, right?

21    A.    That is correct, yes.

22    Q.    And everything that you were initially handling was in

23    Spanish, correct?

24    A.    Yes, that is correct.

25    Q.    And as a result of that, you have to send those out to get

1    them translated, correct?

2    A.    Most stayed within the FBI Boston division or within the

3    task force, but there was a few that once we had some drafts on

4    for the finalization would be sent out to translators who have

5    already worked on the case that were initially brought into the

6    Boston Division, then went back to their field offices and then

7    we'd send the information back there for them to finish.

8             MR. NORKUNAS:  Could I have the Elmo just for the

9    witness, please.

09:20AM 10    Q.    I'm showing you a document.  Do you recognize what

11    that -- to yourself, just yes or no, do you recognize what that

12    depicts?

13    A.    Yes.

14    Q.    And that deals with the translation of a particular

15    recording, correct?  It's a cover sheet for it, right?

16    A.    Yes, sir.

17    Q.    And that indicates that it was done out of the Tampa

18    Division in Tampa, Florida, correct?

19    A.    Yes.

09:21AM 20    Q.    And also were recordings sent to other divisions?  Showing

21    you another one, do you recognize what that depicts?

22    A.    Yes.

23    Q.    And was that sent to -- it says an L and an A.  Would that

24    be Los Angeles?

25    A.    I think the office is Houston from the HO.

1    Q.    And this one would show that a tape was sent where?

2    A.    I believe that's for the -- I could be wrong, but I

3    believe OC stands for Oklahoma City for Oklahoma City office.

4    Q.    All right.  Oklahoma.  And this one would show you the

5    tapes were sent to Houston, Texas?

6    A.    Yes, sir.

7    Q.    Now, and then within the Boston Field Office, there were

8    numerous individuals who also did transcribing, correct?

9    A.    Yes, sir.

09:22AM 10    Q.    And it would it be fair to say when these folks were doing

11    their transcriptions, they were doing the Spanish to the

12    English, right?

13    A.    Yes, sir.

14    Q.    And it would also be fair to say when they're doing their

15    transcriptions, you didn't have any of your cooperating

16    witnesses flying to Houston, Tampa, Florida, Oklahoma City to

17    do any type of assistance with those?

18    A.    Well, as I mentioned previously --

19         THE COURT:  Let him answer.

09:23AM 20    A.    We brought people here, and at that point that's when our

21    CW helped listen.  We also had most of all of our recordings

22    were also reviewed by Trooper Estevez and Trooper Depena.  And

23    then once we had rough drafts and everything, we sent them back

24    to people who had already worked on them when they were here,

25    so I would say when they were shipped out, we had already had

1    that initial review done before they went back out to the other

2    field offices.

3    Q.   It's fair to say as you had looked at where there was a

4    video or had listened to the audio, on all of these it was a

5    multiplicity of voices speaking, most of the time together,

6    right?  People would cut each other off, people would step in,

7    correct?

8         MR. POHL:  Objection.

9         THE COURT:  Well, I assume he's seen the video.  I'll

09:24AM 10    let him answer, go ahead.

11    A.   There are times where people -- there are people talking

12    and sometimes they cut over one another, yes.

13    Q.   And when the videos were sent out to -- for the initial

14    translation, they're sent out to people that have no awareness

15    of who anybody in a room may be, correct?

16    A.   Well, no, that's incorrect because we didn't do that.  I

17    just testified to the fact that Trooper Depena and

18    Trooper Estevez typically reviewed everything before anyone

19    else got it just to get an overview of what happened.  And then

09:24AM 20    we also would start work here and we brought people from all

21    those other field divisions to Boston, and they would review it

22    here, and then once we needed to start getting more of a

23    draft -- from the draft to a formalized version, then we sent

24    it back to those people who had already worked on it, so they

25    were already familiar with it.

1    Q.    So, again, the individual that would work on it out of

2    Oklahoma City prepares a cover sheet that says, "Oklahoma

3    City."  That task was actually done in Oklahoma City?

4    A.    It says name and office of linguist.

5    Q.    Right.

6    A.    So, name and office of linguist.  If she's assigned to

7    Oklahoma, whether she's sitting here, she's still listing her

8    office, because it says name and office of linguist.  So,

9    again, we brought linguists here to Boston to help us, and then

09:25AM 10    once we got done the initial, here are our drafts, they were

11    not finalized versions, they were very draft oriented, they

12    went back to their field offices, and then when we said, oh, we

13    need this done more, we sent it back to the person who already

14    worked on it and sent it to that field office.

15    Q.    So you flew in everybody, a myriad of translators,

16    linguists from the FBI to Boston?

17    A.    Yes, we did.  From October to January, we had several

18    linguists from around the country sitting here going over all

19    our video and audio recordings.

09:26AM 20    Q.    Now, was there ever a collective meeting, to your

21    knowledge, of the linguists where somebody is saying I think

22    that was Fred, somebody saying I think that was John and

23    somebody is correcting them?

24    A.    I don't ever remember a group of linguists sitting

25    together.  Each linguist got a recording, and during that

1    timeframe we brought the CW in with Trooper Brian Estevez and

2    Trooper Jose Depena, and they would sit down with the linguists

3    going over everything, so that they would make sure that they

4    could ensure that the linguists knew who was talking, knew what

5    was being said because in Spanish even though you may be from

6    Spain, you have a different dialect in Puerto Rico and

7    Puerto Rico to Chile, and there's all these different dialects.

8         So we had some people that came in that were very

9    knowledgeable of the El Salvadoran dialect, others that

09:27AM 10    weren't, and so Trooper Depena, Trooper Estevez, who had been

11    listening to these recordings for a while now, had very

12    distinct knowledge of those, that dialect.  The CW knowledge of

13    that dialect would be able to explain the nuances of each

14    conversation that was going on.

15    Q.    A lot of the conversation that was taking place with these

16    gentlemen was slang incident only to El Salvador, correct,

17    street slang?

18    A.    Which is what I just said, yes.

19    Q.    Now, in context of your position as the case agent in this

09:28AM 20    particular case, would it be fair to say that it's appropriate,

21    on occasion, to look at preceding reports, such as if you took

22    over in 2015 as the case agent, you would still go back on

23    occasion and look at 2012 or 2013 reports of other members of

24    the task force, correct?

25    A.    Yes, we can do that.  Yes.

1   Q.   And you've testified in this case on numerous occasions,

2   correct?  You, yourself, have testified in relation to the

3   overall context of MS-13 on numerous occasions?

4   A.   Well, we've only had one trial before this one, so that

5   would be twice for testifying in this case.

6   Q.   Well, you prepared affidavits under oath, right?

7   A.   Yes, sir.

8   Q.   You testified before a grand jury on many occasions,

9   correct?

09:29AM 10   A.   Yes, sir.

11   Q.   And in each and every one of those occasions when you used

12   a nickname for my client, that was C-h-e-C-h-e, correct?

13   A.   CheChe, yes.

14   Q.   And when you looked at the reports of other individuals in

15   this particular case, it's also fair to say that the agents

16   associated with the case were using that same CheChe,

17   C-h-e-C-h-e, correct?

18   A.   I believe so.

19   Q.   And including right up to the time of the arrest of

09:30AM 20   Mr. Martinez, the name referenced in the reports is CheChe,

21   C-h-e-C-h-e, correct?

22   A.   I believe that's correct.

23   Q.   Now, are you familiar with, I'm showing you a report

24   that's dated from November of 2015 about an October of 2015

25   meeting, and in the context of that I'm going to flip the page.

1    There had been references to an outside meeting in Everett, and

2    there had been someone who had participated in that and came

3    out to you at some point in time and indicated to some agent, I

4    think you are listed, and talked about the people that were

5    there.  Is your memory refreshed about that?

6    A.    Yes.

7    Q.    And within that, he indicated there was someone he did not

8    know their full name and when you don't know someone's full

9    name, is there an abbreviation that's consistently used?

09:31AM 10    A.    Yes.

11    Q.    What is that?

12    A.    First name unknown, last name unknown and once I've

13    spelled it out at point, then I say FNU/LNU.

14    Q.    FNU/LNU is the common symbolism for that, right?

15    A.    Yes.

16    Q.    And that means first name, as you said, unknown, last name

17    unknown?

18    A.    Correct.

19    Q.    And he said there was a person in there, he didn't know

09:31AM 20    who that was, but he knew -- he claims he knew other people

21    present, but that person who he didn't know had the name of

22    CheCha, correct?

23    A.    I see that, yes.

24    Q.    Okay.  And that was in October of 2015, correct?

25    A.    Yes.

1    Q.    Now, I believe that you have talked to Mr. Pohl and

2    Mr. Iovieno about the purpose of the protection details, and

3    basically the purpose of that was people that would not be

4    selling drugs, but you're looking to see if you can somehow get

5    them involved in drugs was the purpose of putting together by

6    the FBI protection details around the country, right?

7    A.    We've done that around the country where we used

8    protection details, yes.

9    Q.    Within that concept, right?  You come to me, you're not

09:32AM 10    going to be able to make a buy, I'm not doing drugs, but you

11    may be able to lure me into a protection detail involving

12    drugs, correct?

13    A.    I wouldn't say "lure," I would say -- I would ask if you

14    would volunteer to help me protect my drug shipment.

15    Q.    And finally in regard to your testimony in this particular

16    case, let me just go back for one extra question for you in

17    response to that.  You didn't participate -- your participation

18    was October, December of 2014 in protection details, correct?

19    Actual participation.

09:33AM 20    A.    Actual participation for surveillance or something

21    involved was in October.  In December, I was helping -- for the

22    December one, I had helped at the -- what we call the -- we say

23    Curoc (ph), but it's just an undercover meeting where we get

24    supervisors in the Bureau and the executive management of the

25    Bureau to agree to this kind of -- to agree to an undercover

1    operation, so I was the supervisor for the squad when we had to

2    get that approval.

3    Q.    Okay.  And the ones in October and December, Mr. Martinez

4    was not involved with those, correct?

5    A.    No, he was involved in the first one.

6    Q.    Well, that was one back in when?

7    A.    That was in the earlier part of 2014.

8    Q.    And you were not involved with that, correct?

9    A.    That's correct.

09:34AM 10    Q.    Now, were there any rules or were there rules in place

11    that you were aware of for the group that using drugs

12    recreationally, you would be punished?

13    A.    I knew the rules saying that you weren't allowed to be

14    publicly intoxicated or high because if you brought something

15    bad onto the clique, that was a punishable offense.

16    Q.    And if you missed meetings, you would get punished?

17    A.    Yes, you could be punished for missing meetings.

18          MR. NORKUNAS:  Thank you, I have nothing further.

19          THE COURT:  Mr. Murphy.

09:35AM 20          MR. MURPHY:  Thank you, your Honor.

21                        CROSS-EXAMINATION

22    BY MR. MURPHY:

23    Q.    Good morning, Agent Wood.

24    A.    Good morning, sir.

25    Q.    My name is Marty Murphy, and I represent Herzzon Sandoval.

1    He's the person you've identified as Casper, correct?

2    A.    Yes, sir.

3    Q.    Now, you testified on direct examination about the origins

4    of MS-13, correct?

5    A.    Yes.

6    Q.    And as you understand it, MS-13 started in Los Angeles?

7    A.    Yes.

8    Q.    And it was started by immigrants from El Salvador who'd

9    fled El Salvador's civil war, correct?

09:36AM 10    A.    Yes, sir.

11    Q.    And oftentimes their legal status in the United States was

12    uncertain, correct?

13    A.    Yes, sir.

14    Q.    And oftentimes you've learned that they joined MS-13

15    because they faced risks from other gangs in the Los Angeles

16    area, correct?

17    A.    Yes.

18    Q.    Now, you've identified Mr. Sandoval as one of the leaders

19    of ESLS, correct?

09:36AM 20    A.    He was the first word, yes, sir.

21    Q.    And that was the group of men that you testified met in

22    that Norman Street garage we've seen photos of, correct?

23    A.    Yes, sir.

24    Q.    Now, is it fair to say that you don't know when

25    Mr. Sandoval first became affiliated with ESLS?

A.   I don't know, no.

Q.   And you don't know anything about the circumstances that led him to do that, correct?

A.   That is correct.

Q.   And you don't know, for example, to the extent Mr. Sandoval has tattoos, you don't know when he got those, correct?

A.   I don't know when he got tattoos, no.

Q.   Or what the circumstances were that led him to get those tattoos, correct?

A.   No.

Q.   Now, you testified -- let me ask you.  In 2013 and 2014 and 2015, I think you said, that's when CW-1, the person who was known as Pelon, was recording conversations in that Norman Street garage, correct?

A.   Yes, sir.

Q.   And also some in 2016, correct?

A.   I think we only had one, we may have had two in 2016.  I don't remember the exact amount right off the top of my head.

Q.   But before 2014 and 2015 and 2016, as early as before he began recording those meetings, you sent or the FBI sent Pelon, CW-1, out to gather intelligence about the activities of cliques in the Boston area, correct?

A.   Yes.

Q.   And one of his objectives was to ingratiate himself with

1    clique members in the Boston area, correct?

2    A.    To get to know them, yes.

3    Q.    Well, was his job to ingratiate himself?

4    A.    My first recollection is that he was there to meet MS-13

5    clique members and pose as a drug dealer and start to

6    infiltrate them.

7    Q.    You testified that even though you were not the case agent

8    in 2014 and 2013, you did monitor the reports that were

9    written, correct?

09:38AM 10    A.    I didn't read the reports, all of them, but I did talk to

11    the case agents, both federal and state and local members of

12    the task force to keep myself apprised of the on-goings of the

13    case, yes.

14    Q.    So you knew the major things that were going on, correct?

15    A.    Yes.

16    Q.    After you became the case agent, I think you testified in

17    response to Mr. Norkunas' questions, you did go back and look

18    at the reports that had been done?

19    A.    I said that I could have and I reviewed a couple, but I

09:39AM 20    didn't go and read every single report that was written before

21    I became the case agent.

22    Q.    So your testimony then about what happened in 2013 and

23    2014 is based on what you learned from the folks that you were

24    working with, sort of your office mates?

25    A.    Well, some from reviewing the reports and some from my

1    conversations with Sergeant Millett, Special Agents Ben

2    Wallace, Dave Cederleaf, John Kelley and Detective Scott

3    Connolly.

4    Q.   And all those people during that period were writing

5    reports, correct?

6    A.   Well, not every single person in that group wrote reports,

7    but some of them did, yes.

8           MR. MURPHY:  If I could have the document camera for

9    the witness only, please.

09:40AM 10   Q.   Showing you a document dated October 16, 2013, do you

11   recall reading this report, sir?

12   A.   I did not read that report, no.

13   Q.   Do you recall, sir, that as part of the effort to get to

14   know other clique members in the Boston area, the FBI gave

15   CW-1, Pelon, cigarettes, women's handbags, and sunglasses to

16   give out?

17   A.   I did not know that until I just read that document.

18   Q.   Now, there were many meetings that Pelon CW-1 went to that

19   he did not record, correct?

09:41AM 20   A.   Yes, sir.

21   Q.   And whether he recorded the meetings or not, it was

22   typical, wasn't it, for agents to sit down with Pelon and brief

23   him afterwards, correct?

24   A.   I would say debrief him afterwards.

25   Q.   Fair enough.  So they would debrief him.  That is, he

1    would give them an account of what was going on?

2    A.    That is correct, yes.

3    Q.    And that provided useful intelligence to the agents

4    conducting the investigation about what was happening in the

5    field, correct?

6    A.    I would say yes.

7    Q.    And it was part of the intelligence that you were hearing

8    about as you were paying attention to what was going on in your

9    office relating to this investigation, correct?

09:41AM 10    A.    Yes.

11    Q.    And even after there are transcripts done of reports --

12    let me ask the question a different way.  The investigation was

13    moving pretty quickly, correct, in 2013, 2014?  Things were

14    happening on a day-to-day basis?

15    A.    I knew that there would be times when things didn't happen

16    quickly.  I knew that when I became the co-case agent in 2015

17    that things moved quickly constantly.  I couldn't tell you how

18    things were playing out on a day-to-day basis in '13 or '14.

19    Q.    Is it fair to say, though, that these debriefings that you

09:42AM 20    were getting from Pelon, the FBI would proceed and make

21    strategic decisions about what to do next based on these

22    debriefings because the investigation was generally moving

23    faster than the ability to get formal translations of any tapes

24    you recorded?

25    A.    I don't -- I wouldn't be able to answer that the way

1   you're phrasing it because, again, I wasn't a part, and if I

2   remember correctly, things didn't move as quickly as they did

3   in 2015.

4   Q.   These debriefings that the agents conducted of Pelon,

5   CW-1, the agents typically wrote reports to document what Pelon

6   had said in them, correct?

7   A.   Yes.

8   Q.   And this was part of the information that the agents

9   working on the case then found valuable in understanding what

09:43AM 10   was happening in the cliques in the Boston area, correct?

11   A.   I would imagine so.

12   Q.   And, sir, when you were describing the kind of

13   intelligence that gets shared by law enforcement agencies about

14   MS-13, intelligence reports like that form a significant part

15   of the basis that leads to law enforcement's understanding of

16   what MS-13 is and what it's doing, correct?

17   A.   I think you're trying to put too much into one question.

18   I can -- I would say before we released an intelligent document

19   that goes out around the country, we've corroborated

09:44AM 20   everything, so if we have an uncorroborated report, we're not

21   going to release that information --

22   Q.   Okay.

23   A.   -- because we haven't corroborated it.

24   Q.   So an uncorroborated report.  What's an uncorroborated

25   report, sir?

A.    Well, if our CW comes and tells us something, we listen to it, we look at it, we evaluate it, but I'm not going to let the entire law enforcement community throughout the United States know that this is gospel for MS-13.  I'm going to wait and see, oh, do we have a recording of it.  Then I can review the recording, compare it to what he said, and if they match, now I have it corroborated, because it's -- we have evidence that what he's saying is truthful.  Just because he told us something, we want to make sure we have other ways to back that up.

Q.    Right.  And you recognize, sir, that you wouldn't rely on something a cooperating witness told you without that kind of corroboration, correct?

A.    Correct.

Q.    So if a corroborating witness tells you something and there's no tape of it, that's not something that in your judgment should be viewed as worth relying on, correct?

A.    I wouldn't say that the way you just phrased it, sir.  I would say I would look at it, but I'm not going to bring that into court as evidence, based -- unless I have, oh, here, it's on tape.

