```
1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2


3
      UNITED STATES OF AMERICA          )
4                                       )
      vs.                               )  Criminal Action
5                                       )
      HERZZON SANDOVAL,                 )  No. 15-10338-FDS
6     EDWIN GUZMAN,                     )
      CESAR MARTINEZ,                   )
7     ERICK ARGUETA LARIOS,             )
                      Defendants        )
8


9

      BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
10


11
                        JURY TRIAL DAY 6
12


13
                        TESTIMONY ONLY
14


15        John Joseph Moakley United States Courthouse
                        Courtroom No. 2
16                      1 Courthouse Way
                        Boston, MA 02210
17
                        February 6, 2018
18                         9:00 a.m.

19


20


21


22                     Valerie A. O'Hara
                      Official Court Reporter
23        John Joseph Moakley United States Courthouse
                1 Courthouse Way, Room 3204
24                      Boston, MA 02210
                  E-mail: vaohara@gmail.com
25
```

APPEARANCES:

For The United States:

    United States Attorney's Office, by CHRISTOPHER J. POHL,
ASSISTANT UNITED STATES ATTORNEY, and KELLY BEGG LAWRENCE,
ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200,
Boston, Massachusetts 02110;

For the Defendant Herzzon Sandoval:

    Foley Hoag LLP, by MARTIN F. MURPHY, ESQ. and
MADELEINE K. RODRIGUEZ, ATTORNEY,
155 Seaport Boulevard, Boston, Massachusetts 02210;

For the Defendant Edwin Guzman:

    Lawson & Weitzen, by SCOTT P. LOPEZ, ESQ.,
88 Black Falcon Avenue, Suite 345, Boston, Massachusetts 02210

For the Defendant Erick Argueta Larios:

    THOMAS J. IOVIENO, ESQ., 345 Neponset Street
Canton, MA 02021;

For the Defendant Cesar Martinez:

    Stanley W. Norkunas, 11 Kearney Square,
Howe Building, Suite 202, Lowell, Massachusetts 01852.

1                    I N D E X

2  WITNESS                          DIRECT   CROSS  REDIRECT  RECROSS
   SHAWN RILEY
3    By Ms. Lawrence                   4
     By Mr. Iovieno                            14
4
   ROBERT IMPEMBA
5    By Ms. Lawrence                   16

6  CARLOS RIVERA
     By Ms. Lawrence                   21
7
   MICHAEL CAPASSO
8    By Ms. Lawrence                   33
   STAR CHUNG
9    By Mr. Pohl                       42
     By Mr. Norkunas                           57
10 DEBORAH HUACUJA
     By Ms. Lawrence                   59            103
11   By Mr. Iovieno                            80            105
     By Mr. Norkunas                           89
12   By Ms. Rodriguez                          92
     By Mr. Lopez                             101            107
13 JOSE HERNANDEZ MIGUEL
     By Mr. Pohl                      108
14
       EXHIBITS                          FOR I.D.   IN EVIDENCE
15
        D                                  107
16      5 and 19                                       12

17      7, 9, 10, 11, 12                                133
        11                                              27
18      14                                              38
        206, 28                                         96,
19      Portion of 28                                   99
        34.1 through 34.17                              46
20      35.1 and 35.2                                   55
        45                                              40
21      46.1, 46.2 and 46.3                             41
        49.1 and 49.2                                  109
22      51, 52, 53 and 54                               20
        68                                               7
23      69                                              14
        82.1, 82.2 and 82.3                             30
24      83.1, 84, and 86                                31
        85                                              32
25      87                                              31
        206                                             96

<pre>
 1                          TESTIMONY ONLY

 2              THE CLERK:  All rise for the jury.

 3              (JURORS ENTERED THE COURTROOM.)

 4              THE COURT:  Good morning, everyone.

 5              MR. POHL:  Good morning, your Honor.

 6              THE COURT:  Ms. Lawrence, are you ready?

 7              MS. LAWRENCE:  The government calls Shawn Riley.

 8              SHAWN RILEY, having been duly sworn by the Clerk,

 9      testified as follows:

10                       DIRECT EXAMINATION

11      BY MS. LAWRENCE:

12      Q.   Good morning.  Can you please state and spell your name

13      for the record jury, please.

14      A.   Good morning.  My name is Shawn Riley, S-h-a-w-n,

15      R-i-l-e-y.

16      Q.   Where do you work?

17      A.   I've been employed by the Massachusetts State Police since

18      June of 2000.

19      Q.   What is your title?

20      A.   I'm a trooper.

21      Q.   And, Trooper Riley, what is your current assignment with

22      the Massachusetts State Police?

23      A.   I'm assigned to the state-wide gang unit.

24      Q.   Do you have any other assignments?

25      A.   Yes, I'm also a task force officer with the FBI
</pre>

1    North Shore Gang Task Force.

2    Q.   Can you tell us a little bit about the North Shore Gang

3    Task Force and what it does?

4    A.   It's a collaborative of different agencies, local, state,

5    federal.  We investigate gangs and the various crimes that they

6    commit.

7    Q.   As part of your work with the Massachusetts State Police

8    Gang Unit, do you also investigate gangs?

9    A.   Yes.

09:12AM 10    Q.   Through your work with the task force and Massachusetts

11    State Police, have you become familiar with a gang known as

12    MS-13?

13    A.   Yes, I have.

14    Q.   And what is MS-13?

15         MR. MURPHY:  Objection, your Honor.

16         THE COURT:  I think we've been over this.  Sustained.

17    Go ahead.

18    Q.   Have you personally participated in police investigative

19    activities in connection with the MS-13 gang?

09:12AM 20    A.   Yes, I have.

21    Q.   What kinds of things have you done?

22    A.   I've partaken in surveillance of gang meetings, also

23    surveillance of controlled narcotic buys, as well as my patrol

24    function just patrolling certain areas of the Commonwealth.

25    Q.   I want to turn your attention to January 28, 2015.  Were

1      you involved in an arrest on that date?

2      A.    Yes, I was.

3      Q.    How did you get involved?

4      A.    I was notified by a trooper that I work with that his

5      informant was with an individual at a restaurant in Chelsea,

6      Massachusetts that had a firearm on them.

7      Q.    And what did you do when you received that information?

8      A.    Myself and others went to that area and conducted

9      surveillance.

09:13AM 10             MS. LAWRENCE:  Okay.  I'd like Exhibit 68 just for the

11      witness, please.

12      Q.    Trooper Riley, do you recognize the area shown in this

13      photograph?

14      A.    Yes, I do.

15      Q.    What is it?

16      A.    It's a depiction of a Casa Mariachi, which is a business

17      located on Everett Avenue in Chelsea at the corner of Walnut

18      Street.

19      Q.    Does the picture show the restaurant and the area in front

09:14AM 20      of it as it looked on January 28, 2015?

21      A.    No, it does not.

22      Q.    How is it different?

23      A.    There was a lot of snow.

24      Q.    And apart from the lack of snow in this photograph, does

25      it accurately represent the business and the sidewalk street

1    area around it?

2    A.    Yes, it does.

3            MS. LAWRENCE:  Your Honor, at this time I move to

4    admit Exhibit 68 in evidence.

5            THE COURT:  It's admitted, Exhibit 68.

6            (Exhibit No. 68 received into evidence.)

7    Q.    Trooper Riley, using this photograph, and if you'd like to

8    draw on the screen with your finger, you can, can you describe

9    what happened when you arrived at this location on January 28,

09:14AM 10    2015?

11    A.    We were conducting surveillance of that restaurant, and an

12    individual who we believed was the person that we were

13    surveilling stepped out of the restaurant and walked to this

14    area over here on the side of building, which is on Walnut

15    Street.

16    Q.    And the person that you were surveilling that day, do you

17    see that individual in the courtroom today?

18    A.    Yes, I do.

19    Q.    Can you please point him out for the jury.

09:15AM 20    A.    The gentleman sitting in the middle table right there.

21    Q.    Can you describe what he's wearing, please?

22    A.    A blue sports coat with a white shirt.

23    Q.    Okay.  Thank you.  So you saw the individual walk around

24    the corner toward Walnut Street.  What happened next?

25    A.    Myself and Trooper Christopher St. Ives decided to

approach the individual.  I pulled my cruiser down Walnut

Street and exited my cruiser and approached the individual from

the Walnut Street side in this area over here, and

Trooper St. Ives came in this area here, so we started having a

conversation with him on the sidewalk on the side of the

restaurant.

Q.   What did you say to him?

A.    Initially just identified myself.  Because we're dressed

in plain clothes, I didn't want to -- in my past experience, I

didn't want to alarm the person, so I identified myself, I

said, "State Police, can I talk to you for a minute?"  And my

badge was shown and when we started talking to the individual,

just having casual conversation, I eventually asked him, I

said, "Hey, do you happen to have a weapon on you?"

Q.   And what did he do when you asked him that?

A.   He started to look around and he backed up towards the

restaurant.

Q.   Did you do anything in response to his actions?

A.   I did.

Q.   What was that?

A.   I was standing, which would have been to his left, my

right, I immediately grabbed his left hand, and

Trooper St. Ives grabbed his right hand.

Q.   Did you do anything after that?

A.   I did.

1    Q.    What was it?

2    A.    While we had control of his hands, with my left hand, I

3    reached around his waistband from the front patting him down.

4    Q.    Did you feel anything during the pat frisk?

5    A.    I did.

6    Q.    What?

7            MR. NORKUNAS:  Objection, your Honor.

8            THE COURT:  Overruled.

9    A.    I felt what, in my experience, has taught me to be the

09:17AM 10    butt of a handgun.

11    Q.    And when you felt what you thought to be the butt of the

12    handgun, what did you do?

13    A.    I notified Trooper St. Ives of what I thought was a

14    handgun on his hip, and Trooper St. Ives reached in and pulled

15    out a handgun that was on the individual's right hip.

16    Q.    And where did he put that gun when he took it from the

17    individual?

18    A.    He put it in his pocket.  Trooper St. Ives put it in his

19    pocket.

09:17AM 20    Q.    So you're holding onto the individual.  You've taken a gun

21    from his waistband.  What happened next?

22    A.    I looked right at him, I said, "Hey, do you have a license

23    for this gun?"  And he said, "No."

24    Q.    And what did you do?

25    A.    At that point, we placed him in handcuffs and told him

1    that he was under arrest for possession of handgun.

2    Q.    Did you leave with him at that point, or what did you do

3    with him?

4    A.    Yes, eventually we transported him to the State Police

5    Barracks in Revere where he was booked.

6    Q.    And what happened to the handgun?

7    A.    It was placed into evidence.

8    Q.    Okay.  And while you were booking this individual, did you

9    learn his name?

09:18AM 10    A.    We did, yes.

11    Q.    What was his name?

12    A.    Erick Argueta.

13         MS. LAWRENCE:  For the witness, please.

14    Q.    I'm showing you what's been marked as Exhibit 5.  Do you

15    recognize the person in this photograph?

16    A.    Yes.

17    Q.    Who is it?

18    A.    Mr. Argueta.

19    Q.    The person you arrested?

09:18AM 20    A.    Yes.

21    Q.    With the gun?

22         MS. LAWRENCE:  Okay.  Next, I'm showing just for the

23    witness, please, Exhibit 19.

24    Q.    Do you recognize the man in this photograph?

25    A.    Yes.

1    Q.    And who is it?

2    A.    Again, Mr. Argueta.

3    Q.    What are those hand gestures that he is making in this

4    photograph?

5           MR. NORKUNAS:  Objection, your Honor.  Foundation.

6           THE COURT:  Sustained.

7    Q.    Do you know Mr. Argueta by another name?

8    A.    Yes.

9    Q.    What is that?

09:19AM 10          MR. NORKUNAS:  Objection, your Honor.

11          THE COURT:  Again, you'll have to lay a foundation.

12   Sustained.

13   Q.    Did you -- when you arrested Mr. Argueta and booked him at

14   the police station --

15   A.    Yes.

16   Q.    -- did you observe anything about his physical appearance?

17   A.    Yes.

18   Q.    What was that?

19   A.    He had several tattoos on his body.

09:19AM 20   Q.    Can you describe, if you remember, what those look like,

21   or any one of them?

22   A.    I'd have to see them.

23          MS. LAWRENCE:  Your Honor, I move Exhibits 5 and 19

24   into evidence at this time.

25          THE COURT:  What are 5 and 19?

1           MS. LAWRENCE:  The photographs the trooper just --

2           MR. NORKUNAS:  Objection.

3           MS. LAWRENCE:  Trooper Riley just identified.

4           THE COURT:  The two photographs?

5           MS. LAWRENCE:  Two photographs.

6           MR. IOVIENO:  My objection is to the second

7    photograph.

8           MS. LAWRENCE:  He identified the individual, your

9    Honor, in the second photograph.

09:20AM10           THE COURT:  Overruled.  5 and 19 are admitted.

11           (Exhibit Nos. 5 and 19 received into evidence.)

12   Q.   Back to the gun that you took from Mr. Argueta, you said

13   you placed it into evidence?

14   A.   Yes.

15           MS. LAWRENCE:  Permission to approach the witness,

16   your Honor.

17           THE COURT:  Yes.

18           While we're doing is that, let me give the jury an

19   instruction.  Again, all four defendants are charged with

09:20AM20   racketeering conspiracy, which I'll define for you at the end

21   of the case.  Two others are also charged with drug conspiracy,

22   which I'll also define.

23           To prove a racketeering conspiracy, the government has

24   to prove beyond a reasonable doubt a number of those things.

25   One of those things is that the defendant in question agreed to

1    or intended that one or more members of the racketeering

2    enterprise would commit two or more racketeering acts.

3         Basically, and in summary form, racketeering acts are

4    crimes, certain defined crimes under federal and state law.

5    The indictment here charges specific racketeering acts, it

6    charges specific murders, attempted murders, drug trafficking,

7    and so on.  It does not charge any firearms crimes as

8    racketeering acts.

9         There are different types of firearm crimes.  For

09:21AM 10   example, possession of a firearm without a license is a crime,

11   but that crime is not charged in the indictment, either by

12   itself or as part of the racketeering conspiracy.

13        I'm permit you to hear this evidence for whatever

14   weight you choose to give it in terms of the overall proof of

15   the racketeering enterprise, but just to be clear, this

16   defendant is not charged with a firearms crime, and no firearm

17   crime is charged as a racketeering act.

18        All right, Ms. Lawrence.

19        MS. LAWRENCE:  Thank you, your Honor.

09:22AM 20   Q.   Trooper Riley, showing you what's been marked as

21   Exhibit 69, do you recognize this?

22   A.   I do.

23   Q.   And what is it, please?

24   A.   It is a Ruger 9 millimeter handgun, and it's the handgun

25   that was taken off of Mr. Argueta.

1      MS. LAWRENCE:  Thank you.  Permission to publish to

2  the jury, your Honor?

3           THE COURT:  Well, it has to be admitted first.

4           MS. LAWRENCE:  I'm sorry.  Move to admit Exhibit 69.

5           MR. IOVIENO:  Same objection, your Honor.

6           THE COURT:  Overruled.  It's admitted.

7           (Exhibit No. 69 received into evidence.)

8           MS. LAWRENCE:  No further questions, your Honor.

9           THE COURT:  Mr. Iovieno.

09:22AM10                    CROSS-EXAMINATION

11  BY MR. IOVIENO:

12  Q.   Good morning, Trooper Riley.

13  A.   Good morning, sir.

14  Q.   My name is Thomas Iovieno.  I represent Mr. Larios.  You

15  testified that you were provided information that led you to

16  this area?

17  A.   Yes, sir.

18  Q.   And that information was provided to you by another

19  trooper?

09:23AM20  A.   Yes, sir.

21  Q.   And he indicated that the -- there was a confidential

22  informant inside the restaurant with Mr. Larios?

23  A.   Yes, sir.

24  Q.   And he reported that Mr. Larios had a firearm?

25  A.   Yes, sir.

1  Q.   And that confidential informant, do you know he was

2  identified as confidential informant CW-1?  Do you know that?

3  A.   I believe so.  Yes, sir.

4  Q.   And he's known as Pelon?

5  A.   Yes, sir.

6  Q.   And you're familiar with that name, correct?

7  A.   Yes, sir.

8  Q.   And did the trooper tell you that Pelon had given the

9  firearm to Mr. Larios?

09:23AM 10            MS. LAWRENCE:  Objection, your Honor.

11            THE COURT:  Sustained.

12  Q.   In any event, you recovered the firearm from Mr. Larios,

13  and is it fair to say that the firearm was -- did not contain

14  any ammunition?

15  A.   Yes, sir.  It did not.

16  Q.   No bullets in the chamber, nor was there a magazine inside

17  the firearm, correct?

18  A.   That is correct, sir.

19  Q.   And you subsequently charged Mr. Larios with possession of

09:24AM 20  a firearm in the Chelsea District Court?

21  A.   I believe so.  Yes, sir.

22  Q.   And that case was dismissed?

23  A.   I don't know the disposition.

24            MR. IOVIENO:  All right.  Thank you.  No further

25  questions.

1          THE COURT:  Anything else?

2          MR. NORKUNAS:  No, your Honor.

3          THE COURT:  Any redirect?

4          MS. LAWRENCE:  No redirect, your Honor.

5          THE COURT:  All right.  Thank you.  You may step down.

6          THE WITNESS:  Thank you, your Honor.

7          THE COURT:  Ms. Lawrence.

8          MS. LAWRENCE:  The government calls Carlos Rivera.

9          Your Honor, I'd like to take a witness out of order if

09:25AM10   it's okay.  We're going to call instead Robert Impemba.

11          ROBERT IMPEMBA, having been duly sworn by the Clerk,

12   testified as follows:

13                     DIRECT EXAMINATION

14   BY MS. LAWRENCE:

15   Q.    Good morning.

16   A.    Good morning.

17   Q.    Can you please state and spell your name for the jury,

18   please.

19   A.    Yes, Robert Impeba, I-m-p-e-m-b-a.

09:25AM20   Q.    Where do you work?

21   A.    I'm employed by the City of Revere, the Revere Police

22   Department.

23   Q.    What is your title?

24   A.    I'm a sergeant detective responsible for the supervision

25   of the narcotics in the gang unit.

1    Q.    Sergeant Detective Impemba, how long have you worked with

2    the Revere Police Department?

3    A.    I'm in my 13th year.

4    Q.    And what kind of work do you do as part of the narcotics

5    and gang unit?

6    A.    On the narcotics end, we do a lot of street level

7    narcotics, distribution monitoring, prepare search warrants,

8    undercover buys, confidential informant buys.  On the gang

9    side, we typically conduct FIOs, identify any impact players in

09:26AM10   our neighborhoods and try to disrupt any street level gang

11   activity or youth violence.

12   Q.    Do you have any other assignments outside the Revere

13   Police Department?

14   A.    No.  I'm assigned to the -- I'm sorry, I do.  I'm assigned

15   to the FBI North Shore Gang Task Force as part of my

16   responsibilities with the Revere Police Department.