      If you look at our case, everything we have that we're charging is on tape, so I'm not going to say it's worthless, it's just I'm not going to use that as my evidence unless I have somebody else saying it or, as I said, on tape.

1    Q.    Fair enough.  Now, you testified that in 2015 you went to

2    El Salvador, correct?

3    A.    I did.

4    Q.    And when you were in El Salvador, you learned that the

5    leaders of MS-13 in El Salvador were trying to implement

6    stricter rules about how the cliques in the United States

7    should operate, correct?

8    A.    Yes.

9    Q.    And they wanted the cliques in the United States to

09:46AM 10   operate, essentially, more like the organization operated in

11   El Salvador, right?

12   A.    That is correct.

13   Q.    El Salvador is, unfortunately, a very violent place, you

14   would agree?

15   A.    Yes.

16   Q.    It has one of the highest murder rates in the world?

17   A.    I believe it has the highest murder rate in the world.

18   Q.    And it's been that way since the civil war that you talked

19   about, correct?

09:46AM 20   A.    I can't testify going all the way back to the '70s and

21   '80s.

22   Q.    Okay.  But MS-13 in El Salvador is also in what's known as

23   the rent collection business, correct?

24   A.    Yes.

25   Q.    And could you explain to the members of the jury what the

1    rent collection business is?

2    A.    In an MS-13 controlled neighborhood, the MS-13 gang

3    members extort every business, whether it's trucks coming in to

4    deliver supplies, goods, the bodegas, the taxicab drivers.  So

5    everyone has to pay money to MS-13, and they collect that

6    money.

7    Q.    And, in addition, you learned in 2015 that MS-13 wanted to

8    make sure that the cliques in the United States were sending

9    money to MS-13 gang members in prisons in El Salvador, correct?

09:47AM 10    A.    Well, they were already doing that before 2015, but they

11    wanted to set it up in a different process than before.

12    Q.    They wanted to centralize it, correct?

13    A.    Well, they wanted to go through the programs.

14    Q.    To make it more like it was in El Salvador?

15    A.    Yes.

16    Q.    Now, you learned about -- you say you learned about these

17    efforts in 2015?

18    A.    Yes.

19    Q.    Do you recall, sir, learning that CW-1 was telling task

09:47AM 20    force agents about the leadership in El Salvador's efforts to

21    centralize control as early as 2013?

22    A.    I'm not aware of that, no.

23    Q.    Do you recall, sir, learning that the leaders in

24    El Salvador, learning that Pelon was telling agents as early as

25    2013 that the leaders in El Salvador wanted to impose the same

1    rules on the cliques here as were imposed on MS-13 members in

2    El Salvador?

3    A.    Again, as I just said, I didn't learn about the programs

4    until 2015.

5    Q.    Well, my question, sir, was about whether the leaders in

6    El Salvador, as early as 2013, whether you learned that they

7    wanted to apply El Salvador rules to cliques in the Boston

8    area?

9    A.    I wasn't that involved in the investigation to know the

09:49AM 10    extent of what was being told and what was said.  I knew I

11    heard from my partner once about East Coast Program.  I didn't

12    really know what he meant until I went to El Salvador and then

13    I fully understood what the programs were.

14    Q.    Do you recall learning in 2013 that Pelon told agents that

15    MS-13 in El Salvador wants the same rules applied to cliques in

16    the U.S. as they are in El Salvador?

17              MR. POHL:  Objection.

18              THE COURT:  I think you've asked that three times now,

19    Mr. Murphy.

09:49AM 20              MR. MURPHY:  Thank you, your Honor.

21    Q.    Did you learn in 2013 whether Mr. Sandoval had a

22    particular point of view about that?

23              MR. POHL:  Objection.

24              THE COURT:  Particular -- you'll have to rephrase.

25    Sustained.

1    Q.    Did you learn from the agents you were working with that

2    Pelon had collected information about Mr. Sandoval's views

3    about the orders that were being issued by El Salvador?

4              MR. POHL:  Objection.

5              THE COURT:  Overruled.

6    A.    I didn't know anything until 2015.

7    Q.    So --

8              MR. MURPHY:  Could I have this just for the witness,

9    please, on the document camera.

09:50AM 10    Q.    If I show you a document dated February 17th -- I'm sorry,

11    February 7, 2014, is that a document you recall reading in

12    connection with this investigation?

13    A.    I did not read that document, no.

14    Q.    And that's a report written by one of your fellow agents,

15    sir?

16    A.    That was written by -- I'd have to see the bottom of the

17    document to see who actually wrote it, but there were two

18    agents there.  That was written by David Cederleaf, a

19    Special Agent with the FBI.

09:50AM 20    Q.    So that's not a document that you've seen before today; is

21    that correct?

22    A.    That's correct.

23    Q.    Do you recall learning anything about efforts in 2014 by

24    El Salvador to require cliques here to send money to

25    El Salvador for people in prison?

40

1    A.    I knew that money was being sent back to El Salvador all

2    along.  I've known that for a while.

3    Q.    Do you recall learning in 2014 that that was something

4    that Mr. Sandoval did not want to do?

5    A.    I wasn't aware of anything in 2014 along those lines.

6    Q.    So if I were to show you --

7          MR. MURPHY:  If we could have this just for the

8    witness, please.

9    Q.    -- a report dated February 12, 2014?

09:52AM 10    A.    I didn't read that report, no.

11    Q.    And who was that report written by?

12    A.    Special Agent David Cedarleaf.

13    Q.    And is it a report about something that -- one of his

14    debriefings with Pelon?

15    A.    Correct.

16    Q.    But did you recall learning in February 2014 that

17    Mr. Sandoval had told Pelon that he didn't want things in the

18    cliques in the Boston area to be run the way they were in

19    El Salvador?

09:52AM 20    A.    No.

21    Q.    And if I were to show you -- for the witness only,

22    please -- a report dated February 13, 2014.  Do you see that,

23    sir?

24    A.    I'm reading it right now.  I didn't read that report, but

25    there were a few items that I had been be briefed about, but

1    that was it.

2    Q.   So you did not read -- this is another report that was

3    written by -- let me turn the page over -- by Special Agent

4    Cedarleaf?

5    A.   That's correct.

6    Q.   And that's not a report that you read before today?

7    A.   That is correct.

8    Q.   Now, did the task force investigate a shooting that

9    occurred in April 2014?  April 2014, pardon me.

09:54AM 10    A.   We -- I wasn't a part of the investigation then.  I knew

11    there was some brawls going on in Chelsea.  I'd have to be more

12    specific of what shooting because there were lots of shootings,

13    stabbings that occurred.

14    Q.   Do you recall learning in April 2014 that Mr. Sandoval

15    told Pelon, CW-1, that he thought Tremendo -- and who's

16    Tremendo?

17    A.   Another MS-13 gang member.

18    Q.   That he was angry with Tremendo for acting like he's in

19    El Salvador, correct?

09:54AM 20    A.   I wasn't aware of that conversation, no.

21    Q.   And if I show you a -- on the document camera, a report

22    with the date of April 29, 2014, did you read that report

23    before you came here last week to testify?

24    A.   No, sir.

25    Q.   Isn't your name on the bottom left-hand corner of that,

1    sir?

2    A.    Yes.

3    Q.    And that's an electronic signature, correct?

4    A.    Yes.

5    Q.    But you didn't read it before you signed it?

6    A.    No, I don't remember -- I did read it, but I wasn't paying

7    attention like I am now.  So I see my signature, yes, I know I

8    would have read it, but I wasn't paying attention to it at that

9    point to remember that I read it.

09:55AM 10    Q.    Okay.  So Agent Cedarleaf -- and this report was also

11    written by Agent Cedarleaf, correct?

12    A.    Yes.

13    Q.    And you said there was a period of time when you were the

14    acting supervisor, correct?

15    A.    Yes, but I wasn't acting at that point.

16    Q.    Okay.  What led you to be the second signature on that

17    report, sir?

18    A.    I have the ability -- I had the ability back then to sign

19    reports for agents when the boss was in meetings, the boss was

09:56AM 20    out.  There's several agents who have that ability, so when the

21    in box got full, we'd go in and just try to sign them out for

22    the agents trying to get them into the file.

23    Q.    Doesn't the second signature, isn't that supposed to

24    signify that someone has actually reviewed the report?

25    A.    Right.  As I said, I reviewed it, but I just read it to

1    make sure, okay, there's information in there and there's

2    nothing wrong.  I wasn't the supervisor, so it wasn't my job to

3    delve down, as I do now as a supervisor, where I actually

4    scrutinize everything that I sign.

5    Q.    Okay.  So you just read it -- you read it, you signed it,

6    but you didn't really pay attention to what was going on?

7    A.    Correct.

8    Q.    Now, CW-1, Pelon, had a direct open line of communication

9    to MS-13 leadership in El Salvador, correct?

09:57AM 10    A.    He earned that down the road, yes.

11    Q.    Isn't it fair to say that as early as May of 2013, Pelon,

12    that is CW-1, was participating in a teleconference call from a

13    prison in El Salvador where the El Salvadorian leadership of

14    MS-13 is housed?

15    A.    Again, I wasn't aware of that.  I didn't start recording

16    conversations or having reports on conversations with

17    leadership of El Salvador until several months after I became a

18    case agent in 2015.

19    Q.    So if I could ask you to look at the document that's on

09:57AM 20    the screen.  That's a report dated May 29, 2013?

21    A.    The report is dated May 29, 2013, yes.

22    Q.    And it was written, if we turn over to the back side, by

23    Agent Freestone, did I get that, correct?

24    A.    That may be a problem with the -- can you flip it over

25    again for me for a second?

1    Q.    Is there a person named Blaine Freestone?

2    A.    I don't know who Blaine Freestone is.

3    Q.    The case agent's name is listed as Chad Blackwood,

4    correct?

5    A.    That is correct.

6    Q.    Do you know who he is?

7    A.    I do know who he is.

8    Q.    And there's a list of all persons present, including

9    yourself, do not include the CHS, correct?

09:59AM 10    A.    That is correct.

11    Q.    And in that space -- and this isn't -- we're looking at an

12    official FBI report.  You'll give me that, correct?

13    A.    Yes, that's -- oh, that's correct, yes.

14    Q.    And it relates to this investigation, correct?

15    A.    Correct.

16    Q.    And there's a person named Blaine Freestone who apparently

17    wrote the report that you don't know who that person is, right?

18    A.    That's correct.  He's not assigned to the Boston Division.

19    Q.    Man, woman, you don't know?

09:59AM 20    A.    I have no idea.

21    Q.    Okay.  And is it fair to say that until you are seeing

22    this document here today, you did not know that CW-1 was

23    participating in conference calls with the leadership of

24    El Salvador's MS-13 from a prison in El Salvador as early as

25    2013?

1    A.    That is correct.

2    Q.    Now, El Salvador's leadership in -- MS-13's leadership,

3    pardon me, in El Salvador, many of them have been in prison,

4    correct?

5    A.    I know that L. Diablito and his council are all in prison.

6    Q.    And they're all in a single prison, right?

7    A.    No, they're in different prisons.

8    Q.    And is there one prison where many of them are?

9    A.    They're spread out.

10:00AM 10    Q.    All right.  By 2015, you were directly involved in this

11    investigation, correct?

12    A.    Yes, sir.

13    Q.    And do you recall that on May 29, 2015, Pelon, that is

14    CW-1, engaged in a drug transaction with an individual named

15    Flaco?

16    A.    I am aware that there were many drug buys in 2015.  I

17    imagine there was one in May.

18    Q.    Do you recall, sir, an occasion when, during a drug buy,

19    Flaco got a call from an individual named Bandito?

10:01AM 20    A.    I believe I remember that drug buy, yes.

21    Q.    Who's Bandito?

22    A.    I believe he was a leader of MS-13 down in El Salvador.

23    Q.    And let me ask you whether this is a report.  Do you

24    recall what that conversation was between Bandito and Flaco

25    during that drug transaction on May 29, 2015?

1    A.    If I remember correctly -- and, again, I'd have to review

2    my report or my partner's report, but I believe I was present

3    during that drug deal.  We were doing a controlled purchase of

4    drugs from Flaco, and he was saying this is good, I'm going to

5    have you talking to leaders down in El Salvador because Flaco

6    was the leader of the East Boston clique.

7    Q.    Let me show you, if I may, a document dated September 29,

8    2015.  Do you see that, sir?

9    A.    Yes.

10:02AM 10    Q.    And that -- although it's dated September 29th, it refers

11    to an event on May 29, 2015, correct?

12    A.    Correct.

13    Q.    And this does concern a controlled purchase, a purchase of

14    drugs with an individual named Flaco by CW-1, correct?

15    A.    Yes, sir.

16    Q.    Who is Flaco again, by the way?

17    A.    He's the leader of the East Boston Loco Salvatruchas

18    clique.

19    Q.    Not ESLS?

10:02AM 20    A.    No, that's EBLS.

21    Q.    And is it fair to say, sir, that CW-1 briefed agents about

22    what Bandito had said during the call that he made to Flaco?

23    A.    Yes.

24    Q.    And later that was recorded, correct?  That was recorded

25    at the time, I should say, correct?

1    A.    Well, the conversation between Flaco and the CW were

2    recorded.  I don't think we were able to record that phone call

3    because I don't think -- that was outside our presence, it was

4    during the drug buy, so if they didn't have a speaker, it would

5    be very hard for us to pick up that conversation.

6    Q.    But you were briefed on that by CW-1, correct?

7    A.    Yes.

8    Q.    And what CW-1 told you was that the leader --

9         MR. POHL:  Objection.

10:03AM 10    THE COURT:  Let me see counsel at sidebar.

11         (THE FOLLOWING OCCURRED AT SIDEBAR:)

12         THE COURT:  Why is it not hearsay, Mr. Murphy?

13         MR. MURPHY:  There are two reasons, your Honor.

14    Number 1, it's not being offered for the truth.  Number 2 --

15         THE COURT:  What do you expect the answer to be, the

16    full question and answer?

17         MR. MURPHY:  The full question is that -- and I will

18    say at the beginning of the questions that this agent -- which

19    he testified about on direct examination, that this agent

10:04AM 20    learned that there was a significant dispute between the

21    leaders of MS-13 in El Salvador and Mr. Sandoval.  He learned

22    about that from Pelon, so we say, your Honor, it's admissible

23    for a number of different reasons.

24         First, the government was permitted over the defense

25    objection to provide this agent 's summary of a number of steps

1    in the investigation, and he's already testified in very

2    summary fashion, and we would say somewhat misleading by this

3    dispute, that's Number 1.

4         So, Number 2 is that we say that to the extent that

5    these are statements from Pelon, which they all are, that they

6    are admissions of a party opponent, and that issue has been

7    briefed, as the Court has already said.

8         But I would say, your Honor, that, you know,

9    ultimately, the government, having chosen to put this witness

10:05AM 10    on as a summary witness, we are entitled to ask specific

11    questions about the fax data that he wrote that underlie the

12    summary.

13         THE COURT:  I thought the dispute evidence came on

14    cross-examination.  I don't think the government elicited that.

15    I thought that was elicited by Mr. Iovieno.  I don't remember

16    he testifying, and Mr. Pohl, help me out.  What is your -- what

17    did he testify on direct?

18         MR. POHL:  Concerning?

19         THE COURT:  Concerning the dispute.

10:05AM 20         MR. POHL:  I mean, I think there was testimony that

21    agents were aware, through the recordings through Pelon, to the

22    extent that Pelon was the delivery device for the recordings,

23    that there was an ongoing dispute between MS-13 leaders in

24    El Salvador and the East Coast Program concerning whether that

25    clique was going to join, but -- and that frankly, that

1    information elicited and captured on recordings in several

2    different forms and dates was one of the reasons why the agents

3    had warned Mr. Sandoval.

4            THE COURT:  Oh, that's right.

5            MR. POHL:  But I think -- so I don't, A, agree that

6    Special Agent Wood testified as a summary witness.  And, B,

7    everything that's going to come through that question would be

8    hearsay.

9            THE COURT:  Well, I don't accept the confidential

10:06AM 10   witness as agent argument.  I've looked at that, and I

11   just -- I find that troublesome, so put that aside.

12           It seems to me that evidence having come out on direct

13   is the background for warning the witness that there was this

14   dispute that I will permit some -- either partway down this

15   path in order to provide a complete picture.  If you say, you

16   know, isn't it true that CW-1 told you that there was this

17   dispute and these were the contours of the dispute, that door

18   having been opened slightly, I think I'll let you get that out,

19   but it is otherwise I think hearsay, classic hearsay.

10:07AM 20           Again, I'm not saying it's irrelevant.  CW-1 could so

21   testify, Sandoval could so testify, that's not the issue.  The

22   witness is can we get it in through this witness, but I will

23   allow if we could go question by question to go down this path

24   to provide a complete picture of the dispute with headquarters

25   in El Salvador.

1          MR. POHL:  Okay.  Thank you.

2          (SIDEBAR CONFERENCE WAS CONCLUDED)

3          THE COURT:  I think we have a juror who needs a break,

4     so we might as well take our break now.

5          THE CLERK:  All rise.

6          (A recess was taken.)

7          THE CLERK:  Thank you.  You may be seated.  Court is

8     now back in session.

9          THE COURT:  I think what we'll do is we'll go until --

10:20AM 10    I don't know, 11:30, 11:40 somewhere in there and take our next

11    break.

12    Q.   Special Agent Wood, we're talking about May, 29, 2015, the

13    time when you were working on this case, correct?

14    A.   Yes.

15    Q.   And that was the day that an individual named Bandito was

16    called into the middle of this drug transaction that you'd

17    arranged, correct?

18    A.   Well, we directed, yes.

19    Q.   And Bandito, you said, was a leader of MS-13 in

10:21AM 20    El Salvador, correct?

21    A.   Yes.

22    Q.   And he called CW-1, correct, on CW-1's phone?

23    A.   Yes.

24    Q.   And CW-1 had a conversation with Bandito that he reported

25    back to you about, correct?

1    A.    Yes.

2    Q.    And ultimately there was a recording of that call, which

3    you had a report about, right?

4    A.    Well, if it worked properly, we had consensual T3 on so we

5    should have recorded that, and, yes, I do remember this day

6    very well, and I remember writing my report.

7    Q.    So, Bandito told CW-1 that he and the other leaders in

8    El Salvador were concerned about Mr. Sandoval and Mr. Guzman,

9    correct?

10:21AM  10    A.    That is correct, yes.