17   Q.    And as part of your work with the North Shore Gang Task

18   Force or the Revere Police Department, are you familiar with a

19   street gang called MS-13?

09:26AM20   A.    Yes, I am.

21   Q.    And have you personally participated in investigative

22   activities related to MS-13?

23   A.    Yes, I have.

24   Q.    What kinds of things have you done in connection with that

25   investigation?

1    A.   We've assisted in controlled narcotics purchases,

2    surveillance, search warrants, that type of stuff.

3    Q.   I'm going to turn your attention to May 20, 2016.  Did you

4    participate in the execution of a search warrant on that day?

5    A.   May 20, 2016 was a consent search.  Yes.

6    Q.   And how did you get involved in that search?

7    A.   I was notified by one of the agents on my task force that

8    he had a location in Revere that he wanted to go to after

9    receiving information to search a certain area.

09:27AM 10    Q.   Do you remember the address of the location?

11    A.   I do, it was 538-540 Beach Street in Revere.

12    Q.   Was that address significant to you?

13    A.   Yes.

14    Q.   Why?

15    A.   During a series of arrests that we made relevant to an

16    investigation, it was one of the target locations.

17    Q.   Okay.  Do you know who lived there?

18    A.   I do.

19    Q.   Who was that?

09:27AM 20    A.   It was an individual identified as Jose Hernandez Miguel.

21    Q.   Do you know him by other name?

22    A.   I do, Muerto.

23    Q.   And after you got the call telling you that you wanted to

24    search that location, what did you do?

25    A.   I met the agents along with a couple of Mass. State Police

1   troopers assigned to my task force at that location.

2   Q.   And did you search that location?

3   A.   Yes, I was involved in the search of the basement area of

4   that location.

5   Q.   And I believe you said earlier you had consent to search?

6   A.   Yes, the agents assigned to my task force received consent

7   prior to responding to that address, and I believe they had the

8   building manager fill out a consent form.

9   Q.   And can you describe the search, please, and what you did?

09:28AM 10   A.   Basically, we responded directly to the common area

11   basement on the bottom level, ground level of 538-540

12   Beach Street, and I had a very specific location that we were

13   directing our attention towards.  It was under a set of stairs

14   leading into the basement.

15   Q.   And did you find anything there?

16   A.   Yes, we did.

17   Q.   What was that?

18   A.   We found a silver, grayish-type cooler bag almost, if you

19   will, that contained a semiautomatic firearm and numerous

09:29AM 20   rounds of ammunition.

21   Q.   What did you do with that, those items after you found

22   them?

23   A.   Those items were taken into our possession, brought back

24   to the Revere police station and then turned over to the Mass.

25   State Police.

1          MS. LAWRENCE:  Permission to approach?

2          MR. IOVIENO:  Judge, for the record, could we have a

3     continuing objection to this line?

4          THE COURT:  Yes.

5     Q.   Sergeant Detective Impemba, I'm showing you what's been

6     marked as Exhibit 51.  Do you recognize this?

7     A.   Yes, I do.

8     Q.   What is it?

9     A.   This is the semiautomatic firearm that we located under

09:30AM 10    the basement stairs of 538-540 Beach Street.

11    Q.   And I'm showing you what's been marked as Exhibit 52.

12    A.   Yes.

13    Q.   53 and 54.  What are these items, if you know?

14    A.   These are two boxes of 9 millimeter ammunition that were

15    located inside the bag, as well as a plastic bag containing

16    several round of .45 caliber ammunition.

17         MS. LAWRENCE:  Your Honor, I move to admit Exhibit 51,

18    52, 53 and 54 into evidence.

19         THE COURT:  All right.  They're admitted.

20         (Exhibit Nos. 51, 52, 53 and 54 received into

21    evidence.)

22         MS. LAWRENCE:  Permission to publish?

23         THE COURT:  Yes.

24         MS. LAWRENCE:  No further questions.

25         THE COURT:  All right.  Cross-examination.

 1          MR. IOVIENO:  No questions, your Honor.

 2          MR. NORKUNAS:  No.

 3          THE COURT:  Okay.  All right.  You may step down.

 4     Thank you.

 5          Ms. Lawrence.

 6          MS. LAWRENCE:  Your Honor, the government would call

 7     Carlos Rivera.

 8          CARLOS RIVERA, having been duly sworn by the Clerk,

 9     testified as follows:

10                       DIRECT EXAMINATION

11     BY MS. LAWRENCE:

12     Q.   Good morning.

13     A.   Good morning.

14     Q.   Can you please state and spell your name for the jury.

15     A.   Carlos Rivera, R-i-v-e-r-a.

16     Q.   Where are you employed?

17     A.   I'm employed with the Massachusetts State Police.

18     Q.   What's your title there?

19     A.   I'm a trooper assigned to the Violent Fugitive

20     Apprehension Task Force.

21     Q.   Trooper Rivera, can you explain what the Violent Fugitive

22     Apprehension Task Force is?

23     A.   We basically look for individuals wanted on violent felony

24     warrants in and out of Massachusetts.

25     Q.   Turning your attention to September 16, 2016, did you

1    arrest a fugitive on that day?

2    A.    Yes, I did.

3    Q.    How did you get involved?

4    A.    I'm sorry, ma'am.

5    Q.    How did you get involved?

6    A.    I received information from one of my counterparts in the

7    Boston area about an investigation he was helping the State

8    Police and FBI gang unit and led information of possible

9    subject associated with the wanted person out in the Pittsfield

09:33AM 10    area.

11    Q.    And wanted person is -- can you explain what a wanted

12    person is?

13    A.    He was warranted on a federal warrant for a RICO

14    conspiracy along with other charges.

15    Q.    Do you remember the individual's name?

16    A.    Efrain Vasques-Yanes.

17    Q.    Okay.  When you learned information -- when you got the

18    information that Mr. Vasques-Yanes might be located in the

19    Pittsfield area, what did you do?

09:33AM 20    A.    I basically advised the task force members of the

21    information we assembled.  I gathered some more information of

22    my own and we basically went to the address to try and attempt

23    to locate the subject.

24    Q.    What did you do when you arrived at the address?

25    A.    We basically showed the photo of the possible subject in

case we encountered someone in or around the house.  We
basically did a perimeter around the house to make sure the
person didn't escape if he decided to see police, and we
confirmed the address as a person of interest that he was
associated with living at the house.

Q.   Do you remember what that address was?

A.   It was 226 Bradford Street in Pittsfield.

Q.   Okay.  So after you secured the perimeter, what did you
do?

A.   We entered the -- it's a two-sided duplex.  We found the
226, looked at the mailbox, and saw the name associated with
Vasques-Yanes and at that point decided to knock at the door.

Q.   Did anyone answer?

A.   Yes.

Q.   What happened then?

A.   There was a male that answered the door after a few
minutes, broken English.  I asked what the name was in English,
and he gave his last name as being Flores and was a little
hesitant to give me his first name.  I saw he might have been a
little hesitant because of the language barrier, so I asked him
again in Spanish what the last name of the residence was.

Q.   So you speak Spanish?

A.   Yes, I do.

Q.   Did you continue the conversation with him in Spanish?

A.   Yes, I did.

1    Q.    And what did you say to him next?

2    A.    I advised I was looking for Ms. Yasmin Hernandez, which

3    was a person associated with the target.  He stated that she

4    did live at the house and was unsure if she was inside the

5    apartment or not.

6    Q.    So what did you do next?

7    A.    We asked to come in and talk to him and possibly talk to

8    Yasmin if she was there.  We basically entered, and then at

9    that point he started becoming elusive in regards to his

09:35AM 10    answers when we're asking if she was upstairs, if she was in

11    the house.  At that point, we basically started getting a

12    little suspicious.

13    Q.    And based on your suspicions, what did you do?

14    A.    We advised him that we were going to make sure that Yasmin

15    was inside the house, do a protective sweep, and see if anyone

16    else -- he also did advise that he did have a brother that was

17    sleeping upstairs possibly on the third floor.

18    Q.    So did you conduct that protective sweep of the house?

19    A.    The other officers did conduct a protective sweep as I

09:36AM 20    continued talking to Mr. Flores, and as I started talking to

21    him, I noticed some markings on his sleeve like a tattoo.  I

22    started asking, you know, what the tattoo was, and he started

23    covering up his arms as he couldn't produce any proper

24    identification when we asked him his actual name.

25    Q.    And his actions, what did his actions cause you to do

1    next?

2              MR. MURPHY:  Objection, your Honor.

3              THE COURT:  Overruled.

4              MR. MURPHY:  Just relevance.

5              THE COURT:  Okay.  Overruled.

6              MR. MURPHY:  Thank you.

7    A.   It was a little suspicious, because of the fact we were

8    looking for someone that was wanted on gang activity charges

9    from the Boston area, and in my experience, the way he was

09:37AM 10   answering my questions was being a little elusive, so for my

11   safety and the protection of the other officers that were

12   inside, I decided to place him in handcuffs just for -- until

13   we identified who he actually was.

14   Q.   And did you learn any information from the officers

15   who -- actually, let me ask you this.  Can you describe what a

16   protective sweep is?

17   A.   Protective sweep is just looking inside the house to make

18   sure no one else is hiding in any location.  That's for our

19   safety.

09:37AM 20   Q.   And you said, while you were speaking with this

21   individual, other officers were conducting the protective

22   sweep?

23   A.   Yes, ma'am.

24   Q.   Did they find anyone or anything?

25   A.   Yes, as I was talking to the gentleman on the first floor,

26

1    they advised that they had seen a gentleman on the third floor

2    peek down the stairs and then go out of view still on the third

3    floor walking around.

4    Q.    So what did you do with that information?

5    A.    At that point, the gentleman on the first floor was

6    already secured in handcuffs, trying to get his identity.  The

7    officers upstairs were trying to call the individual down to,

8    you know, make sure that they knew who he was and go from

9    there.

09:38AM 10    Q.    Did you speak with that individual eventually?

11    A.    Eventually, yes.  Once the individual came down, they

12    secured him in handcuffs to make sure and then walked him

13    downstairs and he had given a different name from the person we

14    were looking for.

15    Q.    Trooper Rivera --

16          MS. LAWRENCE:  This is for the witness only, please.

17    Q.    I'm showing you what has been marked as Exhibit 11.  Do

18    you recognize the person in this photo?

19    A.    Yes, ma'am.

09:38AM 20    Q.    Who is he?

21    A.    That's the subject, Efrain Vasques-Yanes that we were

22    looking for.

23    Q.    And did you recognize him when he was brought downstairs?

24    A.    I did.  I asked him what his name was.  He gave me the

25    alias name.  I believe the last name was Hernandez, and at that

1    point I turned the photo to him, and I said, "Who's this?"  At

2    that point, he –

3    Q.   I'm sorry, excuse me, what was on the phone -- the photo,

4    sorry.

5    A.   The photo I had on my paperwork, I flipped it over to him,

6    and I asked him, "Who is this?"  At that point, he smiled, And

7    he basically says, "Okay, you got me," and then he stated his

8    name was Efrain Vasques-Yanes.

9         MS. LAWRENCE:  Your Honor, I'd move to admit

09:39AM 10   Exhibit 11 into evidence.

11        MR. MURPHY:  Objection, relevance, your Honor.

12        THE COURT:  Overruled.  It's admitted, Exhibit 11.

13        (Exhibit No. 11 received into evidence.)

14   Q.   So you mentioned that you had Mr. Vasques-Yanes in

15   handcuffs?

16   A.   Correct.

17   Q.   At that point.  Did you find anything else during the

18   protective sweep?

19   A.   The two gentlemen were downstairs.  There seemed to be

09:39AM 20   more rooms that were in the house.  It's a three-level duplex.

21   So as they stayed downstairs, I continued assisting the

22   officers upstairs, and it appeared that on the third deck where

23   the subject was hiding or at least located, there seemed to be

24   things out of place that looked like he was attempting to hide

25   something.

Q.   Did you see anything in particular that was suspicious to
you?

A.   There was a bright green sweater that was folded in a
manner consistent and very quickly as to try to conceal
something from our view.

Q.   Okay.  And did you take that item or look at it more
closely at that time?

A.   I did not.  We had information from the officers and
detectives out here that he was known to carry and was supposed
to be carrying a firearm with him at all times due to the
propensity of violence and the threats that he has been getting
and giving.

Q.   So what did you do?

A.   We at that point decided to secure the apartment or the
duplex.  I contacted the attorneys and the FBI investigators
involved in this area.  I advised them what we had, and we
basically waited for a search warrant.

Q.   Did you eventually get a search warrant?

A.   Yes, we did.

Q.   Did you execute that search warrant?

A.   Yes, we did.

Q.   Did you find anything when you executed the search
warrant?

A.   Yes, ma'am.

Q.   What did you find?

1    A.    We actually were able to find a firearm that was inside

2    that bright green sweatshirt along with a lot of ammunition,

3    along with false documents of the name that he had given to

4    police officers, some knives and a machete.

5              MS. LAWRENCE:  Permission to approach the witness,

6    your Honor.

7              THE COURT:  Yes.

8    Q.    Trooper Rivera, I'm showing you what has been marked as

9    Exhibit 82.1.  Do you recognize this?

09:42AM 10    A.    I do.

11    Q.    What is it?

12    A.    That is basically a black semiautomatic handgun that we

13    located that day.

14    Q.    Okay.  Where was it located when you recovered it?

15    A.    That was inside the bright green sweatshirt.

16    Q.    Okay.  I'm also showing what has been marked as Exhibits

17    82.3 and 82.2.  Do you recognize these?

18    A.    That is the clip that was inside and these are the rounds

19    that's marked as .45 caliber rounds that were inside the

09:42AM 20    magazine.

21    Q.    Okay.  All wrapped up in the sweatshirt?

22    A.    Yes, ma'am.

23              MS. LAWRENCE:  I move to admit Exhibit 82.1, .2 and .3

24    into evidence.

25              MR. MURPHY:  Your Honor, may we have a continuing

30

1    objection on relevance to the --

2            THE COURT:  Yes.

3            MR. MURPHY:  Thank you.

4            THE COURT:  Overruled.  82.1, 82.2, 82.3 are admitted.

5            (Exhibit Nos. 82.1, 82.2 and 82.3 received into

6    evidence.)

7            MS. LAWRENCE:  Permission to publish?

8            THE COURT:  Yes.

9    Q.    I'm showing you now what's been marked as Exhibit 83.1.

09:43AM 10    A.    Yes, ma'am.

11    Q.    84?

12    A.    Yes, ma'am.

13    Q.    And 86.

14    A.    Yes, ma'am.

15    Q.    Okay.  Do you recognize these items?

16    A.    I do.  Those are items that were seized with the firearm.

17    It's basically ammunition for the .45 that we took into

18    evidence.

19    Q.    Is this chewing gum?

09:44AM 20    A.    It is not chewing gum.  It's pretty much a deception to

21    make believe it's chewing gum, but there's actually rounds

22    inside.

23    Q.    And were these wrapped up in the sweatshirt or found

24    somewhere else?

25    A.    I believe everything was with the firearm and sweatshirt.

1          MS. LAWRENCE:  Your Honor, I move to admit

2    Exhibit 83.1, 84, and 86 into evidence.

3          THE COURT:  They're admitted, 83.1, 84, and 86.

4          (Exhibit Nos. 83.1, 84, and 86 received into

5    evidence.)

6    Q.   Trooper Rivera, showing you what's been marked as

7    Exhibit 87, do you recognize this item?

8    A.   Yes, ma'am.

9    Q.   What is that?

10   A.   That is a butterfly knife that was located inside the

11   apartment.

12   Q.   And by butterfly, what do you mean?

13   A.   It easily opens in a fashion that would make it look very

14   flashy.

15   Q.   And where did you find this, if you remember?

16   A.   I believe it was on the third floor.

17   Q.   Okay.

18          MS. LAWRENCE:  Your Honor, I'd move to admit Exhibit

19   87 into evidence.

20          THE COURT:  All right.  It's admitted, 87.

21          (Exhibit No. 87 received into evidence.)

22   Q.   I'm showing you what's been marked as Exhibit 85.  Do you

23   recognize this?

24   A.   I do.

25   Q.   And what is it?

1      A.    That is a machete.

2      Q.    And where did you find this?

3      A.    That was located downstairs, I believe, in a closet on the

4      first floor.

5            MS. LAWRENCE:  Okay.  Your Honor, I'd move to admit

6      Exhibit 85 into evidence.

7            THE COURT:  All right.  It's admitted.  85.

8            (Exhibit No. 85 received into evidence.)

9      Q.    Trooper Rivera, do you know Mr. Efrain Yanes-Vasques by

09:46AM 10   another name?

11     A.    Just the name that he had given officers.  I don't recall

12     the actual first name, but I know the last name was Hernandez.

13     I'd have to refer to my report to get the exact.

14           MS. LAWRENCE:  No further questions for this witness,

15     your Honor.

16           THE COURT:  Cross?

17           MR. IOVIENO:  Nothing, your Honor.

18           MR. NORKUNAS:  No.

19           THE COURT:  Okay.  Thank you.  You may step down.

09:47AM 20   THE WITNESS:  Thank you, sir.

21           MS. LAWRENCE:  The government calls Michael Capasso.

22           MICHAEL CAPASSO, having been duly sworn by the Clerk,

23     testified as follows:

24           THE WITNESS:  Good morning, your Honor.

25

1                          <u>DIRECT EXAMINATION</u>

2     BY MS. LAWRENCE:

3     Q.    Good morning.

4     A.    Good morning.

5     Q.    Could you please say and spell your name for the jury?

6     A.    My name is Michael Capasso.  And did you say spell it?

7     Q.    Just the last name.

8     A.    C-a-p-a-s-s-o.

9     Q.    And where do you work?

09:48AM 10    A.    Somerville Police Department.

11    Q.    Do you have a title?

12    A.    I do.

13    Q.    What is it?

14    A.    Detective sergeant.

15    Q.    How long have you worked for the Somerville Police

16    Department?

17    A.    Ten years.

18    Q.    And what is your current assignment?

19    A.    My current assignment is the gang unit supervisor.

09:48AM 20    Q.    Have you held other assignments with the Somerville Police

21    Department?

22    A.    I have.

23    Q.    And what are those?

24    A.    Patrol officer and narcotics detective.

25    Q.    Focusing on January 2015, what kind of police work were

1    you doing at that time?

2    A.    I was assigned to the patrol unit.

3    Q.    And what kinds of activities did you do with the patrol

4    unit?

5    A.    That was a uniformed division, so I would answer any calls

6    that came into the 9-1-1 center, whether they be emergency or

7    just calls for service.

8    Q.    Were you working on the night of January 1, 2015?

9    A.    I was.

09:48AM 10    Q.    Did you take a call that night?

11    A.    Yes.

12    Q.    And where did you go?

13    A.    7 Cross Street.

14    Q.    And why did you go to 7 Cross Street?

15    A.    We received an unknown trouble 9-1-1 call.

16    Q.    Okay.  What did you do when you responded to

17    7 Cross Street?

18    A.    We went to the -- the house that we went to was a third --

19    apartment number 3.  We entered the house with -- I entered the

09:49AM 20    house with two of my fellow police officers.