11    Q.    And that they weren't following the rules established by

12    the East Coast Program, correct?

13    A.    Yes, sir.

14    Q.    And that he would not hesitate ordering Mr. Sandoval's

15    removal as the leader of the clique, correct?

16    A.    Yes.

17    Q.    And that there was discussions about promoting Muerto,

18    correct?

19    A.    Yes.

10:22AM  20    Q.    And CW-1, in that same conversation, when he was talking

21    back to the man in El Salvador said --

22          MR. POHL:  Objection.

23          THE COURT:  Is this something off the report now,

24    Mr. Murphy?

25          MR. MURPHY:  It's something off the summary

1    transcript, your Honor.

2              THE COURT:  I'm sorry.  This is not a summary of a

3    recorded conversation, it's something different?

4              MR. MURPHY:  This is a summary of the same recorded

5    conversation, your Honor.

6              THE COURT:  All right.  Overruled.

7    Q.   And what CW-1 told the individual in El Salvador, the

8    leader, was that the leader could ask any clique about CW-1 and

9    the only ones on the street were him and Muerto, correct?

10:23AM 10   A.   That's what it says, yes.

11   Q.   Now, on May 31, 2015, CW-1, Pelon, told agents about a

12   conference call that he had with a number of MS leaders in

13   El Salvador, correct?

14   A.   I believe so, but I'd have to see my report.

15   Q.   So let me put a document on the document camera.  Let me

16   show you a report.  That's a report by Ben Wallace dated

17   May 31, 2015?

18   A.   That doesn't say it's by Ben Wallace, he was the case

19   agent for --

10:23AM 20   Q.   I apologize.  The second page, the last page would tell us

21   who wrote the report, correct?

22   A.   Yes, and that's me.

23   Q.   And turning to the last page, it was you, correct?

24   A.   Yes, sir.

25   Q.   In this report, if we turn to page 2, talks about a

1    conference call between Pelon and a number of leaders in -- of

2    MS-13 in El Salvador, correct?

3    A.    Yes.

4    Q.    And that included Bandito, the man they were talking about

5    a moment ago, correct?

6    A.    Yes.

7    Q.    A person by the name of -- it's spelled here "Sugar," but

8    do you know how that's pronounced?

9    A.    I believe we called it "Suga," we dropped the R.

10:24AM 10    Q.    And who was he?

11    A.    Another leader within the clique or within the East Coast

12    Program.

13    Q.    And was he also situated down in El Salvador?

14    A.    He was.

15    Q.    And a person named Gorras, G-o-r-r-a-s.  Who is that?

16    A.    A leader in El Salvador.

17    Q.    So CW-1 was directly in touch with those leaders in

18    El Salvador, correct?

19    A.    Yes, I believe I testified earlier that in 2015, I was

10:25AM 20    aware of those communications with him and the CW and leaders

21    in El Salvador.

22    Q.    And on those conference calls, what Pelon told you about

23    them was that the leaders in El Salvador expressed their

24    displeasure with Mr. Sandoval's leadership of the ESLS clique,

25    correct?

1    A.    Yes.

2    Q.    But they were upset about his failure to include the

3    clique in the East Coast Program?

4    A.    Yes, that's correct.

5    Q.    And that recently Mr. Sandoval had refused to even speak

6    with those individuals who were the leaders of the East Coast

7    Program in El Salvador, correct?

8    A.    Yes.

9    Q.    And they talked on those conference calls -- and this is

10:25AM 10   back in the end of May 2015, right?

11   A.    Correct.

12   Q.    They talked in those conference calls about punishing

13   Mr. Sandoval for disobeying their orders and replacing him as

14   leader of the clique, correct?

15   A.    Yes.

16   Q.    They stressed that the punishment would consist of a

17   beating, which could be administered by the leader of a MS

18   clique in Rhode Island, correct?

19   A.    Yes, sir.

10:26AM 20   Q.    And that was May 31, 2015?

21   A.    Yes.

22   Q.    Now, on July 14, 2015, so about six weeks later, Pelon,

23   that is CW-1, briefed agents about another call that he had

24   with Gorras, that's one of the big guys in El Salvador,

25   correct?

1   A.   Yes.

2   Q.   Suga and others, correct?

3   A.   Yes.

4   Q.   And during that call, do you recall that the leaders in

5   El Salvador instructed local clique members to elect two

6   members to ensure that the rules of the East Coast Program

7   would be followed?

8   A.   I'd have to see my report, but I believe that was in

9   reference to two clique members, two clique leaders

10:27AM 10   representing all of the cliques operating in Massachusetts in

11   the East Coast Program.

12   Q.   So let me show you a document dated July 18, 2015 and ask

13   you whether you recognize that document?

14   A.   I do.

15   Q.   And does that refer to a conference call among Gorras,

16   Sugar and others?

17   A.   Yes.

18   Q.   And this was a conference call, again, that CW-1

19   participated in, correct?

10:27AM 20   A.   Yes.

21   Q.   Mr. Sandoval was not part of this conference call,

22   correct?

23   A.   That is correct.

24   Q.   And what you learned after this call was that the leaders

25   in El Salvador wanted to set up a meeting to elect two members

1    who would ensure that the rules of the East Coast Program would

2    be followed, correct?

3    A.    Yes.

4    Q.    And that the two elected members would be in charge of all

5    of the Massachusetts MS cliques and tasked with enforcing the

6    rules of the East Coast Program, correct?

7    A.    They would be the East Coast Program representatives over

8    the cliques here in Massachusetts.

9    Q.    And CW-1 called Mr. Sandoval to tell him, right?

10:28AM 10    A.    What's that?

11    Q.    CW-1, after this call that he participated in from the big

12    guys in El Salvador, called Mr. Sandoval to tell him about it,

13    right?

14    A.    Yes, it says that right there.

15    Q.    Right.  And eventually CW-1 did talk to Mr. Sandoval about

16    it, correct?

17    A.    Yes.

18    Q.    And what he told CW-1 when they eventually did talk was

19    that he was going to call a meeting to discuss the East Coast

10:29AM 20    Program --

21            MR. POHL:  Objection.

22            THE COURT:  Sustained.

23    Q.    What did CW-1 tell you Mr. Sandoval said about the East

24    Coast Program?

25            MR. POHL:  Objection.

1          THE COURT:  Let me see you at sidebar.

2          (THE FOLLOWING OCCURRED AT SIDEBAR:)

3          THE COURT:  All right.  Now you're listening to your

4    own client's statements as opposed to these calls.  The only

5    reason I'm allowing this at all was the idea was the government

6    had learned, you know, this information.  That was the basis of

7    their warning to him, but his opinions as stated by him out of

8    court seem to me to be classic hearsay.

9          MR. MURPHY:  Your Honor, I think, again, the

10:30AM 10   government was allowed to elicit summary testimony over our

11   objection.

12         THE COURT:  I don't remember any summary testimony at

13   all, but go on.

14         MR. MURPHY:  And the agent was allowed to give a

15   generalized description of this dispute and what the ESLS

16   clique's position was.  First they said they didn't want to

17   join now, then they said they did, then they said they didn't,

18   so all of that stuff has been the subject of testimony already

19   as part, and I think, frankly, your Honor, the record will

10:30AM 20   reflect that you said this was permissible summary testimony.

21         And so we need to be able to, having the door been

22   opened, we need to be able to put in the details.

23         THE COURT:  Why can't you do that without your own

24   client 's statements as to what his beliefs and intentions and

25   opinions are, as opposed to the threat against him, which is

1    just what the door was opened.  Again, you can call your

2    client, obviously.

3              MR. MURPHY:  I understand, your Honor.

4              THE COURT:  Or you call someone else who, you know,

5    who has something that falls within the hearsay exception, but

6    it seems to me, you know, here you're just eliciting your own

7    client's statements that are, you know, that perhaps the whole

8    thing is problematic from a hearsay standpoint, but this is

9    another layer beyond that where you just, you know, the

10:31AM 10   government can't cross-examine your client about these

11   statements, and I don't think it's necessary for completeness

12   under the circumstances, so I can also take it a question at a

13   time, but this is just him stating his intentions or supposedly

14   his opinions, and you are eliciting your own client's

15   statements, so I'm going to sustain the objection.

16             MR. MURPHY:  Thank you.

17             MR. POHL:  Thank you.

18             (SIDEBAR CONFERENCE WAS CONCLUDED)

19             THE COURT:  All right.  Let's put another question to

10:32AM 20   the witness.

21   Q.   You testified on questions Friday, I believe, that -- let

22   me ask you a different question.  Do you recall that on

23   July 29, 2015, Mr. -- CW-1, Pelon, gave your team another

24   briefing?

25   A.   I'd have to see the report.  There was a lot of -- okay.

1    Q.   And he reported about a meeting of the folks at that

2    Norman Street Garage, correct?

3    A.   Yes.

4    Q.   And the subject of the meeting was that -- the dispute

5    between Mr. Sandoval and the leaders of MS-13 in El Salvador,

6    correct?

7    A.   Can you turn the page so I can continue reading, please?

8    Q.   Absolutely, sir.

9    A.   Okay.  I did review this, yes, but I did not write this

10:33AM 10    report.

11    Q.   Fair enough, sir.  Is it fair to say that you learned that

12    the upshot of this meeting was that, at least for a time, the

13    members of ESLS decided to -- that they would tell the leaders

14    in El Salvador that they would be part of the ESLS -- they

15    would be part of the East Coast Program, but they didn't want

16    them to have control of the clique?

17    A.   Yes.

18    Q.   And when you testified Friday about there was a time when

19    they did join the East Coast Program, it was this that you

10:34AM 20    referred to, correct?

21    A.   I was not referring to this one, no.

22    Q.   Now, is it fair to say, sir, that on August 15th, Pelon

23    conducted another controlled purchase of drugs from that

24    individual named Flaco?

25    A.   I would have to see the report, but we purchased a lot so

1    I would say that we were purchasing drugs throughout the entire

2    year, so Herzzon, we did purchase drugs from him in August.

3    Q.    And if I show you a report dated August 6, 2015, does this

4    concern a drug purchase on August 15th between Pelon and this

5    individual Flaco?

6    A.    It appears so.  Yes, it does.  Yes.

7    Q.    Flaco reported to Pelon about --

8           THE COURT:  I'm sorry, this says August 5th.  I think

9    you said August 15th earlier, Mr. Murphy.

10:35AM 10          MR. MURPHY:  I'm sorry.  I meant to say August 5th,

11   your Honor.

12          THE COURT:  Go ahead.

13   Q.    So we're on August 5th, correct?

14   A.    It was August 5th, yes.

15   Q.    And Pelon, CW-1, told you what he had heard from Flaco

16   about what was happening in this dispute between the leaders in

17   El Salvador and Mr. Sandoval, correct?

18   A.    Yes.

19   Q.    And what he told you was that El Salvador --

10:36AM 20          MR. POHL:  Objection.

21          THE COURT:  Overruled.

22   Q.    -- was now sending someone to discipline Casper and that's

23   Mr. Sandoval, right?

24   A.    I believe Special Agent Wallace was debriefing on this

25   one, so reading this report, that's what it says.

61

1    Q.    Now, you don't doubt that the report was accurate,

2    correct?

3    A.    No, I believe the report is accurate.

4    Q.    Okay.  So we're not quibbling about whether that

5    report --

6    A.    No, no.  I just want to make sure that --

7    Q.    It's not your report?

8    A.    It's not my report, yes, sir.

9    Q.    Fair enough.  So what Flaco told CW-1 was that El Salvador

10:36AM 10    was now sending someone to discipline Casper for not accepting

11    the East Coast Program rules and he also said that that

12    information came from a person named Donkey, correct?

13    A.    Yes.

14    Q.    Who is Donkey?

15    A.    He's a leader of MS-13.

16    Q.    In El Salvador?

17    A.    Yes, sir.

18    Q.    Okay.  Now, between August 15th and September 3, 2015,

19    things began to continue to escalate concerning this threat to

10:37AM 20    Mr. Sandoval, correct?

21    A.    According to this, this is August 5th.  You said August

22    15th again.

23    Q.    I did, I apologize.  So between August 5th and

24    September 3rd, this dispute continued to escalate, correct?

25    A.    I believe it did.

62

1    Q.    And it was on September 3, 2015 that you and several other

2    officers went to warn Mr. Sandoval that his life was in danger,

3    correct?

4    A.    Yes.

5    Q.    And that was according to FBI policy, correct?

6    A.    I don't know if it's policy, it's just the thing to do,

7    the right thing to do.  If we get information that someone's

8    life is in danger, we warn them.

9    Q.    And even after that warning, you picked up information

10:38AM 10   that this dispute continued, correct?

11   A.    I believe so.

12   Q.    And you intercepted conversations in which Mr. Sandoval

13   told the leaders in El Salvador directly that he was not going

14   to be participating in the East Coast Program, correct?

15   A.    I don't know.  I'd have to see reports on intercepted

16   conversations between Mr. Sandoval and the East Coast leaders.

17   I didn't have a Title III on his phone.

18          THE COURT:  Ladies and gentlemen, let me explain what

19   a Title III is.  That's the reference to the section of the law

10:39AM 20   that permits the government, under some circumstances, to

21   intercept telephone calls, which requires a showing of probable

22   cause and a court warrant, and it's called T3 or Title III.

23   It's just kind of law enforcement jargon.  Go ahead.

24   Q.    So let me show you a transcript summary that was completed

25   on September 23, 2015.  Do you see that, sir?

63

1    A.    I do.

2    Q.    And it shows that the date and time of the recording was

3    September 15th -- September 5, September 5, 2015, pardon me?

4    A.    Yes, September 5, 2015 at 7:49 p.m.

5    Q.    And this describes a conversation that was -- that

6    occurred between Pelon, whose phones you were recording,

7    correct, CW-1, and others, correct?

8    A.    Yes.

9    Q.    And at that point CW-1 was giving instructions to

10:40AM 10    Mr. Sandoval --

11         MR. POHL:  Objection.

12    Q.    -- about how to deal with these folks in El Salvador --

13         MR. POHL:  Objection.

14    Q.    -- that he had a direct line to, correct?

15         THE COURT:  Sustained.

16    Q.    Was CW-1 providing advice --

17         MR. POHL:  Objection.

18    Q.    -- to Mr. Sandoval?

19         THE COURT:  I'll allow that.  Overruled.

10:40AM 20    A.    All homeboys can give advice to the leaders of the gang,

21    so, yes.  CW-1 offered advice.

22    Q.    And what CW-1 advised Mr. Sandoval is to tell the leaders

23    in El Salvador --

24         MR. POHL:  Objection.

25         THE COURT:  I'm sorry.  Let me see counsel.

```
 1              (THE FOLLOWING OCCURRED AT SIDEBAR:)

 2         THE COURT:  What's your objection to this piece of it

 3    as opposed to, you know, how we've gotten to this point?  In

 4    other words, what's different about this?

 5         MR. POHL:  Well, I think to the extent that it was

 6    allowed before, it was as a generalized way of completing -- I

 7    don't think it was an incomplete picture on direct or after

 8    Mr. Iovieno's cross, but to the extent that this was let out, I

 9    think we've sort of reached the end point of that.

10         We have, you know, the cooperating witness's

11    conversation is with Casper, so whatever is coming next is

12    going to be classic hearsay either through CW-1 or an attempt

13    to elicit what Mr. Sandoval said in return and for the reasons

14    we've set before, I don't think that's...

15         THE COURT:  This is advice to Casper, okay, for

16    whatever that's worth, CW-1 tells him that, Casper with the

17    meetings --

18         MR. MURPHY:  I would be turning to the next page, your

19    Honor.

20         THE COURT:  Well --

21         MR. MURPHY:  Your Honor.

22         THE COURT:  Yes.

23         MR. MURPHY:  I would say that in addition to the

24    arguments that I made before that this is not hearsay because I

25    said before that it was not offered for the truth.  That's
```

1    because it's offered to show Mr. Sandoval's state of mind.  It

2    falls within the state of mind exception to the hearsay rule,

3    your Honor.

4           THE COURT:  Okay.  Casper's own statements are -- all

5    right.  Obviously CW-1's statements are hearsay, but the

6    hearsay within hearsay, you're saying it's Casper's state of

7    mind?

8           MR. MURPHY:  CW-1's statements are also state of mind.

9           THE COURT:  And just to be -- well, yes, I'm sorry,

10:44AM 10    Ms. Lawrence.

11           MS. LAWRENCE:  No.  I think, you know, to the extent

12    the state of mind exception would apply, it would only have to

13    apply to something that's overlooking gravity at this moment

14    and not to prove the fact of the dispute.

15           THE COURT:  But it can be his future intention, it

16    could be his state of mind.  All right.  One of the reasons I'm

17    having trouble with this is I'm having also trouble seeing just

18    how this hurts the government and so -- well, let's do this.  I

19    haven't gotten down -- this far down the path.  I'm going to

10:44AM 20    allow it here, and I'll allow you to elicit your client's

21    statements to the extent that it is his current state of mind

22    or his future intentions.

23           MR. MURPHY:  Your Honor, with respect to the

24    beginning, the prelude?

25           THE COURT:  The prelude, I'll permit that.

1              (SIDEBAR CONFERENCE WAS CONCLUDED)

2              THE COURT:  Go ahead, Mr. Murphy.

3    Q.    So, on the first paragraph, the highlighted paragraph,

4    sir, that tells us the advice that CW-1 gave to Mr. Sandoval

5    about what he should tell the leaders of MS-13 down in

6    El Salvador, correct?

7    A.    Yes.

8    Q.    And CW-1 advised Mr. Sandoval that Mr. Sandoval needs to

9    calmly tell Gorras -- he was one of the leaders, right?

10:46AM 10   A.    Yes.

11   Q.    That they, as a clique, have all decided that continuing

12   to be part of Gorras' program is not convenient for them

13   because they cannot be responsible for all the things that take

14   place down there and cannot deal with their consequences,

15   correct?  That's what he said?

16   A.    That's a summary.  It's not verbatim, so, you know, as a

17   summary, I would say that's what he's advising, but the

18   specifics, we don't have a specific exact word for word

19   verbatim translation here.

10:46AM 20   Q.    Fair enough, sir, but this is a summary prepared by one of

21   those linguists that you were talking about with Mr. Norkunas,

22   right?

23   A.    That is correct.

24   Q.    She's flown in?

25   A.    Actually, she's assigned to the Boston office, if you look

1    at the front page.