21    Q.    And what did you do when you arrived at the third floor

22    apartment?

23    A.    When I entered the house, I observed a Hispanic male

24    sitting on the couch who was pointing to a bedroom door.

25    Q.    Did you talk to him?

1    A.    I did not, no.

2    Q.    Did anyone else talk to him?

3    A.    Yes, one of my colleagues.

4    Q.    Did they say anything?

5    A.    They did have a conversation, which we later discovered.

6    Would you like me to --

7    Q.    No, no.  You said he was pointing at a door?

8    A.    Correct.

9    Q.    And what did you do when you saw him pointing at the door?

09:49AM 10    A.    I knocked on the door.

11    Q.    What happened?

12    A.    After a brief delay, I heard the door lock.

13    Q.    Did anyone speak on the other side of the door?

14    A.    No.

15    Q.    You heard the door lock.  What did you do next?

16    A.    As soon as I heard the door lock, I heard somebody running

17    away from the door.  At that point, I announced to my partner

18    that I was going to force open the door due to the fact that we

19    were there for unknown trouble, and I did not know what was

09:50AM 20    going on behind that now locked door.

21    Q.    Did you force the door open?

22    A.    No, I did not.

23    Q.    Why?

24    A.    Because as I was about to force the door, a female opened

25    the door ever so slightly with just enough room that her head

1    popped out.

2    Q.    Did you speak to her?

3    A.    No, one of my colleagues did.

4    Q.    Why didn't you talk to her?

5    A.    She did not speak English, and I don't have any bilingual

6    skills.

7    Q.    And your colleague did speak Spanish?

8    A.    Yes, he's now Lieutenant Jaliveira (ph.), he spoke to her

9    in Spanish.

09:50AM 10    Q.    Okay.  After he spoke to her, what happened?

11    A.    We entered the bedroom to do a protective sweep.  Again,

12    based on the unknown trouble call, we needed to make sure that

13    nobody was in there that needed any medical assistance or was

14    injured.

15    Q.    And when you entered the bedroom, what did you see?

16         MR. MURPHY:  Objection.  Relevance.  And may we have a

17    continuing objection?

18         THE COURT:  Overruled.  And, yes, you may have a

19    continuing objection.

09:51AM 20         MR. MURPHY:  Thank you, your Honor.

21    Q.    When you entered the bedroom, what did you see, Sergeant

22    Detective Capasso?

23    A.    On the right-hand side of the room, I saw a bed with an

24    infant crying, and I saw behind the bed was a walk-in closet

25    with the lights on with no door, and on the left-hand side, I

37

1    saw an opened window with a blanket blowing due to the frigid

2    cold and the wind blowing the blanket open.

3    Q.    Were there any other individuals in the room besides the

4    baby and the woman who let you in?

5    A.    Yes, there was.

6    Q.    Who?

7    A.    Jose Andrade.

8    Q.    Where was he located?

9    A.    Jose was directly across from the window laying kind of

09:52AM 10    sideways with his feet on the ground and his upper torso on the

11    bed itself near the baby.

12        MS. LAWRENCE:  Could I have Exhibit 14 for the

13    witness, please.

14    Q.    Sergeant Detective Capasso, do you recognize the person in

15    this photograph?

16    A.    Yes, I do.

17    Q.    And who is it?

18    A.    That would be Mr. Andrade.

19    Q.    The person you said was in the bedroom that evening?

09:52AM 20    A.    Correct.

21        MS. LAWRENCE:  I move to admit Exhibit 14 into

22    evidence, your Honor.

23        THE COURT:  This is Exhibit 14?

24        MS. LAWRENCE:  Yes, it is.

25        THE COURT:  Yes, it's admitted, 14.

1                    (Exhibit No. 14 received into evidence.)

2        Q.    What did you do after you entered the room and observed

3        the window open, Mr. Andrade on the bed?

4        A.    I went up to Mr. Andrade and conducted a pat frisk of his

5        person to make sure he was not concealing any weapons.

6        Q.    Was he concealing any weapons?

7        A.    No.

8        Q.    And what happened after that?

9        A.    At that point, I instructed my colleague, Officer Cicerone

09:53AM 10       to wait with Mr. Andrade while I conducted a quick sweep of the

11       walk-in closet to make sure that there was nothing in there

12       that would potentially harm us.

13       Q.    Did you find anything in the closet?

14       A.    No, I did not.

15       Q.    Did you do anything else in the room?

16       A.    I did.

17       Q.    What?

18       A.    I looked out the window because I thought it was odd that

19       the window at the time of night with a sick child crying on the

09:53AM 20       bed would be open with no screen, insect screen, so I popped my

21       head out the window to take a look outside.

22       Q.    Why did you think it was odd that the window was open?

23       A.    It was 10:40 at night, it was freezing out.  I don't

24       remember exactly how cold, but it was uncomfortably cold out,

25       and due to the fact that the baby was sick, according to the

1    mom, it didn't make any sense for a window to be opened at that

2    time of night with the cold.

3    Q.    When you popped your head out the window, did you see

4    anything?

5    A.    I did.

6    Q.    What did you see?

7    A.    I could see the side yard of a house leading to the

8    backyard of the house that was across the street.

9    Q.    But you didn't see -- was that unusual for you to look out

09:53AM 10    the window and see the side of the house?

11    A.    No, no.

12    Q.    Okay.  What did you do after you looked out the window?

13    A.    I advised my colleagues that I believed Mr. Andrade had

14    possibly thrown something out the window, and I was going to go

15    outside and check.

16    Q.    Okay.  And did you go check?

17    A.    I did.

18    Q.    Okay.  Describe where you went after you left the bedroom.

19    A.    So when I was still in the room, I had looked outside,

09:54AM 20    obviously, to find out where I was based on where the window

21    was and straight down.  So I went to that spot outside, looked

22    up, confirmed that it was the same exact spot that I had been

23    looking out.

24    Q.    Okay.  And when you were outside, did you find anything?

25    A.    I did find -- I found a firearm resting on top of a pile

1      of leaves.

2             MS. LAWRENCE:  Exhibit 45 for the witness, please.

3             THE WITNESS:  I'm sorry, could you repeat that?

4             MS. LAWRENCE:  I was just bringing up a picture.

5      Q.    Sergeant Detective Capasso, do you recognize this

6      photograph?

7      A.    Yes, I do.

8      Q.    And what is it?

9      A.    That would be the firearm that I located on the side of

09:54AM 10    the house.

11            MS. LAWRENCE:  Your Honor, at this time I move to

12     admit Exhibit 45 into evidence.

13            MR. IOVIENO:  I object, your Honor.

14            THE COURT:  That's this photo?

15            MS. LAWRENCE:  Yes, it is.

16            THE COURT:  All right.  Overruled.  It's admitted.

17     45.

18            (Exhibit No. 45 received into evidence.)

19     Q.    What did you do when you saw the gun lying on top of the

09:55AM 20    leaves?

21     A.    I yelled out to my colleagues that I located a firearm,

22     and subsequently they went upstairs and placed Mr. Andrade in

23     our custody.

24     Q.    Okay.  And what did you do with the firearm?

25     A.    I contacted Detective Thermidor from the Somerville Police

1    Criminal Investigation Division.  He came by and photographed

2    the firearm.

3            MS. LAWRENCE:  Permission to approach, your Honor?

4            THE COURT:  Yes.

5    Q.   Sergeant Detective Capasso, I'm showing you what's been

6    marked as Exhibit 46.1, 46.2 and 46.3.  Do you recognize these

7    objects?

8    A.   I do.

9    Q.   What are they?

09:56AM 10    A.   That would be the firearm and the magazine from the back

11    yard.  It's okay to open these?

12    Q.   You can open them, if you like.

13    A.   Ammunition.  Yeah.

14            MS. LAWRENCE:  The government moves to admit 46.1, .2,

15    and .3 into evidence.

16            THE COURT:  They're admitted, 46.1, 46.2, 46.3.

17            (Exhibit Nos. 46.1, 46.2 and 46.3 received into

18    evidence.)

19    Q.   Sergeant Detective Capasso, did you know Mr. Andrade by

09:56AM 20    any other name?

21    A.   I believe that he went by an alias name as "Triste," and I

22    heard rumors that --

23            MR. IOVIENO:  Objection.

24            THE COURT:  Sustained.  Stop there.

25            MS. LAWRENCE:  Thank you.  No further questions, your

 1    Honor.

 2              THE COURT:  Any cross?

 3              MR. IOVIENO:  No, your Honor.

 4              THE COURT:  All right.  You may step down.

 5              THE WITNESS:  Thank you, your Honor.

 6              MR. POHL:  Your Honor, at this time the government

 7    calls Star Chung.

 8              STAR CHUNG, having been duly sworn by the Clerk,

 9    testified as follows:

10              THE WITNESS:  Good morning, your Honor.

11              MR. POHL:  May I inquire, your Honor?

12              THE COURT:  Yes.

13              MR. POHL:  Thank you.

14                          DIRECT EXAMINATION

15    BY MR. POHL:

16    Q.    Good morning.

17    A.    Good morning, sir.

18    Q.    Can you please introduce yourself to the ladies and

19    gentlemen of the jury?

20    A.    Yes.  Good morning, jurors.  My name is Officer

21    Star Chung.

22    Q.    Could you spell your last name for the record?

23    A.    Yes, C-h-u-n, as in November, g.

24    Q.    Where do you work?

25    A.    Chelsea Police Department.

1    Q.    How long have you worked for the Chelsea Police

2    Department?

3    A.    Eight years now, sir.

4    Q.    And what is your current assignment, Officer Chung?

5    A.    I'm in patrol, I work overnights.

6    Q.    From when to when?

7    A.    11:30 at night to 7:30 in the morning.

8    Q.    Officer Chung, let me direct your attention to

9    December 14, 2014.  Do you remember if you were working on that

09:58AM 10    date?

11    A.    Yes.

12    Q.    All right.  Let me direct your attention to the early

13    morning hours of December 14, 2014.  Do you remember, did you

14    receive a radio call?

15    A.    Yes.

16    Q.    And what was the radio call for?

17    A.    It was a call for a victim of a gunshot wound, shots

18    fired.

19    Q.    Okay.  And do you remember where the shots fired call

09:59AM 20    directed you to go?

21    A.    Yes, an address on Chester Avenue.

22    Q.    Okay.  And what did you do when you got the radio call?

23    A.    I began responding to the scene.

24    Q.    And you pull up to -- is there a particular address on

25    Chester Avenue that you pulled up to, Officer Chung?

1   A.    Yes, 60 Chester Avenue specifically was called in for

2   Apartment Number 2.

3   Q.    Now, let me ask you, Officer Chung, we're talking about

4   December 14, 2014.  Before that date, before December 14, 2014,

5   were you familiar with that address, 60 Chester Avenue?

6   A.    Yes, sir.

7         MR. MURPHY:  Objection, your Honor.

8         THE COURT:  Sustained.

9   Q.    All right.  Officer Chung, you pulled up, got to

10:00AM 10  60 Chester Avenue.  Why don't tell the ladies and gentlemen of

11  the jury what you saw when you pulled up.

12  A.    Upon my approach, there was a male party out in the front

13  area of said address.  When I pulled up, I noticed that he was

14  holding onto his left pectoral area.

15  Q.    What did you do when you saw that?

16  A.    At that point, I asked him if he was hurt, if he's been

17  shot due to the nature of the call, in which -- at that point I

18  lifted up his shirt and could see that there was a gunshot

19  wound.

10:00AM 20  Q.    What did you do next?

21        MR. MURPHY:  Objection, your Honor, relevance.  And

22  again, may we have a continuing objection to this subject

23  matter?

24        THE COURT:  Yes, overruled, and you may have the

25  continuing objection.

1              MR. MURPHY:  Thank you.

2       Q.   Officer Chung, you lifted up the individual's shirt,

3       correct?

4       A.   Yes, sir.

5       Q.   Saw he had a gunshot wound?

6       A.   Yes, sir.

7       Q.   What's the next thing that you did?

8       A.   I hailed for EMS Cataldo for medical aid.

9              MS. LAWRENCE:  And can we have Exhibit 34.1 for the

10:01AM10      witness, please.

11      Q.   All right.  So, Officer Chung, do you see the photograph

12      in front of you on your screen?

13      A.   Yes, sir.

14      Q.   Do you recognize that location?

15      A.   60 Chester Ave.

16      Q.   Okay.  And I'm going to quickly walk you through a series

17      of photographs that follow that I think you reviewed before

18      your testimony here today.  I want you to quickly take a look

19      at them.

10:02AM20           Have you seen those pictures before your testimony

21      here today?

22      A.   Yes.

23      Q.   All right.  Do you recognize those?

24      A.   Yes.

25      Q.   And how do you recognize them?

1    A.    I was there on scene that night.

2    Q.    Those pictures are from -- do they accurately depict

3    60 Chester Avenue, Apartment 2 as you saw it on December 14,

4    2014?

5    A.    Absolutely.

6          MR. POHL:  All right.  I'd move to admit Exhibits 34.1

7    through 34.17 and ask your permission to publish to the jury,

8    your Honor.

9          MR. MURPHY:  Same objection, your Honor.

10:02AM 10          THE COURT:  All right.  Overruled.  They're admitted.

11    34.1 through 34.17.

12          (Exhibit Nos. 34.1 through 34.17 received into

13    evidence.)

14    Q.    All right.  Officer Chung, why don't you take us through

15    these pictures as you were there that night.  On -- what are we

16    looking here with 34.1?  It's the first picture in the

17    sequence.  What's this?

18    A.    This is the front area to 60 Chester Ave.

19    Q.    All right.  So where -- I think you testified a moment ago

10:03AM 20    about the person you encountered who had a gunshot wound to his

21    chest.  Where was that person when you pulled up to 60 Chester

22    Ave.?

23    A.    He was actually on the center steps to the left of

24    60 Chester Ave.

25    Q.    So just out of view of this photo?

1    A.    Yes.

2    Q.    All right.  And when you pulled up to 60 Chester Avenue,

3    how did you and -- where did the person with the gunshot wound,

4    did you walk to him, did he walk to you?  What happened?

5    A.    As soon as we arrived and he saw us, he immediately went

6    to his feet and went to us to seek for help.  Now, we met right

7    in the middle where 60 Chester Ave. was.

8    Q.    Okay.  And did you have a conversation with that

9    individual?

10:03AM 10    A.    Yes.

11    Q.    Did you later learn his name?

12    A.    Yes.

13    Q.    And what was his name?

14    A.    His name was Saul Rivera.

15    Q.    And based on that conversation that you had with

16    Mr. Rivera, what did you try to do next?

17    A.    At that point, I applied pressure to his wound while we

18    were waiting for Cataldo.  He also informed us of what

19    occurred, and then at that point through the authorization of

10:04AM 20    our street supervisor, we attempted to make entry to the front

21    common door.

22    Q.    Of 60 Chester Ave.?

23    A.    Yes, sir.

24    Q.    And why did you want to go inside 60 Chester Avenue?

25    A.    Because Saul said that there were other -- possible other

1    victims upstairs who were also shot.

2    Q.    Okay.  The front door that you were talking about is --

3    you can actually -- Officer Chung, you can actually draw on it

4    with your finger on the screen.

5    A.    Yes.

6    Q.    What's the 60 Chester Avenue front door that you're

7    talking about?

8    A.    (Witness drawing on diagram)

9    Q.    Right there, okay.  Thank you.  When you got to the front

10:05AM 10   door of 60 Chester Avenue and you tried to go inside, what

11   happened?

12   A.    The door was locked.

13   Q.    What did you do?

14   A.    At that point, we hailed for the fire department to come

15   by to assist in the forced entry.

16   Q.    Did you get inside the door?

17   A.    Yes, sir.

18   Q.    All right.  When you got inside the door, what did you

19   see?

10:05AM 20   A.    Trails of blood.

21   Q.    All right.  So let's go through some of these pictures

22   quickly.  Let's go to 2.  All right.  What do you see here,

23   Officer Chung?

24   A.    I see, again, the front steps of 60 Chester Ave. and some

25   blood particles.

1    Q.    Okay.  3.

2    A.    This is the other view to 60 Chester Ave. and also there

3    are some blood droplets there.

4    Q.    4.

5    A.    A closer zoomed in view of 60 Chester Ave. front steps

6    with the blood droplets.

7    Q.    5, please.  Is this the front door?

8    A.    The front door now ajarred with the -- some blood droplets

9    on the door.

10:06AM 10    Q.    6?

11    A.    Closer look of the blood droplets on the door.

12    Q.    7.  Where is this, Officer Chung?

13    A.    This is as soon as you open the door and you could see the

14    blood droplets of blood.

15    Q.    And there's a stairway.  That's fine.  The next

16    photograph, there's a stairway essentially right as you enter

17    that front door?

18    A.    Yes.

19    Q.    What did you do when you got to those stairs?

10:06AM 20    A.    Due to the possible presence of a firearm, all officers

21    drew our department-issued firearm.

22    Q.    Where did you go next?

23    A.    At that point, we went up to the second landing.

24    Q.    When you got to the -- next photograph, please.  Stairs?

25    A.    Stairs leading up to the second landing.

1   Q.   Down on the left-hand side of the stairs, you see what?

2   A.   The left-hand side of the stairs, there's also blood

3   droplets on those steps.

4   Q.   All right.  So I think I could -- am now caught up to you.

5   This is the second floor landing?

6   A.   Yes.

7   Q.   What do you see right before the door?

8   A.   There's a yellow item there, there's also some blood

9   droplets there.

10:07AM 10   Q.   All right.  So you said that -- I think you used the word

11   "we," "We drew our service weapons."  Were you with other

12   officers at this time?

13   A.   Yes, sir.

14   Q.   All right.  How many officers approached the door to the

15   second floor landing?

16   A.   There were three of us, including myself.

17   Q.   Okay.  And when you got to the second floor landing,

18   Officer Chung, what did you do then?

19   A.   At that point actually a female tenant came out from the

10:08AM 20   second, apartment 2.

21   Q.   And what happened next?

22   A.   That's when my street supervisor, Lieutenant Sanchez,

23   engaged her at the door, spoke to her in Spanish gaining

24   consent to enter.  She let us in.

25   Q.   All right.  So there's three of you.  Do you remember the

1    sequence of officers who went in and -- sort of in what order?

2    A.    Yes, sir.

3    Q.    And what was that?

4    A.    It was Lieutenant Sanchez guiding point, Officer Tom Riley

5    in the middle and myself in the rear.

6    Q.    Okay.  So where did the -- the first two officers that you

7    just mentioned, where did they go in the apartment?

8    A.    At that point, they conducted a protective sweep of the

9    apartment, they entered, and they split into the rooms.

10:08AM 10    Q.    And looking for what?

11    A.    For presence of a weapon, any other suspects hiding,

12    victims.

13    Q.    All right.  What did you do when you went in the

14    apartment?

15    A.    As soon as I entered the apartment, there was a bathroom

16    to my right with the door ajarred, in which I could see a male

17    party lying on the floor.