2    Q.    But she's here the whole time, correct?

3    A.    Yes, sir.

4    Q.    So it's an FBI linguist summary of a tape recording that

5    the FBI made?

6    A.    That is correct, sir.

7    Q.    And as part of this advice, CW-1 told Mr. Sandoval to say,

8    to tell them, for them down there, it's easy to kill and it's

9    easy to collect but not here, correct?

10:47AM 10    A.    Yes, that is correct.

11    Q.    And, in fact, Mr. Sandoval did have a conversation with

12    these individuals in El Salvador, correct?

13    A.    Further down it looks like there is a conversation.

14    Q.    And these are the ones who you believe had threatened to

15    kill him, correct?

16    A.    Well, when it says they talked to Chuba, I'm not sure

17    there, but, yes.

18    Q.    And in that conversation, Mr. Sandoval told an individual

19    named Suga -- do you know whether that's Suga or whether that's

10:47AM 20    simply a mistranslation?

21    A.    It could very well be, yes.

22    Q.    You don't know a person name Chuga, C-h-u-g-a, in

23    El Salvador's leadership?

24    A.    Is it C-h-u-b-a?

25    Q.    It's C-h-u-g-a in this, or b-a in this one.

1    A.    I think it's b-a from what I'm reading -- oh.  And then

2    there's another one where it says C-h-u-g-a.  I would believe

3    that's Suga.

4    Q.    Okay.  So that's one of the leaders in El Salvador?

5    A.    Correct.

6    Q.    And Mr. Sandoval tells Suga that his clique is not going

7    to continue with the Program or being part of it at all,

8    correct?

9    A.    Yes.

10:48AM 10    Q.    That his clique cannot find common ground with the

11    Program?

12    A.    That is correct.

13    Q.    And that they're not going to continue to be part of the

14    Program and there's nothing that says they have to, correct?

15    A.    That's correct.

16    Q.    And Suga told Mr. Sandoval that the barrio is the one who

17    will be making decisions for ESLS and not Casper and his

18    members, correct?

19    A.    He does say that, yes.

10:48AM 20    Q.    And what's the barrio?

21    A.    That's MS-13.

22    Q.    Now, you testified about a beating that took place in

23    December, 2015.  Do you recall that, sir?

24    A.    Was it December or January?

25    Q.    Let me ask you.  This was a meeting that took place in

1    Virginia, sir.  Do you recall testifying about that?

2    A.    Oh, the East Coast Program leader meeting?

3    Q.    Yes.

4    A.    Yes.

5    Q.    So, I will try to shortcut this.  What happened is that an

6    individual named Demente, correct, another clique leader?

7    A.    Yes.

8    Q.    Not part of ESLS?

9    A.    No, he's not with ESLS.

10:49AM 10    Q.    Was asked to give -- asked CW-1 to give him a ride down to

11    this meeting in the Maryland-Virginia area, correct?

12    A.    Yes.

13    Q.    And they went to Maryland first, correct?

14    A.    Yes.

15    Q.    To a couple different locations there, correct?

16    A.    Yes.

17    Q.    And they ended up in Richmond, Virginia, correct?

18    A.    They did.

19    Q.    And that was a meeting that was led by an individual named

10:50AM 20    Chucky, correct?

21    A.    Chucky.

22    Q.    Chucky?

23    A.    Correct.

24    Q.    And Chucky was the leader of the East Coast Program,

25    correct?

1    A.    In the United States, yes.

2    Q.    And before Chucky permitted CW-1 to come into the meeting,

3    he had to make a call to El Salvador to make sure that someone

4    in El Salvador would vouch for Pelon, correct, for CW-1?

5    A.    I believe that is correct.

6    Q.    And during -- it was a long meeting, correct?

7    A.    Yes, it was.

8    Q.    And during that meeting, there was a discussion that

9    specifically focused on Mr. Sandoval; isn't that correct?

10:50AM 10    A.    Yes, I believe so.

11    Q.    And there is a transcript of that meeting, correct?

12    A.    Yes, sir.

13    Q.    And showing you a document on the screen, do you recognize

14    that as a transcript of that meeting?

15    A.    Yes.  Is it an excerpt?  It's an excerpt of the

16    transcript, though.

17    Q.    Again, prepared by the government, correct?

18    A.    Yes, sir.

19         MR. MURPHY:  Your Honor, with the Court's permission,

10:51AM 20    I'd like to mark this now for identification.

21         THE COURT:  For identification?  All right.  What's

22    the number?

23         THE CLERK:  Judge, the next number would be 225.

24         THE COURT:  225.  225 for identification.

25         (Exhibit 225 was marked for identification.)

1    Q.   And that contains several passages that relate directly to

2    Mr. Sandoval, correct?

3    A.   I believe it does, yes.

4    Q.   And if we turn to page 11.

5    A.   Yes.

6    Q.   Does that part of the transcript --

7            THE COURT:  Hold on.  Are we showing this to the jury?

8            THE CLERK:  No.

9            THE COURT:  This is not in evidence.

10:52AM 10            MR. MURPHY:  It shouldn't be.

11            THE COURT:  Did you take it -- okay.  Go ahead.

12    Q.   Does that part of the document -- it says verbatim at

13    10:03:07, does that relate at page 11 moving onto page 12 to a

14    conversation about Mr. Sandoval?

15    A.   Well, I know they were talking about Mr. Sandoval, yes.

16    Q.   And if we turn to page 29, does that show additional

17    conversation about Mr. Sandoval?

18    A.   It doesn't start off, it just says -- the question is

19    asked "What's happening?"  And they ask the CW-1 what's

10:53AM 20    happening, so you'd have to go forward where they start talking

21    about your client, sir.

22    Q.   But on the next page, on page 30, they do, correct?

23    A.   Yes.

24            MR. MURPHY:  If I may approach, your Honor?

25            THE COURT:  Yes.

72

1    Q.   Let me show you a three-page document, Special Agent Wood,

2    and ask you whether that's an excerpt of a longer excerpt that

3    we've been looking at that was marked as an exhibit for

4    identification that contains those passages that we just looked

5    at on the document marked for identification relating to the

6    discussion of Mr. Sandoval?

7    A.   Yes, it appears to be exactly that.

8              MR. MURPHY:  May we offer this as an exhibit?

9              MR. POHL:  Objection.

10:54AM 10    THE COURT:  Can I see it?  All right.  I'll admit it.

11    226.

12              (Exhibit No. 226 received into evidence.)

13              MR. MURPHY:  May I approach, your Honor?

14              THE COURT:  Yes.

15              MR. MURPHY:  I'm going to put it up on the document

16    camera.

17    Q.   So when you were reading transcripts with Mr. Pohl, you

18    were taking the position of CW-1; is that correct?

19    A.   Yes, sir.

10:55AM 20    Q.   So why don't we do the same, and if we could read this

21    transcript together.

22              MR. MURPHY:  The jury does not have this, your Honor,

23    but I would propose to, now that it's been admitted, to submit

24    it to be part of the jury's evidence binder.

25              THE COURT:  Well, I don't know how we're going to do

1    that, but can they see it now?

2         MR. MURPHY:  Yes.

3         THE COURT:  All right.  We'll talk about that later.

4    Go ahead.

5    Q.   So at 1:03:07, Chucky, he's the leader of the East Coast

6    Program in the United States, correct?

7    A.   Yes, sir.

8    Q.   He says, "How many cliques are there organized in the

9    sector which work together?  Some?  Is there Mara there?"

10:56AM 10        And then Demente -- who's Demente?

11   A.   Demente is the leader of the Molinos.

12   Q.   It's another Boston area clique?

13   A.   It's the United States clique.

14   Q.   Okay.  Not ESLS, correct?

15   A.   That's correct.

16   Q.   Demente says, "No, because how many times have they had

17   you pay?"

18        Chucky:  "Nothing, no one from that sector."

19        Demente:  "Well, me, we were looking, I made them see

10:56AM 20   before, well, yes, but there --"

21        Chucky:  "And how is it there with your clique?"

22   A.   CW-1:  "No, man, the main leader was pushing us down.  You

23   know, what I mean?  He was like --- I'm being honest."

24   Q.   Chucky:  "The old guy?"

25   A.   CW-1: "Yeah, man."

1    Q.    Chucky:  "Who was this guy?"

2    A.    CW-1:  "Casper."

3    Q.    Chucky: "And why don't you kill him?  Why don't you get

4    together?"

5    A.    CW-1:  "Well, that is the plan we have right now since

6    we're like only about 30, but we are all older.  We are

7    planning, like some seven homeboys who are the ones who

8    coordinate."

9    Q.    Chucky:  "You are all older."

10:57AM 10    A.    CW-1:  "Yes."

11    Q.    Chucky:  "So why haven't you?"  Chucky:  "Why don't you

12    all get together, the ones who are willing to meet this

13    challenge, because that guy is making your clique look bad, you

14    can?"

15    A.    CW-1:  "Yes, that's what we are talking about.  That's why

16    I am here, man, to face things.  You know what I mean?  To see

17    what (unintelligible.)  Because the thing is that the guy, he

18    is saying he is here, but he doesn't run with anyone, you know?

19    That's it.  He will be independent.  So what happens then?

10:58AM 20    That we --"

21    Q.    Demente:  "That's why I say we have to bring this guy so

22    he can face things."  Chucky:  "Okay, if you are willing to

23    represent your clique and see what's up or to organize with

24    homeboys who want to and tell them, look, homeboy, that's

25    really not good."

1          Demente:  "But Mamia."

2          Now, who's Mamia?

3      A.   A leader from a different clique in the East Coast

4      Program.

5      Q.   "Take him out."

6          Chucky:  "You, yourself, can come."

7          Demente:  "But this is very dangerous for these

8      homeboys."

9          Now, later in the meeting in the transcript that was

10:58AM 10   marked for identification, there's another discussion about

11     Mr. Sandoval, correct?

12     A.   Yes, sir.

13     Q.   And that's summarized here, that's excerpted here, I

14     should say?

15     A.   Yes.

16     Q.   And if we could read the parts as before.  Suga, he's the

17     person we were talking about before, correct?

18     A.   Yes.

19     Q.   The leader in El Salvador?

10:59AM 20   A.   Correct.

21     Q.   They got him on the phone?

22     A.   Yes.

23     Q.   "We're going to do something, but right now I want to talk

24     to these dudes in the Eastside Program.  What's happening,

25     Pelon?"

1   A.   CW-1:  "Not much, doggie."

2   Q.   Suga:  "When you go back to your homeboys."

3   A.   CW-1: "That's right.  I'm going there."

4   Q.   Suga:  "I want you to meet with your people, brother so

5   that they don't come here, you know the reality of your clique,

6   brother, because your clique doesn't, you know, and I don't

7   know why the homeboys?"

8   Q.   CW-1:  "Suga, you know the whole thing with Casper.  This

9   is (redacted.)  What was I told?  (Unintelligible.)  Me and

10:59AM 10   Muerto, but we had to (unintelligible.)  So now we are

11   planning, me, Muerto and Caballo, we're seniors and we're going

12   to be Eastside, but we're going to be like two groups, because

13   we're going to, they never support us here.  You know how those

14   dudes are."

15   Q.   Now, in that transcript that we just saw, CW-1 said he was

16   going to kill Mr. Sandoval, correct?

17   A.   He never said that he was going to kill your client, sir.

18   I think he says that's what we're planning.

19   Q.   Oh, that's what we're talking about?

11:00AM 20   A.   Yes.

21   Q.   Okay.  So CW-1 was talking about killing Mr. Sandoval?

22   A.   In this report, yes, or in this transcript.

23   Q.   Now, let me turn to a number of different subjects.

24   Number 1, you testified a few moments ago about these

25   protection details, correct?

1    A.    Yes.

2    Q.    And you said the protection details offered people who

3    were -- offered people the opportunity to volunteer to

4    participate in a drug transaction, correct?

5    A.    Yes.

6    Q.    Pelon gave that opportunity to volunteer to Mr. Sandoval,

7    correct?

8    A.    He did.

9    Q.    Mr. Sandoval said no, correct?

11:00AM 10    A.    I believe that is correct.

11    Q.    Now, it's true, isn't it, that sometimes cliques commit

12    crimes as a group for the benefit of the group, correct?

13    A.    Yes, sometimes cliques do commit crimes that benefit the

14    whole group.

15    Q.    So, for example, the Everett clique, you learned in the

16    course of this investigation, has some of its members with

17    selling marijuana, which was a group clique project, correct?

18    A.    Yes.

19    Q.    And the money from that clique, the money that were

11:01AM 20    received from selling marijuana became clique money, correct?

21    A.    Yes.

22    Q.    Okay.  But you learned in the course of your investigation

23    that sometimes clique members or associates freelanced,

24    correct?

25    A.    I'm not sure.  Do you mean that -- can you rephrase that

1    because I'm not quite sure what you mean by the freelancing

2    aspect.

3    Q.    Sure.  So, sometimes people who were members of cliques or

4    were associated with cliques would commit crimes on their own

5    without the knowledge or permission of the clique's leaders,

6    correct?

7    A.    Cliques would commit -- clique members could commit

8    crimes, but the clique would find out about it.  They may not

9    know beforehand, but they discussed crimes that would occur

11:02AM 10    depending on the type of crime.

11    Q.    Okay.  Well, let me give you a specific example, sir.  Did

12    you learn in the course of your investigation that there was an

13    individual named Clacker, correct, right, who was associated

14    with the Enfermos clique in Boston?

15    A.    Yes.

16    Q.    And did you learn that in the winter of 2014 and '15

17    Clacker and others committed between 30 and 40 armed robberies

18    of gypsy cab drivers, stealing money and cell phones and

19    sharing money with their accomplices, but they did that without

11:03AM 20    the knowledge of the clique itself?

21    A.    I would disagree with how you're phrasing that.  I don't

22    know if that number is completely accurate, and I would also

23    say at the point that those robberies were occurring -- at that

24    point, most of the Enfermos were already arrested, Clacker were

25    not, so it would be very hard for Clacker to tell his clique

1    what he had been doing in 2014.

2    Q.    Well, let's see if we can break that down.  Clacker was

3    affiliated with the Enfermos clique, correct?

4    A.    Yes, sir.

5    Q.    And the leader of the Clacker's clique was in jail,

6    correct?

7    A.    Yes, sir.

8    Q.    But somebody else was designated as the leader when he was

9    not, correct?

11:03AM 10    A.    Yes.  Well, no, Tremendo was still the leader, but there

11    was also another leader.

12    Q.    An acting leader?

13    A.    Yes, that be would fine to say.

14    Q.    And it was Clacker who told you about these 30 or 40 armed

15    robberies of gypsy cab drivers that he committed with others,

16    correct?

17    A.    Yes, he told us that he was committing robberies, but the

18    questions were asked where he said, "How many did you do?"  And

19    he said, "I did several."

11:04AM 20            "Well, how many?"  "I don't know."

21            "Would it be fair to say 7?"  "Yes."

22            "Would it be fair to say 10?"  "Yes."

23            "Would it be fair to says 15?"  "Yes."

24            So he didn't really know, and he just agreed to make

25    it say 30, 40, but I would believe that it was actually less

80

1    than that.

2    Q.   Clacker testified in the grand jury that it was between 30

3    and 40, correct?

4    A.   I didn't read his testimony, so I don't know what he

5    actually testified.  When we asked him what he had done, he

6    agreed to that number.  Again, as I said, I think he

7    overestimated.  I don't believe it, but that's what we put on

8    the record, 30 to 40.

9    Q.   So I'm going to try to see if I understand that.  Clacker

11:04AM 10   told you about these armed robberies of gypsy cab drivers that

11   he and others had committed, correct?

12   A.   Yes, sir.

13   Q.   You put on the record, as you say, that it was between 30

14   and 40, correct?

15   A.   Yes, because he didn't fully remember, and he just kept

16   agreeing to the number that was asked him, so we said, okay,

17   that's what he thinks, we're going to go with that.  As I said,

18   personally, I think it's lower than that, but that's what we

19   had him finally say, yes, I think it's 30 to 40, so we're going

11:05AM 20   to go with 30 to 40.

21   Q.   You weren't there, correct?

22   A.   No.

23   Q.   Clacker was?

24   A.   At the robberies?

25   Q.   Yes.

1    A.    Yes.

2    Q.    And is it your experience, sir, that people who are

3    talking to the FBI typically inflate the number of crimes they

4    committed rather than minimize them?

5    A.    I have found some people are very truthful and admit to

6    everything.  I found some people try and bolster who they are.

7    I find that people also limit or try and hide what they've

8    done, so I've seen it range from underestimating to

9    overestimating.

11:06AM 10    Q.    And I take it you don't know what Chucky testified in the

11    grand jury about whether any clique members knew what he was

12    doing?

13    A.    I don't know, no.

14    Q.    Because you've never read his grand jury under oath,

15    correct?

16    A.    I have not, no.

17    Q.    Were there any reports that were written about this

18    interview of Chucky where -- I'm sorry, of Clacker, where he

19    said might have been 5, might have been 10, might have been 7,

11:06AM 20    might have been 30, might have been 40?

21    A.    I know -- I believe a report was written.  I didn't read

22    that report.  I can remember I was driving home from Virginia

23    from that meeting when I was called and said this is what we

24    just found out from Clacker, and I remember that's how I was

25    told the conversation went with trying to figure out how many

1    he had committed.

2    Q.    And who was that call from, sir?

3    A.    That was either from Special Agent Wallace or

4    Sergeant Millett.

5    Q.    And do you know of your own personal knowledge whether

6    either of them ever wrote a report about this meeting you're

7    describing?

8    A.    I believe Special Agent Wallace would have written a

9    report.

11:07AM 10    Q.    But you have not read it?

11    A.    If the report was generated, no, I've not read it.

12    Q.    And did you ever talk to Clacker personally about whether

13    it was 5 or 10 or 15 or 20 or 30 or 40?

14    A.    I have not spoken directly to him, no, sir.

15    Q.    Now, when CW-1 was out there working for the FBI, the FBI

16    recorded the calls on one of his phones, correct?

17    A.    Yes.

18    Q.    But he had two phones, correct?

19    A.    Yes, sir.

11:07AM 20    Q.    Why was he given two phones?

21    A.    We didn't give him two phones.  He had his phone and then

22    we had his other phone.

23    Q.    Okay.  You didn't record the calls on the second phone,

24    correct?

25    A.    Yes, that's correct.

1    Q.    You had something called a pen register on that, correct?

2    A.    I believe we had a pen register on both phones, but I'd

3    have to go back to review and see if we had pen registers on

4    both phones or just the one.