18    Q.    The next photograph, please.  Is that the bathroom,

19    Officer?

10:09AM 20    A.    Yes, sir.

21    Q.    All right.  You come in the front door and the bathroom is

22    where?

23    A.    To my right, immediate right.

24    Q.    All right.  Can you tell the ladies and gentlemen of the

25    jury what you're seeing, what you see in the bathroom floor?

1    A.    Ladies and gentlemen of the jury, in the bathroom floor

2    here, I saw a male party on the floor in a fetal position,

3    which actually his -- may I?

4    Q.    Yes.

5    A.    With his head facing this way towards the door.

6    Q.    What did you do when you saw the man lying on the

7    bathroom?

8    A.    At that point, I immediately engaged him.  I checked him

9    for injuries.  I noticed that he was not breathing.  He was

10:10AM 10    also unconscious.  I lifted up his shirt and checked for

11    injuries, and indeed there were gunshot wounds.

12            THE COURT:  I'm sorry, Officer, can you -- the mic is

13    very sensitive.  If you could just move maybe an inch further

14    away.

15            THE WITNESS:  Like this, your Honor?

16            THE COURT:  Yes.  Thank you.

17            THE WITNESS:  No problem, sir.

18            MR. POHL:  Thank you, your Honor.

19    Q.    All right.  Officer Chung, you lifted up the shirt of the

10:10AM 20    man on the bathroom floor?

21    A.    Yes.

22    Q.    All right.  And what did you see?

23    A.    Gunshot wounds.

24    Q.    What did you do then?

25    A.    At that point, I immediately conducted chest compressions

1    and rendered medical aid.

2    Q.    The person wasn't breathing?

3    A.    No, sir.

4    Q.    And how long did you do that for?

5    A.    I did it for at least two rounds for chest compressions,

6    which are at 30 intervals.

7    Q.    After you had completed doing chest compressions, what

8    happened?

9    A.    At that point, Cataldo subsequently came up behind me, and

10:11AM 10   they took over medical aid.

11   Q.    Were you present when the -- maybe everybody knows this,

12   maybe they don't.  Cataldo are emergency technicians, right?

13   A.    Paramedics, yes.

14   Q.    And were you there when the paramedics attempted to help

15   the person in the bathroom?

16   A.    Yes, sir, but they removed him from the bathroom to give

17   them a little bit more space.

18   Q.    Okay.  Where did they bring the individual that you had

19   done chest compressions on?  Where did they bring in the

10:11AM 20   apartment?

21   A.    They brought him out into the hallway and brought him more

22   into the kitchen space where there was more space.

23   Q.    Okay.  Next photograph, please.  What are we seeing here,

24   Officer Chung?

25   A.    This is behind us would be the entryway, behind us to the

1    right would be the bathroom, and this is the hallway leading

2    out into the kitchen with the blood droplets on the floor and

3    the big puddle of blood there was where he was worked on.

4    Q.    Next photograph, please.

5    A.    Again, this is the -- a more open view of the kitchen

6    space as you're standing immediately inside of it, and right

7    there is the some of the tools paramedics used during the

8    medical aid of the victim.

9    Q.    And, Officer Chung, let's take a step back.  Do you

10:12AM 10   see -- what do you see on the kitchen counters, on the table,

11   on the table against the window there?

12   A.    A large amount of beer cans.

13   Q.    Okay.  Next photograph, please.  Is this just a reverse

14   angle of the same picture we were looking at before?

15   A.    Yes, sir.

16   Q.    All right.  What do you see on the floor?

17   A.    On the floor you see the big puddle of blood here where

18   the victim was worked on.  Again, you see the beer bottles

19   lining the apartment.

10:13AM 20           MR. POHL:  Can we have Exhibit 35 for the witness,

21   please.

22   Q.    Officer Chung, I'm going to show you, I think there's two

23   pictures.  Let me show you both.  35.  This is Exhibit 35.1 and

24   .2.  Do you recognize those?

25   A.    Absolutely, sir.

1    Q.    How do you recognize them?

2    A.    This is the rear porch of 60 Chester Ave.

3    Q.    Okay.  And did you see -- did you take a look outside onto

4    the porch when you were there on December 14, 2014?

5    A.    Yes, I did.

6    Q.    All right.  And do those fairly and accurately capture how

7    the porch looks?

8    A.    Absolutely.

9         MR. POHL:  Your Honor, I'd offer 35.1 and 2 into

10:14AM 10   evidence and ask to publish.

11        THE COURT:  All right.  They're admitted.

12        MR. POHL:  Thank you.

13        (Exhibit Nos. 35.1 and 35.2 received into evidence.)

14   Q.    All right.  Officer Chung, what are we looking at here?

15   A.    This is another angle of the rear porch.

16   Q.    Okay.  And .2.

17   A.    And, again, this is the other angle.

18   Q.    Okay.  So to get to the porch from the apartment, what did

19   you do?

10:14AM 20   A.    You'd have to enter through the kitchen, open up the rear

21   door, and then it leads out to the rear porch.

22   Q.    Okay.  Officer Chung, what happened next that night while

23   you were at 60 Chester Avenue?

24   A.    At that point, Cataldo attempted to work on the gentleman

25   like I've mentioned, and then they shipped him for transport.

```
 1    Q.    You remained on scene?

 2    A.    I was on scene.  I spoke to other roommates who were in

 3    the living quarters.

 4    Q.    Okay.  And after the conversations that you had with those

 5    individuals, what did you do next?

 6    A.    At that point, I was cleared to go back to the station to

 7    write the report.

 8    Q.    While you were writing the report of what transpired that

 9    night, Officer Chung, did you learn the name of the person that
```

10:16AM 10    was on the bathroom floor that you gave chest compressions to?

```
11    A.    Yes.

12    Q.    And who was that?

13    A.    Javier Ortiz.

14    Q.    And while you were writing your report, Officer Chung, did

15    you receive an update as to Mr. Ortiz' medical condition?

16    A.    Yes.

17    Q.    What did you learn?

18    A.    I learned that he succumbed to his injuries and as a

19    result was pronounced deceased at 4:01 in the morning.
```

10:16AM 20             MR. POHL:  Thank you very much.

```
21             THE WITNESS:  Thank you, sir.

22             THE COURT:  Cross-examination.

23             MR. IOVIENO:  No.

24             MR. NORKUNAS:  If I might, Judge, just briefly.

25
```

1                      CROSS-EXAMINATION

2    BY MR. NORKUNAS:

3    Q.   Good morning, Officer.

4    A.   Good morning, sir.

5    Q.   You looked at a series of photographs relative to

6    60 Chester Ave. in this particular case.  And if I could just

7    have you -- I think it's 34.3, the front door.  The next one,

8    please.  That actually shows the door.  In relation to this

9    particular area, would it be fair to say when you examined that

10:17AM 10   there did not appear to be any forced entry to that door?

11   A.   Yes.

12   Q.   You're saying yes.  You mean there was not any evidence?

13   A.   There was no forced entry to the door, correct, sir.

14   Q.   And there is not a photograph of the door entering the

15   individual apartment up on the second floor, correct?

16   A.   Correct.

17   Q.   Was there any evidence to your memory that there was any

18   type of forced entry to that door?

19   A.   Which one, sir, the second floor landing?

10:18AM 20   Q.   Second floor entry?

21   A.   No, sir.

22   Q.   And if we could show the kitchen area on -- I think it

23   would probably be four more up.  This area.  It did not

24   appear -- when you went into that area of the apartment, there

25   did not appear to be any evidence that there had been a

1    physical struggle; is that fair to say?

2    A.    Yes.

3    Q.    Nothing -- there's obviously disarray from the EMTs that

4    were trying to administer to the person, but nothing is thrown

5    about, knocked about.  There's cans and bottles on tops of the

6    tables and counters, right?

7    A.    Yes.

8              MR. POHL:  And if we could have the next photograph,

9    please.

10:18AM 10   Q.    The view there, there's a significant amount of blood

11   there, but appeared that there was nothing disarrayed on the

12   countertops as well, correct?

13   A.    Yes.

14   Q.    And you indicated -- I believe you indicated the body was

15   found in the bathroom?

16   A.    Yes.

17   Q.    But it appears that he was treated in the kitchen.  Did

18   the EMTs bring him out or did he come out on his own to that

19   spot?

10:19AM 20   A.    I testified earlier, sir, that the EMTs brought him out

21   from the bathroom into the hallway and into the kitchen where

22   there was more space.

23   Q.    When you -- you had also testified to there was a rear

24   door going out to a back porch, correct?

25   A.    Yes, sir.

1    Q.    Was there any evidence that that had been a forced entry

2    or broken entry?

3    A.    No, sir.

4    Q.    And then there was an actual exterior door to the porch as

5    well, correct?

6    A.    Yes.

7    Q.    Was that, again, appeared to be broken or forced in any

8    way?

9    A.    No, sir.

10:19AM 10        MR. NORKUNAS:  Thank you.  I have nothing further,

11   Judge.

12        THE WITNESS:  Thank you, sir.

13        THE COURT:  Redirect?

14        MR. POHL:  No, your Honor.  Thank you, Officer.

15        THE COURT:  Thank you.  You may step down.

16        THE WITNESS:  Thank you, your Honor.  Thank you,

17   jurors.

18        MS. LAWRENCE:  The government calls Deborah Huacuja.

19        DEBORAH HUACUJA, having been duly sworn by the Clerk,

10:20AM 20   testified as follows:

21                    DIRECT EXAMINATION

22   BY MS. LAWRENCE:

23   Q.    Good morning.

24   A.    Good morning.

25   Q.    Can you please say and spell your name for the jury.

1    A.    My name is Deborah Huacuja, D-e-b-o-r-a-h, H-u-a-c-u-j-a.

2    Q.    Where were you born?

3    A.    I was born in Mexico.

4    Q.    And what is your first language?

5    A.    Spanish.

6    Q.    You also speak English?

7    A.    Yes.

8    Q.    When did you learn English?

9    A.    I started studying English in first grade.

10:21AM 10    Q.    Did you at some point move to the United States?

11    A.    I'm sorry, I did not hear you.

12    Q.    Did you at some point move to the United States?

13    A.    Yes, while I was in high school.

14    Q.    Do you have a college degree?

15    A.    I do.  I went to Rutgers at the Mason Gross School of Art.

16    Q.    Do you have any advanced degrees?

17    A.    No.

18    Q.    What do you do for a living, Ms. Huacuja?

19    A.    I'm an interpreter in the federal courts and in the state

10:21AM 20    courts.

21    Q.    How long have you been working as an interpreter?

22    A.    I became certified in the State of Washington in 1991.

23    Q.    Do you also hold a certification here in the federal

24    court?

25    A.    Yes, I became federally certified in 1998.

1    Q.    And in what languages are you certified to interpret?

2    A.    In the federal system, there's only certification for

3    Spanish and Navajo, but I'm qualified for -- I'm certified in

4    Spanish, English, and I'm qualified for Hebrew.

5    Q.    Can you explain what the certification process is for the

6    federal court?

7    A.    The process is -- takes two years.  First, you have to

8    pass a written exam, which is I would say equivalent to a

9    master's degree language proficiency.  And if you pass the

10:22AM 10   written exam, a year later, you are able to take the oral exam,

11   which is much more specific to the judicial language.

12   Q.    And what do you mean by "judicial language"?

13   A.    To be familiar with all the terminology in criminal cases,

14   both in the courts, in the courtroom, and at the level of

15   ordinary people on the street.

16   Q.    Once you become certified, do you have recertification,

17   tests or exams?

18   A.    Not really, no.

19   Q.    And when you interpret for the Court, who do you work for?

10:23AM 20   A.    I work for myself.  I'm self-employed.

21   Q.    And are there different types of things that you do in the

22   course of providing services?

23   A.    Yes.  I pretty much cover every aspect of the judicial

24   system, starting with interpreting for probation, pretrial

25   services.  I work for both the defense attorneys and for the

1    prosecution, and I know there's something else, but basically

2    every aspect of the Court procedures in and out of court.

3    Q.    And when you do that work, whether you're interpreting for

4    pretrial services or the Court, the government or the

5    defendant, are you paid?

6    A.    Yes.

7    Q.    Okay.  And the party that hires you pays you, or the Court

8    pays you for everything?

9    A.    Correct -- no.  Well, a lot of it -- I think there are two

10:24AM10    budgets, like CJA and court and probation is one, is paid by

11    the Administrative Court, and the prosecution is paid by the

12    Department of Justice.

13    Q.    And have you provided interpreter services in connection

14    with this case?

15    A.    Yes.

16    Q.    And how long have you been working on this case?

17    A.    Since before -- I'd say about roughly three years.

18    Q.    And in connection with this case, has the work that you

19    have done included a variety of things that you just described,

10:24AM20    working for the Court, probation, the government and the

21    defense?

22    A.    Yes.

23    Q.    And I want to focus on your work for the government right

24    now.  Have you prepared English transcripts of Spanish

25    recordings?

1    A.    Yes, I have.

2    Q.    Can you please describe how you create a transcript of a

3    recording.

4    A.    I have a headset, and I'm given the recording and the

5    laptop, and I listen to the recording, and I translate it, and

6    I write it down on the laptop, and that's it.

7    Q.    And you said translate.  Can I ask you, is there a

8    difference between interpreting or translating?

9    A.    Yes.

10:25AM 10    Q.    What is that?

11    A.    Interpreting is usually oral.  Like I will -- like in a

12    trial or in a hearing, if the defendant doesn't speak English

13    and speaks Spanish, one of -- myself or one of my colleagues

14    will stand and translate, what we call interpreting, what is

15    being said so that there is a communication between the Court

16    and the defendant.

17    Q.    And so when you're making your transcript, you're

18    listening to the recording?

19    A.    Yes.

10:26AM 20    Q.    And you're typing while you're listening, or how does that

21    work?

22    A.    Well, it's actually a pretty tedious process because you

23    don't listen to it once, you know.  Sometimes the recordings

24    aren't great, sometimes -- and usually you have to listen more

25    than once even when the recording is great, you don't like --

1    it's not like speaking where you say it and you're done.

2    Writing it down is -- you have to be very exact.

3    Q.   And what kinds of things are you considering when you're

4    listening to a recording and you're trying to make it an exact

5    translation of what you're listening to?

6    A.   Well, at all times, regardless of whether I'm transcribing

7    or interpreting, you know, verbally, I am always interested in

8    focusing, laser focusing on being accurate, so that is my main

9    concern is to be accurate.  If I am not able to be sure of what

10:27AM 10    I hear, I will write "unintelligible."  I don't guess.

11   Q.   When you -- a slightly different question.  In your

12   experience, do all Spanish speakers speak Spanish in the same

13   way?

14   A.   Well, Spanish is one language.  It's the same language

15   that we all speak.  We can all understand each other, of

16   course.  In different parts of the world, there are many

17   countries that are Spanish-speaking, and people develop the

18   language in different ways.  Sometimes there are different

19   accents, or words might be used differently.

10:28AM 20        The simplest example would -- even the word for beans

21   in Mexico is "frijoles," and in other places, it might be

22   "porotos."  And so one of the challenges and pleasures, I'd

23   say, of being an interpreter is becoming familiar with all the

24   different ways of using the same words or similar words.

25   Q.   And in addition to a word having different -- not the word

having different meanings but the same thing being described by

two different words, are there other considerations or

differences in the language in terms of context or formality

that you take into consideration?

A.    Yes, that's what we call the register of the language.

For instance, when the Judge is giving instructions to a jury,

that's very formal and high level language; whereas if you're

having coffee with your friend, it's going to be much more

relaxed, and so that we call the registry, and I think part of

being an interpreter is maintaining the same tone or the same

register of what has been said.

Q.    And you said earlier that your goal was to make an

accurate transcript?

A.    Correct.

Q.    And it takes a long time?

A.    Sometimes, yes.

Q.    And actually do you have a sort of benchmark that you use

for how long it would take to transcribe a certain amount, like

a minute of recording takes this amount of time, or is there

anything like that that you use?

A.    Sometimes interpreters are asked -- you know, if they're

going to be asked to do a recording how long it will take, and

the benchmark is about an hour per minute of recording.

Q.    Per minute of spoken?

A.    From hearing and writing and translating.

1    Q.    Okay.  When you are listening to a recording and you are

2    transcribing the words that are spoken, taking into

3    consideration the differences in regional -- regional word

4    usage and the register, do you also attempt to identify the

5    voices of the speakers?

6    A.    No.

7    Q.    No.  And if your transcript includes voices, speakers

8    identified, where do those come from?

9    A.    I'm told who the speakers are, or it's already included in

10:30AM 10    the information that I have, and if I have the opportunity to

11    verify it, if I don't know who the speaker is, I write

12    unidentified male or female, so that would be the UM or UF.

13    Q.    When you're making transcripts, do you sit down and write

14    a final transcript from the recording when you listen to it?

15    A.    What do you mean?

16    Q.    Is your product one final product?

17    A.    You usually make a draft of it because of, you know, I

18    might need to review it again and just to make sure because

19    it's something that I want to do correctly.

10:31AM 20    Q.    So you might have several iterations of a translation

21    before you reach the point where you feel like it's accurate?

22    A.    Yes.

23    Q.    In this case, in terms of achieving an accurate transcript

24    and also identifying voices, did you work with anyone to try to

25    do both of those things?

1    A.    Yes.

2    Q.    And who was that individual?

3    A.    You want his name?

4    Q.    Yes, please.

5    A.    Jose Hernandez.

6    Q.    And who is he in connection to this case?

7    A.    He's a defendant.

8    Q.    Okay.  And you worked with him as part of making these

9    transcripts, correct?

10:32AM 10    A.    Well, no, I made the transcripts.

11    Q.    Yes.

12    A.    And I had the opportunity to let him listen to them and

13    identify the speakers.

14    Q.    Okay.  And did he also at times identify words or phrases

15    or provide context?

16    A.    Yes.

17    Q.    Okay.  So you did take into consideration some of the

18    things he said in producing the final transcripts?

19    A.    That is correct.

10:32AM 20            THE COURT:  Is this a good break point?

21            MS. LAWRENCE:  Sure.

22            THE CLERK:  All rise.

23            (JURORS EXITED THE COURTROOM.)

24            (A recess was taken.)

25            THE CLERK:  All rise for the jury.

1           (JURORS ENTERED THE COURTROOM.)

2           THE CLERK:  Thank you.  You may be seated.  Court is

3   now back in session.

4   Q.   Ms. Huacuja, when we broke, just before we broke, we were

5   talking a bit about your process for preparing a transcript?

6   A.   Correct.

7   Q.   And you mentioned that you worked with Jose Hernandez

8   Miguel as part of that process?

9   A.   Yes.

10:49AM 10  Q.   Can you tell the jury what you did as part of that process

11  with him?

12  A.   Well, I was not alone with Mr. Hernandez.  There were

13  agents, and there was a laptop and we played the recording for

14  Mr. Hernandez Miguel to listen to while I already had my

15  transcript, my draft transcript in front of me.  And as we

16  listened to each recording, he identified who the speakers

17  were.  If there was a word or a phrase that I was unfamiliar

18  with, I had the opportunity to ask him the meaning of that, and

19  that's what we did with each recording.