5    Q.    And a pen register, if you did have it on the second

6    phone, that does not allow you to record the contents of any

7    conversations between someone who calls CW-1 and CW-1, correct?

8    A.    That is correct, yes.

9    Q.    It tells you the numbers that are called in and the

11:08AM 10    numbers that he calls out, correct?

11    A.    It breaks it down by the date, the time, you know, on this

12    date, this time this phone call was either made or incoming,

13    yes.

14    Q.    But it looks more or less, not exactly, but more or less

15    like a detailed cell phone bill like we used to get in the old

16    days, right, with all the numbers that we called?

17    A.    Yes.

18    Q.    And unless you looked and checked to see who CW-1 was

19    talking with on his second line, you wouldn't know who he was

11:09AM 20    talking to, correct?

21    A.    Yes, that's absolutely correct.

22    Q.    And do you recall ever doing that during the course of the

23    investigation?

24    A.    No, I wasn't checking the phone logs, other people were.

25    Q.    Now, the in-person meetings that CW-1 recorded, he had to

1    tell you about those, correct?

2    A.    Yes.

3    Q.    So he would be the one who would alert you to a meeting

4    that he thought should be recorded, correct?

5    A.    No, he would alert us to -- on having a meeting or having

6    been called to a meeting or I'm going to meet so and so, and at

7    that point we'd say, okay, let's get this recorded.

8    Q.    But you were relying on him to tell you when there were

9    meetings, correct?

11:10AM 10    A.    Yes.

11    Q.    And if he didn't tell you about a meeting, you'd never

12    know about it?

13    A.    Odds are that would be absolutely correct, yes.

14    Q.    Now, the conversations that we've seen that were tape

15    recorded in his car, he had the authority -- he had the ability

16    to turn that recorder on and off, correct?

17    A.    Yes.

18    Q.    You had a kill switch that could turn that car off

19    remotely, correct?

11:10AM 20    A.    That was only during the protection details.  We didn't

21    kill switch his case, just the car that was used for the

22    protection details.

23    Q.    Fair enough, sir.  But he had control over the tape

24    recording equipment in his car, correct?

25    A.    At the end of the investigation, yes.  In the initial, no.

1    We turned it on and off and then due to the amount of times he

2    was meeting people, we showed him how to work it so he could

3    turn it on.

4    Q.    But you didn't turn it on and off remotely, correct?

5    A.    You can't turn it off and on remotely, no, sir.

6    Q.    So even earlier in the investigation when it required the

7    FBI to turn it on, he had to bring the car to a designated

8    location and you turned it on then, correct?

9    A.    We would install the recorder for those meetings because

11:11AM 10    yes, as I told you, when the procedures we talked about last

11    week, that be would part of the procedure.

12    Q.    So Mr. -- CW-1, it's fair to say, had lots of

13    conversations with lots of people in and out of the car that

14    the FBI did not record, correct?

15    A.    Oh, absolutely, yes.

16    Q.    And it was essentially his decision about what the FBI

17    would record and not?

18    A.    No, it was not his decision like that, the way you phrased

19    it, no, sir.

11:12AM 20    Q.    But if he didn't tell you about a meeting or a -- if he

21    didn't tell you about a meeting, you wouldn't know to record

22    it?

23    A.    Yes, that's correct.

24    Q.    Now, as part of your investigation in this matter, did you

25    look into a stabbing that took place on May 12, 2015 near

1    Highland Park in Chelsea?

2    A.    Yes.

3    Q.    Tell us what you did to investigate that stabbing, sir.

4    A.    We interviewed the CW.

5    Q.    Did you do anything else, sir?

6    A.    I believe we got the reports from the stabbing.

7    Q.    Was a person named Miner Ochre the victim of that

8    stabbing?

9    A.    I can't remember the victim of the stabbing at this point.

11:12AM 10    I'd have to see the reports to see.

11    Q.    What did you learn in the course of your investigation

12    about the circumstances of that stabbing, sir?

13    A.    If I remember correctly, an MS member had seen 18th

14    Street, he called for backup, people came in, one of the MS

15    members stabbed the kid, and then they all fled the area.

16    Q.    So who was the MS member that first saw the 18th Street

17    people, as you understand it in your investigation?

18         MR. POHL:  Objection.

19         THE COURT:  I don't know how he could testify about

11:13AM 20    this.  Well, sustained.

21    Q.    Do you know, sir?

22         MR. POHL:  Objection.

23         THE COURT:  Sustained.

24    Q.    Now, you testified on direct examination about the

25    Trenton Street homicide of Irvin De Paz that was committed by

1   the individual you've identified as Animal, correct?

2   A.   Yes, sir.

3   Q.   At the time of Mr. De Paz's stabbing, Animal was not then

4   associated with ESLS, correct?

5   A.   That is correct.

6   Q.   But he did know CW-1, correct?

7   A.   I don't know when he first met him, but, yes, he at some

8   point did become familiar with CW-1.

9          MR. MURPHY:   If I could ask for Exhibit 103, the

11:14AM 10   transcript.

11          THE COURT:   I'm sorry, is this in evidence?

12          MR. POHL:   It is in evidence, your Honor.

13          THE COURT:   Okay.  Go ahead.

14   Q.   So this is the conversation that we saw on tape earlier,

15   correct?

16   A.   Yes, sir.

17   Q.   And it's between Animal and CW-1, correct?

18   A.   Yes, but I believe there were at least or two other people

19   in the back of the, car and I don't believe they were speaking

11:14AM 20   during this portion -- well, no, one did.  David spoke, but

21   yes.

22   Q.   So none of these defendants were in the back of the car?

23   A.   That is absolutely correct, sir.

24   Q.   And CW-1 says about two-thirds of the way down the page,

25   "And, hey, you just didn't take down anyone," correct?

1    A.    That is correct.

2    Q.    And Animal says, "No, a major culero," correct?

3    A.    Correct.

4    Q.    And what does CW-1 say next?

5    A.    "A major culero, I had already smashed his head, dude,"

6    didn't they tell you how -- or, "didn't they tell you?"

7    Q.    And that's Pelon CW-1 saying that he had already smashed

8    Mr. De Paz's head, correct?

9    A.    Yes.

11:15AM 10    Q.    And if we turn to page 2, I think the fifth line, The

11    fifth entry down, Animal says, "He could never stop me, the

12    culero, and whenever he would see me, he would immediately

13    run."

14          And then CW-1 says, could you read that, please?

15    A.    "Scooby and I asked Snoopy.  I gave him a fucking beating

16    with Snoopy."

17    Q.    And does he later say that he hit him with a bat in this

18    conversation?

19    A.    Yes.

11:16AM 20    Q.    And that was CW-1 talking, correct?

21    A.    Yes, sir.

22    Q.    And those were not activities that were authorized by the

23    FBI, correct?

24    A.    I don't believe those activities took place.  I think he's

25    using the cover right now to make himself look good in front of

1    Animal.

2    Q.   And how do you know that, sir?

3    A.   Because I would've believe we would have found a report

4    saying that people hit this kid with a baseball bat, and I

5    don't remember ever having a report or seeing a report saying

6    that this kid had been hit in the head with a baseball bat.

7    Q.   Did you confront CW-1 about it?

8    A.   Not at all.

9    Q.   You didn't say how come you're bragging about hitting this

11:17AM 10    kid with a baseball bat?

11    A.   Not at all.

12    Q.   Because you were confident, sir, that this was just a

13    cover story, correct?

14    A.   Yes.

15    Q.   Did you have any reason to believe that CW-1 was doing

16    things like this in circumstances where it was not a cover

17    story?

18    A.   No.

19    Q.   To this day?

11:17AM 20    A.   To this day, I know of things that occurred, but then when

21    you were asking me, no.  I wasn't aware of anything in

22    September of 2015.

23    Q.   So whatever CW-1 was or was not doing in September 2015

24    that was not authorized by the FBI, you didn't know about?

25         MR. POHL:  Objection.

```
 1              THE COURT:  I'm not sure I follow the question.  Let's
 2       start there.  Rephrase.
 3       Q.    You since learned about some things that CW-1 was doing --
 4              MR. POHL:  Objection.
 5       Q.    -- that were unauthorized by the FBI?
 6              THE COURT:  I'll allow that.  Yes or no.
 7       A.    Yes.
 8       Q.    But whatever those things were, you didn't know about them
 9       back in September of 2015?
11:18AM 10       A.    That is correct.
11       Q.    When CW-1 made the statements on this tape, correct?
12       A.    That is correct.
13       Q.    Now, you testified on direct examination about the reasons
14       why Animal was not arrested after November 2nd, when he
15       confessed on tape?
16       A.    Yes.
17       Q.    Now, one of the reasons you gave was that you were
18       concerned about the safety of CW-1 and his family, six
19       individuals here and another 12 in El Salvador?
11:18AM 20       A.    Give or take that number, yes.
21       Q.    Isn't it fair to say, sir, that the government controlled
22       the timing of when that relocation process would begin?
23       A.    Not at all.
24       Q.    You couldn't have done that before?
25       A.    No.
```

1   Q.   Why not, sir?

2   A.   Because when this fell in our lap, we weren't prepared and

3   we weren't prepared to bring his family into the country.

4   Q.   Well, you could have located them as soon as he started

5   cooperating back in 2014 and 2013, correct?

6   A.   I don't think we could have.

7   Q.   Because he hadn't done enough to justify that effort, is

8   that your testimony?

9   A.   I'm not saying that, either.  I'm just saying we weren't

11:19AM 10   sure.  In 2013, this was brand new.  We didn't know what was

11   going on to say what we can and can't do for someone.

12   Q.   You knew, sir, that in November 2015 the Boston Police had

13   located a witness who had information about the stabbing,

14   correct?

15   A.   I believe that is correct.

16   Q.   And is it fair to say that if you had wanted to, you could

17   have given the Boston Police Department a photograph of

18   Mr. Martinez and said why don't you put this photograph in a

19   photo array, a photo lineup, and show it to your witness?  Did

11:20AM 20   you think about doing that, sir?

21   A.   I wasn't aware of -- and no.

22   Q.   You had a photo of Mr. Martinez, correct?

23   A.   We did, yes.

24   Q.   And you knew the Boston Police Department was working the

25   case as an active homicide investigation, correct?

1    A.    We did, yes.

2    Q.    And you knew they had a witness?

3    A.    I wasn't aware of them having a witness to show a photo

4    array to, no.

5    Q.    Did you know that they had already showed a photo array

6    with a different suspect to the witness?

7    A.    I wasn't a part of that investigation to know what they

8    were and weren't doing at the time.  I knew they were

9    investigating a homicide.

11:20AM 10    Q.    And there were no Boston Police Officers assigned to your

11    task force back in November 2015, correct?

12    A.    Not from the homicide unit, but we have a Boston Detective

13    assigned to the task force.

14    Q.    You said that one of the reasons you wanted to bring

15    Animal -- you wanted Pelon, CW-1, to bring Animal back to

16    Boston so he'd be close when the big take down occurred,

17    correct?

18    A.    Yes, we wanted to know where he was and we didn't have a

19    good solid working knowledge of where he was located in Newark,

11:21AM 20    New Jersey.

21    Q.    Well, CW-1 was in contact with him by phone, correct?

22    A.    Yes.

23    Q.    And CW-1 went down to visit him, correct?

24    A.    Yes.

25    Q.    So CW-1 knew where he lived and how to find him?

A.   Well, he had an idea of where he lived, but it doesn't mean that we had solid proof that this is, you know, the exact house he's living in.  We had an idea, but we weren't sure, but if we had him here, we would know exactly where he would be.

Q.   Now, it's true, isn't it, that there are FBI offices all around the country?

A.   Yes.

Q.   And pretty much every day all around the country, FBI agents from one district arrest people on warrants issued by other districts, correct?

A.   That does occur.  I don't know if it's every single day, but, yes, we do make arrests for other field offices around the country.

Q.   And there's an office in the Newark area, correct?

A.   There is a Newark office, yes.

Q.   Now, you said you wanted to know where Animal was.  When you brought him back here -- and it was Pelon who brought him back here, CW-1, correct?

A.   Yes, we directed the CW to go down and pick him up and bring him back.

Q.   Did you take any steps to monitor his whereabouts?

A.   We were doing our best at that time to monitor everyone we were planning to arrest and their whereabouts.

Q.   And were you conducting surveillance on Animal?

A.   We were going out and looking at all the addresses where

1    all of the defendants were residing so we could try and put

2    them, as we call, to bed.  That way when we go and hit the

3    houses in the morning, we're hitting the right house.

4    Q.   But you weren't conducting surveillance in the sense of

5    following him around, right?

6    A.   No.

7    Q.   And did you give the Boston Police a heads-up that he was

8    back?

9    A.   I don't remember if we told them that he was back or not.

11:23AM 10   Q.   Now, I think you volunteered in response to -- I think it

11   was Mr. Iovieno's questions that December 2015 and January 2016

12   was the most stressful time of your professional career?

13   A.   Started in November, yes.

14   Q.   And part of the work was the work necessary to charge the

15   defendants?

16   A.   Part of that was the work to charge, part of that was what

17   we had going on, part of that was the fact that my boss was

18   leaving and so I didn't have a supervisor and I was doing his

19   job and my job at that time.

11:24AM 20   Q.   Part of it was dealing with the relocation of CW-1 and his

21   family?

22   A.   Absolutely.

23   Q.   You were preparing search warrants and arrest warrants,

24   correct?

25   A.   We were in the grand jury, so the indictment would have

1    granted the arrest warrants, but we were also seeking search

2    warrants.

3    Q.   Now, was there any other significant event relating to the

4    case that was causing you stress in that period, sir?

5    A.   You'd have to be specific to say what was causing me

6    stress.

7    Q.   I mean, can you think of anything as you sit here today,

8    anything else that was major going on in the investigation that

9    contributed to the stress that you volunteered?

11:24AM 10    A.   Just the whole 9 yards of everything getting ready.  We

11    were trying to indict, we were trying to make sure we kept the

12    community safe.

13        We had meetings that occurred, and each time we had a

14    meeting, we didn't have a transmitter so we couldn't listen

15    realtime what was going on in the meetings, and I know that

16    MS-13 members have killed other members they suspect of

17    cooperating with law enforcement at these meetings, so you're

18    always concerned will they find the recorder on the CW, will

19    they kill him in that meeting, and we won't know, we won't be

11:25AM 20    able to go in there and try and save him because I have

21    participated in meetings where things go wrong, not in this

22    case, but in other cases where we have to come in and save

23    either a CW or an undercover.  So all those things at once was

24    very stressful.

25        MR. MURPHY:  May I approach, your Honor?

1          THE COURT:  Yes.

2          MR. MURPHY:  I'm sorry.  I meant sidebar.

3          (THE FOLLOWING OCCURRED AT SIDEBAR:)

4          MR. MURPHY:  Your Honor, I think at this point I would

5     like to ask the following question:

6          Isn't it true that you were told in December of 2015

7     that Pelon participated in the armed robberies of a number of

8     gypsy cab drivers in East Boston and Chelsea, along with -- I

9     think at this point, your Honor, there's been a foundation laid

11:26AM 10     for that relevance.

11          I would say, Number 1, he testified about why he

12     didn't have any concerns about Pelon having smashed

13     Irvin De Paz in the head.  I think that he also has testified

14     to a whole litany of things about why he was stressed in

15     November, December, January of 2015, and, frankly, I think it's

16     incredible that he would say all that but omit the fact that he

17     learned that his own cooperating witness had been out there

18     committing crime.

19          THE COURT:  What does any of this have to do with the

11:27AM 20     guilt or innocence of any of these defendants?

21          MR. MURPHY:  It goes to the credibility of this

22     witness who's been allowed to testify about MS-13 in a way,

23     your Honor, which suggested anybody who joins MS-13 is guilty

24     of the charges that --

25          THE COURT:  He didn't testify about that.

1          MR. MURPHY:  I say I think that's the logical

2    inference of his testimony, your Honor.  That it's all about

3    violence, that it's a rule that they kill people, so I think it

4    goes directly to his credibility, your Honor, and I think it's

5    relevant.  It's relevant.  He's been presented as a person who

6    conducted a detailed thorough investigation, and the fact that

7    this stuff was going on under his nose is relevant to his

8    overall credibility as a witness.

9          THE COURT:  The government, what's your response?

11:27AM 10         MS. LAWRENCE:  That information had already been

11   brought out.  I think you allowed him in court to admit to the

12   fact that he was committing unauthorized acts while he was

13   under the cooperation agreement that's been brought out on

14   cross-examination, and I don't see any reason why we need to go

15   into the details of that.  I don't know how this is remotely

16   relevant to the point we're trying to make.

17         THE COURT:  I'm going to be consistent and keep the

18   details of that out because I think it's irrelevant, but I

19   suppose to complete this completely irrelevant line of

11:28AM 20   testimony about his personal stress, which was irrelevant in

21   the first place and continues to be irrelevant, I would permit

22   you to ask isn't it true that the unauthorized -- that you

23   learned, you know, in November, whenever it was, that this was

24   when CW-1 was committing unauthorized acts and that added to

25   his stress but not the details of what those acts were.

1          MR. POHL:  Your Honor, may I ask unauthorized criminal

2    acts?

3          THE COURT:  Yes.

4          (SIDEBAR CONFERENCE WAS CONCLUDED)

5    Q.    Special Agent, is it also fair to say that another thing

6    that was contributing to your stress in November and

7    December of 2015 was that you learned that CW-1, whom you

8    brought here, the FBI had brought here from El Salvador to work

9    for the FBI, had been committing unauthorized criminal acts

11:29AM 10   without your knowledge?

11   A.    That didn't cause me any stress, no.  I mean, not like

12   what you're suggesting, no.

13         MR. MURPHY:  May I have a moment, your Honor?

14         THE COURT:  Yes.

15   Q.    Sir, I just want to return to one point.  It's been your

16   experience that sometimes people who are speaking to law

17   enforcement exaggerate and embellish what they have done,

18   correct?

19   A.    Yes, people have done that, yes.

11:30AM 20         MR. MURPHY:  Thank you, your Honor.  Nothing further.

21         THE COURT:  Mr. Lopez.

22         MR. LOPEZ:  Thank you, your Honor.

23                      CROSS-EXAMINATION

24   BY MR. LOPEZ:

25   Q.    Good morning, Agent Wood.

1    A.    Good morning, sir.

2    Q.    My name is Scott Lopez.  I represent Edwin Guzman.  Now, I

3    think you testified on your direct that MS-13 began as a

4    nonviolent gang?