10:50AM 20  Q.   And in the course of preparing the transcripts, you

21  mentioned earlier that you listened to the recordings several

22  times?

23  A.   Correct.

24  Q.   And you described how long it would take.  It's fair to

25  say several hours you'd listen to a recording in preparing that

1    one transcript?

2    A.    Yes, more than that even.

3    Q.    Okay.  And how many hours do you think you spent listening

4    to recordings in this case preparing transcripts?

5    A.    I couldn't say a number, but many.

6    Q.    Many.  In the course of listening those recordings, did

7    you become familiar with certain voices?

8    A.    Yes, I could hear that there was a voice similar to the

9    one I had heard previously.

10:51AM 10    Q.    And did you also watch videos?  Were some of these

11    recordings video and audio?

12    A.    Yes.

13    Q.    And when you were watching the video, could you see people

14    speaking at times on screen?

15    A.    Yes.  My focus was mostly audio.  Having a visual really

16    makes no difference in my translation.

17    Q.    Did it make any difference to you in whether you felt your

18    identification of a speaker or someone else's was accurate?

19    A.    I really didn't focus that much on it.  I just really

10:52AM 20    focused on what each person was saying.

21    Q.    And the translation of those words onto the transcript?

22    A.    Yes.

23    Q.    Okay.  Ms. Huacuja, I'd like to show you -- just for the

24    witness, please.  Exhibit -- I'm sorry, this is just for the

25    witness.  This is what's been marked as Exhibit 200.  Do I hit

1    it or -- this is a disk -- well, tell me, what is this that

2    you're seeing on the screen right now?

3    A.    I see an envelope with a compact disk in it.

4    Q.    And is there a date on that disk?

5    A.    Yes, 1-25-14.

6    Q.    Do you know what this is?

7    A.    It says Exhibit 200 from 15-10338.

8    Q.    And is this a recording made on January 25, 2014?  This is

9    a disk of that recording?

10:53AM 10   A.    I don't know when it was made, but it is a recording.

11   Q.    Okay.  All right.  Did you listen to this recording?

12   A.    Yes.

13         MS. LAWRENCE:  Okay.  Can I pull up for the exhibit --

14   this is back to the screen.  Exhibit 20, please.

15   Q.    Ms. Huacuja, do you recognize this document on the screen?

16   A.    Yes.

17   Q.    Okay.  What is that, please?

18   A.    It's a transcript that I made.

19   Q.    And is this the full transcript or an excerpt?

10:54AM 20   A.    Well, all I see is the first page.  I believe this is an

21   excerpt from a full transcript.

22   Q.    And this is a transcript that you made, correct?

23   A.    Correct.

24         MS. LAWRENCE:  Okay.  Back to the Elmo, please, for

25   the witness.

1   Q.   So what's been marked for identification as Exhibit 201.

2   Did you listen to this recording made on February 16, 2014?

3   A.   I listened to that recording, yes.

4        MS. LAWRENCE:   And for the witness, please,

5   Exhibit 119.

6   Q.   Do you recognize this?

7   A.   Yes.

8   Q.   What is it, please?

9   A.   It's another transcript that I made.

10:55AM 10   Q.   That you made, okay.   Thank you.

11       MS. LAWRENCE:   And back to the Elmo, please.   I'm

12   showing you what's been marked as Exhibit 202.

13   Q.   Did you listen to this recording made on June 14, 2014?

14   A.   Yes.

15       MS. LAWRENCE:   And for the witness, please,

16   Exhibit 22.

17   Q.   Ms. Huacuja, do you recognize this item?

18   A.   Yes, it's another transcript that I made.

19   Q.   And also of the June 14, 2014 recording, correct?

10:56AM 20   A.   Yes.

21       MS. LAWRENCE:   Exhibit 120 for the witness, please.

22   Q.   Do you recognize this document?

23   A.   Yes.

24   Q.   And what is it?

25   A.   It's another transcript that I made.

1           MS. LAWRENCE:  Back to the Elmo, please.

2    Q.   Ms. Huacuja, did you listen to this recording made on

3    February 8, 2015?

4    A.   Yes.

5           MS. LAWRENCE:  And Exhibit 23 for the witness, please.

6    Q.   Do you recognize this document?

7    A.   Yes.

8    Q.   And what is that?

9    A.   It's another transcript that I made.

10:56AM 10   Q.   A recording we just --

11   A.   Correct, of the previous recording.

12          MS. LAWRENCE:  Elmo again, please.

13   Q.   Did you listen to this recording made on March 29, 2015?

14   A.   I did.

15          MS. LAWRENCE:  And Exhibit 24 for the witness.

16   Q.   Do you recognize this document?

17   A.   Yes, I do.

18   Q.   And what is it, please?

19   A.   It's another transcript that I made.

10:57AM 20   Q.   Of the recording we just --

21   A.   Of the recording that I just saw.

22   Q.   Okay.

23          MS. LAWRENCE:  Elmo, please.

24   Q.   Did you listen to this recording made on August 31, 2015?

25   A.   Yes, I did.

1          MS. LAWRENCE:  Exhibit 27 for the witness, please.

2     Q.   Do you recognize this document?

3     A.   Yes.

4     Q.   What is it?

5     A.   It's another transcript that I made from the previous

6     recording.

7          MS. LAWRENCE:  Elmo, please.

8     Q.   Did you listen to this recording of an October 24, 2015

9     recording?

10:58AM 10    A.   Yes.

11         MS. LAWRENCE:  Exhibit 28 for the witness, please.

12    Q.   I'm going to show you two documents related to the

13    recording we just saw.  The first is the one before you now.

14    Do you recognize this?

15    A.   Yes, it's a transcript that I made of the recording that

16    we just saw.

17         MS. LAWRENCE:  Okay.  And then Exhibit 121, please.

18    Q.   And do you also recognize this document?

19    A.   Yes.

10:58AM 20    Q.   Okay.  And what is that?

21    A.   It's a transcript that I made of the same recording.

22    Q.   Okay.  And why were there two transcripts?

23    A.   There are two different parts.

24    Q.   Two different parts, okay.

25         MS. LAWRENCE:  Elmo again, please.

1    Q.   Did you listen to this recording made on January 8, 2016?

2    A.   Yes.

3         MS. LAWRENCE:  For the witness, Exhibit 31.

4    Q.   Do you recognize this document?

5    A.   Yes.

6    Q.   What is it, please?

7    A.   It's another transcript that I made of the previous

8    recording.

9    Q.   I will show you another document related to the disk we

10:59AM 10   just saw.  This is Exhibit 122.  Do you recognize this?

11   A.   Yes.

12   Q.   What is it, please?

13   A.   It's a transcript that I made of the previous recording,

14   different section.

15   Q.   Thank you.

16        MS. LAWRENCE:  Elmo again, please.

17   Q.   Did you listen to calls -- I'm sorry, did you listen to

18   the recordings of calls made on December 16, 2014?

19   A.   Yes.

11:00AM 20        MS. LAWRENCE:  For the witness, please.

21   Q.   I'm showing you Exhibit 44.1 through 44.4.  Do you

22   recognize those documents?

23   A.   Yes.

24   Q.   And what are they, please?

25   A.   They are transcripts I made of the previous recordings.

1              MS. LAWRENCE:  Elmo, please.

2    Q.   Did you listen to a recording made on January 21st, 2014?

3              THE COURT:  Before we -- you talked about a disk

4    bearing the date December 16, 2014, but you didn't give it a

5    number?

6              MS. LAWRENCE:  I'm sorry, 209, your Honor.

7              THE COURT:  Okay.  Go ahead.

8    Q.   This is a disk marked for identification as Exhibit 210,

9    recording made on January 21st, 2013.  Did you listen to this

11:01AM 10   recording?

11   A.   Yes.

12             MS. LAWRENCE:  For the witness, please, Exhibit 55.

13   Q.   Do you recognize this document?

14   A.   Yes.

15   Q.   And what is it, please?

16   A.   It's a transcript I made of the previous recording.

17             MS. LAWRENCE:  Elmo, please.

18   Q.   Okay.  Showing you a disk that's been marked as

19   Exhibit 211.  It's a recording of calls made on February 14,

11:01AM 20   2014.  Did you listen to these calls?

21   A.   Yes, I did.

22             MS. LAWRENCE:  For the witness, please, Exhibits 56.1

23   through 53.

24   Q.   Do you recognize those documents?

25   A.   Yes.

```
 1    Q.    What are they?

 2    A.    They are transcripts I made of the recordings.

 3    Q.    That were on the prior disk that we --

 4    A.    Correct, of the previous disk.

 5          MS. LAWRENCE:  Okay.  Elmo, please.

 6    Q.    Showing you a disk that's been marked for identification

 7    as Exhibit 212.  Did you listen to these recordings of calls

 8    made December 1, 2014 through December 8, 2014?

 9    A.    Yes.

10          MS. LAWRENCE:  For the witness, please, Exhibit 62.1

11    through 62.4.

12    Q.    Do you recognize these documents?

13    A.    Yes, they are transcripts that I made of the previous

14    recording.

15          MS. LAWRENCE:  Elmo, please.

16    Q.    Showing you what's been marked as Exhibit 214 for

17    identification, a recording made on June 4, 2015.  Did you

18    listen to this recording?

19    A.    I did.

20          MS. LAWRENCE:  Exhibit 73 for the witness, please.

21    Q.    Do you recognize this document?

22    A.    Yes.

23    Q.    What is it, please?

24    A.    It's a transcript that I wrote of the previous recording.

25          MS. LAWRENCE:  Okay.  Elmo, please.
```

11:02AM (line 10)

11:03AM (line 20)

1    Q.   I'm showing you two disks.  One is marked as

2    Exhibit 215.1, the other is 215.2.  These are recordings made

3    on April 28, 2015.  Did you listen to these recordings?

4    A.   Yes.

5         MS. LAWRENCE:  Okay.  Exhibit 89 for the witness,

6    please.

7    Q.   Do you recognize this document?

8    A.   Yes.

9    Q.   What is it?

11:04AM 10  A.   It's a transcript I made of the previous recordings.

11         MS. LAWRENCE:  Okay.  Elmo, please.

12    Q.   Showing you what's been marked as Exhibit 216 for

13    identification.  This is a recording made on October 2, 2015.

14    Did you listen to this recording?

15    A.   Yes.

16    Q.   Exhibit 103 for the witness, please.  Do you recognize

17    this document?

18    A.   Yes.

19    Q.   What is it?

11:04AM 20  A.   It's a transcript I made of the previous recordings.

21         MS. LAWRENCE:  Elmo, please.

22    Q.   Showing you a disk that's been marked as Exhibit 217.

23    It's a recording made on December 6, 2015.  Did you listen to

24    this recording?

25    A.   Yes, I did.

1            MS. LAWRENCE:  Exhibit 106 for the witness, please.

2    Q.    Do you recognize this document?

3    A.    Yes.

4    Q.    And what is it?

5    A.    It's a transcript I did of the previous recording.

6            MS. LAWRENCE:  I'd like to show the witness also

7    Exhibit 125.

8    Q.    Do you also recognize this document?

9    A.    Yes.

11:05AM 10   Q.    And what is that?

11   A.    It's a transcript I made of the previous recording.

12   Q.    And as with prior disk that had two transcripts, is this a

13   separate part of the recording?

14   A.    Yes.

15           MS. LAWRENCE:  Okay.  Elmo, please.

16   Q.    Showing you what's been marked as Exhibit 218.  It's a

17   recording of a call made on January 1, 2016.  Did you listen to

18   this recording?

19   A.    Yes.

11:05AM 20           MS. LAWRENCE:  Exhibit 115 for the witness, please.

21   Q.    Do you recognize this document?

22   A.    Yes.

23   Q.    And what is it?

24   A.    It's a transcript I made of the previous recording.

25           MS. LAWRENCE:  Elmo, please.

1          MR. MURPHY:  Is that 115 or 114, your Honor?

2          THE COURT:  She said 115.  I think the last one --

3          MS. LAWRENCE:  It was 114.

4          THE COURT:  It should be 114?

5          MS. LAWRENCE:  It should've been 114.

6          THE COURT:  The transcript.

7          MS. LAWRENCE:  Thank you.

8     Q.    Now showing you what's been marked as Exhibit 219 for

9     identification.  It's a recording made on January 2, 2016.  Did

11:06AM 10    you listen to this recording?

11    A.    Yes, I did.

12    Q.    Okay.

13          MS. LAWRENCE:  Now.  Exhibit 115 for the witness.

14    Thank you.

15    Q.    Do you recognize this document?

16    A.    Yes.

17    Q.    And what is it?

18    A.    It's a transcript I made of the previous recording.

19          MS. LAWRENCE:  Elmo again, please.

11:07AM 20    Q.    Okay.  Now I'm showing you what's been marked as

21    Exhibit 220 for identification.  This is a recording -- a

22    different recording made on January 2, 2016.  Did you listen to

23    this?

24    A.    Yes.

25          MS. LAWRENCE:  And Exhibit 116 for the witness,

80

 1    please.

 2    Q.   Do you recognize this document, Ms. Huacuja?

 3    A.   Yes.

 4    Q.   And what is it, please?

 5    A.   It's a transcript I made of the previous recording.

 6              MS. LAWRENCE:  No further questions at this time, your

 7    Honor.

 8              THE COURT:  All right.  Mr. Iovieno.

 9              MR. IOVIENO:  Yes, your Honor.  Thank you.

11:07AM 10                      CROSS-EXAMINATION

11    BY MR. IOVIENO:

12    Q.   Good morning.

13    A.   Good morning.

14    Q.   We know each other, correct?

15    A.   Correct.

16    Q.   We've worked together in the past?

17    A.   Yes, we have.

18    Q.   Is it fair to say that you spent hundreds of hours doing

19    these transcriptions?

11:08AM 20    A.   As I said, I really can't tell you a number, but many

21    hours.

22    Q.   It was a pretty big job to do, correct?

23    A.   Yes, sir.

24    Q.   And you spent about three years doing this for the

25    government?

A.   I've been working on this case for about three years, not only doing this.

Q.   And is it fair to say that this was a tedious process for you doing this?

A.   Which part?

Q.   Actually listening to the tapes and then transcribing them, that that was a tedious type of task for you?

A.   Well, I mean it's -- the nature of the work is tedious in the sense that you have to listen over and over again.

Q.   And you have to listen over and over again because the recordings, if you will, are not sometimes of good quality, correct?

A.   In some cases, the recordings are sometimes not a good quality.  In this case, as it turned out, they were pretty consistently a good quality.

Q.   But with respect to say when there's a number of voices being heard at a meeting, sometimes it's difficult to hear some of the voices that are off and to a distance that are speaking, correct?

A.   That's correct.

Q.   Simply for the fact that the person recording or the recording device is located in one area and the other people may be located a distance away?

A.   That's possible, yes.

Q.   And their voices, if you will, are sometimes -- are

1    muffled?

2    A.    Yes.

3    Q.    And you come across that situation and you can't

4    understand what someone is saying, you put down whatever you

5    heard was unidentified, right?

6    A.    "Unintelligible" or sometimes "voices overlapping," which

7    implies that it's unintelligible.

8    Q.    And that occurred on a number of occasions during the

9    course of this case, correct?

11:10AM 10    A.    Yes.

11    Q.    And with respect to -- you knew the identity of the person

12    who had the recorder on, correct?

13    A.    I knew that person as CW.

14    Q.    CW-1?

15    A.    CW-1, yes.

16    Q.    And it's fair to say that his voice was pretty clear,

17    because the recording device was on him, so you could recognize

18    his voice, correct?

19    A.    Not necessarily.  I mean, all the voices -- there were

11:10AM 20    many voices that were pretty clear.

21    Q.    But with respect to his, in particular, because the

22    recording device was on him, you had no difficulty after

23    listening a few times to identify his voice, correct?

24    A.    I didn't identify any voices.  That was somebody else's

25    job.

1    Q.    Okay.  So, you didn't identify any of the speakers on

2    these transcripts?

3    A.    Correct.

4    Q.    You relied on other people to do that for you, right?

5    A.    To do that, period.  Not for me, but for the case.

6    Q.    And on the documents that you were shown by the

7    government, the actual identification of the speakers you did

8    not do?

9    A.    Correct.

11:11AM 10    Q.    And when you were doing this process, when you first

11    started the process, were you given any draft transcripts by

12    other linguists who did this for the government?

13    A.    Sometimes.

14    Q.    Okay.  And on how many occasions were you given other

15    transcripts done by others?

16    A.    I don't know.

17    Q.    But it was a number of occasions?

18    A.    Yes, not that many, but a few.

19    Q.    And did you work off of those transcripts that other

11:11AM 20    people did to come up with your own version of the transcripts?

21    A.    I sometimes reviewed the other transcripts, but mostly

22    even if there was a previous transcript, I would create my own

23    transcript.

24    Q.    And is it fair to say that you came up with a number of

25    different draft transcripts and they morphed or changed over

1    time?  Is that fair to say?

2    A.   As I progressed, you know, it wasn't like I did the full

3    translation of a transcript in one sitting.  So as I worked on

4    it, it wasn't that only that might have changed but that I was

5    advancing in the translation.  So if it was unfinished, I just

6    called it a draft, and then even once it was finished, I still

7    left myself the option of being able to go back and make a

8    change, if necessary.

9    Q.   And you had conversations with the government about that

11:12AM 10   process; is that fair to say?

11   A.   Yeah.

12   Q.   And its fair to say that you told them that this was not a

13   final product, that this needs work, and the transcripts went

14   over transformation until it became a final transcript, right?

15   A.   I didn't say it needed work.  I'd just write "draft" on

16   it.  It wasn't a conversation about it.

17   Q.   Well, you understood that certain of these draft

18   transcripts were produced during the course of this trial,

19   correct?

11:13AM 20   A.   I'm sorry.  I didn't understand the question.

21   Q.   Was it your understanding that certain drafts of the

22   transcripts were produced during the course of this litigation?

23   A.   Yes.

24   Q.   And you understood that with respect to say one meeting

25   that may have been three, four or five or even six transcripts

1    that were produced that were drafts?

2    A.    I don't know.

3    Q.    You had no role in that, correct?

4    A.    No.

5    Q.    And at some point when you completed your work on say one

6    of the meetings, did you indicate this was the final

7    transcript?

8    A.    Yes.

9    Q.    And there was nothing more for you to do on it?

11:13AM 10    A.    Yes.

11    Q.    That that was the best you could do with it, correct?

12    A.    Correct.

13    Q.    And coming to that end product, there were numerous drafts

14    in between on some of these meetings; not all of them, but some

15    of them?

16    A.    Well, it wasn't that there was a finished draft and then

17    another finished drafts.  Mostly the drafts were, as I said,

18    previously, because it was unfinished.

19    Q.    Well, let's direct your attention to a specific task that

11:14AM 20    you did, okay.

21         MR. IOVIENO:  And I'm going to show the document

22    camera for the witness.