5    A.    I don't know if I said nonviolent, I said they formed a

6    gang in 1979.

7    Q.    And that was the Stoners?

8    A.    Yes.

9    Q.    And the Stoners basically existed to get stoned?

11:31AM 10    A.    They did smoke marijuana, yes.

11    Q.    And to listen to hard rock?

12    A.    That was another thing that they did, yes.

13    Q.    And would you agree with me that most aspects of gang life

14    are nonviolent?

15    A.    I would disagree with you on that one.

16    Q.    Well, would you agree that gangs hang out, socialize on

17    street corners, alleyways, in front of apartment buildings, or

18    in strip malls?

19    A.    Yes, I would say that gang members hang out together.

11:32AM 20    Q.    A yes or no will suffice.

21          THE COURT:  Well, not if it's not a fair response.

22    You can't give that instruction.  Put another question to him.

23    Q.    Would you agree that gang members sometimes watch

24    television, watch movies, or play video games?

25    A.    Yes, they would do that.

```
 1    Q.    Okay.  And they drink beer?

 2    A.    I imagine they drink beer.

 3    Q.    Or alcohol?

 4    A.    Yes.

 5    Q.    Hang out at each other's homes?

 6    A.    Yes.

 7    Q.    They smoke marijuana?

 8    A.    Some do, yes.

 9    Q.    And they like to party?

11:33AM 10    A.    Yes.

11    Q.    And they like to hang out in parks?

12    A.    I don't think that's a yes or no question.

13    Q.    Okay.  And some of them work part-time jobs?

14    A.    Some.

15    Q.    And so there are many things that gang members do that are

16    not violent, would you agree?

17    A.    I still don't know if I'd completely agree with that

18    statement.

19    Q.    Well, could you agree to any extent?

11:33AM 20    A.    No, I think that what I've seen in my experience is that

21    gang members form gangs to be violent and control their

22    territory, so to say that they're not violent, I just don't

23    agree with.

24    Q.    And that's based on your experience as an FBI agent?

25    A.    Yes.
```

Q.   Do you think your view of gangs might be a little skewed

by your experience as an FBI agent?

A.   No.

Q.   Now, most gang members are recruited when they are

teenagers?

A.   That has been a predominant -- I'm trying to think of the

word, it's escaping, but yes.  I've seen high school students,

and I've seen as low as middle school kids being recruited into

the gangs.

11:34AM  Q.   And high school students getting tattoos?

A.   I think you have to be 18 to get a tattoo, so I'm sure

some underage kids get tattoos, but I don't know when or how.

Q.   Are you saying in your experience as an FBI agent, you've

never seen an underage teenager with a tattoo?

A.   No, I have seen some underage, but I'm just saying it's

illegal.  It's usually a little harder for them to get tattoos.

Q.   Well, so are violent acts, but according to you, that's

all they do.  I take that back, your Honor.  Now, do you see a

correlation between adolescents and alcohol?

11:35AM         MR. POHL:  Objection, on relevance grounds.

        THE COURT:  Sustained.

Q.   What about adolescents and drugs?

        MR. POHL:  Objection.

        THE COURT:  Sustained.  I don't think he's an expert

on adolescents.

1          MR. LOPEZ:  Well, actually, your Honor, that's what he

2     was put forth as.  May I be heard?

3          THE COURT:  No, he's talked about gangs.  He doesn't

4     talk about adolescents.  Go ahead.  Put another question to

5     him.

6     Q.   Do you know if there's any correlation between gang

7     membership and female companionship?

8          MR. POHL:  Objection.

9          THE COURT:  I'll allow that.

11:35AM 10   A.   In what sense do you mean?

11    Q.   Well, I'm a high school student, I'm a gang member, and

12    girls are attracted to me.  Does that happen?  Yes or no.

13    A.   I was going to say I don't know if that's quite yes or no

14    because I think all adolescent boys and girls are attracted to

15    one another.

16    Q.   Exactly.  And if your identity is attractive, that's a

17    good thing, right?

18    A.   Certain things can be attractive, yes.

19    Q.   Now, throughout this investigation or through most of it,

11:36AM 20   Mr. Guzman was referred to in many of the reports by the

21    nickname Playa.  Do you agree?

22    A.   Player, Playa, yes.

23    Q.   No, no.  Playa, not Player?

24    A.   Well, I'm not very good at dropping the Rs, so I always

25    called him Player, but, yes.

1    Q.    And then as we've got closer to trial, everything got

2    changed to Playa, right?

3    A.    Well, since I came in on the reinvestigation as a co-case

4    agent in 2015, I always called him Player.

5    Q.    Now, do you know what Playa means in Spanish?

6    A.    No, I'm not a very good Spanish speaker.

7    Q.    Do you know why Mr. Guzman's nickname is Playa?

8    A.    No.

9    Q.    Do you know whether or not he got that name because he was

11:37AM 10    a lady's man?

11              MR. POHL:  Objection.

12              THE COURT:  That was your objection?

13              MR. POHL:  Yes.

14              THE COURT:  If you know how he got his nickname, you

15    can say so, but otherwise.

16    A.    I don't know.

17    Q.    Now, would you agree that the average age of most gang

18    members when they're recruited is about 15?

19    A.    I can't agree to that, no.

11:37AM 20    Q.    And some join as young as 13?

21    A.    Again, I know -- depending on where you are, I've seen it

22    younger than that.

23    Q.    And in 2015, I think you testified that some were as young

24    as 11 or 12?

25    A.    That is correct.

1    Q.    And that was in November of 2015?

2    A.    Yes.

3    Q.    And that was at that time a recent phenomenon, right?

4    A.    That was more in El Salvador, but, yes.

5    Q.    And that was in El Salvador, but those recruits were

6    coming into the United States?

7    A.    Yes.

8    Q.    Okay.  And who is Special Agent David LeValle?

9    A.    I'd have to see his name.

11:38AM 10    Q.    You're not familiar with his role in the MS-13

11    investigation in Virginia?

12    A.    Again, I'd have to see him.  I'm not familiar with every

13    single MS-13 investigator in the United States.

14    Q.    Well, in 2016, he was interviewed and he said the mass

15    migration of unaccompanied minors from Central America in 2014

16    created a whole new crop of recruits.  My question is do you

17    agree with his assessments?

18    A.    With the unoccupied minor program, I would say there's a

19    lot of truth to that, yes.

11:38AM 20    Q.    So, in 2014, things began to change vis-à-vis MS-13 and

21    young recruits?

22    A.    Yes, that was a general.

23    Q.    And, in fact, some of those young men who came in, as

24    young as 11 or 12, had already committed murders in

25    El Salvador, right?

1  A.   I would say there were probably a little older than 11 or

2  12, they were recruited at 11 or 12, and then if they had

3  already killed someone that, yes, they would be coming in

4  across the border, but I would say they were probably at that

5  point between 13 to 16.

6  Q.   But that was a new phenomenon that was being discovered in

7  2014 by the FBI, right?

8  A.   Yes.

9  Q.   Okay.  Now, between 2000, the early 2000 and 2012, would

11:39AM 10  you agree that MS-13 was mostly in hibernation?

11  A.   I would not agree with that.

12  Q.   Well, you started in the gang unit in 2004?

13  A.   2002.

14  Q.   2002, and this indictment was filed in 2016, right?

15  A.   Correct.

16  Q.   And the investigation began in 2012?

17  A.   Correct.

18  Q.   So if these MS-13 cliques existed between 2000 and 2012,

19  there weren't any prosecutions of them, right?

11:40AM 20  A.   Not federally, no.

21  Q.   Now, when you look at gang members, do you differentiate

22  between violent and nonviolent gang members?

23  A.   They are all violent to me.  A gang is a violent gang.

24  Q.   During the course of your investigation in this case, did

25  you categorize MS-13 gang members?

1    A.    What do you mean categorize?

2    Q.    Well, are you aware that there are peripheral gang members

3    of MS-13?

4    A.    Well, I believe I testified that you have your paros that

5    are the new brand new recruits, they're under observation, then

6    your chequeos, and then your homeboys.

7    Q.    I'm talking about homeboys.  Are there peripheral homeboys

8    that you're aware of?

9    A.    No, you're a homeboy.

11:41AM 10    Q.    Are there core members of the group that you're aware of?

11    A.    If you're a homeboy, you're a homeboy, sir.

12    Q.    Are there hard core members of the group that you're aware

13    of?

14    A.    Again, sir, if you're a homeboy, you're a homeboy.

15    Q.    So just one broad stroke, anyone who's a homeboy is hard

16    core?

17    A.    Yes, sir.

18    Q.    Are you aware that only about 5 percent of hardcore MS-13

19    members commit violent crimes?

11:41AM 20    A.    I would disagree with that, sir.

21    Q.    Well, you said that you've been studying this group since

22    2002.  Have you done any reading on it?

23    A.    Yes.

24    Q.    Have you read any books on it?

25    A.    Not books, no.

1    Q.    You've never read a book about MS-13?

2    A.    No, I've read the intelligence documents that the FBI puts

3    out.

4    Q.    So the source of your information has all been law

5    enforcement sources?

6    A.    And debriefing of or MS-13 gang members themselves.

7    Q.    Are you aware of a rule in MS-13, in the MS-13 gang, that

8    allows older members to step away from the gang life and

9    essentially retire or become comado (ph)?

11:42AM 10    A.    In my investigation, I knew things like that occurred, but

11    then by 2015, well, we had learned that the way to get out of

12    the gang was to find church, and then you were out of the gang.

13    Q.    I think you previously testified that although that was an

14    option, that you needed permission?

15    A.    Well, you had to go to the leaders and say I found church,

16    I found God, I want to leave the gang.

17    Q.    And that permission was rarely granted?

18    A.    No, no, I didn't say permission was rarely granted.  I

19    said that they would be granted permission.  I also said

11:43AM 20    that --

21    Q.    So --

22          THE COURT:  Don't interrupt him.

23    A.    At an East Coast Program meeting, the leader said surveil

24    those who have sought to leave the gangs through church and God

25    to make sure that they are, in fact, going to church, they are

1    following the way of God, because if not, then we will kill

2    them.

3    Q.    And so you're basing your information, your knowledge

4    about finding God based on what one of the leaders said?

5    A.    What the whole, all the leaders in that meeting were

6    agreeing to.

7    Q.    Well, prior to that, were you aware that that was a way

8    out of the gang?

9    A.    Well, like all gangs, I've known --

11:44AM 10    Q.    Sir, were you aware that that was a way out of the gang

11    prior to that?  Yes or no.

12    A.    What part?  The God?

13    Q.    Prior to that meeting, were you aware that finding God was

14    a way out of the gang?  Yes or no.

15    A.    Yes, I knew that finding God was a way out.

16    Q.    And were you aware that there were other ways out?

17    A.    At that point in the investigation, it was you either died

18    or you found God.

19    Q.    And that was in 2015?

11:44AM 20    A.    Correct.

21    Q.    What about from 2000 to 2015?  Was there another way that

22    you knew about as someone who is so knowledgeable about MS-13

23    if there was another way out?

24    A.    Well, again, in 2015, when I learned, I'm not sure when

25    finding God first came into place.  I knew that like other

1    gangs, MS-13, if you had been in long enough --

2    Q.    I'm concerned about --

3              THE COURT:  Please don't interrupt him.

4              MR. LOPEZ:  But, your Honor --

5              THE COURT:  Please.  I get to control the questioning

6    and answering, Mr. Lopez.  Don't interrupt me, or the witness.

7    Okay.  Please continue your answer.

8    A.    So I knew that like other gangs, senior long-term members

9    could get out in a retirement phase, but again, as I said, when

11:45AM 10   I took over the case, I became involved in the case, it was

11   finding God or you're dead.

12   Q.    So with respect to other gangs, you were aware that there

13   was a way to retire from gang life?

14   A.    I said other gangs and MS-13.  I said it was a broad range

15   of gangs.

16   Q.    So both other gangs and MS-13 members could retire,

17   correct?

18   A.    Yes.

19   Q.    Without finding God, correct?

11:45AM 20   A.    Yes.

21   Q.    And without being killed, correct?

22   A.    Yes.

23             THE COURT:  Let me -- are you changing to another

24   subject now?

25             MR. LOPEZ:  Yes, I am.

1              THE COURT:  Let's take a break.

2              THE CLERK:  All rise.

3              (A recess was taken.)

4              THE CLERK:  All rise for the jury.

5              (JURORS ENTERED THE COURTROOM.)

6              THE CLERK:  Thank you.  You may be seated.  Court is

7    now back in session.

8              THE COURT:  Mr. Lopez.

9              MR. MURPHY:  Thank you, your Honor.  May I approach

12:01PM 10    the witness, your Honor?

11             THE COURT:  Yes.

12   Q.   Agent, I've put a book before you entitled *Gangsters*

13   *Without Borders: An Ethnography of a Salvadoran Street Gang* by

14   Professor Thomas W. Ward?

15   A.   Yes, I see this, yes.

16   Q.   Have you seen that before?

17   A.   No.

18   Q.   I take it you haven't read it?

19   A.   No, sir.

12:02PM 20   Q.   And are you familiar with what an ethnographic study is?

21   A.   I am not, no.

22   Q.   Well, do you know what ethnography is?

23   A.   No.

24   Q.   Do you know whether it's a branch of anthropology that

25   involves trying to understand how people or cultures live?

1    A.    Again, I don't know.

2    Q.    Have you ever seen any other book on MS-13?

3    A.    I have not read any other books on MS-13.

4          MR. MURPHY:  Your Honor, I'd like to ask him about

5    some passages in this book.

6          THE COURT:  Well, I think we need a foundation under

7    Rule 803, 18(b).

8          MR. MURPHY:  Well, your Honor --

9          THE COURT:  I mean, he's not acknowledged as an

12:03PM 10    authority, and we don't have any other testimony.

11          MR. MURPHY:  Correct, but you can take judicial notice

12    of it.

13          THE COURT:  I'm not sure I can do that.  Let me see

14    that book.  Well, I'm not sure I can do that.  To do that, it

15    has to be beyond dispute.  I just don't know one way or the

16    other.  I don't think I can take judicial notice of it.

17    Q.    Now, directing your attention to CW-1 --

18    A.    Yes, sir.

19    Q.    So I just want to be clear, his mission was to take down

12:04PM 20    MS-13, right?

21    A.    No, that's my mission, sir.  His mission is to cooperate

22    with the Federal Government.

23    Q.    So your mission was to take down MS-13?

24    A.    My mission is to investigate violent street gangs, in this

25    case, MS-13, disrupt and dismantle them.

1    Q.    And CW-1 was authorized to lie, right?

2    A.    I'm not sure what you mean by that, sir.

3    Q.    Well, he was authorized to tell falsehoods to gang members

4    in order to induce them into making incriminatory statements,

5    right?

6    A.    I don't think we induced anyone, as you're trying to

7    reference.

8    Q.    Well, Mr. Murphy asked you some questions about whether or

9    not you believed the statements in the transcript that he

12:04PM 10    showed you and you said you didn't believe him?

11    A.    Oh, in that sense, absolutely, yes.

12    Q.    So he lied, right?  In your mind, he lied?

13    A.    Yes.

14    Q.    Because you didn't believe what he said in those tapes?

15    A.    Correct.

16    Q.    So he was authorized to lie?

17    A.    He's authorized to keep to his story of being an MS-13

18    gang member.

19    Q.    He was authorized to have a cover story?

12:05PM 20    A.    Yes.

21    Q.    And the cover story was a lie?

22    A.    Yes.

23    Q.    So he was authorized to lie?

24    A.    Yes.

25    Q.    And he was authorized to sell drugs?

1    A.    No, he did not sell drugs.

2    Q.    Oh, he was authorized to participate in protection

3    details?

4    A.    Correct.

5    Q.    And he wasn't authorized to sell drugs?

6    A.    No, we purchased drugs from targets, and then he did the

7    protection details.  That's not selling drugs to civilians.

8    Q.    And he was authorized to drive a gypsy cab?

9    A.    Yes.

12:05PM 10    Q.    And a gypsy cab is an illegal cab?

11    A.    Yes.

12    Q.    And you, the FBI, provided him with the very cab to do

13    that?

14    A.    Yes.

15    Q.    Now, he wasn't authorized to commit murder?

16    A.    Correct.

17    Q.    And he wasn't authorized to commit attempted murder?

18    A.    Correct.

19    Q.    Or assault with intent to murder?

12:06PM 20    A.    Correct.

21    Q.    Or robbery?

22    A.    Correct.

23    Q.    Or attempted robberies?

24    A.    Correct.

25    Q.    Now, was he authorized to bring Muerto and Brujo to the

1       Highland Street Park in Chelsea on May 12, 2015?

2       A.    We did not talk to him before that, no.

3       Q.    So he did that on his own?

4       A.    He did that with the gang, yes.

5       Q.    And then afterwards he told you that he really didn't do

6       anything?

7                 MR. POHL:  Objection.

8                 THE COURT:  I'm sorry, is there an objection?

9                 MR. POHL:  Yes.

12:06PM 10                 THE COURT:  Let me hear the question.

11                 MR. LOPEZ:  I'll strike the question, your Honor.

12      Q.    Was he authorized to participate in that attempted murder

13      of Miner Ochoa?

14                 MR. POHL:  Objection.

15                 THE COURT:  I'll allow it.  Overruled.

16      A.    He was not participating when we interviewed him.  He said

17      he drove there and that Muerto stabbed the kid, but he did not

18      stab him.

19      Q.    Can you try to answer the question I asked instead of the

12:07PM 20      question you want me to ask?  The question is did you authorize

21      him to participate in the attempted murder of Miner Ochoa?

22      A.    No.

23      Q.    And you learned later that he actually drove the person

24      who stabbed Mr. Ochoa to the scene?

25      A.    We found out almost immediately that yes, he was there.

1    Q.    And he drove them from the scene?

2    A.    Yes.

3    Q.    Now, if Mr. Guzman had done that, Mr. Guzman could be

4    charged with conspiracy to commit attempted murder, right?

5    A.    Yes.

6    Q.    But you didn't charge CW-1 with conspiracy to commit

7    attempted murder?

8    A.    No, we charged the stabber.

9    Q.    Who is now cooperating with the government?

12:08PM 10    A.    Yes.