23         MS. LAWRENCE:  Your Honor, objection.

24         THE COURT:  I'm sorry.

25         MS. LAWRENCE:  Objection.

1          THE COURT:  Well, he hasn't shown anything.  Let me

2    see what he's showing her.  This is the witness, should be

3    witness only?

4          MR. IOVIENO:  Yes.

5          THE COURT:  Yes.

6    Q.    I'm going to show you a document, and it appears to be the

7    January, 2016 draft transcript, correct?

8    A.    Yes.

9    Q.    The first page of it?

11:14AM 10    A.    I'm sorry.

11    Q.    The first page of it?

12    A.    Yes.

13    Q.    All right.  And that's a draft transcript that you did for

14    the government, right?

15    A.    Yes.

16    Q.    And with respect to this meeting, is it fair to say that

17    there were a number of draft transcripts that you submitted

18    regarding this meeting?

19    A.    Possibly.

11:15AM 20    Q.    Okay.  And there were certain information or translations

21    in that transcript during the various drafts that changed over

22    time, correct?

23    A.    I believe so, yes.

24    Q.    And with respect to say the identification of the

25    speakers, it's your understanding that also changed on some

1    occasions?

2    A.    Yes.

3    Q.    Okay.  And that changed because somebody told you it was a

4    different speaker, right?

5    A.    Correct.

6    Q.    And that wasn't something that you did?

7    A.    Correct.

8    Q.    And if I could just turn to page 51.  And, again, just so

9    we're clear, the identification of the speakers on page 51, on

11:16AM 10    this version, this is not something that you did, someone else

11    did?

12    A.    Correct.

13    Q.    I'll show you another document which appears to be another

14    draft transcript of the January 8, 2016 recording, correct?

15    A.    Yes.

16    Q.    Okay.  This is another version of the transcript that you

17    put in to the government?  You gave this to the government?

18    A.    It appears to be different, yes.

19    Q.    It's an earlier version of what I just showed you earlier,

11:16AM 20    correct?  This predated that version?

21    A.    Well, this might be one of the transcripts that was

22    originally made by somebody else.

23    Q.    So with respect to the January 8th meeting, specifically,

24    that's one of the transcripts that someone else may have

25    contributed to in making the --

1    A.    Possibly, yes.  There are certain abbreviation lists that

2    I don't use.

3    Q.    And could you just point that out on this document for me?

4    A.    Right there.

5    Q.    And that is something that you do not use, and that would

6    indicate to you that you didn't produce this draft transcript?

7    A.    It's possible that I worked on it.

8    Q.    Now, with respect to the -- I think you testified that

9    some of the language was -- the dialect was different?

11:17AM 10    A.    Some words are different.  It's not a different dialect.

11    Q.    Is it fair to characterize some of the language that you

12    heard on these tapes as slang?

13    A.    Yes.

14    Q.    And it's fair to say that there were certainly muffled

15    words and language during the course of your doing these

16    transcriptions?

17    A.    Well, like I said, if it's muffled, if I can't understand

18    it, I don't translate what I didn't hear.

19    Q.    And, again, with respect to -- you understood that there

11:18AM 20    was someone with the name of Lobo that was identified to you as

21    perhaps one of the speakers, correct?

22    A.    As a nickname, yes.

23    Q.    Okay.  And were you told that there were two Lobos

24    involved in this case?

25    A.    No.

1          MR. IOVIENO:  I have nothing further.

2          THE COURT:  Any other cross?  Mr. Norkunas.

3                     CROSS-EXAMINATION

4    BY MR. NORKUNAS:

5    Q.    Good morning.

6    A.    Good morning.

7    Q.    We also have worked together.

8    A.    That is correct.

9    Q.    In relation to the rough product, if I could call it that,

11:19AM 10  the original disk that came in, was there ever a meeting in

11    which multiple interpreters or translators were all together in

12    one area and trying to work on transcripts?

13    A.    No.

14    Q.    Did you ever meet or discuss transcripts that came from

15    other providers as to why they had interpreted certain terms in

16    certain ways?

17    A.    No.

18    Q.    It's fair to say that -- is it fair to say that there were

19    different people -- you became familiar with there were

11:20AM 20  different people in different sections of the country that were

21    interpreting the rough tapes and then those transcripts were

22    coming to you?

23    A.    I'm sorry.  Could you repeat the question?

24    Q.    There were other interpreters in other sections of the

25    country which were preparing initial transcripts of some of the

90

1    recordings and then those would come to you?

2    A.    I don't know where they came from.

3    Q.    So you were never told by anybody we have had a certain

4    person do transcripts and they're coming to you?

5    A.    No.

6    Q.    You didn't know their proficiency, you didn't know their

7    training, you didn't know their background, you were just given

8    a transcript and told this is part of the case?

9    A.    I didn't know anything about the transcripts that were

11:20AM 10    done before I saw them.

11    Q.    So once you were given a transcript, a typed version of a

12    recording, you weren't asked to redo it, correct?

13    A.    Most of the transcripts that I made, I was given a

14    recording from the start.  Some transcripts had been done

15    previously.  I was -- I looked at some of them because I was

16    asked to and then produced my own transcript, if necessary.

17    Q.    That would be -- some of them, is that a number that means

18    1, 2, 3, 4?

19    A.    Yes, maybe three or four.

11:21AM 20    Q.    Three or four, all right.  Do you know how many came in

21    from other interpreters that you had not met or encountered?

22    Do you know what the total number of that would have been?

23    A.    No, I have no idea.

24    Q.    And did you simply -- or not simply.  Did you go into

25    those to determine if there was something there that you

1    thought that was not consistent with the way you were

2    interpreting a phrase or a name?

3    A.   When I was asked to review a transcript, it was already

4    done by somebody else.  My process was to listen to the

5    recording while I'm reviewing the transcript and see if I agree

6    with that transcript or not.  And if it was a transcript that

7    needed to be produced, I made changes in my own transcript.

8    Q.   So there were terms used by another interpreter someplace

9    that you may have disagreed with and then you would change it?

11:22AM 10    A.   No terms, words.

11    Q.   Words that you would disagree with and you would change

12    those?

13    A.   Sometimes it would say "unintelligible," and I could tell

14    what was being said, so I would put in what I heard, and

15    sometimes there were things that were incorrect and I corrected

16    them.

17    Q.   When you say incorrect, that was your interpretation of

18    whether that was correct or not correct?

19    A.   Yes and no because a language is used because it has

11:23AM 20    meaning, so if something that you hear is -- if you hear it and

21    what is written is not what you hear, then that is incorrect,

22    so it's not a matter of interpretation, it's, you know, what it

23    says.

24    Q.   But you were unfamiliar with the knowledge or the skills

25    of the person that had given you the original transcript,

1    correct?

2    A.    I had no knowledge of the person who had done the original

3    transcript.

4    Q.    You became the final judge?

5    A.    Yes.

6         MR. NORKUNAS:  Thank you.

7         THE COURT:  Anyone else?  Any redirect?  I'm sorry,

8    Ms. Rodriguez.

9                    CROSS-EXAMINATION

11:24AM10    BY MS. RODRIGUEZ:

11    Q.    Good morning, Ms. Huacuja.

12    A.    Good morning.  How are you?

13    Q.    We have not worked together, but my name is

14    Madeleine Rodriguez, and I represent Mr. Sandoval.  I just want

15    to ask you a few questions about some of the translations that

16    you reviewed with Ms. Lawrence, if that's okay.

17    A.    Yes.

18         THE COURT:  Can you get the cord off the screen, if

19    you would, please.  Thank you.

11:25AM20    Q.    Ms. Huacuja, do you recall seeing this translation

21    transcript?

22    A.    Yes.

23    Q.    And you prepared this transcript, correct?

24    A.    Correct.

25    Q.    I want to direct your attention to the statement -- the

 1    paragraph towards the bottom.  I'm going to play for you the

 2    original recording, if that's all right, and then once we've

 3    listened to the Spanish, I'd like to discuss the translation.

 4         THE COURT:  This isn't in evidence.  It has not been

 5    admitted into evidence, the recording or the transcript, at

 6    this point.  If everyone agrees, we can just admit it, if that

 7    saves time, but --

 8         MS. RODRIGUEZ:  Could we be seen at sidebar briefly?

 9         THE COURT:  All right.

11:25AM 10         MS. RODRIGUEZ:  Thank you.

11         (THE FOLLOWING OCCURRED AT SIDEBAR:)

12         MS. LAWRENCE:  It hasn't been admitted because the

13    speakers have not been identified yet by Ms. Huacuja.

14         THE COURT:  I understand why you haven't offered it

15    yet.  If she wants to offer the recording or the disk, you're

16    not going to object to it, you intend to offer it at some

17    point, right?

18         MR. POHL:  I don't think so.  I don't think we intend

19    to offer the Spanish recording.  I mean, there's one or two

11:26AM 20    excerpts for one or two reasons like the one last week with --

21    but I don't expect we would offer the full recordings

22    themselves.

23         THE COURT:  Even so, what would the objection be to

24    playing the recording?  Presumably, it's the government's own

25    recording in Spanish.

1          MS. LAWRENCE:  Sorry.  The objection would be that

2     that's not the evidence, and we're not entirely sure what the

3     point of playing --

4          THE COURT:  But how else does Ms. Rodriguez, if she

5     wants to contest the translation of a word?

6          MS. LAWRENCE:  Is it the translation or the speaker

7     because we haven't --

8          THE COURT:  If it's the speaker, she's not the right

9     witness.  Is it the translation?

11:27AM 10          MS. RODRIGUEZ:  It's the translation.

11          THE COURT:  Okay.  Well, it seems to me that -- I

12     guess I don't see any reason why I can't admit the disk, at

13     least for this purpose and then, at a minimum, we can admit the

14     transcript of the relevant paragraph or word or whatever that

15     she's arguing about, although, I don't know why the whole, you

16     know, again, unless someone objects --

17          MS. LAWRENCE:  We are going to object because we're

18     offering it.

19          THE COURT:  You are not offering it?

11:27AM 20          MS. LAWRENCE:  We would be offering it.

21          THE COURT:  Okay.  Is there an objection to the whole

22     transcript coming in?  Does anyone object to it?

23          MR. IOVIENO:  I would object to the transcript coming

24     in?  It's the first time I've heard that the tapes weren't

25     going in.  So if the tapes don't go in, I don't know how the

1       transcript is coming in, so I object to the transcripts.

2                   MS. LAWRENCE:  The tapes are the evidence of the --

3                   THE COURT:  Because the tapes are in Spanish, they

4       aren't normally the evidence English transcription is.  You can

5       offer it.  I mean, it's relevant, again, for the purpose of

6       proving that it's wrong, as we're doing here, but I don't know

7       that we need to clutter the record with 30 disks.

8                   MR. IOVIENO:  Doesn't the transcript have to interpret

9       something that's in evidence?

11:28AM 10           THE COURT:  Well, no.  I mean, like -- I guess it's a

11      form of expert testimony.  It can be based on things that, you

12      know, could be admissible, but you don't have to admit the

13      underlying recordings.  If they were English, they'd come in.

14                  So let's do this, let's admit the disk, and I will

15      admit, so far as the transcript as -- it's a particular

16      sentence or phrase or paragraph or whatever that you're

17      disputing and identify it and maybe put a piece of paper over

18      the rest of it until I admit the whole transcript.  I thought I

19      heard someone saying you were objecting to the transcript as a

11:28AM 20          whole?

21                  MR. IOVIENO:  Yes.

22                  THE COURT:  Okay.  Why don't we handle it that way.

23      And just for the sake of convenience, I don't know if it's

24      possible to block off the speaker's name or not.  If it's not,

25      I'll have to give a limiting instruction at this point.

1          MS. RODRIGUEZ:  Thank you, your Honor.

2          (SIDEBAR CONFERENCE WAS CONCLUDED)

3          THE COURT:  Ladies and gentlemen, let me try to

4    explain what we're doing here.  Counsel expects to

5    cross-examine the witness about the Spanish translation.  I'm

6    going to admit the underlying disk in evidence so that she can

7    listen to it.

8          What is the relevant disk?  What number?

9          MS. RODRIGUEZ:  I believe it's 206, your Honor.

11:29AM10          THE COURT:  All right.  Exhibit 206 is admitted.

11          (Exhibit No. 206 received into evidence.)

12          THE COURT:  And then as to this document, which is

13    Exhibit 28, the government expects to introduce it later, but

14    it's not yet in evidence.  I'm going to admit the apparently

15    disputed translation portions in this case.  You're going to be

16    shown what looks like a sentence or a paragraph or so and that

17    piece.  So Exhibit 28, that portion of Exhibit 28 will be

18    admitted.

19          (Exhibit No. 28 received into evidence.)

11:30AM20          MS. RODRIGUEZ:  Thank you, your Honor.

21          THE COURT:  Whenever you're ready, Ms. Rodriguez.

22    Q.   All right.  So, Ms. Huacuja, as I said, we're going to

23    focus on this specific paragraph, and I'm going to play you the

24    corresponding audio recording.  You could just listen and

25    follow along with me.

1          THE COURT:  We're not going to play the whole disk?

2          MS. LAWRENCE:  Objection, your Honor.

3          THE COURT:  We're just --

4          MS. LAWRENCE:  As to the identification of this

5    portion of the tape corresponding to that part of the

6    transcript.  It was a foundation.

7          THE COURT:  Overruled.

8          (Video in Spanish played)

9    Q.    Ms. Huacuja.

11:31AM 10   A.    Huacuja.

11   Q.    Huacuja, I'm sorry.  Did you hear in that excerpt the

12   following Spanish phrase, "Y no se que decisiones van a tomar

13   despues de que le peguen al desconton a este loco?"

14   A.    Al desconton, I heard, yes.

15   Q.    Did you hear "despues de que le peguen al desconton ay

16   este loco"?

17   A.    I'd have to listen again.

18   Q.    Would you like me to play it again for you?

19   A.    Yes, please.

11:31AM 20         (Video played in Spanish)

21   A.    I believe that's what you said.

22   Q.    Okay.  And if we return to the translation that you

23   prepared, you translated that phrase as, "So I don't know what

24   decisions you will make after you give this dude the beating,"

25   correct?

1    A.    Correct.

2    Q.    And just turning momentarily back to the Spanish phrase,

3    there's a word in there that's "peguen", correct?

4    A.    I believe so, yes.

5         THE COURT:  Could you spell that for the record?

6         MS. RODRIGUEZ:  P-e-g-e-n.

7         THE WITNESS:  P-e-g-u-e-n.

8         THE COURT:  P-e-g-u-e-n is the word, correct?

9         THE WITNESS:  Yes.

11:32AM 10         THE COURT:  All right.  Go ahead.

11    Q.    And so in the translation that you prepared, the sentence,

12    "So I don't know what decisions you will make after you give

13    this dude the beating," the word "peguen", what is that

14    translating to in the English?

15    A.    The word "pegar" is usually to hit, it can also mean to

16    "attach" or "glue."  And, again, it's colloquial Spanish, so

17    can you tell me what your question is, again?

18    Q.    Sure.  So you mentioned that one of the translations would

19    be the word "to hit"; is that correct?

11:33AM 20    A.    It can be, yes.

21    Q.    Okay.  So in this sentence that you translated from that

22    audio recording, the sentence, "So I don't know what decisions

23    you will make after you give this dude the beating," peguen, or

24    as you said, which is a conjugated form of the verb pegar, what

25    is that being translated into?

99

1    A.   I'm not translating that word alone.  I'm translating it

2    with the word that comes afterwards, which is "desconton,"

3    which is one of the words of art used in this case, and it was

4    explained to me by Mr. Hernandez, which means a beating.

5    Q.   "A beating."  So, "peguen," it's hitting in this sentence

6    in the form of a beating; is that fair to say?

7    A.   No.   In this sentence, I'd say is "give him a desconton,"

8    so the "pegar un desconton" would be to -- pegar would be to

9    sort of give him -- that's not the part of the phrase that is

11:34AM 10    the hitting part.

11    Q.   Fair enough.

12         THE COURT:  Okay.  I'm sorry to do this to you, but

13    can I ask you to spell the phrase that you're talking about

14    here?

15         THE WITNESS:  Yes, your Honor, "peguen" is

16    p-e-g-u-e-n, "desconton" would be d-e-s-c-o-n-t-o-n.

17         THE COURT:  Thank you.

18    Q.   All right.  I'd like to turn to another paragraph in this

19    same transcript, if that's all right.

11:35AM 20         THE COURT:  All right.  This paragraph, which in the

21    translation begins, "the problem is that" will be admitted,

22    again, as a portion of Exhibit 28.

23         (A portion of Exhibit No. 28 received into evidence.)

24    Q.   All right.  And do you see this paragraph?

25    A.   Yes, I do.

1    Q.    And you prepared this transcription, correct?

2    A.    That's correct.

3    Q.    Okay.  I'd also like to now listen to the corresponding

4    Spanish underlying this sentence.

5            (Video played in Spanish)

6    Q.    During that recording, did you hear the phrase, the

7    Spanish phrase, "habemos y hay muchos que han pegado, homie"?

8    A.    Yes.

9    Q.    And is it fair that you've translated that phrase into

11:37AM 10    "There are many of us here who have killed, homie"?

11   A.    Yes.

12            MR. LOPEZ:  Objection, your Honor.

13            THE COURT:  Overruled.

14   Q.    So in that Spanish recording that we listened to, you

15   confirmed that we heard the word "pegado", correct?

16   A.    "Han pegado" from the same verb "pegar".

17   Q.    Yes, from the same verb "pegar".  And earlier you said

18   that "pegar" can be translated into, you know, hitting someone,

19   "glue," being, you know, "adjacent to one another," but not the

11:37AM 20   word "kill," correct?

21   A.    That's correct.

22   Q.    I'd like to turn to another translation.

23            THE COURT:  While she's getting set up, ladies and

24   gentlemen, let me again just remind you.  It's up to you to

25   decide whether to accept a particular version of the

1    translation or when we get to that point, the identification of

2    the speakers.  It's a decision that you are to make in the

3    context of deciding this case.  Go ahead.

4    Q.   Do you recognize this transcript?

5    A.   It appears to be one of the transcripts that was

6    previously translated before I translated it.  It might be one

7    that I worked on.

8    Q.   Do you recall whether or not you worked on this

9    translation?

11:39AM 10    A.   I'd to have see the transcript.

11              THE COURT:  Do you have the whole document?

12              MS. RODRIGUEZ:  I do.  May I approach?

13              THE COURT:  Yes.

14              THE WITNESS:  I don't recall this offhand.

15              MS. RODRIGUEZ:  No further questions, your Honor.

16              THE COURT:  Mr. Lopez.

17                        CROSS-EXAMINATION

18    BY MR. LOPEZ:

19    Q.   Good morning.

11:41AM 20    A.   Good morning.

21    Q.   I, as the others, have worked with you?

22    A.   Yes, many times.

23    Q.   Directing your attention to a transcript of an excerpt

24    from January 25, 2014, at the bottom of page 3.