11    Q.    So, this investigation began around March of 2012?

12    A.    I believe so, yes.

13    Q.    And the indictment was unsealed in January of 2016?

14    A.    Yes.

15    Q.    So nearly a four-year investigation?

16    A.    Correct.

17    Q.    And would you agree with me that all you needed for the

18    indictment to be filed was probable cause?

19    A.    I don't know if I can answer the way you're asking that

12:08PM 20    question.

21    Q.    Are you aware of what the standard of proof is for an

22    indictment?

23              MR. POHL:  Objection.

24              THE COURT:  Well, I mean you're asking him a legal

25    principle.  To convict someone based on an indictment, it has

1    to be proof beyond a reasonable doubt.  Put another question to

2    the witness.

3    Q.    You're an FBI agent?

4    A.    Yes, sir.

5    Q.    For 18 years?

6    A.    Yes, sir.

7    Q.    And do you know what you need in order to get an

8    indictment issued?

9    A.    I know what I need.

12:09PM 10    Q.    And you need probable cause, right?

11    A.    Yes.

12    Q.    And that's to say a crime probably was committed?

13    A.    Correct.

14    Q.    And proof that something probably happened?

15    A.    To charge, yes.

16    Q.    It's not proof beyond a reasonable doubt?

17    A.    Correct.

18    Q.    Now, before the indictment was filed -- strike that.  Did

19    you conduct any investigation into Mr. Guzman's background

12:09PM 20    before the indictment was filed?

21    A.    What kind of background?

22    Q.    Well, you're an FBI agent.  You know how to do a

23    background check, don't you?

24    A.    Yes.

25    Q.    Okay.  Did you do a background check of Mr. Guzman before

1    you filed the indictment?

2    A.    I had the evidence that the FBI had gathered over the

3    course of the investigation, and that's what I had.

4    Q.    Sir, we're going to try this again, and I'm going to ask

5    you to answer the question I asked, not the question you wanted

6    me to ask.  Did you conduct an investigation into Mr. Guzman's

7    background before you -- before the indictment was filed?

8    A.    Again, that's not a complete yes or no question.  I know

9    what you're trying to ask me, but the answer isn't a simple yes

12:10PM 10   or no the way you're asking, so --

11   Q.    Did you determine whether he was in the comado stage in

12   his membership in the gang?

13   A.    Not at all, he was not.

14   Q.    Did you determine what age he was when he became a member?

15   A.    I did not.

16   Q.    Did you determine what age he was when he got a tattoo?

17   A.    I did not.

18   Q.    Did you determine whether he was married?

19   A.    I did not.

12:11PM 20   Q.    Did you determine whether he had two children?

21   A.    I had not.

22   Q.    Did you know that -- did you determine whether he had full

23   employment?

24         MR. POHL:  Objection.

25         THE COURT:  Sustained.

1    Q.   Did you know anything about his work history?

2         MR. POHL:  Objection.

3         THE COURT:  Sustained.

4    Q.   Did you know that he was a home owner?

5         MR. POHL:  Objection.

6         THE COURT:  Sustained.

7    Q.   Did you know that he was a taxpayer?

8         MR. POHL:  Objection.

9         THE COURT:  Sustained.  All right.  Let's move on.

12:11PM 10   Q.   Now, did he have any convictions or drug dealing?

11        MR. POHL:  Objection.

12        THE COURT:  Sustained.

13        MR. LOPEZ:  Your Honor, may I approach?

14        THE COURT:  No.

15   Q.   Now, Mr. Murphy talked about the green light that was put

16   on Herzzon Sandoval?

17   A.   I don't think we ever fully -- we got word that there was

18   a green light.  I don't know if we every got proof that there

19   was a full green light issued.

12:11PM 20   Q.   I don't want to quibble with you about interpreting the

21   evidence.  That's for the jury.  My question is that at some

22   point, you went and warned Mr. Sandoval, right?

23   A.   Yes, I did.

24   Q.   Now, in that meeting in December, 2015 in Virginia, there

25   was also discussion of Mr. Guzman, right?

1    A.    I thought the transcript I read was talking about Casper,

2    not your client, sir.

3    Q.    Do you know whether or not Mr. Guzman's name was raised in

4    that meeting?

5    A.    I'd have to read the whole transcript and not the excerpt

6    that was provided to me.

7    Q.    So as you sit here today, you don't know?

8    A.    I'd have to review it.  I don't remember.

9    Q.    So you don't know today, as you sit here?

12:12PM 10    A.    I don't remember.  If I had the transcript, I could easily

11    refresh my memory.

12    Q.    Well, I think you testified that Mr. Guzman was the second

13    in command?

14    A.    That is correct.

15    Q.    By the way, what are the duties of the second in command

16    based on your experience with respect to MS-13?  What exactly

17    do they do?

18    A.    They're the second in command.  He collected dues when he

19    was -- they were hosting meetings, and if Casper wasn't around,

12:13PM 20    he would be in charge, but Casper was here, and so Casper was

21    the first word, he was the second word.

22    Q.    So, his function was primarily ceremonial?

23    A.    No, it would be like a commander in the Army and the

24    executive commander, the executive officer for the Army.

25    Q.    So you said that he collected dues?

1    A.    Yes.

2    Q.    And wouldn't the treasurer collect dues?

3    A.    No, not necessarily.

4    Q.    And I think you said that if Casper wasn't there, that he

5    would run meetings?

6    A.    He could run meetings or he'd be someone who would issue

7    commands.

8    Q.    Over the four-career investigation in this case, did you

9    come upon any meetings that Mr. Guzman started and ran?

12:14PM 10    A.    Me, personally, no.  I don't know.

11    Q.    Now, after that meeting in Virginia among the MS

12    leadership, no one warned Mr. Guzman that, as a leader, his

13    life might be in danger as well, right?

14    A.    That is right.

15    Q.    Now, I think you said that this case -- in this case you

16    targeted MS-13?

17    A.    Yes.

18    Q.    And you targeted Mr. Guzman?

19    A.    When I became included in the case, yes, and reviewing

12:14PM 20    other reports and everything, he was a target from the start,

21    yes.

22    Q.    And you used CW-1 to target MS-13.

23    A.    Yes.

24    Q.    And you imbedded CW-1 into the Eastside clique?

25    A.    That's the clique that accepted him.  We didn't just say

1    this is a clique you're in.  He -- that's who recruited him

2    into the clique.

3    Q.    And you encouraged CW-1 to try to get Eastside clique

4    members to commit violent acts, right?

5    A.    No, I would not say he recruited people on the Eastside to

6    commit violent acts.

7    Q.    Have you really listened to the tapes in this case?

8    A.    Yes, I have.

9    Q.    And you don't have any memory of CW-1 ever encouraging

12:15PM 10   Muerto or Brujo or Tigre to commit violent acts against others?

11   A.    Not the way you're suggesting, no.

12   Q.    You don't have any memory of CW-1 complaining that

13   Mr. Guzman and Mr. Sandoval didn't want people to go out and

14   commit violent acts?

15   A.    I remember a meeting where Casper, Mr. Sandoval and

16   Mr. Guzman wanted the CW-1 and Muerto punished, disciplined for

17   talking to East Coast Program leaders.  And they made the case,

18   they made the pitch, the whole clique got to listen to the

19   responses, and the clique voted that, no, they should not be

12:16PM 20   punished.

21   Q.    Let me try again.  In your review of the tapes, you

22   haven't seen any conversations where Mr. Guzman and

23   Mr. Sandoval are telling clique members not to go out into the

24   street?

25   A.    To make sure that I understand your question properly, are

1    you saying that they are telling people not to go out and do

2    violent acts?

3    Q.   Yes.

4    A.   That's a tough -- let me think how to answer that question

5    because I know how you're getting, sir.  I remember

6    conversations where I believe it was Casper, he said, "We've

7    already done our dirt."  I remember conversations where they

8    issued a punishment.

9    Q.   Sir --

12:17PM 10        MR. LOPEZ:  Your Honor, can I move to strike this

11   answer?  It's not responsive to my question.

12   A.   I'm not sure where your question --

13        THE COURT:  Hold on.  Hold on.  The precise question

14   was have you seen conversations where Guzman and Sandoval are

15   telling clique members not to go out into the street?

16        MR. LOPEZ:  That's a --

17        THE COURT:  Go out into the street.  Answer the

18   question, go ahead.

19   A.   No, I would disagree.  I would say the orders were, you

12:17PM 20   know, you need to have your presence known out on the street.

21   I don't -- the way you're phrasing the question is difficult

22   for me to answer.

23        THE COURT:  All right.  Let's stop and put another

24   question.

25   Q.   Did CW try to get Mr. Guzman to commit crimes?

1    A.    I don't know if he had asked Mr. Guzman to participate in

2    the protection detail.  Again, I'm not sure what kind of crimes

3    you're talking about.  I don't know.

4    Q.    Well, with respect to the protection detail, do you know

5    whether Mr. Guzman refused to participate?

6    A.    I know that both Mr. Sandoval and Mr. Guzman did not

7    participate.

8    Q.    Because they were working?

9         MR. POHL:  Objection.

12:18PM 10         THE COURT:  I'll let you say whatever was on the

11    tapes.

12    A.    I don't know the answer of why they did not participate.

13    I wasn't --

14    Q.    Well, as part of your investigation, wouldn't that be

15    important to know whether or not they were actively

16    participating in crimes?

17    A.    I knew they were actively participating in crimes.

18    Q.    During the course of this investigation?

19    A.    Yes.  Being the leaders of the gang --

12:18PM 20         THE COURT:  Stop.  Okay.  Put another question to him.

21         MR. MURPHY:  The last answer, your Honor.

22         THE COURT:  The last bit will be struck, yes.  Go

23    ahead.

24    Q.    Now, you encouraged CW-1 to get Joel Martinez, the Animal,

25    into the Eastside clique, right?

1    A.    We directed the CW to ask if the clique would accept him

2    into that clique, yes.

3    Q.    Well, I don't want to get into semantics here, but by

4    suggesting to CW-1 to get him into the clique, you wanted him

5    to succeed, right?

6    A.    I wanted to see if the clique leaders would accept Animal

7    into the clique.

8    Q.    So you encouraged CW to try to do that?

9    A.    We asked the CW, we listened to a phone call where Casper

12:19PM 10    talks to Animal, and he says, "Come up here so we can observe

11    you."

12    Q.    And CW persuaded Muerto to support Animal getting brought

13    into the clique, right?

14    A.    I don't know where Muerto came in other than I do know

15    that Muerto went down with the CW to bring Animal back.

16    Q.    You are the lead case agent on this case, right?

17    A.    Oh, yes.

18    Q.    Okay.  And Mr. Guzman was against the idea of Mr. Martinez

19    being jumped into the clique, right?

12:20PM 20    A.    I would say no to the way you phrased that question.

21    Q.    Is Mr. Guzman on any tape saying that he wants

22    Joel Martinez to be brought into the clique that you're aware

23    of?

24    A.    I know that in the jump-in meeting, he's a participant of

25    that meeting and he's all for it.

Q.   Well, the tape that you played doesn't show him, right?

A.   Oh, I think it does.  I remember that someone said,

pointed him out to me two -- a little over two years ago.

Q.   So what you're saying, if I understand correctly, is that

his mere presence indicated his approval, correct?

A.   It was more than his presence, he welcomed him into the

MS-13 gang.

Q.   Well, let's talk about that because that's where I was

going.  Now, early on in this case you --

12:21PM   MR. POHL:  Judge, objection.

THE COURT:  There's no question yet.

Q.   You believed that it was Mr. Guzman who said when

Mr. Martinez was jumped in, "Welcome to the Mara," right?

MR. POHL:  Objection.

THE COURT:  I'll allow that.

A.   Yes.

Q.   And you've subsequently learned that wasn't him, right?

A.   I have not learned that, no.

Q.   You have not learned that?

12:22PM   A.   My impression was he was there and he welcomed him to the

Mara.

Q.   So if you're wrong about that, that would be news to you

as the lead case agent, right?

A.   The last I remember is he was there welcoming him into the

Mara like the rest of the gang.

1    Q.    But did he say the words "Welcome to the Mara"?

2    A.    That's what I was told, yes.

3    Q.    That's what you were told?

4    A.    Yes, I don't speak Spanish.

5    Q.    Okay.  Now, would it be fair to say that this prosecution

6    has been good for your career?

7                MR. POHL:  Objection.

8                THE COURT:  It's pretty argumentative.  Sustained.

9    Q.    Well, in 2016, you were promoted to supervisory special

12:22PM 10   agent?

11   A.    I was.

12   Q.    And that position came with a pay raise?

13   A.    Not a very big one.

14   Q.    But a pay raise, nonetheless?

15   A.    Yes.

16   Q.    And a higher profile within the FBI?

17   A.    Actually, I thought I had a higher profile as a case agent

18   than I do as a supervisor.

19   Q.    And that's led to speaking engagements?

12:23PM 20   A.    I was speaking before I became a supervisor.

21   Q.    And attendance at conferences?

22   A.    I was doing that long before I ever became a supervisor.

23   Q.    And you've hosted conferences here in Boston?

24   A.    I have hosted, yes.

25   Q.    And you've talked on the campus of the University of

1    Maryland, you've talked on the campus of Boston College, right?

2    A.    I have.

3    Q.    And in 2017, you went to the annual meeting of the

4    International Association of Chiefs of Police held in

5    Philadelphia, and you gave a briefing on the FBI Gang Task

6    Force, right?

7    A.    Yes.

8    Q.    And specifically the work that you did in this case?

9    A.    Well, specifically for the work the task force did, not

12:23PM 10    just me.

11    Q.    Now, you've previously testified that CW-1 was going to be

12    charged with a Hobbs Act robbery, right?

13              MR. POHL:  Objection.

14              THE COURT:  Sustained.

15              MR. LOPEZ:  May I approach, your Honor?

16              (THE FOLLOWING OCCURRED AT SIDEBAR:)

17              THE COURT:  Well, to begin, his prior testimony is

18    hearsay, but where are you going in terms of relevance?  In

19    other words, you start with asking about previous testimony is

12:24PM 20    x.

21              MR. LOPEZ:  It's inconsistent with his current

22    testimony that he --

23              THE COURT:  We've heard nothing about Hobbs Act.

24              MR. LOPEZ:  Well, about whether or not CW-1 was going

25    to be charged for the robberies that he did with Clacker and he

1    testified here that he wasn't going to be charged, and he

2    testified previously twice and in the affidavits to the Court

3    to get a search warrant that he was going to be charged.

4        THE COURT:  First off, Hobbs Act is extortion, not

5    robbery, but, anyway, tell me where you're going with this.

6        MR. LOPEZ:  It's inconsistent testimony.

7        THE COURT:  All right.  Mr. Pohl.

8        MR. POHL:  I don't recall any testimony in this trial

9    about, you know, the nature of the charge or any of that.  I

12:25PM 10    think we left all of that out because we, you know, I think as

11    we talked about -- I think this came on Friday, it became

12    relevant because of the connection in the November trial with

13    Clacker and the fact that that came up together, but in this

14    trial we haven't talked about it.  We've had a generic

15    disclosure that there was an unauthorized activity while he was

16    cooperating, but that was --

17        THE COURT:  I don't remember any testimony about him,

18    whether he would be charged or not charged.

19        MR. POHL:  I agree.

12:25PM 20    THE COURT:  So --

21        MR. LOPEZ:  He didn't testify on direct that the CW

22    wasn't charged, that a decision subsequently was made not to

23    charge him?

24        THE COURT:  Even assuming that's true, although I

25    don't remember.  Let's assume it's true.  How is it

1    inconsistent that at one point he thought that the person would

2    be charged?  How is that inconsistent?

3          MR. LOPEZ:  Your Honor, if the plan was to charge him,

4    and it didn't happen.

5          THE COURT:  That's not a prior inconsistent statement

6    though.  That just means your plan didn't -- you know, somebody

7    overruled him or he changed his mind.

8          MR. LOPEZ:  Then he should have qualified his

9    testimony under oath that he might be charged, not that he will

12:26PM 10    be charged.

11          THE COURT:  I'm not following the whole thing, so

12    sustained.

13          (SIDEBAR CONFERENCE WAS CONCLUDED)

14   Q.   Now, I think you testified earlier that when the

15   translations that we've seen in this case, when they were done,

16   CW-1 actually had a role in determining the accuracy of the

17   tape?

18   A.   He would provide to non-El Salvadorian speaking Spanish

19   translators the slang that El Salvadorians used, so when they

12:27PM 20   would go through, they could understand what was being said.

21   Q.   And did people believe them when he told them those words?

22          MR. POHL:  Objection.

23          THE COURT:  Sustained.

24          MR. LOPEZ:  No further questions.

25          THE COURT:  Redirect.  Thank you, your Honor.

1                          REDIRECT EXAMINATION

2       BY MR. POHL:

3       Q.   Good afternoon, Special Agent Wood.

4       A.   Good afternoon, sir.

5       Q.   I only have a few questions for you.  There's been a

6       couple inquiries on cross-examination concerning the period of

7       time after the FBI recorded Animal on its -- on a video

8       recording talking about the Irvin De Paz murder and the time

9       that he was arrested.  So can I ask you, you and members of the

12:28PM 10    task force did have conversations with the Boston Police

11      Department about that, correct?

12      A.   We did.

13      Q.   All right.  And Mr. Murphy suggested you could have simply

14      given a picture of Mr. Martinez to the Boston Police

15      Department.  You've been an investigator for 18 years, correct?

16      A.   Yes.

17      Q.   All right.  And in your capacity as a federal law

18      enforcement agent, you're often called upon to meet with state

19      and local counterparts, correct?

12:29PM 20            THE COURT:  You're not allowed to lead.  Sustained.

21            MR. POHL:  Thank you.

22      Q.   In the 18 years that you've been a special agent, have you

23      met with state and local counterparts coordinating

24      investigations?

25      A.   I have.

1    Q.   All right.  And during those conversations, what kind of

2    information -- can you just tell the jury something about that?

3    When those meetings occur, what type of information are you

4    typically exchanging?

5         THE COURT:  Are you talking about in general or in

6    this case?

7    Q.   Well, let's make it specific in this case.  What kind of

8    information would you be exchanging in this case?

9         MR. MURPHY:  Objection, your Honor.

12:29PM 10        THE COURT:  I'll allow that as a very general matter.

11   A.   We would provide information that we have evidence now

12   helping solve different crimes and that we're working towards

13   indictments and we're just trying to share information that we

14   can share that's allowed by the Attorney General.

15   Q.   And one of the pieces of information in this case was the

16   recording?