25              MR. LOPEZ:  Can I just show this to the witness?

1   Q.   Do you see the highlighted portion there?

2   A.   Yes.

3   Q.   And it's attributed to a particular speaker?

4   A.   Yes.

5   Q.   And I think you said that it was Mr. Hernandez who

6   assisted you in identifying the speakers?

7   A.   He didn't assist me in identifying, he identified.  I did

8   not identify.

9   Q.   He's also known as Muerto?

11:42AM 10   A.   That is his street name.

11   Q.   And so he was the one that told you that the person

12   identified at the bottom of page 3 of this transcript was the

13   person identified, not Mr. Muerto?

14   A.   I'm sorry.

15   Q.   Do you follow me?  Muerto was the one that told you this

16   speaker wasn't him?

17   A.   He told me who the speaker was.

18   Q.   And he told you it wasn't him?

19   A.   Well, it wasn't -- if it was that person, then it wasn't

11:43AM 20   another person.

21   Q.   Fair enough.  Now, there's also a transcript from

22   January the 8th that we expect to see.  And on page --

23          THE COURT:  I'm sorry, January the 8th.  What year?

24          MR. LOPEZ:  I'm sorry, your Honor, 2016.

25          THE COURT:  2016.

1    Q.   And on page 23 of that transcript, there is a reference to

2    a phrase, "Welcome to the Mara," do you see that?

3    A.   Yes.

4    Q.   Now, originally when the indictment came down in this

5    case, do you know who that phrase was attributed to?

6    A.   No.

7    Q.   You don't.  At some point in November of last year, were

8    you aware that a similar transcript attributed this to someone

9    other than the person identified in this document?

11:44AM 10   A.   I believe so.

11   Q.   And it wasn't the same person that's identified here?

12   A.   I'd have to see both transcripts.

13   Q.   What I'm trying to get at, at some point the person who

14   was identified in the transcript that was used during the

15   November trial, if you know, was changed to the person who's

16   identified here?

17   A.   I don't know.

18   Q.   You don't know.  Then for this trial, yet a third person

19   was identified?

11:44AM 20   A.   Possibly.  You know, I didn't memorize the transcripts.

21             MR. LOPEZ:  No further questions, your Honor.

22             THE COURT:  Redirect, Ms. Lawrence.

23                        REDIRECT EXAMINATION

24   BY MS. LAWRENCE:

25   Q.   You were asked on cross-examination a little bit about

1    your process and you were asked about different drafts?

2    A.    Correct.

3    Q.    Again, can you just explain to the jury how you go through

4    the process of preparing a transcript from a recording, just in

5    simple terms?

6    A.    I listen to the recording, and I write the -- I transcribe

7    it into English.

8    Q.    And you make changes as you go as you listen to the

9    recording repeated times?

11:45AM 10    A.    Yes.

11    Q.    Okay.  And you also talked about you testified that you

12    did not identify the speakers?

13    A.    Correct.

14    Q.    And that one source of identification that appears on the

15    transcripts you create is information from Jose Hernandez

16    Miguel?

17    A.    Yes.

18    Q.    I believe you also testified on direct that there was

19    another source of information for the identity of the speakers?

11:46AM 20    A.    Yes, I could be -- I could have received the information

21    along with a recording of who the speakers are, but I don't

22    know exactly who identified those.

23    Q.    I'd like to show you.

24         MS. LAWRENCE:  This is just for the witness, please.

25    This is the excerpt of Exhibit 28 that was admitted into

1    evidence.  The jury can see this, too, correct?  It's been

2    admitted, this particular piece?

3              THE COURT:  Yes.

4              MS. LAWRENCE:  Thank you.

5    Q.   You were asked about the phrase in English, "There are

6    many of us here who have killed, homie"?

7    A.   Yes.

8    Q.   And you were asked about the meaning of the word "peguen,"

9    the Spanish?

11:46AM 10   A.   Peguen, of the word here, yes.

11   Q.   So why did you translate this particular Spanish phrase

12   into this English phrase?

13   A.   That is one of the words that is used by this group of

14   people to mean either a hit or a murder, a kill.

15   Q.   How do you know that?

16   A.   Because I was told by Mr. Hernandez.

17             MS. LAWRENCE:  One minute, your Honor.  Nothing

18   further, your Honor.

19             THE COURT:  Recross.

11:47AM 20                      RECROSS-EXAMINATION

21   BY MR. IOVIENO:

22   Q.   With respect to certain phrases now, you relied on Jose

23   Miguel Hernandez specifically with this phrase to tell you what

24   a word meant, correct?

25   A.   Not only on him, because I have in the last three years

1    become familiar through talking with different people involved

2    in this case, so I have acquired a vocabulary in the sense for

3    this particular case.

4    Q.    From other people involved in this case, correct?

5    A.    Well, you know, I think you'd call it experience.  From

6    working on something, you learn about it, and you learn the

7    words that are used.  I don't remember specifically where I

8    first heard the word, meaning -- with this meaning, but

9    including Mr. Hernandez, yes.

11:48AM 10    Q.    Were there other people who gave you that information

11    besides Mr. Hernandez?

12    A.    Nobody that comes to mind at this moment.

13    Q.    And you indicated that you relied on Mr. Hernandez, Jose

14    Miguel-Hernandez to identify the speakers, but you also relied

15    on unidentified people who had made other draft transcripts

16    that identified some speakers, too, also?

17    A.    For the final draft, I relied only on Mr. Hernandez to

18    identify.

19    Q.    For the other drafts that you incorporated into the final

11:49AM 20    draft, you relied on other people's interpretation in

21    identification of speakers, correct?

22    A.    I may have begun with a certain identification, but if

23    Mr. Hernandez identified it differently, I changed -- if it was

24    different, I changed it.

25    Q.    So you relied on what Mr. Hernandez gave you even to

1    change what other people had given you, correct?

2    A.   Well, who do you mean by other people?  Do you mean the

3    previous identifications in some of -- in the three or four

4    drafts that I saw?

5    Q.   Yes.

6    A.   Yes.

7    Q.   Thank you.

8         MR. LOPEZ:  Can I just have one question, your Honor?

9         THE COURT:  Yes.

11:49AM  10                    RECROSS-EXAMINATION

11   BY MR. LOPEZ:

12   Q.   You never relied on CW-1; is that fair to say?

13   A.   Yes.

14        MR. LOPEZ:  Thank you.

15        THE COURT:  You may step down now.  Thank you.  And we

16   may as well take our break now.

17        THE CLERK:  All rise.

18        (JURORS EXITED THE COURTROOM.)

19        (A recess was taken.)

12:03PM  20        THE CLERK:  All rise.

21        THE COURT:  Can I see counsel quickly at sidebar.

22        (SEALED SIDEBAR RELATING TO A JUROR).

23        (Exhibit D was marked for identification.)

24        THE COURT:  We need to swear in Ms. Huacuja as a

25   translator, which is different from being sworn in as a

 1    witness.

 2                (The interpreter was sworn.)

 3                JOSE HERNANDEZ MIGUEL, having been duly sworn by the

 4    Clerk, testified through the Interpreter as follows:

 5                MR. POHL:  May I, your Honor?

 6                THE COURT:  Yes.

 7                MR. POHL:  Thank you.

 8                        DIRECT EXAMINATION

 9    BY MR. POHL:

12:07PM 10    Q.    Good afternoon.

11    A.    Good afternoon.

12    Q.    What is your name?

13    A.    Jose Hernandez Miguel.

14    Q.    How old are you?

15    A.    Thirty.

16    Q.    You appear here today in court in an orange jumpsuit,

17    correct?

18    A.    Yes.

19    Q.    In 2016, were you charged in this court?

12:07PM 20    A.    Yes.

21    Q.    And did you plead guilty to the crimes you were charged

22    with?

23    A.    Yes.

24    Q.    And at the time you pleaded guilty, did you have a plea

25    agreement?

A.    Yes.

           MR. POHL:  For the witness, Madam Clerk.  Thank you.

Q.    Do you see the document in front of you, Mr. Hernandez
Miguel?

A.    Yes.

Q.    Okay.  Have you reviewed that document before your
testimony here today?

A.    Yes.

Q.    And I'm going to start with the first paragraph here.  To
make it easier for you to read, I'm going to blow it up I think
a little bit.  And this is paragraph 1 -- is this your plea
agreement?

A.    Yes.

Q.    Okay.  And does it list the crimes to which you pleaded
guilty?

A.    Yes.

Q.    And --

           THE COURT:  Excuse me, are you going to offer this?

           MR. POHL:  Yes, your Honor.

           THE COURT:  What number?

           MR. POHL:  It would be 49.1, and the corresponding
cooperation agreement will be 49.2.  If there's no objection,
I'll just move these into evidence now.

           THE COURT:  We'll admit them, 49.1 and 49.2.

           (Exhibit No. 49.1 and 49.2 received into evidence.)

1          THE COURT:  Thank you, your Honor.

2          MR. POHL:  Thank you.  All right.  Madame Clerk, for

3    the jury.

4    Q.   All right.  This is part of your plea agreement, correct?

5    A.   Yes.

6    Q.   And it sets out the crimes to which you've pleaded guilty,

7    correct?

8    A.   Yes.

9    Q.   And there are three crimes?

12:09PM 10   A.   Yes.

11   Q.   And one of them is racketeering conspiracy?

12   A.   Yes.

13   Q.   One of them is conspiracy to distribute 5 kilograms or

14   more of cocaine?

15   A.   Yes.

16   Q.   And the last one is conspiracy to distribute cocaine and

17   cocaine base, sometimes called "crack cocaine"?

18   A.   Yes.

19   Q.   Okay.  And there's a final portion of the plea

12:10PM 20   agreement -- of this section of the plea agreement below it,

21   correct?

22   A.   Yes.

23   Q.   As part of your plea in the racketeering conspiracy, you

24   admitted that you committed a violent crime, correct?

25   A.   Yes.

1    Q.    And what was that?

2    A.    That's participating in organized crime.

3    Q.    And while you were participating in that, did you commit a

4    stabbing?

5    A.    Yes.

6    Q.    Okay.  All right.  So I'll quickly go through this next

7    paragraph, Mr. Hernandez Miguel.  It talks about the maximum

8    penalty that you can get for the crimes you pleaded guilty to,

9    correct?

12:11PM 10    A.    Yes.

11    Q.    And for racketeering conspiracy, you can go to prison for

12    20 years, correct?

13    A.    Yes.

14    Q.    Okay.  And for the conspiracy to distribute 5 kilograms or

15    more of cocaine, you could go to prison for the rest of your

16    life, correct?

17    A.    Yes.

18    Q.    And at a minimum, you could serve -- you have to serve --

19    you would be required to serve 10 years in prison?

12:12PM 20    A.    Yes.

21    Q.    And for the conspiracy to distribute cocaine and crack

22    cocaine, you could again be sentenced to prison for 20 years?

23    A.    Yes.

24    Q.    Okay.  I'm going to show you the last two pages of this

25    part of your plea agreement.  This is the signature page,

1    correct?  This is a signature page, correct?

2    A.    Yes.

3    Q.    Where the government lawyer signed, correct?

4    A.    Yes.

5    Q.    And that's my signature on the bottom, correct?

6    A.    Yes.

7    Q.    Okay.  And the next page is the agreement by you, correct?

8    A.    Yes.

9    Q.    All right.  And is there a place where you signed to

12:13PM 10   indicate that you understood what you were agreeing to when you

11   signed the plea agreement?

12   A.    Yes.

13   Q.    Okay.  And is your signature on that document?

14   A.    Yes.

15   Q.    And under that signature is a space for your lawyer?

16   A.    Yes.

17   Q.    And that was signed on October 10, 2016?

18   A.    Yes.

19   Q.    Okay.  In addition to the plea agreement, it sets out the

12:14PM 20   charges against you, correct?  You had a second agreement,

21   correct?

22   A.    Yes.

23   Q.    All right.  Mr. Hernandez Miguel, have you reviewed

24   this -- this is, for the record, 49.2.  Have you reviewed this

25   document before you testified here today?

1    A.    Yes.

2    Q.    Okay.  And I'm going to just skip all the way to the end.

3    Again, there's a signature lines for the government lawyers to

4    sign, correct?

5    A.    Yes.

6    Q.    And then the final page, there's again a space for you to

7    sign, correct?

8    A.    Yes.

9    Q.    Okay.  And Mr. Hernandez Miguel, can you, in your own

12:15PM 10    words, explain what you are required to do under the

11    cooperation agreement that you signed?

12    A.    What I understand from this paper is that I have to speak

13    only the truth.

14    Q.    Okay.  You've pleaded guilty in this case, correct?

15    A.    Yes.

16    Q.    All right.  Have you been sentenced yet?

17    A.    No.

18    Q.    Okay.  And do you know, as you sit here today, what

19    sentence you will get for the crimes you've pleaded guilty to?

12:16PM 20    A.    Yes.

21    Q.    Okay.  Well, you haven't been sentenced yet, correct?

22         MR. MURPHY:  Objection, your Honor.

23         THE COURT:  Overruled.

24    A.    No.

25    Q.    Okay.  And do you know when you are -- do you have a date,

 1    do you know when that sentencing is going to happen?

 2    A.    Yes.

 3    Q.    Okay.  Well, Mr. Hernandez Miguel, when you said that you

 4    have to tell the truth, okay --

 5    A.    Yes.

 6    Q.    -- prior to your testimony here today, have you met with

 7    agents?

 8    A.    Yes.

 9    Q.    Okay.  And have they asked you questions?

12:17PM 10    A.    Yes.

11    Q.    Okay.  And have you reviewed recordings?

12    A.    Yes.

13    Q.    And audio recordings?

14    A.    Yes.

15    Q.    And video recordings?

16    A.    Yes.

17    Q.    Mr. Hernandez Miguel, have you ever heard of the

18    organization known as "La Mara Salvatrucha" or "MS-13"?

19    A.    Yes.

12:18PM 20    Q.    Okay.  Are you a member of MS-13?

21    A.    Yes.

22    Q.    Where were you born?

23    A.    In El Salvador.

24    Q.    How long did you -- well, when did you first come to the

25    United States?

1    A.    In 2001.

2    Q.    And where did you grow up in El Salvador?

3    A.    La Union.

4    Q.    And who did you live with?

5    A.    With my parents.

6    Q.    Okay.  Do you have any brothers and sisters?

7    A.    Yes.

8    Q.    How many?

9    A.    Nine.

12:19PM 10    Q.    Did you ever hear of MS-13 when you lived in El Salvador?

11    A.    Yes.

12    Q.    How did you hear about MS-13 in El Salvador?

13    A.    In the area where I lived, there were many members of MS.

14    So in the area where we lived, there were a lot of members, and

15    that's how I met them.

16    Q.    So, how old were you when you first met members of MS-13?

17    A.    About 10 years ago.

18    Q.    Did you join MS-13 when you were in El Salvador?

19    A.    No.

12:20PM 20    Q.    Okay.  How old were you when you first came to the

21    United States?

22    A.    Fourteen years old.

23    Q.    How did you come to the United States?

24    A.    I came with a coyote.

25    Q.    Okay.  What is a coyote?

A.    Someone whom you pay who knows the route well and you pay
them to bring you to this country.

Q.    So how did you -- tell the jury how you did that.  How did
you leave El Salvador and how did you travel to the
United States?

A.    When I was 14 years old, an uncle of mine came to
El Salvador to travel, and he told me that he would help me in
order for me to help my family, to help my father.

Q.    Let me interrupt you.  Your uncle, did he live in the
United States at the time he came to visit you in El Salvador?

A.    Yes.

Q.    Okay.  So your uncle came to visit?

A.    Yes.

Q.    And after that visit, you decided to come to the
United States?

A.    Yes.

Q.    With the coyote?

A.    Yes.

Q.    Okay.  How did you get from El Salvador to the
United States when you came at age 14?

A.    My uncle paid for a coyote.  He paid half in El Salvador
and the other half when I was in L.A.

Q.    Where did you cross into the United States?

A.    Through Arizona.

Q.    Did you walk across?

1    A.    Yes.

2    Q.    And after you crossed into Arizona, where did you go?

3    A.    I reached L.A., and my uncle picked me up in L.A.  My

4    uncle lived at a place called Seaside in California.  It's near

5    Salinas.

6    Q.    And is that where you settled initially?

7    A.    Yes.

8    Q.    Did you go to school?

9    A.    Yes.

12:23PM 10    Q.    Where did you go to school?

11    A.    At the high school in Seaside.

12    Q.    What happened in high school?

13    A.    When I arrived, I had two jobs, when I arrived at Seaside.

14    After that, a friend that played soccer with me asked me how

15    old I was.  I told him I was 15, and he told me you have to go

16    to high school.  And he said if you ever want to go to high

17    school, call me, I will take responsibility for you.  So one

18    day I called him that I wanted to go to school, and he took

19    charge, and that's why I went to high school.

12:24PM 20    Q.    Okay.  While you were in high school, okay, would it be

21    fair to say that you got in fights while you were in high

22    school?

23    A.    Yes, when I started high school, I met the Surenos.

24    Q.    Okay.  What are the Surenos?

25    A.    It's an L.A. gang, and they are called Surenos 13.  I met

1    about four of them, and they represent the blue, the color

2    blue.  So I started joining them, and it was through them that

3    I met a member of MS because one day I went out to smoke with

4    them, and we used to fight the Nortenos, and one day, through a

5    girl, he told me to go with him to smoke at a dude's house who

6    was from MS.

7    Q.   Smoke what?

8    A.   Marijuana.

9    Q.   So your friends that were in the Surenos took you to a

12:26PM 10   house, and the person who lived in the house was an MS-13?

11   A.   Yes.

12   Q.   Okay.  Who was that?

13   A.   But I went with a girl to the member's house of MS-13.

14   Q.   Okay.  All right.  Who did you meet at that house?

15   A.   Curly.

16   Q.   Okay.  Who was Curly?

17   A.   He was the word for a clique called Eastside Loco

18   Salvatrucha.

19        THE INTERPRETER:  I'm sorry, not Eastside, Seaside

12:27PM 20   Loco Salvatrucha.

21   Q.   Okay.  You said that he was the word?

22   A.   Yes.

23   Q.   What does that mean, to be the word?

24   A.   He's the -- palabrero is the person that runs the clique

25   because in the clique there's first word and second word.  The

1    first word is in charge of bringing together all the members of

2    the clique for a meeting, for meetings.

3    Q.    What is a clique?

4    A.    Cliques are small groups of MS-13.

5    Q.    And the person that you met, Curly, was the first word of

6    a particular clique?

7    A.    Yes.

8    Q.    Okay.  And it was called Seaside?

9    A.    Yes.

12:28PM 10    Q.    All right.  Once you met Curly, did you begin spending

11    time with members of MS-13?

12    A.    Yes.

13    Q.    What kind of things did you do?

14    A.    When I first met Curly, he asked me who I hung out with,

15    and I told him I hung out with Surenos in the high school, and

16    he said why don't you hang out with the dudes from MS-13, and I

17    told him I hadn't met anyone in that area, so he told me that

18    if I wanted to, I could start hanging out with them, and that's

19    when I started hanging out with the MS.