17   A.   Yes.

18   Q.   All right.  And when you had -- when you and the members

19   of the task force had those meetings, were you in a position to

12:30PM 20   provide them, the FBI, with that recording?

21   A.   No.

22        MR. MURPHY:  Objection, your Honor.

23   Q.   And why not?

24        THE COURT:  I'll allow that.

25   Q.   Why not, Special Agent Wood?

1   A.   Because it would expose the identity of our cooperating

2   witness, and by the Attorney General rules, we can't release

3   that information without certain authority from higher-ups.

4   Q.   Was -- well, do you know when Joel Martinez was arrested

5   in this case?

6   A.   I believe the take-down was January 29, 2016, so our

7   arrest for most of the subjects in this case were on that day,

8   but we had fugitives that were in New York, New Jersey, other

9   parts of the country that we had to track down.

12:31PM 10   Q.   To the best of your knowledge as you sit here today, do

11   you remember when Joel Martinez was arrested in this case?

12   A.   On that day, which would have been -- I believe it was

13   January 29, 2016.

14   Q.   There was some questions during cross-examination about

15   the difference between a cooperating witness and a cooperating

16   defendant.  I want to talk to you about that for just a few

17   minutes.  In the course of your career as an FBI Special Agent,

18   can you tell the jury what it is that you mean when you used

19   the term "cooperating witness"?

12:31PM 20   A.   It's a very broad term.  The FBI has confidential

21   informants.  One branch is a CI confidential informant that

22   just provides information but no evidence.  You have to prove

23   what they tell you, it's just kind of information.  Your

24   cooperating witness actually gathers evidence that we can then

25   bring here for you to review.

1            So that's -- in this case, we used a cooperating

2    witness, not a confidential informant.

3    Q.    Okay.  Now, that's a cooperating witness?

4    A.    Correct.

5    Q.    Okay.  All right.  A "cooperating defendant."  Have you

6    heard that term used in the course of your career as a FBI

7    Special Agent?

8    A.    Yes, I have.

9    Q.    All right.  So what's the difference between a cooperating

12:32PM 10    witness -- well, first of all, what is a cooperating defendant?

11    A.    It's somebody that we have indicted, has been charged and

12    now they're seeking consideration on their sentence for

13    cooperating with the government.

14    Q.    Okay.  So, we've testified -- you've testified I think

15    several times concerning the protection details?

16    A.    Yes.

17    Q.    All right.  And so you personally were on surveillance for

18    the October 2014 protection detail, correct?

19    A.    I was, yes.

12:33PM 20    Q.    And that protection detail involved a cooperating witness,

21    correct?

22    A.    Yes.

23    Q.    And that was who?

24    A.    Pelon.

25    Q.    Okay.  And during the course of your surveillance on the

1    October 2014 protection detail, did you see or learn whether or

2    not Jose Hernandez Miguel was present?

3    A.   Yes.

4    Q.   All right.  And Jose Hernandez Miguel is who?

5    A.   Muerto.

6    Q.   And at the time -- and was Jose Hernandez Miguel the only

7    MS-13 gang member present on that protection detail?

8    A.   No.

9    Q.   All right.  And you may not have been physically present

12:33PM 10   for the protection detail before and the protection detail

11   after, correct?

12   A.   That's correct.

13   Q.   You've certainly reviewed the reports and recordings of

14   those protection details, correct?

15   A.   I have.

16   Q.   All right.  Was Jose Hernandez Miguel, to the best of your

17   knowledge, involved in all three of the protection details?

18   A.   Yes.

19        MR. MURPHY:  Objection.

12:34PM 20        THE COURT:  Sustained.  The answer will be struck.

21   Q.   Well, let me ask the question this way, Special Agent

22   Wood.  You've talked in the protection details about a

23   cooperating witness being represent for the protection detail

24   you were on, correct?

25   A.   Yes.

1    Q.    And you used undercover police officers, correct?

2    A.    Yes.

3    Q.    All right.  Sort of at the front and at the back?

4    A.    Yes.

5    Q.    All right.  Is there any other cooperating witness

6    involved in the October 2014 protection detail?

7    A.    No.

8    Q.    I think you were asked about the location of the ESLS

9    clique meetings earlier today.  At the time -- are you aware of

12:35PM 10    whether or not ESLS had clique meetings in other locations

11    other than the garage that we've seen in Exhibit 1?

12    A.    Yes.

13    Q.    All right.  You became the case agent in 2015?

14    A.    Yes.

15    Q.    All right.  At the time -- at your time in 2015, beginning

16    in 2015, was there -- where were the locations where ESLS held

17    its clique meetings?

18    A.    The garage in Everett.

19    Q.    All right.  To the best of your knowledge, as you sit here

12:35PM 20    today, do you recall any other locations besides that garage

21    that we've seen in Exhibit 1 being the location of where ESLS

22    had its clique meetings?

23    A.    I knew in one of the meetings they were outside of that

24    garage, but when I was present, all the meetings occurred at

25    that location in Everett.

1    Q.    And you testified I think on -- you were asked on

2    cross-examination concerning recordings and how you made

3    recordings in this case.  Special Agent Wood, both in terms of

4    the time you've had as the case agent and reviewing some of the

5    evidence that was gathered before you became a case agent,

6    could you estimate, as you sit here today, how many hours of

7    recordings the FBI made in connection with this investigation?

8    A.    A few thousand, if not more.  It was -- we made lots of

9    tape, we had -- as talked about with the consensual Title III

12:36PM 10    where the CW allowed us to intercept his phone calls.  That's

11    just hours upon hours of recordings.

12    Q.    And were there occasions when CW-1 advised you of a

13    meeting that you were not able to record it?

14    A.    Yes.

15    Q.    All right.  How frequently did that happen?

16    A.    It happened quite frequently.

17    Q.    In 2015, Special Agent Wood, I think you testified that

18    the pace of the recordings of ESLS had sort of picked up?

19    A.    Yes.

12:37PM 20    Q.    And one of the meetings you recorded involving a beating,

21    correct?

22    A.    Yes.

23    Q.    Involved a beating.  So I want to take a step back, not

24    talk specifically about the case but about your experience with

25    MS-13 and your conversations that you've had with other law

1    enforcement agents in El Salvador and throughout the country,

2    all right.

3          What can you tell the jury about the -- what kind of

4    person would be allowed into an MS-13 clique meeting?

5          MR. MURPHY:  Objection, your Honor.

6          THE COURT:  Sustained without a foundation.

7    Q.   Well, let me start -- maybe I'll start specifically with

8    the garage recording.  You've reviewed the clique, the recorded

9    meetings of ESLS at least in 2015, correct?

12:38PM 10    A.   Yes.

11    Q.   All right.  What time of night -- what time of day would

12    those meetings typically begin?

13    A.   It was at night.

14    Q.   All right.  And were you in a position through

15    surveillance to identify the people that were coming and going

16    from the garage?

17    A.   No.

18    Q.   Were you in a position to tell from your review of the

19    recordings whether the garage was closed or open?

12:38PM 20    A.   I believe the garage was closed.

21    Q.   And so were you -- and can you describe, when you looked

22    at the recordings, sort of what you -- how the meetings that

23    you recorded in the ESLS garage would commence?

24    A.   I believe I testified that Casper would bring them

25    together and form a group where, instead of people being here,

1    there, talking, they all came together as a group.

2    Q.   Well, let me put it this way.  What is the -- the clique,

3    the clique, itself, right, the unit of a clique, how -- well,

4    when you testified about the sort of structure of MS-13

5    previously, what's the relationship between the clique and say

6    a larger program?

7         MR. MURPHY:  Objection, your Honor.

8         THE COURT:  Overruled.

9         MR. MURPHY:  Would my objection stand, your Honor?

12:40PM 10        THE COURT:  Yes.

11   A.   The clique would report to regional East Coast or program

12   leaders, who would then report to the United States program

13   leader, who would report back to El Salvador.

14   Q.   And based on your work on this investigation and

15   conversation with other agents, does MS-13 require cliques to

16   have meetings?

17   A.   Yes, yes.

18   Q.   Okay.  And are those meetings open to the public?

19   A.   No.

12:40PM 20   Q.   So, what kind of people would be at a clique meeting?

21   A.   Homeboys.

22        MR. MURPHY:  Objection.  Hearsay.

23        THE COURT:  Sustained.

24   Q.   Special Agent Wood, Mr. Murphy, on cross-examination,

25   asked you some questions about recordings that the FBI picked

1    up in 2015 concerning conversations about Casper, correct?

2    A.    Yes.

3    Q.    Do you remember that?  All right.  And some of those

4    conversations discussed what would happen to Casper, correct?

5    A.    Yes.

6    Q.    All right.  Well, let me say this, Special Agent Wood.  I

7    think you testified earlier that MS-13 has gang rivals,

8    correct?

9    A.    Yes.

12:42PM 10   Q.    Okay.  And based on your work on this investigation, your

11   time in El Salvador, your conversations with other agents,

12   debriefing of cooperating witnesses and defendants, what does

13   MS-13 have to do to seek permission to kill a rival?

14          MR. MURPHY:  Objection, your Honor.

15          THE COURT:  Is this someone in another gang?

16          MR. POHL:  Yes, not MS-13.

17          THE COURT:  All right.  I'll permit this testimony,

18   again, as a general matter about how MS-13 -- the witness

19   believes MS-13 ordinarily operates.  Go ahead.

12:42PM 20   A.    If there's a question of the identity, or -- if this

21   person is, they're not sure if the person is a member of the

22   gang, they need to get permission from their leaders, but there

23   is a standing order that if they have solid proof and they

24   could safely get away with it, kill the person on sight.  If

25   they know that's an 18th Street gang member and they would have

140

1       their own little photographs that they collected from Facebook

2       or other social media, so they would know who was in a rival

3       gang, so if they saw them, they could assault them.

4       Q.   Well, if you had say conversations or recordings which

5       discussed whether and how to discipline somebody and if the

6       conversations involved other MS-13 gang members, what

7       conclusion would you draw concerning whether or not that person

8       that was the subject of the conversation would be in the MS-13

9       gang?

12:43PM 10           MR. MURPHY:  Objection.

11           THE COURT:  Sustained.

12       Q.   One or two last questions, Special Agent Wood.  You

13       discussed the process by which the recordings were sort of

14       formed into transcripts, correct?

15       A.   Yes.

16       Q.   All right.  And can you tell the jury -- well, at the risk

17       of going over old ground for one second, how many other agents

18       on the task force speak Spanish that were working on this case?

19       A.   Only Trooper Depena and Trooper Estevez, I believe, are

12:44PM 20       Spanish speakers from the task force.

21       Q.   All right.  And you've reviewed many of the recordings

22       that took place, that were made in 2015, correct?

23       A.   Yes.

24       Q.   And let's talk about the clique meetings themselves.  It's

25       fair to say that many of those are multi-party conversations,

1    correct?

2    A.    Yes.

3    Q.    Okay.  And it's fair to say that many of the recordings in

4    2015 were not multi-party conversations?

5    A.    Yes.

6    Q.    All right.  Mr. Murphy pulled up an example, I think, of

7    Exhibit 103.  This is the conversation with CW-1 and Animal,

8    correct?

9    A.    Yes, sir.

12:45PM 10    Q.    All right.  And that conversation -- just to remind the

11    jury, where did that conversation take place?

12    A.    In the CW's vehicle.

13    Q.    Okay.  And where was Animal seated in the vehicle?

14    A.    In the passenger's seat.

15    Q.    And in addition to that, I think you testified -- there

16    are other examples in 2015 like that of conversations you

17    gathered in this investigation from CW-1's car, correct?

18            MR. MURPHY:  Objection.

19            THE COURT:  Yes, not the content of the investigation,

12:46PM 20    but you can answer the question as to how it was gathered.  Go

21    ahead.

22    A.    Yes.

23    Q.    I'm putting up what's previously been admitted, your

24    Honor, as Exhibit Number 108.  Do you remember that photograph,

25    Special Agent Wood?

1    A.    Yes.

2    Q.    Who was seated in the passenger seat?

3    A.    That's Mr. Sandoval.

4    Q.    And that photograph came from a conversation that was

5    recorded in 2015?

6    A.    It did.

7    Q.    And what were the circumstances of that conversation being

8    recorded?

9    A.    This is where the CW, Mr. Sandoval, and Animal have a

12:46PM 10    telephone conversation.

11    Q.    All right.  Mr. Sandoval is in CW-1's car?

12    A.    Yes.

13    Q.    And seated where?

14    A.    In the passenger seat.

15    Q.    You were asked a couple questions about the -- I guess

16    what we'd call the jump-in video, the jump-in from January 8,

17    2016.  Do you recall those questions?

18    A.    Yes, I remember.

19    Q.    And we played -- you saw an excerpt of that video,

12:47PM 20    correct?

21    A.    Yes.

22    Q.    All right.  Prior to your testimony here today, have you

23    reviewed, maybe not all, but many of the recordings that were

24    made in 2015?

25    A.    Yes.

1    Q.    All right.  What can you tell the jury about the full

2    length of the full Animal jump-in video?

3    A.    It was a couple hours.  It wasn't just that.  It was a

4    longer period.

5    Q.    You were asked a couple questions, I think both by

6    Mr. Norkunas and Mr. Lopez, about nicknames?

7    A.    Yes.

8    Q.    During your time in 2015 to today, you've reviewed reports

9    of this case, correct?

12:48PM 10    A.    I have.

11    Q.    And transcripts, correct?

12    A.    I have.

13    Q.    And it's fair to say that -- well, do many of those

14    transcripts contain the gang names or nicknames of the

15    defendants throughout this case, not just seated in this

16    courtroom?

17    A.    Yes.

18    Q.    All right.  Are the spellings always consistent?

19    A.    No.

12:48PM 20    Q.    All right.  When you hear the name CheChe spelled

21    C-h-e-C-h-e --

22    A.    Yes.

23    Q.    -- and C-h-e-C-h-a?

24    A.    Yes.

25    Q.    -- do those names describe the same person?

1          MR. NORKUNAS:  Objection, Judge.

2          THE COURT:  Sustained.

3          MR. POHL:  Can I have just one moment, your Honor.

4     Thank you.

5          THE COURT:  Mr. Iovieno, recross.

6          MR. IOVIENO:  No, your Honor.

7          THE COURT:  Mr. Norkunas.

8          MR. NORKUNAS:  No, Judge.

9          THE COURT:  Mr. Murphy.

12:49PM 10          MR. MURPHY:  Briefly, your Honor.

11                    RECROSS-EXAMINATION

12     BY MR. MURPHY:

13     Q.   Special Agent Wood, you were not at the meetings between

14     the task force --

15          THE COURT:  I'm sorry.  If you're going to examine

16     from over there, can you make sure --

17          MR. MURPHY:  I'll move over here.

18          THE COURT:  Okay.  Thanks.

19     Q.   Mr. Pohl asked you about coordinating with the Boston

12:50PM 20     Police Department after you had learned that Joel Martinez

21     killed Mr. De Paz, correct?  You recall those questions?

22     A.   Yeah, I remember those questions, yes.

23     Q.   You didn't participate in that meeting, correct?

24     A.   There were several meetings, and I did participate in one.

25     Q.   When was that meeting?

1    A.    It was -- the one I participated in, I believe, was in

2    November of 2015.

3    Q.    Did you write a report about that?

4    A.    No.

5    Q.    Is there any record at all of what was discussed in that

6    meeting to your knowledge?

7    A.    No.

8    Q.    And by the time of that meeting, where was Mr. Martinez?

9    A.    New Jersey.

12:51PM 10    Q.    Did you personally meet with the Boston Police Department

11    and tell them that Mr. Martinez was back?

12    A.    No.

13    Q.    You did not, I think we've already established, provide a

14    photograph of Mr. Martinez to the Boston Police Department so

15    that they could use it in a photo array, correct?

16    A.    I did not, no.

17    Q.    And it's not your testimony, is it, sir, that there is

18    some set of Attorney General or Department of Justice or FBI

19    guidelines that says that you couldn't have shared the

12:51PM 20    photograph you had of Joel Martinez with the Boston Police

21    Department?

22    A.    No, I never testified to anything like that, no.

23    Q.    I just wanted to make that clear, sir.  You testified that

24    Mr. Martinez was arrested in connection with this case in late

25    January of 2016?

    1    A.    Yes.

    2    Q.    Did the FBI investigate -- you can just answer this yes or

    3    no with the Court's permission.  Did the FBI investigate a

    4    crime that occurred on December 27, 2015 in connection with

    5    this case?

    6    A.    You'd have to be more specific for me to answer that

    7    question.

    8    Q.    Do you know whether, in this indictment, there are charges

    9    relating to a stabbing that took place on December 27, 2015?

12:52PM 10    A.    If you're referencing two stabbings that occurred around

   11    the holidays, I am aware of two stabbings, and I'm familiar

   12    with the stabbings, yes.

   13    Q.    And who participated in those stabbings?

   14            MR. POHL:  Objection.

   15            THE COURT:  Sustained.

   16            MR. MURPHY:  Thank you, your Honor.

   17            THE COURT:  Mr. Lopez.

   18            MR. LOPEZ:  No questions, your Honor.

   19            THE COURT:  Thank you.  You may step down.

12:53PM 20            THE WITNESS:  Thank you, your Honor.

   21            THE COURT:  All right.  We have eight minutes to go.

   22    I don't ordinarily like to break early.  Are we on track,

   23    Mr. Pohl?

   24            MR. POHL:  Maybe after the break we could talk about

   25    the schedule for tomorrow.

1          THE COURT:  Okay.  We'll break early then rather than

2     have -- instead of eight minutes of testimony.  Ladies and

3     gentlemen, remember my caution not to discuss the case among

4     yourselves or with anyone else, and we'll see you tomorrow at

5     9:00.

6          THE CLERK:  All rise.

7                              - - - -

1                     C E R T I F I C A T E

2

3      UNITED STATES DISTRICT COURT )

4      DISTRICT OF MASSACHUSETTS ) ss.

5      CITY OF BOSTON )

6

7              I do hereby certify that the foregoing transcript was

8      recorded by me stenographically at the time and place aforesaid

9      in Criminal Action No. 15-10338-FDS, UNITED STATES vs. HERZZON

10     SANDOVAL, et al., and thereafter by me reduced to typewriting

11     and is a true and accurate record of the proceedings.

12             Dated this 5th day of February, 2018.

13                     s/s Valerie A. O'Hara

14             _____

15                     VALERIE A. O'HARA

16                     OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25