12:29PM 20    Q.    Okay.  So what kinds of things would you do when you hung

21    out with the members of the Seaside clique of MS-13?

22    A.    Fights against Nortenos, sometimes stabbing.  That's what

23    the MS-13 does is kill rivals.

24    Q.    As you were hanging around and meeting MS-13 members, they

25    taught you about what it means to be an MS-13?

1    A.    Yes.

2    Q.    Did they teach you -- they taught you about cliques,

3    correct?

4    A.    Yes.

5    Q.    As you were hanging out, did you meet members of other

6    cliques?

7    A.    In Seaside, that was the only clique.

8    Q.    Okay.  What did they teach you about how you could become

9    a member of MS-13?

12:31PM 10    A.    That one has to learn, that one has to gain the respect of

11    the homies.

12    Q.    Of the homies, is that what you said?

13    A.    Yes, the people who are already jumped in.

14    Q.    Okay.  So you said three things there.  I'm going to ask

15    you about all three of them.  First of all, you said the word

16    "homies."  Okay.  Is that a shorthand way of saying homeboy?

17    A.    Yes.

18    Q.    What is a homeboy?

19    A.    A homeboy is someone who belongs to MS-13 that's already

12:31PM 20    been jumped.

21    Q.    Okay.  So, how do you become a homeboy in MS-13?

22         MR. MURPHY:  Objection, your Honor, time frame.

23         THE COURT:  Well, I guess we'll start with what he

24    learned or understood as to the Seaside clique during this time

25    period.

1          THE INTERPRETER:  Could you repeat the question?

2     Q.   Let me ask you a better question.  You heard -- you used

3     the term "jumped" or "jumped in."  What does that mean to you?

4     A.   To "jump" or "jump in" is when one already has the respect

5     of the clique and they jump you in.  They make a circle, and

6     three of them hit you while the runner is counting for 13

7     seconds.

8     Q.   And then you used the term "respect."  What things does

9     someone have to do to earn that respect, to become a homeboy in

12:33PM 10    MS-13?

11          MR. MURPHY:  Objection, your Honor, same objection.

12    Time frame.

13          THE COURT:  I guess let's start by putting a time

14    frame on that.

15          MR. POHL:  Yes, your Honor.

16    Q.   This is -- well, you came to the United States in 2001?

17    A.   Yes.

18    Q.   Okay.  All right.  So how many years had you been in the

19    United States when you first began to associate with MS-13?

12:33PM 20    A.   About two years.

21    Q.   Okay.  And so for now, the questions I'm asking you are

22    what you were learning at the time that you were first getting

23    to know people in MS-13.  So at the time that you were learning

24    about MS-13 in California, you were told that you had to earn

25    respect in order to become a member of MS-13; is that correct?

1    A.    Yes.

2    Q.    What kinds of things did you have to do to gain the

3    MS-13's respect before you could become a member?

4    A.    To go out and look for rivals, Nortenos, fight, fight or

5    stab them.

6    Q.    Did somebody tell -- well, how long did you spend time

7    with the members of the clique -- well, let me ask you this.

8    Did you become a member of MS-13 in the Seaside clique in

9    California?

12:35PM 10    A.    Yes.

11    Q.    So how long did you spend getting to know the members of

12    MS-13 before you became a member?

13    A.    About six months.

14    Q.    All right.  Did you do anything during that time, those

15    six months, to earn MS-13's respect?

16    A.    Yes.

17    Q.    What was that?

18    A.    Stab, fights.

19    Q.    Let's talk about the stabbing.  Can you tell the jury

12:36PM 20    about the stabbing you committed while you were in this period

21    of six months before you became a member of MS-13?

22    A.    We would go out with other dudes walking to look for

23    Nortenos.  Sometimes we'd go out to the liquor stores on the

24    main streets and stand there, and we would grab them right

25    there and fight with them because that's the mission of the

1    dudes of MS, which is to kill or stab rival members.

2    Q.    Why?  Why is that the mission?

3    A.    Because MS want to be the only one.  It doesn't want any

4    rivals.  It wants to control everything.

5    Q.    All right.  You committed a stabbing while you were

6    getting to know the members of the MS-13 clique in California,

7    correct?

8    A.    Yes.

9    Q.    Okay.  And what did you use to commit the stabbing?

12:38PM 10    A.    It was a knife that had three blades.

11    Q.    Okay.  So you did something with your hand there.  Can you

12    hold it up for me?  What is it that you did?

13    A.    It was like this. (Indicating)

14    Q.    And who did you stab?

15    A.    A Norteno.

16    Q.    And who were you with when you stabbed them?

17    A.    With Curly, a Sureno, and Curly's girlfriend.

18    Q.    After that stabbing, what happened to you with the Seaside

19    clique?

12:38PM 20    A.    Curly said to me that I had already now done something for

21    MS-13 and that I had some respect and that since I had now done

22    something for MS, if I wanted to, I could be jumped in, and I

23    said yes.  So I was taken to a park and they formed a circle,

24    they put me in the middle, and I started getting a beating

25    there and while somebody counted to 13.  And then after the

1    counting is over, everybody throws up their hand to flash the

2    Mara in joy.

3    Q.   What do you mean by that, that everybody holds up their

4    hands?  How do they hold up their hands?

5    A.   Flashing your hand up, flashing the MS-13 sign, the M and

6    the S.

7    Q.   Okay.  So you did it while you were talking.  Can you do

8    it again when you're not talking.  What is it exactly that you

9    do to signify that you're an MS?

12:40PM 10    A.   Like this (indicating).  This is the M and this is the S.

11    Q.   After you became a member of MS-13, did you come to visit

12    Boston?

13    A.   Yes.

14    Q.   Why did you come -- maybe I shouldn't have said Boston.

15    Why did you come to Massachusetts?

16    A.   I had a sister in Massachusetts and her husband had passed

17    away and she asked me to come here.

18    Q.   Where did she live?

19    A.   In East Boston.

12:41PM 20    Q.   And do you remember when approximately you first came to

21    visit your sister in East Boston?

22    A.   Around 2004.

23    Q.   Okay.  And before you left to come to Boston, did you talk

24    about that with Curly?

25    A.   Yes, I spoke to Curly, and I told him that I was planning

1    to come to Boston because I had a sister here, and Curly told

2    me that he had been in Boston and that he knew the dudes from

3    the MS here and that if I came to Boston, he was going to put

4    me in touch with the members of MS so that I could hang out

5    with them.

6    Q.    Okay.  Did he do that?

7    A.    Yes.

8    Q.    How did he do that?

9          MR. MURPHY:  Objection, your Honor.

12:42PM 10          THE COURT:  Let me see counsel quickly.

11          (THE FOLLOWING OCCURRED AT SIDEBAR:)

12          THE COURT:  What answer do you expect to elicit?

13          MR. POHL:  Curly put him in touch with Casper and then

14    he met Casper when he came to Boston.

15          MR. MURPHY:  Your Honor, this is really merely to make

16    sure we are not waiving our earlier Petroziello-type objections

17    since I don't know that we've heard of Curly before.  We've

18    heard of him in discovery.

19          MR. POHL:  But not during the trial.

12:43PM 20          THE COURT:  Yes.  Mr. Lopez.

21          MR. LOPEZ:  I would also ask that the witness just

22    answer the question asked and not continue to speak and add

23    stuff about what Curly told him.  I mean, we can move to

24    strike, but I know it's background, but there's a lot of

25    hearsay coupled in.

1          THE COURT:  I'm not sure there's too much of it, but

2    you're going to have to move to strike.  I guess -- I mean, I'm

3    sure Mr. Pohl's ability to limit this is limited, you know, so

4    we'll take it question and answer at a time.  We'll try to

5    control it as best we can as with any witness.  And if you

6    think it's something really out of line, you'll have to move to

7    strike, okay?  Obviously, if you think he's about to blurt out

8    hearsay, you can interrupt him for that purpose with an

9    objection.

12:44PM 10          MR. LOPEZ:  Mu point is simply that there's no

11    allegation that Curly is part of this conspiracy.  His

12    statements are not part of --

13          THE COURT:  Well, I'm assuming that there's no Curly,

14    because of the *Petroziello* statements.

15          MR. POHL:  Correct.

16          THE COURT:  So I don't expect that to be elicited.

17          MR. LOPEZ:  All right.  Okay.  Thank you.

18          (SIDEBAR CONFERENCE WAS CONCLUDED)

19          THE COURT:  Why don't you put the question to the

12:44PM 20    witness again.

21    Q.   So, I think that the question was after you told Curly you

22    were coming to Boston and he told you that he knew people in

23    the Boston area there in MS, did Curly put you in touch with

24    any MS members in Boston?

25    A.   Yes.

1    Q.    Okay.  And who did he put you in touch with?

2    A.    With Casper.

3    Q.    When did you meet Casper?

4    A.    I met him about two weeks after I arrived in Boston.

5    Q.    And where did you meet him?

6    A.    I lived on Eutaw Street in East Boston, and he came by

7    there to pick me up.

8              MR. POHL:  And for the witness.

9    A.    That's Casper.

12:46PM 10    Q.    This is -- for the record, I'm showing the witness

11    Exhibit 2.  That's Casper?

12    A.    Yes.

13              MR. POHL:  I'd offer this, your Honor.

14              THE COURT:  It's already in.

15              MR. POHL:  All right.

16    Q.    When Casper came to pick you up, what do you remember

17    about the first time you met Casper?

18    A.    Well, Curly had already told me that Casper was a homeboy,

19    so he came by --

12:46PM 20              MR. MURPHY:  Objection, your Honor.

21              THE COURT:  I'm going to strike the thing about what

22    Curly said.  Let's start over.

23              MR. POHL:  Sure.

24    Q.    And you met with -- well, you got in the car with Casper?

25    A.    Yes.

1    Q.    And where did you go?

2    A.    We went to hang out in Lynn, but since I didn't know my

3    way around, I don't remember which house we went to, but I do

4    remember that there were other dudes from MS there.

5    Q.    Like who?

6    A.    Playa was there, there were other dudes as well, like

7    Rebelde (ph).  There was a dude that they called Tecolote, (ph)

8    and there were more there, but I don't recall.

9    Q.    Can I put up Exhibit 3, which has already been admitted.

12:47PM 10    Mr. Hernandez Miguel, I'm putting up Exhibit 3.  Do you

11    recognize the person in that photograph?

12    A.    Yes, Playa.

13    Q.    All right.  So that -- what did you do that day when you

14    met Casper and Playa?

15    A.    We went there and we were drinking there.

16    Q.    When you met Casper and Playa and the other people that

17    you met that day, is there a way that you, as a member of

18    MS-13, would introduce yourself to other members?

19    A.    Yes.

12:48PM 20    Q.    What would you say?  Well, strike that.  What did you say?

21    A.    Well, when you arrive somewhere where there are other

22    dudes from MS-13, you flash the MS sign, and you say the name

23    of the clique you belong to, and you also say what rank you

24    are.

25    Q.    Okay.

1    A.    I'm sorry, and you also say your street name.

2    Q.    Okay.  So did you have a street name at that time?

3    A.    Yes.

4    Q.    Okay.  Did you get it at the time that you were -- or did

5    you being to use it after you were jumped in?

6    A.    That name you are given after you become a homeboy.

7    Q.    Right.  And what was the name that you used after you

8    became a homeboy with MS-13?

9    A.    Muerto.

12:50PM 10    Q.    So, all right, let's jump back to Boston now.  So when you

11    met Casper, Playa, the other people you talked about, you

12    introduced yourself?

13    A.    Yes.

14    Q.    And how did you introduce yourself?

15    A.    That I was Muerto from the Seaside Locos in California.

16    Q.    Okay.  And I think you said, in your answer before, you

17    said something about your rank or your position.  What did you

18    say to that?

19    A.    Yes.

12:50PM 20    Q.    What did you say?

21    A.    Homeboy.

22    Q.    Okay.  And did you have that conversation with Casper?

23    A.    While we were in the car.

24    Q.    What did Casper say to you when you -- after you

25    introduced yourself?

1    A.    He was the runner of the Eastsides.

2    Q.    After he drove you to the house in Lynn and you met

3    Playa -- excuse me after you met Mr. Guzman, you introduced

4    yourself to -- you introduced yourself?

5    A.    Yes.

6    Q.    The same way?

7    A.    Yes.

8    Q.    What did Mr. Guzman say to you after you introduced

9    yourself?

12:51PM 10    A.    Well, one flashes MS and identifies the clique.  At first,

11    he didn't tell me that he was a runner.

12    Q.    The first time you met him, how did he introduce himself?

13    A.    As a homeboy.

14    Q.    So, Mr. Hernandez Miguel, how long did you say in Boston

15    that first time that you met Casper and Playa?

16    A.    About six or seven months, something like that.

17    Q.    And after that time, where did you go?

18    A.    I went back to California.

19    Q.    Eventually -- would I be correct that you came back and

12:52PM 20    forth from California to Boston a couple of times?

21         MR. MURPHY:  Objection, leading.

22         THE COURT:  Sustained.

23    Q.    Well, at some point, Mr. Hernandez Miguel did you move to

24    Massachusetts permanently?

25    A.    Yes.

1    Q.    About when was that?

2    A.    Around 2007.

3    Q.    When you came to Massachusetts in 2007, where did you

4    live?

5    A.    In East Boston.

6    Q.    Okay.  And did you spend -- well, when you moved back in

7    2007, what did you do?  Well, who did you -- did you see Casper

8    and Playa when you came back in 2007?

9    A.    Not in the first few days because I went to hang out with

12:53PM 10   some dudes in Somerville, so I was hanging out with the dudes

11   in Somerville, and about six months later I came and met with

12   them.  I started to see them again in Everett at Tecolote's

13   house.

14   Q.    And when you began to see them again six months after you

15   came back to Massachusetts to stay, did you have a conversation

16   with Casper about his clique?

17         THE INTERPRETER:  I'm sorry.  Can you repeat the last

18   part of the question?

19   Q.    And his clique.

12:54PM 20   A.    Yes.

21   Q.    Okay.  And what did Casper -- what did you and Casper talk

22   about concerning his clique, concerning Casper's clique?

23   A.    Since I was hanging out with the dudes in Somerville and

24   then I came to hang out at Tecolote's, one day Casper said why

25   don't you run with the Eastside clique since my clique was in

1    California and to take the word with Eastside.

2    Q.    What did you say to that?

3    A.    I said yes.

4    Q.    And through -- after that conversation, did you begin to

5    associate yourself with the Eastside clique?

6    A.    Yes.

7    Q.    Okay.  Now, you were jumped into MS-13 in Seaside in

8    California, correct?

9    A.    Yes.

12:55PM 10    Q.    Yet you were allowed to associate with Eastside here?

11           MR. MURPHY:  Objection, your Honor.  Leading.

12           THE COURT:  Sustained.

13    Q.    Well, when Casper brought you into the -- well, when

14    Casper suggested that you start to hand out with Eastside, did

15    you meet other members of the clique?

16    A.    Yes, I saw Playa again.

17    Q.    Okay.  And what would you do with Casper and Playa?

18    A.    Well, Casper was the runner and at that point Playa

19    introduced as second.

12:56PM 20    Q.    Did you meet other members of the clique through Casper

21    and Playa?

22    A.    Yes.

23    Q.    I'm putting up Exhibit 5.  Who is that?

24    A.    Lobo.

25    Q.    Putting up Exhibit 4, who is that?

1       A.    CheChe.

2       Q.    Okay.  All right.  I'm going to show you a series of other

3       pictures starting with 7 for the witness.

4       A.    Tigre.

5       Q.    8?

6       A.    Brujo.

7       Q.    9?

8       A.    Animal.

9       Q.    10?

12:57PM 10    A.    Vincentino.

11      Q.    And 11.

12      A.    Caballo.

13      Q.    I want to show you one more picture, 12.

14      A.    Danger.

15      Q.    Okay.  How do you know those people?  How do you know

16      Tigre, Brujo, Animal, Vincentino, Caballo, and Danger?

17                  MR. MURPHY:  Objection.

18                  THE COURT:  I'll allow it.

19                  THE WITNESS:  They are homeboys.

12:58PM 20                  MR. POHL:  I'd offer all of those, your Honor, 7

21      through 12, yes.  8 is already in, 7, 9, 10, 11, 12.

22      Thank you, Madam Clerk.

23                  THE COURT:  7, 9, 10, 11, 12 are admitted.

24                  (Exhibit No. 7, 9, 10, 11, 12 received into evidence.)

25      Q.    Let's go back to 4 for one minute, okay.  Who is that?

```
 1    A.    CheChe.

 2    Q.    When did you meet CheChe?

 3    A.    Around 2008 or maybe 2007.

 4    Q.    And tell us about how you met CheChe.

 5    A.    I met him in East Boston.

 6    Q.    And did you introduce yourself to him?

 7    A.    Yes.

 8    Q.    All right.  And after you introduced yourself to him, how

 9    did he introduce himself to you?

10    A.    He was a homeboy.

11    Q.    Okay.  With what clique?

12    A.    Eastside.

13          MR. NORKUNAS:  Judge, I object to that and ask that

14    that be stricken.

15          THE COURT:  Overruled.

16    Q.    Okay.  And putting up Exhibit 5, who is that?

17    A.    Lobo.

18    Q.    All right.  And when -- do you remember meeting Lobo?

19    A.    Yes.

20    Q.    When did you meet Lobo?

21    A.    I met him around 2013.

22    Q.    All right.  Where did you meet him?

23    A.    I met him after he had been jumped.

24    Q.    Okay.  And you introduced yourself to him?

25    A.    Yes.
```

12:59PM (line 10)
01:00PM (line 20)

1    Q.    And when you said you met him after he had been jumped,

2    what clique had he been jumped into?

3    A.    The Eastside Locos Salvatrucha.

4          MR. POHL:  Judge, would this be a good time to stop?

5          THE COURT:  Yes.  All right.  Ladies and gentlemen,

6    we're going to stop for the day.  Tomorrow is the day that

7    we're going to start at 9:30.  We'll still go to one.  My plan

8    is, unless someone needs a break, to try to break whatever the

9    mid-point is of that, 11:15, somewhere in there and go to 1:00

01:01PM 10   to have a normal day, and hopefully it will be about as long as

11   a regular day.

12         So again, please remember my caution not to discuss

13   the case among yourselves or with anyone else and not to pay

14   any attention to any media reports if there are any, and I'll

15   see you tomorrow morning at 9:30.

16         THE CLERK:  All rise.

17         (JURORS EXITED THE COURTROOM.)

18                              - - - -

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7            I do hereby certify that the foregoing transcript was

8    recorded by me stenographically at the time and place aforesaid

9    in Criminal Action No. 15-10338-FDS, UNITED STATES vs. HERZZON

10   SANDOVAL, et al., and thereafter by me reduced to typewriting

11   and is a true and accurate record of the proceedings.

12            Dated this 5th day of February, 2018.

13                    s/s Valerie A. O'Hara

14            _____

15            VALERIE A. O'HARA

16            OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25