1                      UNITED STATES DISTRICT COURT
                         DISTRICT OF MASSACHUSETTS
2

3

UNITED STATES OF AMERICA              )
4                                     )
   vs.                                )  Criminal Action
5                                     )
   HERZZON SANDOVAL,                   )  No. 15-10338-FDS
6  EDWIN GUZMAN,                       )
   CESAR MARTINEZ,                     )
7  ERICK ARGUETA LARIOS,               )
                       Defendants      )
8

9

BEFORE:   THE HONORABLE F. DENNIS SAYLOR, IV
10

11

                        JURY TRIAL DAY 12
12

13                        TESTIMONY ONLY

14

          John Joseph Moakley United States Courthouse
15                       Courtroom No. 2
                        1 Courthouse Way
16                       Boston, MA 02210

17              14th day of February, 2018

18

19

20

21

22

23                      Valerie A. O'Hara
                       Official Court Reporter
24        John Joseph Moakley United States Courthouse
                 1 Courthouse Way, Room 3204
25                      Boston, MA 02210
                    E-mail: vaohara@gmail.com

1     APPEARANCES:

2     For The United States:

3          United States Attorney's Office, by CHRISTOPHER J. POHL,
      ASSISTANT UNITED STATES ATTORNEY, and KELLY BEGG LAWRENCE,
4     ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200,
      Boston, Massachusetts 02110;
5
      For the Defendant Herzzon Sandoval:
6
           Foley Hoag LLP, by MARTIN F. MURPHY, ESQ. and
7     MADELEINE K. RODRIGUEZ, ATTORNEY,
      155 Seaport Boulevard, Boston, Massachusetts 02210;
8
      For the Defendant Edwin Guzman:
9
           Lawson & Weitzen, by SCOTT P. LOPEZ, ESQ.,
10    88 Black Falcon Avenue, Suite 345, Boston, Massachusetts 02210

11    For the Defendant Erick Arueta Larios:

12         THOMAS J. IOVIENO, ESQ., 345 Neponset Street
      Canton, MA 02021;
13
      For the Defendant Cesar Martinez:
14
           Stanley W. Norkunas, 11 Kearney Square,
15    Howe Building, Suite 202, Lowell, Massachusetts 01852.

16         ROBERT M. SALTZMAN, ESQ., 1 Central Street, Suite 5,
      Stoneham, Massachusetts 02180.
17

18

19

20

21

22

23

24

25

3

1                          I N D E X

2    WITNESS                    DIRECT   CROSS  REDIRECT  RECROSS

3    EDWARD NOFTLE
       By Ms. Lawrence            5
4
     TIMOTHY O'CONNOR
5      By Ms. Lawrence           10
       By Mr. Norkunas                   18
6      By Mr. Murphy                     20
       By Mr. Lopez                      22
7
     GLENN COTE
8      By Mr. Pohl               23
       By Mr. Norkunas                   35
9
     MATTHEU KELSCH
10     By Mr. Pohl               37
       By Mr. Norkunas                   48
11
     BRIAN ESTEVEZ
12     By Ms. Lawrence           51              129
       By Mr. Iovieno                    99
13     By Mr. Norkunas                   110              131
       By Mr. Lopez                      124
14
     SCOTT CONLEY
15     By Mr. Pohl              132
       By Mr. Norkunas                   145
16     By Mr. Murphy                     146

17   WILLIAM BRIZUELA
       By Mr. Pohl              153
18     By Mr. Murphy                     159

19   MAURICIO SANCHEZ
       By Ms. Lawrence          161
20

21

22

23

24

25

1

| EXHIBITS | FOR I.D. | IN EVIDENCE |
|---|---|---|
| 37 | | 11 |
| 39.1 through 39.5 | | 31 |
| 41 | | 17 |
| 42 | | 18 |
| 43 | | 63 |
| 59 | | 144 |
| 64.4 | | 88 |
| 64.5 | | 90 |
| 70 | | 7 |
| 71 | | 5 |
| 110.1 and 110.2 | | 163 |
| 111 | | 155 |
| 117.1, 117.2 and 117.3 | | 158 |
| 118.1 through 118.30 | | 91 |

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>TESTIMONY ONLY</u>

1              MS. LAWRENCE:  The government calls Edward Noftle.

2              EDWARD NOFTLE, having been duly sworn by the Clerk,

3 testified as follows:

4                  DIRECT EXAMINATION

5 BY MS. LAWRENCE:

6              THE WITNESS:  Good morning, Judge.

7              THE COURT:  Good morning.

8              MS. LAWRENCE:  Your Honor, before I begin my direct

09:03AM 9 examination, the parties have a stipulation regarding the

10 admissibility of Exhibit 71, which is a 9-1-1 tape.  I

11 offer 9-1-1 -- sorry, I offer Exhibit 71 into evidence and ask

12 that it be played for the jury.

13              THE COURT:  All right.  It's admitted, Exhibit 71.

14            (Exhibit No. 71 received into evidence.)

15            (Video plays)

16 Q.  Good morning.  Can you please introduce yourself to the

17 jury?

18 A.  Good morning.  Edward Noftle.  Last name is N-o-f, like

09:04AM 19 Frank, t-l-e, and I'm a police officer with the City of

20 Chelsea.

21 Q.  Thank you.  How long have you worked for the Chelsea

22 Police Department?

23 A.  This is my 30th year.

24 Q.  What unit are you currently assigned to?

1    A.    I'm assigned to the patrol division, and I'm a canine

2    handler.

3    Q.    What's your title, sir?

4    A.    Police officer.

5    Q.    What kinds of things do you do as a patrol officer with

6    the K-9 unit?

7    A.    We handle routine calls for service, accidents, domestics,

8    fights.

9    Q.    Were you working as a patrol officer on May 12, 2015?

09:05AM 10    A.    Yes.

11    Q.    Did you receive a call that day?

12    A.    Yes, I did.

13    Q.    And what did you do?

14    A.    I responded to Highland Park.

15    Q.    When you arrived, what did you see?

16    A.    There were a group of males on the right side.  As you

17    enter the park, there's a basketball court.

18    Q.    Actually, one moment, please.  Can I show you Exhibit 70,

19    please.  Do you recognize this photograph?

09:05AM 20    A.    Yes.

21    Q.    What is it a picture of?

22    A.    It's Highland Park in Chelsea.

23    Q.    Does this look like it did on May 12, 2015?

24    A.    Yes.

25            MS. LAWRENCE:  Your Honor, I move to admit Exhibit 70.

1          THE COURT:  All right.  It's admitted, Exhibit 70.

2          (Exhibit No. 70 received into evidence.)

3    Q.    Okay.  Officer Noftle, as you were describing when you

4    arrived on the park, can you point on the screen where you

5    responded to?

6    A.    (Indicating) I came on scene from Willow Street, which is

7    here and the entrance to the parking lot is just north of right

8    here.

9    Q.    And when you arrived at the parking lot, what did you see?

09:06AM 10   A.    I pulled in on the far side, and to my right, which was

11   right in this area here, there were a group of males, and there

12   was one male laying on the ground with his back against the

13   fence.

14   Q.    What did you do when you saw him?

15   A.    I could see that he was bleeding, lifted up his shirt,

16   applied direct pressure to -- it was a single stab wound.

17   Q.    In what area of his body?

18   A.    It was middle of his torso to the left of center just

19   below his breast line.

09:06AM 20   Q.    Did you see anything else when you lifted up his shirt?

21   A.    He had several tattoos on his torso.

22   Q.    Did you or someone from your force, police officer force,

23   take a picture of the tattoos?

24   A.    No, I did not.

25   Q.    And why did you not do that?

1    A.    At the time because of the blood and the stab wound just

2    applying direct pressure waiting for the ambulance to show up.

3    Once the ambulance came, we got him right in, and they

4    transported him immediately to the hospital.

5    Q.    Okay.  But did you observe a tattoo?

6    A.    Yes.

7    Q.    And prior to your testimony here today, did you look at

8    examples, pictures of other tattoos?

9    A.    Yes.

09:07AM 10        MS. LAWRENCE:  Exhibit 222 for the witness, please.

11    Q.    Officer Noftle, what is this?

12    A.    That's a tattoo.  The X and the 8 usually symbolizes the

13    18th Street gang.

14    Q.    And is this similar to the tattoo that you observed on the

15    person who had been stabbed on May 12, 2015?

16    A.    It is.

17        MS. LAWRENCE:  Okay.  May we publish this to the jury

18    as a chalk please, your Honor?

19        THE COURT:  All right.

09:08AM 20    Q.    And, again, Officer Noftle, can you just describe to the

21    jury what this is?

22    A.    So the X would be the roman numeral 10 here and then the

23    8, so added together it would be 18 for 18th Street.

24    Q.    Okay.  You said that after you had applied direct pressure

25    to the wound, the victim was taken away in an ambulance.  Did

1    you happen to learn the victim's name at some point?

2    A.    Yes.

3    Q.    What was that?

4    A.    I believe the last was Ochoa.  I'm not sure of the -- I

5    don't remember the first.

6    Q.    After he was taken away, Mr. Ochoa was taken away, what

7    did you do?

8    A.    He was put into the ambulance, and his sister arrived on

9    scene and she was visibly upset.  She was trying to get

09:08AM 10  information from us about her brother, and she asked about the

11   stab wound.

12   Q.    What did you tell her?

13   A.    I told her that it was a stab wound to the chest, could be

14   fatal, sometimes they're superficial, there's no way to tell on

15   scene, but that she should try to find out from her brother if

16   she could get any information on who stabbed him.

17   Q.    What did she do after you told her to talk to her brother?

18   A.    She went into the front of the ambulance and I never heard

19   from her again.

09:09AM 20  Q.    So she never provided you with any information about the

21   stabbing?

22   A.    No.

23              MS. LAWRENCE:  Okay.  Nothing further, your Honor.

24              THE COURT:  Cross?

25              MR. IOVIENO:  No, your Honor.

1          THE COURT:  Okay.  Thank you.  You may step down.

2          THE WITNESS:  Thank you, Judge.

3          MS. LAWRENCE:  The government calls Timothy O'Connor.

4          TIMOTHY O'CONNOR, having been duly sworn by the Clerk,

5     testified as follows:

6                         DIRECT EXAMINATION

7     BY MS. LAWRENCE:

8     Q.   Good morning.

9     A.   Good morning.

09:10AM 10     Q.   Can you please introduce yourself to the ladies and

11     gentlemen of the jury?

12     A.   My name is Trooper Timothy O'Connor.

13     Q.   Who do you work for Trooper O'Connor?

14     A.   Massachusetts State Police.

15     Q.   How long have you worked for the State Police?

16     A.   Approximately 12 years.

17     Q.   What's your current assignment?

18     A.   I'm currently assigned to the homicide division of the

19     Suffolk County Detective unit.

09:10AM 20     Q.   What kind of things do you investigate?

21     A.   We conduct death investigations throughout Suffolk County,

22     which includes Chelsea, Revere, Winthrop, state property in the

23     City of Boston, MassPort, Seaport District.  We conduct

24     homicide investigations, any type of unattended death, suicide,

25     overdose.

1    Q.    Were you called to investigate a death on December 14,

2    2014?

3    A.    I was.

4    Q.    And tell us what happened that night?

5    A.    I received a call from the Chelsea Police that there was

6    an active homicide scene at 60 Chester Ave. Apt No. 2 in

7    Chelsea.

8    Q.    So by active homicide, does that mean someone had already

9    died?

09:11AM 10    A.    Yes.

11    Q.    Do you know who that person was?

12    A.    I do.

13    Q.    Who was he?

14    A.    Javier Ortiz.

15         MS. LAWRENCE:  For the witness, please, Exhibit 37.

16    Q.    Trooper O'Connor, do you recognize this document?

17    A.    I do.

18    Q.    What is it?

19    A.    It's the death certificate for Javier Ortiz.

09:11AM 20         MS. LAWRENCE:  Your Honor, I'd move to admit

21    Exhibit 37 into evidence.

22         THE COURT:  All right.  It's admitted, Exhibit 37.

23         (Exhibit No. 37 received into evidence.)

24         MS. LAWRENCE:  Can we blow up the name, please.

25    Q.    So is this the individual who had died on December 14,

1    2014?

2    A.    It is.

3         MS. LAWRENCE:  Okay.  Can we blow up the cause of

4    death.

5    Q.    And can you please tell us what the cause of death was?

6    A.    Multiple gunshot wounds of torso.

7    Q.    Okay.  Thank you.  Do you know if there are any other

8    victims that night?

9    A.    Yes.

09:12AM 10    Q.    Did that person die?

11    A.    No, he survived.

12    Q.    Do you remember his name?

13    A.    I do.

14    Q.    What was it?

15    A.    Saul Rivera.

16    Q.    When you responded to the scene, what did you see?

17    A.    I noticed that the area was cordoned off with police tape.

18    I noticed an amount of blood on the sidewalk out front of

19    60 Chester Ave.  I entered through the front door, it was a

09:12AM 20    three apartment multi-family dwelling.  There was a blood trail

21    that led from the first floor up to the second floor apartment.

22    Q.    Trooper O'Connor, I want to show you some photographs.

23    These have already been admitted into evidence.

24         MS. LAWRENCE:  Exhibit 34.1, please.

25    Q.    Do you recognize this?

13

1    A.    Yes.

2    Q.    What is it?

3    A.    It's 60 Chester Ave. in Chelsea.

4          MS. LAWRENCE:  34.12, please.

5    Q.    Okay.  You said that you went upstairs to the second

6    floor?

7    A.    Yes.

8    Q.    Did you enter the apartment?

9    A.    I did.

09:13AM 10   Q.    Do you recognize this photograph?

11   A.    I do.

12   Q.    What is it?

13   A.    The hallway as you enter Apartment No. 2.

14   Q.    Okay.  And what is on the floor?

15   A.    There's a blood trail and debris from EMTs treating the

16   victim.

17         MS. LAWRENCE:  34.14, please.

18   Q.    And what is this a photograph of?

19   A.    That's the kitchen.

09:13AM 20   Q.    And on the floor again?

21   A.    Blood.

22         MS. LAWRENCE:  34.15, please.

23   Q.    We're looking at the hallway again?

24   A.    Yes.

25   Q.    What are the markers on the floor?

1    A.    Evidence.

2          MS. LAWRENCE:  34.16.

3    Q.    What is this a photograph of?

4    A.    It's a shell casing and a projectile.

5    Q.    And where exactly was that in relation to the hallway?

6    A.    The threshold to the bathroom.

7          MS. LAWRENCE:  34.17.

8    Q.    And what are these on the floor near the markers?

9    A.    Two more shell casings.

09:14AM 10   Q.    And where was this in relation to the hallway?

11   A.    In the hallway adjacent to the bathroom.

12   Q.    Okay.  Trooper O'Connor, was there anyone else inside the

13   apartment apart from law enforcement when you got there?

14   A.    Yes.

15   Q.    Who was that?

16   A.    It was three male roommates who had been sleeping in the

17   back bedrooms.

18   Q.    Did you talk to them?

19   A.    I did not.

09:14AM 20   Q.    Okay.  Did you talk to anyone there?

21   A.    I did.  I talked to a third floor tenant while I was

22   there.

23   Q.    What did you do after you talked to the tenant?

24   A.    I had asked the Chelsea Police to bring the three males to

25   the station for interview, and then I proceeded to go draft a

1    crime scene search warrant to process the apartment.

2    Q.   Did you obtain a search warrant from a Judge?

3    A.   I did.

4    Q.   And was it executed?

5    A.   It was.

6    Q.   Do you know what was recovered?

7    A.   I do.

8    Q.   What were those things?

9    A.   There was the .380 caliber shell casings, three of them,

09:15AM 10   projectile, which was also a .38 caliber class, a number of

11   empty Bud Light beer cans and additional swabbings of blood.

12   Q.   Through your investigation, were you able to identify a

13   suspect for the murder of Javier Ortiz?

14   A.   Yes.

15   Q.   Who was that?

16   A.   A male by the name of Vida Loca.

17   Q.   What was his real name?

18   A.   Hector Enamorado.

19   Q.   What did you know about Mr. Enamorado?

09:15AM 20   A.   At the time we knew that his mother had lived next door --

21        MR. MURPHY:  Objection, your Honor.

22        THE COURT:  Sustained.

23   Q.   Once you identified Hector Enamorado as a suspect, what

24   did you do?

25   A.   We -- I assembled photo arrays to be shown to witnesses.

1    Q.   Okay.  And did you show those photo arrays?

2    A.   I did not, but they were shown to witnesses.

3    Q.   Okay.  And after you showed the photo arrays, did you take

4    any next investigative steps?

5    A.   Yes.

6    Q.   What was that?

7    A.   I drafted a search warrant for his wife's residence at

8    60 Parker Street in Chelsea and also obtained an arrest warrant

9    for him.

09:16AM 10   Q.   Okay.  Was he arrested immediately?

11   A.   No.

12   Q.   Why not?

13   A.   We didn't know where he was.

14   Q.   Okay.  Did you take any steps to locate him?

15   A.   Yes.

16   Q.   What did you do?

17   A.   I assembled a wanted poster with his picture, and it was

18   disseminated to law enforcement agencies as well as the media.

19        MS. LAWRENCE:  For the witness, please, could I have

09:16AM 20   Exhibit 41.

21   Q.   Do you recognize this, Trooper O'Connor?

22   A.   Yes.

23   Q.   What is it?

24   A.   It's the wanted poster of Hector Enamorado that I put

25   together.

1      MS. LAWRENCE:  Okay.  I'd like to move to admit

2  Exhibit 41 into evidence.

3      THE COURT:  All right.  It's admitted, 41.

4      (Exhibit No. 41 received into evidence.)

5  Q.    You said this was made public?

6  A.    Yes.

7  Q.    So it was released to the media?

8  A.    Yes.

9  Q.    What happened next in your investigation?

09:17AM 10  A.    At some point I was contacted on December 16th by members

11  of the North Shore Gang Task Force.

12  Q.    And what did you do after you received information from

13  them?

14  A.    They advised me that they had received information that

15  Hector Enamorado was attempting to flee the state.

16  Q.    Was he ultimately arrested?

17  A.    He was.

18  Q.    On what date?

19  A.    December 16th.

09:17AM 20  Q.    And what happened after his arrest?  Did you see him

21  again?

22  A.    I did.

23  Q.    Where?

24  A.    At the Chelsea Police Department.

25  Q.    What did you do with him there?

18

1    A.    I interviewed him.

2    Q.    Okay.  Was he also booked at the Chelsea Police

3    Department?

4    A.    He was.

5          MS. LAWRENCE:  For the witness, please, can I have

6    Exhibit 42?

7    Q.    Do you recognize this photograph?

8    A.    I do.

9    Q.    What is it?

09:17AM 10   A.    It was taken at booking.  It's a picture of Hector

11   Enamorado and a small bruise under his left eye.

12         MS. LAWRENCE:  I'd move to admit Exhibit 42.

13         THE COURT:  All right.  It's admitted, 42.

14         (Exhibit No. 42 received into evidence.)

15         MS. LAWRENCE:  I have nothing further, your Honor.

16         THE COURT:  Cross?  Mr. Murphy?

17         Mr. Norkunas.

18                        CROSS-EXAMINATION

19   BY MR. NORKUNAS:

09:18AM 20   Q.    Good morning, Trooper.

21   A.    Good morning, sir.

22   Q.    In relation to your investigation, you indicated that you

23   found some spent shells in the apartment; is that correct?

24   A.    Correct.

25   Q.    And in an assessment of those, they all came from the same

1  caliber weapon?

2  A.   I did not -- I'm not a ballistician, but to my knowledge,

3  yes, they came from the same weapon.

4  Q.   They all appeared to be -- I think you said a .38 caliber

5  or consistent with a .38 caliber?

6  A.   .380 shell casing.

7  Q.   .380 caliber.  And there was no other indications of a

8  second shooter, correct?

9  A.   No.

09:19AM 10  Q.   And at any point in time, did you interview, or did you

11  know if Saul Rivera had been interviewed by members of your

12  department?

13  A.   I interviewed him.

14  Q.   You interviewed him?

15  A.   Yes.

16  Q.   And he sustained wounds to where?

17  A.   Chest.

18  Q.   And that led you to believe that he would have seen his

19  assailant, correct?

09:19AM 20  A.   He said he saw who shot him, yes.

21  Q.   And did he indicate where he was shot in the building?

22  A.   In the kitchen.

23  Q.   Of that second floor apartment?

24  A.   Yes.

25       MR. NORKUNAS:  That's all I have, thank you.

1           THE COURT:  Mr. Murphy.

2                  CROSS-EXAMINATION

3    BY MR. MURPHY:

4    Q.   Good morning, Trooper.  My name is Marty Murphy, and I

5    represent Mr. Sandoval.  Could you explain to the members of

6    the jury in more detail what a photo array is?

7    A.   So we assemble 8 total photos with a suspect photo and 7

8    similar looking individuals, and they're shown in some kind of

9    order by a presenter, and they read a form, they show them the

09:20AM 10   pictures one at a time, and if they see somebody they

11   recognize, they identify it to the presenter and tell them how

12   or why they know that person.

13   Q.   And so the 8 photos are photos of individuals that the

14   police happened to have, correct?

15   A.   Yes.

16   Q.   And you typically include a photo of the suspect, correct?

17   A.   Correct.

18   Q.   And photos of other people who look more or less like him

19   so that it's not obvious to the individual who the suspect is,

20   correct?

21   A.   Similar looking individuals, yes.

22   Q.   Thank you, sir.  Let me ask you, you work for the

23   Suffolk County Homicide Squad of the Massachusetts State

24   Police, correct?

25   A.   Correct.

1    Q.    And is it fair to say, sir, that there are homicide squads

2    like that in every county in the state?

3    A.    Correct.

4    Q.    Including Middlesex County?

5    A.    That's right.

6    Q.    And that's been the case since you began working for the

7    State Police some 12 years ago?

8    A.    Yes.

9    Q.    And it's their job to respond to every unattended death in

09:21AM 10    the county, correct?

11    A.    Yes, sir.

12    Q.    And so you work on a call system?

13    A.    That's right.

14    Q.    And so somebody has a call and has to go out no matter

15    what time of day, correct?

16    A.    Yes.

17    Q.    And so whenever anyone is found anywhere in the state in

18    those areas where the State Police has jurisdiction, a trooper

19    will respond to the scene of that unattended death, correct?

09:21AM 20    A.    Typically, yes.

21          MR. MURPHY:  I have nothing further, your Honor.

22    Thank you.

23          THE COURT:  Any redirect?  Oh.  I'm sorry.

24          Mr. Lopez.

25

1                        CROSS-EXAMINATION

2    BY MR. LOPEZ:

3    Q.   Good morning, Trooper.  My name is Scott Lopez.  I

4    represent Mr. Guzman.  When you identified Vida Loca as the

5    murderer, were you approached by any other law enforcement

6    agencies and asked to delay your investigation in any way?

7    A.   No.

8    Q.   Were you made aware of an ongoing investigation that was

9    being conducted by the U.S. Attorney's Office into MS-13?

09:22AM 10   A.   Yes, I had received information from the North Shore Gang

11   Task Force that -- in regards to Mr. Enamorado, yes.

12   Q.   And I take it then that you weren't asked to delay arrest

13   in order to -- because of any safety concerns they had for

14   their cooperating witness?

15   A.   No.

16           MR. LOPEZ:  Thank you.

17           THE COURT:  Any redirect?

18           MS. LAWRENCE:  Nothing further, your Honor.

19           THE COURT:  All right.  Thank you, Trooper.  You may

09:23AM 20   step down.

21           Mr. Pohl.

22           MR. POHL:  Thank you, your Honor.  The government

23   calls Glenn Cote.

24           GLENN COTE, having been duly sworn by the Clerk,

25   testified as follows:

DIRECT EXAMINATION

1

2    BY MR. POHL:

3            MR. POHL:  May I, your Honor?

4            THE COURT:  Yes.

5            MR. POHL:  Thank you.

6    Q.   Good morning, sir.

7    A.   Good morning, Counselor.

8    Q.   Can you do me a favor and pull that microphone up nice and

9    close to you?  Thank you.  Could you please introduce yourself

09:24AM 10   to the ladies and gentlemen of the jury?

11   A.   My name is Glenn Patrick Cote.

12   Q.   Could you spell your last name for the record, sir.

13   A.   Yes, the spelling of my last name is C-o-t-e.

14   Q.   Where do you work?

15   A.   I work for the Massachusetts State Police.  I'm a trooper

16   currently assigned to the firearms identification section, also

17   referred to as ballistics.

18   Q.   Okay.  How long have you been a trooper?

19   A.   I have been a trooper for approximately 18 years, and

09:24AM 20   prior to that I was a local police officer for a little over

21   five years.

22   Q.   Okay.  And how long have you been assigned to the

23   ballistics unit?

24   A.   About 11 years now.

25   Q.   Okay.  And can you tell the ladies and gentlemen of the

1    jury something about the training and experience that you've

2    had since joining the ballistics unit?

3    A.    Yes.  Just prior to joining, I was in the firearms

4    identification unit -- I mean, I was a firearms instructor at

5    the academy.  But while in the unit, I've attended some

6    schools.  I've gone down to Lago, Florida and learned under a

7    place called NIBIN, which is the National Institute of

8    Ballistics Information Network, where we learn how to enter

9    cartridge casings and projectiles into a national database to

09:25AM 10    cross-reference against unsolved crimes.

11         I've also learned under senior criminologist Nancy

12    J. McCombs out of the Fresno laboratory.  I've also

13    participated in a two-year apprenticeship type program with the

14    State Police in regards to firearms identification, where I

15    learned under seasoned ballisticians basically where we'd

16    respond to scenes, and I'd do actual work on cases from scene

17    work and from cases that come in over the counter.

18         And I'm an armorer in several different weapons

19    systems.  They send us to manufacturers so that we can become

09:25AM 20    familiar with the nomenclature of firearms in the event we have

21    to render minor repairs to weapons to make them operable.  And

22    I also attend conferences from AFTE, which is the Association

23    of Firearms and Toolmark Examiners.  I've taken microscope

24    courses, I've taken toolmark identification courses, just to

25    name a few.

1    Q.    So what kinds of things are you called upon to do in your

2    work in the ballistics unit of the State Police?

3    A.    Basically I responded to crime scenes where I gather and

4    preserve firearms-related evidence.  I conduct test firings of

5    weapons, including distance type pattern test when requested.

6    And I perform microscopic examinations of recovered evidence

7    against test firearms from suspect weapons.  And I also test

8    firearm ammunition and firearms to determine function

9    capability.  And, lastly, we also receive evidence over the

09:26AM 10    counter from our own State Police barracks and from local

11    municipalities.

12    Q.    Okay.  So let me just ask you about one of the things you

13    just talked about, microscopic testing.  Can you explain that

14    in a little bit more detail for the jury.  What is it that you

15    do -- when you use the term "microscopic testing" what is it

16    exactly that you mean?

17    A.    Well, we have a dual microscope -- we have a couple of

18    dual microscopes in my office, and we can look at evidence

19    under microscope -- evidence meaning either projectiles,

09:27AM 20    bullets that were discharged from the firearm, or the

21    discharged cartridge casings that were also discharged from a

22    firearm.  We can look at them under a high-powered microscope

23    80 times the magnification of what you would see with the naked

24    eye.

25          And we can look for striated marks or impressed

1    markings that are -- from a microscopic point of view, you can

2    see them a lot clearer, and we try to match these objects.  We

3    have a line of bifurcation on the microscope where we can look

4    at two objects at the same time, and we try to match up the

5    striated marks or these impressed markings, and we will make

6    certain determinations or form opinions as to what we think.

7    Q.    Okay.  And what is a striation mark?  What does that mean?

8    A.    A striated mark is when you have a barrel that's produced,

9    the production of that barrel, because there's random and

09:27AM 10   spontaneous shavings that come off during a drill when it's

11   being drilled down a barrel --

12   Q.    And just to be 100 percent clear, when we're talking about

13   the barrel, we're talking about the barrel of a gun?

14   A.    Yes, sir.  We're talking about the barrel of a firearm.

15   When they're actually manufacturing these pieces that will

16   eventually be a firearm, when they send the drill down the

17   barrel, there's small bits of metal and debris that will come

18   off, and as the drill is going in and out and it's making that

19   hole so eventually it can become a barrel that a bullet can go

09:28AM 20   down, it's leaving very specific marks in there that that

21   individual, it's like a fingerprint of that gun for us.

22          So in the final analysis when that barrel is made and

23   a bullet does get fired down it, the softer alloy or lead,

24   whichever substance you're talking that the bullet is made of,

25   will pick up these specific individual microscopic markings in

1    that barrel as it's going down that barrel because it was

2    fired.

3            And we're looking at those -- they're called

4    striations on a microscope, and we'll do several test fires

5    with the weapon to see if there's replication of marks, and if

6    we're satisfied based on this known sample, because we fired

7    it, that there's replication, it is then that we can compare it

8    to an unknown sample, something that might have been recovered

9    from a scene or a body or an object.

09:29AM 10   Q.   And those marks, the marks that are left on a bullet or a

11   shell casing, and those are capable of being compared to

12   weapons themselves to determine whether or not a gun fired

13   those weapons or fired those bullets?

14   A.   Yes, they are.

15   Q.   In the course of your duties in the ballistics unit, I

16   think you testified earlier that you respond to crime scenes,

17   correct?

18   A.   I do, sir.

19   Q.   And can I direct your attention, sir, to December 14, 2014

09:29AM 20   and ask if you responded to a scene on that day?

21   A.   I did.  I was asked to respond to 60 Chester Ave,

22   Apartment No.  2 in regards to a fatal shooting investigation.

23   Q.   Okay.  And what did you do at 60 Chester Avenue?

24   A.   When I was there, I was there to collect any possible

25   ballistics-related evidence, and I did collect some items there

1    that day.

2              MR. POHL:  May I approach the witness, your Honor?

3              THE COURT:  Yes.

4    Q.    Trooper, I'm going to hand you what's been marked Exhibits

5    39.1 through 39.4 and ask you to take a quick look at those and

6    see if you recognize them.

7    A.    Can I open these up?

8    Q.    Sure.

9    A.    This is one of the jacketed lead spent projectiles.  This

09:30AM 10   is a bullet that was recovered from the scene.  This was on the

11   floor in the threshold near the bathroom, and we had marked it

12   Number 3 for photos.

13   Q.    All right.  Thank you.  The other ones looked sealed, but

14   you were the one that -- you recovered those items, correct?

15   A.    I do, so I can speak to them.

16   Q.    Sure.

17   A.    This is -- when I recovered it, I -- we'll use your

18   exhibit numbers.  This is Exhibit No. 39.2.  This was a .380

19   auto-caliber discharged cartridge casing.  It was also

09:31AM 20   recovered on the floor right next to where I recovered that

21   projectile of the threshold to the bathroom.  It had a

22   head-stamp of "win 380 auto," and I recovered it from that

23   scene.

24   Q.    What's a discharged casing, and what's the difference

25   between the bullet that you testified to at 39.1 and the

1    discharged casing that you described at 39.2?

2    A.    Okay.  When you're looking at a bullet that's in a gun, if

3    you're going to fire it, the bullet consists of four

4    components:  It has a cartridge casing.  Inside the casing is

5    gunpowder.  On the back end of the casing is a primer, that's

6    the igniter which will cause the explosion to fire it.  And

7    then you have the projectile, which is on the end of it.

8         Now, when you fire a gun and the bullet is inside of

9    it, the projectile is the small object.  It's either lead or

09:31AM 10    some type of alloy that goes through the barrel.  That's the

11    part the actually causes harm to a person if it hits them.  The

12    discharged cartridge casing is the casing that -- it was

13    encompassing -- it was holding in that gunpowder, and it's

14    formulated, it's manufactured to handle the explosion.

15         When that explosion occurs, if it's in a semiautomatic

16    pistol, which is likely where you're going to recover

17    discharged cartridge casings, it's usually because there was a

18    semiautomatic pistol on scene.  When that explosion occurs, the

19    slide goes back on the weapon, and the extractor grabs that

09:32AM 20    discharged cartridge casing, and it pulls it back, and then

21    another little machine part in the weapon on the slide, it's

22    called an ejector, pushes it out, and it discharges the

23    cartridge casing onto the floor away from the weapon, so that

24    the slide when it's going forward can put a new live cartridge

25    from a magazine, if it's seated in the weapon.  So that's what

1    a discharged cartridge casing is.

2    Q.    Okay.  Why don't you look at the next two items and see if

3    you recognize those, 39.3 and 39.4?

4    A.    Both of these items, 39.3 was a discharged cartridge

5    casing.  It was recovered in the hallway on the floor.  This

6    was marked number 4 for photos and 39.4 was also a discharged

7    cartridge casing.  It was marked number 5 for photos, and it

8    was recovered in the hallway on the floor.

9    Q.    Okay.  Thank you.  And before I leave the stand, in

09:33AM 10    addition to leaving -- to visiting 60 Chester Avenue and

11    recovering that ballistics evidence, did you go to any other

12    scene in connection with this investigation?

13    A.    I did.

14    Q.    Where did you go?

15    A.    I went to -- the following day, on December 15th, I went

16    to the medical examiner's office, and I recovered a jacketed

17    lead spent projectile from the medical examiner's office in

18    regards to -- it was recovered from the victim of the fatal

19    shooting investigation.

09:33AM 20    Q.    And that was?

21    A.    It was Ortiz, I think.

22    Q.    I'm going to hand you what's been marked 35.5.  Do you

23    recognize that?

24    A.    I do.

25    Q.    What is that?

1    A.   This is the jacketed lead spent projectile that I

2    recovered from the victim at autopsy.

3         MR. POHL:  Your Honor, I'd move 39.1 through 5 into

4    evidence.

5         THE COURT:  They're admitted, 39.1 through 39.5.

6         (Exhibit No. 39.1 through 39.5 received into

7    evidence.)

8    Q.   I'll leave those with you, Trooper.

9    A.   Yes.

09:34AM 10   Q.   So Trooper, when you had those -- recovered those items,

11   both from the scene at 60 Chester Avenue and from the body of

12   Mr. Ortiz at the medical examiner's office, what did you do

13   with them?

14   A.   I brought them back to my lab for analysis where we were

15   going to have them sent to the different disciplines for

16   fingerprint analysis, and then once those officers are through,

17   then they come back to my office so that I can analyze them.

18   Q.   And were you able to examine those spent -- the bullet and

19   the spent discharged casings?

09:34AM 20   A.   I was.  I was able to examine both the discharged

21   cartridge casings and the two jacketed lead spent projectiles.

22   Q.   And what, if anything, were you able to determine by

23   examining of those items?

24   A.   It was obvious to me, based on striated marks and

25   impressed markings and firing imprint impression marks that the

1    three discharged cartridge casings were fired by the same

2    weapon and the two jacketed lead spent projectiles were fired

3    by the same weapon.

4    Q.   Were you -- at some point after you visited the crime

5    scene at 60 Chester Avenue and the medical examiner's office,

6    did you receive a request to examine another firearm in

7    connection with your investigation?

8    A.   I did.  The Somerville Police Department had recovered a

9    weapon and dropped it off at our lab for analysis on

09:35AM 10   January 8th, and they were requesting that we compare the

11   weapon that they had dropped off to the evidence that I

12   collected at the scene of the fatal shooting investigation.

13             MR. POHL:  May I approach the witness, your Honor?

14             THE COURT:  Yes.

15   Q.   Okay.  Trooper, I want to show you what has been marked as

16   Exhibit 46.1, which is a firearm recovered from 7 Cross Street

17   in Somerville on January 1, 2015.  Do you recognize that?

18   A.   I do.

19   Q.   How do you recognize it?

09:36AM 20   A.   It's the same .380 auto caliber weapon that I examined

21   that day and the serial number matches what I wrote down, which

22   was CP033661.

23   Q.   And in addition to 46.1, I'm going to show you four

24   envelopes which have been grouped together as Exhibit 46.3 and

25   ask if you recognize those?

1    A.    I do.  These are test fires from the weapon.  I utilized

2    two live cartridges from section inventory in my lab, and I

3    test fired them in this weapon for comparison purposes, and I

4    also utilized two live cartridges that were submitted with this

5    weapon and test fired them also for comparative analysis.

6            MR. POHL:  Your Honor, I don't think we've admitted

7    46.3, but I'd move to admit those now.

8            THE COURT:  I've got it on my list as admitted, but if

9    it hasn't been, we'll admit it now.

09:36AM 10    Q.    Trooper, you said a moment ago that you -- 46.3 contains

11    two different kinds of test fires, correct?

12    A.    Yes, sir.

13    Q.    You said that you used two bullets from --

14    A.    Section.

15    Q.    Or session?

16    A.    Yes.

17    Q.    What do you mean by that?

18    A.    We have a library of ammunition that we can use if we want

19    to conduct test fires, ammunition that's new so it doesn't have

09:37AM 20    any previous chamber marks or cycling marks on it.

21    Q.    Why do you do that?

22    A.    I do that because when -- I want to have pristine

23    ammunition that I'm test firing to make sure that there's no

24    other marks on it and also I want a different sample in terms

25    of when somebody submits -- when evidence is submitted, meaning

1    other ammunition with a gun, I don't know if that has been

2    cycled through a particular weapon.  I want to make sure that

3    I -- at least they're not from the same lot of ammunition, so I

4    have different authentic samples to look at.

5    Q.    And you did that in this case?

6    A.    I did.

7    Q.    All right.  And when you test fired the ammunition from

8    sort of the stock ammo that the State Police have at the

9    ballistics unit and you compared it to the ammunition that you

09:38AM 10    observed and examined from 60 Chester Avenue and from the body

11    of Javier Ortiz, what conclusion did you draw?

12    A.    I think -- my opinion to within a degree of ballistic

13    certainty was that the three discharged cartridge casings

14    recovered from the scene of the fatal shooting were in fact

15    fired by the .380 auto caliber weapon, the Cobra Enterprises

16    Model CA 380 semiauto pistol.

17         And I also formed the opinion that the two projectile

18    -- the jacketed lead spent projectiles, one recovered from the

19    scene and one recovered from the victim, Ortiz, at autopsy were

09:38AM 20    also fired by the same .380 auto caliber Cobra Enterprises

21    Model 380.

22    Q.    And finally you said that the gun came with two -- you

23    test fired two rounds of ammunition that came with the gun

24    itself, correct?

25    A.    I did.

1    Q.   All right.  And did you compare those test fires to the

2    ammunition recovered at the scene and from the body of

3    Mr. Ortiz?

4    A.   I did.  I compared all four test fires to the evidence

5    recovered from the fatal shooting.

6    Q.   And what conclusion did you draw?

7    A.   Same conclusion.

8              MR. POHL:  Thank you, sir.

9              THE WITNESS:  Thank you.

09:39AM 10         THE COURT:  Cross?

11             MR. IOVIENO:  No, your Honor.

12             THE COURT:  Mr. Norkunas.

13             MR. NORKUNAS:  Just briefly, Judge, if I might.

14                        CROSS-EXAMINATION

15   BY MR. NORKUNAS:

16   Q.   Good morning, Trooper.

17   A.   Good morning, Counselor.

18   Q.   You told us about how you became a ballistician, and it's

19   fair to say that that's a learned trade, correct?

09:39AM 20   A.   Yes, sir.

21   Q.   You don't go to B.U., you don't go to M.I.T. and get a

22   degree as a ballistician?

23   A.   No, sir.

24   Q.   And as you learned it, you're passing on the trade that

25   you learned to others that are coming up through the ranks as

1   well, correct?

2   A.   Yes, sir.

3   Q.   And you indicated also that you had a designation as an

4   armorer?

5   A.   Yes, sir.

6   Q.   And is it fair to say that there's only the one official

7   armorer in the State Police at a time stationed out in

8   New Braintree?

9   A.   That's fair to say.  Yes.  He's the official armorer for

09:40AM 10   the State Police.

11   Q.   But when you had attended the schools at the various

12   manufacturers, you became more familiar with it and you could

13   use that term in your trade, correct?

14   A.   Yes, sir.

15   Q.   Okay.  Since it's a trade, is it fair to say when you

16   render an opinion, such as you have here today, that it's

17   really you're saying it's consistent with rather than a

18   reasonable degree of ballistic certainty?

19   A.   Well, my opinion is based on both objective, you know,

09:41AM 20   facts and subjective analysis.  So that's where, when I state

21   that it's within a reasonable degree of ballistic certainty,

22   it's based on my training and experience.

23   Q.   It's like a carpenter saying, you know, in my trade it's

24   consistent with what I know, right?

25   A.   Well, it is consistent with what I know, yes.

37

1    Q.    But there's no -- it's not, as with a doctor, a reasonable

2    degree of medical certainty, there's no ballistics courses,

3    it's a learned trade, so it's a consistency, right?

4    A.    Well, I don't believe it's just a learned trade, because

5    there's a lot of education that goes into it as well in terms

6    of the courses you have to take, the analysis you go through,

7    the conferences you attend, so there's a little bit more that I

8    think does enable me to say to within a degree of ballistic

9    certainty that's why I usually state that.

09:41AM 10   Q.    Thank you, Trooper.

11            MR. NORKUNAS:  Thank you, Judge.

12            THE COURT:  Okay.  Any redirect?

13            MR. POHL:  No, your Honor.

14            THE COURT:  Thank you.  You may step down.

15            MR. POHL:  Mattheu Kelsch.

16            MATTHEU KELSCH, having been duly sworn by the Clerk,

17   testified as follows:

18                      DIRECT EXAMINATION

19   BY MR. POHL:

09:42AM 20            MR. POHL:  May I, your Honor?

21            THE COURT:  Yes.

22   Q.    Good morning, sir.

23   A.    Good morning.

24   Q.    Could you please introduce yourself to the ladies and

25   gentlemen of the jury?

1    A.   Yes, my name is Matthew Kelsch, and I'll spell both

2    because it's a little different.  It's M-a-t-t-h-e-u, and

3    Kelsch is K-e-l-s-c-h.

4    Q.   Where do you work?

5    A.   I work for the Bureau of Alcohol, Tobacco, Firearms and

6    Explosives, or more commonly called ATF.

7    Q.   What's your title, sir?

8    A.   I'm a special agent.

9    Q.   How long have you been a special agent with ATF?

09:43AM 10   A.   I've been with ATF for approximately 17 years.

11   Q.   And what is your current assignment?

12   A.   Currently assigned to our intelligence group.  We call it

13   the Crime Gun Intelligence Center.

14   Q.   And during your time that you have worked for the Bureau

15   of Alcohol, Tobacco, Firearms and Explosives, have you received

16   any training and experience concerning what's called interstate

17   nexus analysis?

18   A.   Yes.  All our agents, when they go through our basic

19   academy, a six-month academy down in Georgia, receive some

09:43AM 20   training on firearms identification and firearms manufacturing,

21   but then there are certain agents that go onto further training

22   which is what we call interstate nexus.

23   Q.   And what is that?

24   A.   So interstate nexus, in a nutshell to make it very simple,

25   is determining where a particular firearm or ammunition were

1    manufactured.

2    Q.    And how do you develop that information?  How do you learn

3    sort of where firearms are manufactured?

4    A.    So ATF has a specialized school that's held down in our

5    firearms tracing center.  In order to go down, you're given

6    study material.  Once you arrive at the class, you take an

7    examination.  Once you pass that examination, you're allowed to

8    go through their one-week course.  That course specializes in

9    firearms identification, the different parts of a firearm, and

09:44AM 10    more specifically the markings that, by law, have to be placed

11    on a firearm.

12          In addition to that, ATF has almost like a library,

13    but instead of having books, we have firearms.  So they have a

14    catalogue of over 10,000 different firearms.  So if you're a

15    gun enthusiast, it would be your dream place to be.  You spend

16    time there, and there's also testing on identifying different

17    types of firearms, the markings on them, and also ammunition

18    during that time.

19          At the end of that one-week training, there's a

09:45AM 20    written examination.  If you pass that examination, you're

21    allowed to testify as to nexus.  We also have advanced courses

22    in ammunition and in factory tours.  So during the advanced

23    factory tour, the agents actually go to a number of different

24    firearms manufacturers that are located -- a lot of them are up

25    here in the Northeast, and we see the different manufacturing

1   processes for firearms and how the identifying numbers and

2   information are actually placed on the firearms during that

3   process.

4   Q.    Have you -- and you've taken that course?

5   A.    Yes, I have.

6   Q.    And have you been called upon to testify concerning the

7   origin of firearms and whether -- and the sort of interstate

8   nexus of firearms prior to your testimony here today?

9   A.    Yes, I have.

09:45AM 10          MR. IOVIENO:  Objection, your Honor.

11          THE COURT:  I'll let it stand.  Overruled.

12          MR. IOVIENO:  May we approach sidebar, your Honor,

13   briefly?

14          THE COURT:  All right.

15          (THE FOLLOWING OCCURRED AT SIDEBAR:)

16          MR. IOVIENO:  Judge, I understand what he's trying to

17   get out of this witness, but in this case a firearm and where

18   it comes from in the nexus to interstate commerce is

19   irrelevant.  This is a racketeering case along with a drug

09:46AM 20   conspiracy case.  I think this evidence is irrelevant.  It

21   doesn't -- it's not germane to any issue before the Court.  If

22   the Court does allow it, I'd ask for a limiting instruction as

23   the Court previously gave about firearms.

24          THE COURT:  Mr. Pohl.

25          MR. POHL:  It is relevant because one of the elements

1   of the racketeering conspiracy is that the enterprise has to

2   have affected interstate commerce, and the fact that multiple

3   members had possession of firearms that have moved in

4   interstate commerce is relative for that purpose.  I think you

5   admitted it for similar purposes in the November trial.

6           THE COURT:  Yes.

7           MR. POHL:  And I don't think it's appropriate to give

8   another limiting instruction at this time.  They've heard that

9   several times already, and this testimony doesn't really go to

09:47AM 10   that.  It's simply going to talk about where the guns were made

11   and the fact that they were all made outside of Massachusetts.

12           THE COURT:  Okay.  I agree with that.

13           MR. POHL:  Thank you.

14           (SIDEBAR CONFERENCE WAS CONCLUDED)

15           THE COURT:  Mr. Pohl, put a question for the witness.

16           MR. POHL:  Thank you very much, your Honor.

17   Q.    You have testified concerning where firearms were made and

18   manufactured prior to your testimony here today?

19   A.    Yes, I have.

09:47AM 20   Q.    Approximately how many times have you offered that type of

21   testimony, Special Agent Kelsch, in the course of your career?

22   A.    In U.S. District Courts, over 20 times.

23   Q.    And in other courts?

24   A.    I have testified in state courts as well as the District

25   of Massachusetts and the District of Connecticut.

1   Q.   And how many examinations have you conducted of the

2   origins of firearms and whether or not they have moved in or

3   traveled in interstate commerce prior to your testimony here?

4   A.   I've authored over 220 reports, but each of those reports

5   could contain multiple firearms and multiple rounds of

6   ammunition, so hundreds of rounds of ammunition, if not

7   thousands and hundreds of firearms.

8   Q.   All right.  Special Agent Kelsch, were you asked to

9   examine firearms that were recovered in connection with this

09:48AM 10   case?

11   A.   Yes, I was.

12        MR. POHL:  May I approach the witness?

13        THE COURT:  Yes.

14        MR. POHL:  And with the Court's permission, I'm going

15   to bring all four of these items up now.

16   Q.   Special Agent Kelsch, I'm going to show you what has been

17   marked as Exhibit 51 and ask if you have examined that firearm

18   prior to your testimony here today?

19   A.   Yes, I have.

09:48AM 20   Q.   And what can you tell the jury about the make and

21   manufacture of that particular firearm?

22   A.   Sure.  I think I mentioned briefly before that there are

23   certain markings that have to be placed on a firearm.  The Gun

24   Control Act of 1968 mandated that manufacturers put certain

25   markings on a firearm, all right, in particular you have to

1    have the manufacturer's name, the model number, if they -- the

2    model number or make if they have one, the caliber of the

3    firearm, the state and the city where the manufacturer is based

4    and a serial number.

5           So all of those things have to be placed on a firearm.

6    So when I look at a particular firearm during an examination, I

7    break it down, I look for that particular information that is

8    required to be there by law.

9    Q.    Okay.  And did you do that in connection with this

09:49AM 10   particular firearm?

11   A.    Yes, I did.

12   Q.    And what, if anything, did you determine when you examined

13   that firearm?

14   A.    So I'm looking at this particular firearm.  I see that

15   it's labeled "H&K," so -- which is Heckler and Koch is the name

16   of the company.  It's a Model P30, it's a .9 millimeter

17   semiautomatic pistol, and there's also a serial number if you'd

18   like me to read that.  So it's serialized with 129055554.

19          In addition, I left out before, if a firearm is made

09:50AM 20   outside of the United States, in addition to those things I

21   mentioned, it also has to have the name and city and state of

22   the importer, so the company that imported that firearm into

23   the United States also must be present on this firearm.  So

24   this particular firearm also has importer information, which is

25   labeled as HK-I Columbus, Georgia.

1    Q.   All right.  So based on your training and experience,

2    Special Agent Kelsch and your examination of that particular

3    firearm, what, if anything, can you tell the jury about the

4    manufacturer of the firearm?

5    A.   Yes, so this particular firearm would have been

6    manufactured in Germany.

7    Q.   Okay.  And imported into the United States?

8    A.   That is correct, yes.

9    Q.   Where?

09:50AM 10    A.   And that would have been by the company HK-I and they're

11    based in Columbus, Georgia.

12    Q.   Thank you.  Next, I'm going to show you Exhibit Number 69

13    and ask if you had examined that firearm in connection with

14    your work on this case?

15    A.   Yes, I did.

16    Q.   And what, if anything, can you tell the jury about that

17    particular firearm?

18    A.   So, once again, looking at this particular firearm, I look

19    for the required manufacturer information that must be placed

09:51AM 20    on there, so here I see it's labeled as Ruger, which would be

21    the Sturm Ruger Company.  It's a Model P94DC.  It's a .9

22    millimeter semiautomatic pistol, and it's labeled on the side

23    as Southport, Connecticut.  There's no visible serial number on

24    this particular firearm.

25    Q.   Okay.  And what can you tell the ladies and gentlemen of

1    the jury about where that firearm was manufactured?

2    A.    So this particular firearm made by Sturm & Ruger, although

3    it says Southport, Connecticut on the side of it, the company

4    has a variance issued by ATF.  A lot of companies manufacture

5    their firearms in a different state but want to put their

6    headquarters address on the firearm.

7          So Sturm & Ruger is headquartered out of Southport,

8    Connecticut, and that's the information that's on the side

9    here, but all Sturm & Ruger semiautomatic pistols are actually

09:52AM 10  made in Prescott, Arizona, and that's where this pistol would

11   have been manufactured.

12   Q.    Okay.  Thank you.  Let me show you Exhibit 46.1, which is

13   this weapon here.  Did you examine that firearm before your

14   examination -- before your testimony here today?

15   A.    Yes, I did.

16   Q.    And what can you tell the ladies and gentlemen of the jury

17   about that particular firearm?

18   A.    So this particular firearm -- and it's affixed to a box,

19   so I can't flip it over to read you directly, but I know from

09:52AM 20  my training and experience that this is a Cobra Model CA380,

21   caliber .380 semiautomatic pistol, and the serial number on the

22   back strap is CP033661.

23   Q.    Okay.  And you examined that firearm before your testimony

24   here today?

25   A.    Yes, I did.

1    Q.    What can you tell the ladies and gentlemen of the jury

2    about where that firearm was manufactured?

3    A.    This particular firearm would have been manufactured in

4    Salt Lake City, Utah.

5    Q.    Okay.  And finally, I'll take that back from you.  I'm

6    going to show you what's been introduced as Exhibit 82.1 and

7    ask if you recognize that.

8    A.    Yes, I do.

9    Q.    How do you recognize it?

09:53AM 10    A.    So this particular firearm, once again, it's affixed to a

11    box, so I can't read you directly but I can tell from my

12    training and experience that this particular firearm is a high

13    point .45 caliber pistol with Serial Number X464014, and all

14    the other information is on the reverse side of the pistol.

15    Q.    Okay.  And based on your training and experience and your

16    examination of the firearm, can you tell the jury where that

17    firearm was manufactured?

18    A.    Yes, all high point .45 caliber pistols are manufactured

19    by a company called Haskell, and they're manufactured in Lima,

09:54AM 20    Ohio.

21    Q.    Special Agent Kelsch, based on your examination of the

22    firearms themselves and your training and experience, did you

23    form an opinion concerning whether or not the objects that we

24    just had you examine, which are 46.1, 51, 69 and 82,1 moved in

25    or affected interstate commerce?

1          MR. MURPHY:  Objection.

2          MR. IOVIENO:  Objection.

3          THE COURT:  I'll let him testify as to whether they

4    moved in interstate commerce.

5    A.    None of those firearms were manufactured in the

6    Commonwealth of Massachusetts, so they would have all moved in

7    or affected interstate commerce.

8    Q.    All right.  Special Agent Kelsch, let me ask you a general

9    question about ammunition.  In addition to the firearms that

09:55AM 10   you've examined here today and prior to your testimony, there

11   is ammunition that was seized in connection with some of these

12   weapons that you examined, correct?

13   A.    That is correct, yes.

14   Q.    All right.  And you have, in the course of your duties as

15   an ATF agent, been asked to examine many different brands of

16   ammunition, correct?

17   A.    Yes, I have.

18   Q.    All right.  And can you tell the jury generally whether

19   ammunition -- you're aware of whether any ammunition was

09:56AM 20   manufactured in the Commonwealth of Massachusetts?

21   A.    Sure.  So, in speaking of commercial ammunition, when

22   ammunition is made and the bottom of the brass, a

23   manufacturer's name is stamped into the headstamp.  They call

24   it a head-stamp on the ammunition.  So when we look at that

25   ammunition, we look at the headstamp to see who the

1    manufacturer was.

2          Currently, there are no commercial manufacturers of

3    ammunition in Massachusetts.  Historically many years ago,

4    there was military ammunition made in Springfield Armory out in

5    Western Massachusetts, but as far as commercial-made

6    ammunition, there is none being produced in Massachusetts nor

7    has there been.

8    Q.   Thank you, sir.

9    A.   Thank you.

09:56AM 10          THE COURT:  Cross.

11          MR. IOVIENO:  No, your Honor.

12          THE COURT:  Mr. Norkunas.

13          MR. NORKUNAS:  Just briefly, Judge, if I might.

14                    CROSS-EXAMINATION

15    BY MR. NORKUNAS:

16    Q.   Good morning, sir.

17    A.   Good morning.

18    Q.   Relative to your examination of the three weapons that

19    were shown to you, the three handguns, are you able to age

09:57AM 20    them?

21    A.   I'm sorry.  There were four firearms that we talked about.

22    Q.   Four.  That's correct.  Four.  Were you able to age them?

23    A.   So you mean date of manufacture?

24    Q.   Right.

25    A.   We do have their information, I just do not procure that

1    as part of my examination.

2    Q.    Would you have a -- at least, a reasonable degree of

3    professional certainty that they were not new when you examined

4    them?  They did not appear to be something that had been

5    recently purchased and then presented to you?  Let me strike

6    that.  Let me give you perhaps a better question.

7    A.    Sure.

8    Q.    Do firearms evolve such as other products so that if

9    you're having a .9 millimeter, it looks something like this,

09:58AM 10    and then four years later they slightly change the model, they

11    do something different when you're looking at it, you realize

12    that had been Model A vs. Model B?

13    A.    That is a fair assumption.  Firearm manufacturers do

14    change the models over time, yes.

15    Q.    One is because they want sales, too, right?  They want you

16    to come back and buy something new or better?

17    A.    Sometimes that, or something they're just general

18    improvements, safety improvements that are made to certain

19    firearms, so they change that model.

09:58AM 20    Q.    So from the firearms that you examined here, would these

21    be something that would likely to have been 10, 12, 14 years

22    old?

23    A.    I can't suppose to that.  I can tell you that two of the

24    firearms are still currently manufactured in that same model

25    number.  Two others I believe are models that have been

1   discontinued over time, but I don't know the year they were

2   discontinued.

3   Q.   Now, you've indicated with each of the weapons that you've

4   looked at, the handguns had manufacturer, model, caliber, state

5   where their plant is located and a serial number on them.  Do

6   you examine weapons that periodically, when you look at them,

7   someone has filed or attempted to erase all of that

8   information?

9   A.   Just to step back with your question.  It's not the state

09:59AM 10   where it was manufactured that may be on the firearm, it's

11   usually the headquarters of manufacturer or the state where it

12   was manufactured, so it could be either/or, just to correct

13   that, but, yes, I have looked at firearms where the serial

14   numbers have been tampered with.

15   Q.   And from your training and experience as a representative

16   or a Special Agent in ATF, what's your understanding of the

17   purpose for someone doing it?

18   A.   So we're talking about if someone were to obliterate a

19   serial number on a firearm?

10:00AM 20   Q.   Right.

21   A.   The main reason that we a serial number being tampered

22   with or obliterated is to affect the tracing of that firearm,

23   to find out where that firearm came from.

24   Q.   So that if that's used for some elicit purpose and the

25   weapon is found, you're not going to know a person to go back

1  to, right?

2  A.   That is correct, yes.

3  Q.   And the purpose of that is all of this information that's

4  on, generally, a weapon is stored by you, being the ATF,

5  correct?

6  A.   The information is actually stored by the firearms

7  manufacturers and then the dealers of the firearms.  We don't

8  maintain an active database ourselves, we're not allowed to by

9  law, but we take that information, we go back to the

10:00AM 10  manufacturer.  They'll tell us where that firearm was shipped

11  to as far as a dealer, and then the dealer will have the

12  information as to the first person that ever purchased that

13  firearm was.

14  Q.   Thank you, sir.  Thank you.

15          THE COURT:  Redirect.

16          MR. POHL:  No.  Thank you very much, Agent Kelsch.

17          THE WITNESS:  Thank you, your Honor.

18          MS. LAWRENCE:  The government calls Brian Estevez.

19          BRIAN ESTEVEZ, having been duly sworn by the Clerk,

10:01AM 20  testified as follows:

21                    DIRECT EXAMINATION

22  BY MS. LAWRENCE:

23          THE WITNESS:  Good morning, your Honor.

24  Q.   Good morning, sir.

25  A.   Good morning.

1   Q.   Can you please introduce yourself to the ladies and

2   gentlemen of the jury?

3   A.   Yes, Trooper Brian Estevez.

4   Q.   Where do you work Trooper Estevez?

5   A.   I'm currently employed by the Massachusetts State Police.

6   Q.   What's your current assignment there?

7   A.   I'm a trooper with the gang unit, assigned to the gang

8   unit.

9   Q.   And do you have another assignment?

10  A.   Yes.  I'm also assigned to the FBI North Shore Gang Task

11  Force.

12  Q.   Can you tell us a little bit about what you do in the gang

13  unit for the State Police?

14  A.   We conduct long-term and short-term gang investigations

15  along with the FBI task force.  We also have a patrol function

16  every day, Monday through Friday, where we cover cities on the

17  North Shore of Boston, Chelsea, East Boston, Everett, Lynn,

18  Revere.  And we patrol those cities attempting to prevent

19  violence and conduct motor vehicle stops, identify gang

20  members.

21         THE COURT:  Can you move that mic just a little bit

22  closer, not too close.  It's very sensitive.  Okay.  Thank you.

23  Q.   What additional things do you do with the North Shore Gang

24  Task Force?

25  A.   We conduct long-term gang investigations.

1    Q.    And what types of investigative activities does that

2    involve?

3    A.    We conduct surveillance, we do controlled buys with

4    informants and confidential witnesses, we attempt to record

5    evidence.

6    Q.    When you work, you said confidential informants and

7    cooperating witnesses.  Is there a difference between those

8    two?

9    A.    Yes.  A confidential informant or CI is an individual that

10:03AM 10    provides information to law enforcement.  A confidential

11    witness or CW is an individual that proactively gathers

12    evidence and provides information to law enforcement.

13    Q.    As part of your work with either the State Police or the

14    North Shore Gang Task Force or both, have you investigated a

15    street gang called MS-13?

16    A.    Yes.

17    Q.    When did you begin working on the MS-13 investigation?

18    A.    The investigation began in 2014, but I was one of the

19    individuals that picked up the CW-1 at the airport when he

10:04AM 20    arrived in 2013.

21    Q.    Was that individual known by another name during the

22    investigation?

23    A.    Yes, Mako.

24    Q.    Mako.  Did he have even another name?

25    A.    His street name?

1    Q.    His street name.

2    A.    Yes.  They called him Pelon.

3    Q.    Are you a fluent Spanish speaker, Trooper Estevez?

4    A.    Yes.

5    Q.    How many members of the North Shore Gang Task Force are

6    fluent in Spanish?

7    A.    There's two of us, myself and my partner, Trooper Depena.

8    Q.    Did you speak with CW-1 during the investigation in

9    Spanish?

10:04AM 10    A.    Yes.

11    Q.    Does he also speak English?

12    A.    Yes.

13    Q.    And how often did you speak with CW-1 during the

14    investigation?

15    A.    We would speak definitely on several times a week,

16    sometimes daily.

17    Q.    Did you speak to him in person?

18    A.    Yes.

19    Q.    On the phone?

10:05AM 20    A.    Yes.

21    Q.    And are you familiar with his voice?

22    A.    I am.

23    Q.    What was the nature of your conversations with CW-1?

24    A.    CW-1 would call me and provide information that he had

25    gathered from MS-13 members about things that they have said or

1    things that they had done.

2    Q.    And what kinds of things -- again, just in general terms,

3    what kind of things would he report on?

4    A.    He'd talk about statements that they've made about recent

5    violence, gang meetings, clique meetings that they've had,

6    things of that nature.

7    Q.    What steps did you take to verify the information that

8    CW-1 gave to you?

9    A.    The task force would attempt to record these meetings.

10   We'd also conduct surveillance of controlled buys and try to

11   attempt to surveil these events as much as possible.

12   Q.    Did CW-1, in fact, record conversations or meetings with

13   MS-13 members?

14   A.    He did.

15   Q.    Were those recordings -- were the persons speaking on the

16   recordings speaking Spanish or English?

17   A.    Spanish.

18   Q.    Did you listen to those recordings?

19   A.    I did.

20   Q.    Did you listen to them during the investigation or after?

21   A.    Both.

22   Q.    When you listened to the meetings or the recordings, were

23   you able to identify the speakers on the recordings?

24   A.    Yes.

25   Q.    How did you go about doing that?

1    A.    A lot of these individuals I've spoken to in the past,

2    some I've met, and through monitoring these recordings prior to

3    and after the investigation, I made myself familiar with their

4    voices.

5    Q.    When you received the recordings, did you also have

6    information from CW-1 about them?

7    A.    Yes.

8    Q.    What was that information, generally?

9    A.    Generally, he would tell me who was there, who was

10:06AM 10   speaking, and what things were said.

11    Q.    You mentioned that you had talked to some of the

12    individuals during the investigation or after.  I want to focus

13    on the after part.  Did you participate in interviews or what

14    has been called proffer sessions with cooperating defendants in

15    this case?

16    A.    Yes.

17    Q.    Can you explain to the jury what a proffer session is?

18    A.    A proffer is more -- it's kind of an agreement between

19    prosecutors and law enforcement.  An individual will come in

10:07AM 20   and talk to the prosecutors and law enforcement about events

21    and things that they know in this particular case about the

22    gang and the gang's activity.

23    Q.    When you attended a proffer session, did you know in

24    advance, for example, what questions you would ask the person

25    you were interviewing?

A.   Yes, sometimes we did.  We would have some questions in mind, but it all really depended on what they said and what they were able to provide, and then we'd go from there.

Q.   Was it uncommon for you to meet with a particular witness or cooperating defendant more than once?

A.   No.  It was not uncommon.  I've been in proffers with individuals several times.  It's kind of a trust building exercise in the beginning where they kind of get to know you.

MR. MURPHY:  Objection, your Honor.

THE COURT:  I'll allow it.  It's in generals, he's speaking in general terms and not about specific witnesses. I'll allow it.

Q.   You can finish.

A.   It's more of a trust building exercise where individuals come in.  They kind of get to know you in the process, and the next time you talk, they're a little bit more comfortable, they're able to provide a little bit more information.

MR. MURPHY:  Objection.

THE COURT:  Same ruling, he's speaking generically, not about any specific person.

Q.   So you get to know them over time.  And do you also learn information that would cause you to ask different questions of them?

A.   Correct.

MR. MURPHY:  Objection, your Honor, as to relevance.

1          THE COURT:  Well, that's a fair point.  Why don't we

2     move on.

3     Q.   Trooper Estevez, as part of this MS-13 investigation, did

4     you investigate a murder that occurred on December 14, 2014?

5     A.   I did.

6     Q.   How did you get involved in that investigation?

7     A.   I was contacted by CW-1 regarding a conversation that he

8     had with two individuals where they had mentioned --

9          MR. MURPHY:  Objection, your Honor.

10:09AM 10       MR. IOVIENO:  Objection.

11         THE COURT:  All right.  Let's stop there.  Put another

12    question to him.

13    Q.   I'd like to show --

14         MS. LAWRENCE:  Could I have the document camera,

15    please, for the witness.  Thank you.

16    Q.   Okay.  Trooper Estevez, do you see something on your

17    screen right now?

18    A.   Yes.  It's a DVD.

19    Q.   And what is the date on the disk, please.

10:09AM 20    A.   12-14-14.

21    Q.   Okay.  This has been marked as Exhibit 208.  Have you

22    listened to this recording prior to your testimony today?

23    A.   I have.

24    Q.   When you listened to the recording, were you able to

25    identify the speakers on the recording?

1    A.    Yes.

2        MS. LAWRENCE:  Could I have the computer screen now

3    for the witness, please.  43.

4    Q.    I'm now showing you, Trooper Estevez, a transcript of

5    excerpts of the recording on the disk that you just saw.  Did

6    you prepare this transcript?

7    A.    I did not.

8    Q.    Have you read this transcript?

9    A.    I have.

10:10AM 10   Q.    And when you read the transcript and listened to the

11   recording, did you find that the transcript accurately

12   reflected the English and Spanish words that were spoken on the

13   recording?

14   A.    Yes.

15       MS. LAWRENCE:  Your Honor, the disk that we just saw

16   goes with this transcript marked Exhibit 43.  I'd like to move

17   Exhibit 43 into evidence.

18       THE COURT:  I think he needs to say whether he

19   also -- whether the transcript reflects the identity of the

10:10AM 20   speakers.

21   Q.    You said that the words spoken were accurate on the

22   transcript as you listened to it.  Does this transcript also

23   accurately reflect the speakers on that recording?

24       MR. MURPHY:  Objection.

25       THE COURT:  Overruled.

1    A.    Yes.

2           MS. LAWRENCE:  Thank you.  I move Exhibit 43 the

3    transcript.

4           MR. MURPHY:  Your Honor, subject to the Court's

5    *Petroziello* and our prior objection.

6           THE COURT:  I'll give you a standing objection on

7    this.  Thank you.  It's overruled.  It's admitted, Exhibit 43.

8           THE COURT:  Again, one more time, let me remind you,

9    ladies and gentlemen, this is what the government says is an

10:11AM 10   accurate translation and what the government says are the

11   relevant speakers.  That's a question for you to determine

12   based on all of the evidence.

13          MR. MURPHY:  May we approach, your Honor?

14          THE COURT:  Yes.

15          (THE FOLLOWING OCCURRED AT SIDEBAR:)

16          THE COURT:  Yes.

17          MR. MURPHY:  Your Honor, I'd just like to make a very

18   specific objection to Exhibit 43 on the grounds that, although

19   this witness certainly established that he has familiarity with

10:11AM 20   CW-1's voice, he has not established familiarity with the other

21   individuals who were identified on the transcripts, and I think

22   without a basis that he knows what Crazy sounds like, that he

23   knows what Danger sounds like, et cetera, the government should

24   not be permitted to offer the transcript.

25          THE COURT:  I think that's fair.  Why don't you ask

1   him those questions and we'll see.  I'll be prepared to vacate

2   the admission of the exhibit if the foundation is not laid.

3           MR. MURPHY:  Thank you.

4           (SIDEBAR CONFERENCE WAS CONCLUDED)

5           THE COURT:  All right.  Ms. Lawrence.

6   Q.   Trooper Estevez, before we take a closer look at that

7   transcript, I want to show you admitted Exhibit 13, please.  Do

8   you recognize this individual?

9   A.   I do.

10:12AM 10   Q.   Who is he?

11   A.   Noe Perez-Vasquez, a.k.a. Crazy.

12   Q.   And how do you know this person?

13   A.   Through the course of the investigation.

14   Q.   And can you tell us a little bit more about him and what

15   you've learned through the investigation, please?

16   A.   Through the investigation, we've had several recordings of

17   him speaking on tape, also pictures of him, surveillance

18   pictures of him.  He's an influential member of the Everett

19   Locos clique.

10:13AM 20   Q.   He's an MS-13 member?

21   A.   He's an MS-13 member.

22           MS. LAWRENCE:  Okay.  May I have admitted Exhibit 12,

23   please.

24   Q.   Who is this person, if you know?

25   A.   An individual Smiley/Danger.

62

```
 1   Q.   And what have you learned about him through the
 2   investigation?
 3            MR. MURPHY:  Objection, your Honor.
 4            THE COURT:  Sustained in that form.
 5   Q.   Do you know this individual?
 6   A.   I do.
 7   Q.   Have you learned anything about him in the course of your
 8   investigation?
 9   A.   Yes.  An MS-13 member, he's also --
10   10        MR. MURPHY:  Objection.
11            THE COURT:  Sustained.
12   Q.   What do you know about this person that you've learned in
13   the investigation?
14            MR. MURPHY:  Objection, your Honor.
15            THE COURT:  Sustained.  I mean, I thought you were
16   going to ask about whether he's familiar with what his voice
17   sounds like, which is what you're trying to do.
18            MS. LAWRENCE:  Yes, your Honor.
19   Q.   Have you heard this person speak?
20   20        MR. MURPHY:  Objection, your Honor.  Foundation.
21            THE COURT:  Overruled.
22   Q.   In what context, Trooper Estevez, have you heard him
23   speak?
24   A.   Through the course of the MS-13 investigation.
25   Q.   Did you speak to him in person?
```

10:13AM (line 10)
10:14AM (line 20)

```
 1    A.    No.

 2    Q.    How did you hear his voice?

 3    A.    On a recording.

 4    Q.    Okay.

 5          MS. LAWRENCE:  Your Honor, I'd now move to admit

 6    Exhibit 43, if it hasn't been formally admitted.

 7          MR. MURPHY:  Objection, your Honor.

 8          THE COURT:  The objection is overruled, and 43 is

 9    admitted.

10          MS. LAWRENCE:  All right.  Thank you.

11          (Exhibit No. 43 received into evidence.)

12    Q.    Trooper Estevez, I'd like to look at Exhibit 43, please,

13    again.  Please.  All right.  I'd like to read just a little bit

14    of this transcript.  I'll read CW-1, if you would read the

15    other voices, please, starting with the first two lines.

16          CW-1:  "So Vida Loca is gone then, dude?"

17    A.    "Yes, he got away."

18          MS. LAWRENCE:  May I have admitted Exhibit 42, please.

19    Q.    Trooper Estevez --

20          MS. LAWRENCE:  Sorry.  Can I have a moment, your

21    Honor?

22          THE COURT:  Yes.

23          MS. LAWRENCE:  Thank you.  Jurors, open your binders

24    so you can follow along, please.

25    Q.    Do you recognize this individual in the photograph?
```

1    A.    I do.

2    Q.    Who is he?

3    A.    Hector Enamorado, also known as Vida Loca.

4    Q.    And what do you know about him in the context of this

5    investigation?

6    A.    He's a member of the Chelsea Loco Salvatruchas clique and

7    he was a suspect in the homicide.

8    Q.    And is that the person that we -- do you understand that

9    that's the person that Crazy is talking about in this

10:15AM 10   transcript?

11    A.    Yes.

12         MS. LAWRENCE:    Okay.    Could we turn, please, to page

13    2 -- 3, please.    Sorry.

14    Q.    All right.    Let's start at the top of the page with Crazy,

15    if you could read that, please, Trooper Estevez?

16    A.    Yes.  Crazy:  "To kill him because he was already there.

17    The guys wanted to fight him again so then the crazy guy called

18    me and told me, no, man, it's better if you lend me your gun.

19    I'm going over.  I'm going over and I'm going over, and you'll

10:16AM 20   see, hey, dude, do me the favor, fuck, he told me.  They are

21    all rival gang members."

22    Q.    CW-1:  "They are rival gang members.  It can be done

23    there."

24    A.    Crazy:  "Yeah, they are rival gang members.  They are

25    chavalas, 18th Street gang.  They are gang rivals."

1    Q.   CW-1:  "The little lady just told --"

2    A.   Crazy:  "They are rival gang members, but I call them

3    Maras, sons of bitches, and that's why I got into a fight with

4    one of them.  That's what he told me.  There is no problem he

5    said, and, sure enough, he called yesterday at two in the

6    morning."

7         Danger:  "He went over to leave them a rapid fire of

8    beans."

9         Crazy:  "Yes."

10:17AM 10    Q.   CW-1:  "That's fine, the lady, the lady tells me that."

11    A.   Crazy:  "And one is not -- and one of them is in grave

12    condition and alive."

13    Q.   CW-1:  "And the other one is dead?"

14    A.   Crazy:  "Yes, one is dead and the other one is in grave

15    condition."

16    Q.   CW-1:  "Yes, that's what the lady told me and that's why I

17    wanted to tell you that the lady told me that one died and the

18    other one is in serious condition and that --"

19    A.   Crazy:  "Uh-huh.  I have Vida.  Vida shot him in a really

10:17AM 20    good spot."

21    Q.   Okay.  I think we'll pause there.  Trooper Estevez, there

22    was a phrase, a statement by Danger that you read earlier.  He

23    said, "He went over to leave them a rapid fire of beans."  In

24    your training and experience and particularly in connection

25    with this investigation, what do you understand that statement

1    to mean?

2    A.    Beans or frijoles in Spanish are what this gang uses for

3    bullets, so when he says "a rapid fire of beans," it's a rapid

4    fire of bullets.

5    Q.    And we're going to continue on just to the end of the

6    page.  CW-1 says, "So, they were chavalas, dude?"

7    A.    I'm sorry, where are you reading?

8    Q.    The dot dot dot.

9    A.    Okay.  Yes.  Crazy:  "They were chavalas.  There was a

10:18AM 10    bunch of them, there, dude, and --"

11    Q.    CW-1:  "But the lady is telling me that they sold, they

12    sold beer and --"

13    A.    Danger:  "But I called them."

14          Crazy:  "Yes, it's a house, it's an after party house,

15    dude, you know what I mean?"

16          Danger:  "I called the crazy dude when he left, man."

17          Crazy:  "They were drinking.  They were drinking

18    there, dude."

19    Q.    "Huh?"

10:19AM 20    A.    Danger:  "I called Vida when he left, man."

21    Q.    Can you turn to the next page, please.  Okay.  Could we

22    start reading, Trooper Estevez, toward the top of the page

23    about a third down where Crazy starts with "listen".  At the

24    eighth line down.

25    A.    Yes.  Crazy:  "Listen, they came over here to break

1    everything in the house and they are looking for weapons, she

2    told me, and she said I don't know anything about that."

3    Q.    CW-1:  "But you got your gun back?"

4    A.    Crazy:  "That's right."

5          Danger:  "I have it here."

6    Q.    CW-1.  "Oh, that's good, man."

7    A.    Danger:  "It's a .380, but it only has two beans now."

8    Q.    CW-1:  "Son of a bitch, we have to find some beans."

9    A.    Danger:  "That's why I wanted to get that thing soon,

10:20AM 10    too."

11    Q.    CW-1:  "And was he the only one that went over?"

12    A.    Danger:  "With Brujo, Brujo had the .22."

13    Q.    CW-1:  "Really?"

14    A.    Danger:  "Yes, he went with Brujo.  Brujo said, "I'll go

15    with you.  I am not staying behind."  He told them and they

16    left, dude."

17    Q.    CW-1:  "And who shot them, Vida Loca?"

18    A.    Danger:  "Vida Loca was the one who shot them."

19    Q.    CW-1:  "Yes?"

10:20AM 20    A.    Danger:  "Yes.  I was the one that called them."

21          Crazy:  "Vida Loca killed the guy.  You think he was

22    joking?"

23    Q.    CW-1:  "That dude."

24          Trooper Estevez, again, can we stay on page 3 for a

25    second.  When Danger says that the .380 only has two beans in

1    it now, can you explain to the jury what that means again.

2    A.    Yes, the .380 is, it's a firearm -- .380 caliber firearm

3    and it only has two bullets left in it now.

4    Q.    And when Danger says, "With Brujo.  Brujo had the .22, he

5    went with Brujo," what do you understand that to mean?

6    A.    I understand that to be another weapon, a .22 caliber

7    handgun.

8              MS. LAWRENCE:  Could I have admitted Exhibit 8,

9    please.

10:21AM 10    Q.    Do you recognize this individual?

11    A.    Yes.

12    Q.    Who is he?

13    A.    Brujo.

14    Q.    And what do you know about him in the context of this

15    investigation?

16    A.    He's an --

17              MR. MURPHY:  Objection, your Honor.

18              THE COURT:  Sustained.

19    Q.    On page 4, if we could have page 4.  I'm sorry, it's 3.

10:21AM 20    When Crazy says "Vida Loca killed the guy, you think he was

21    joking?"  And then he says, "He shot him and he shot the

22    other."  What is that referring to?

23              MR. LOPEZ:  Objection.

24    Q.    Or what do you understand that to mean?

25              MR. LOPEZ:  Objection.

1          THE COURT:  Sustained.

2   Q.   One more question.  Crazy says, "He got his gun back."

3          MS. LAWRENCE:  Could I have admitted Exhibit 14,

4   please.

5   Q.   Do you recognize this individual?

6   A.   I do.

7   Q.   Who is he?

8   A.   Innocente.

9   Q.   What do you know about him?

10:22AM 10  A.   He's an MS-13 member of the Everett Locos.

11  Q.   Is that the same clique that you said Crazy belonged to?

12  A.   Correct.

13  Q.   Okay.  Just to be clear, Trooper Estevez, this transcript

14  of the recording that we just read, did you listen to that in

15  realtime on December 14, 2014?

16  A.   I did not.

17  Q.   So at that time did you know which MS-13 member was

18  suspected of killing a Javier Ortiz?

19  A.   No.

10:23AM 20  Q.   Was there another state police unit investigating the

21  homicide?

22  A.   Yes.

23  Q.   Who was that?

24  A.   The troopers assigned to the Suffolk County

25  District Attorney's Office.

1    Q.    Were they able to identify a suspect in the murder?

2    A.    Yes.

3    Q.    Do you know who they identified?

4    A.    Yes.

5    Q.    Who was that?

6    A.    Hector Enamorado.

7    Q.    Do you know him by another name?

8    A.    Vida Loca.

9    Q.    Did they -- were they able to arrest him immediately?

10:23AM 10    A.    No.

11    Q.    So what happened next in the investigation after the

12    December 14th information you received from CW-1?

13    A.    On December 16th, CW-1 contacted me via telephone and

14    advised, sorry -- on the December 14th, CW-1 initially

15    contacted me and advised that he believed there was an MS-13

16    member --

17              MR. MURPHY:  Objection, your Honor.

18              MR. IOVIENO:  Objection, your Honor.

19              THE COURT:  I'll allow it not for the truth of the

10:24AM 20    matter asserted but for the fact that the trooper was told

21    this.  Again, ladies and gentlemen, remember my analogy of the

22    witness who comes into the courtroom and says the building is

23    on fire.  In other words, you can consider this for the fact

24    that it was said to the trooper but not for the truth.

25              Go ahead.

1    Q.    And after you received that information on the 14th, did

2    you receive other information on the 16th?

3    A.    I did.

4    Q.    Okay.  And after you received that information, what did

5    you do?

6    A.    On the 16th, the information I received was that Crazy had

7    contacted CW-1 and asked him to move somebody, they wanted to

8    take somebody to New York.

9    Q.    Okay.  I'd like to show you admitted Exhibit 44.1, please.

10:24AM 10    Okay.  Trooper Estevez, this is a transcript of a call between

11    CW-1 and Crazy on December 16th at approximately 5 p.m.  Have

12    you reviewed this transcript?

13    A.    Yes.

14    Q.    Okay.  I want you to read part of the transcript starting

15    with where Crazy says, towards the bottom, "to go on a trip"

16    and I'll read CW-1.

17    A.    Okay.  Crazy:  "To go on a trip, or if you want to go to

18    New York to drop them off over there, what do you say?"

19    Q.    CW-1:  "When?"

10:25AM 20    A.    Crazy:  "Now.  You'll get 400."

21    Q.    CW-1.  "I'll get 400?"  Let's go to page 2, thanks.

22    Q.    Crazy:  "Yes.  Right now, at once, before you leave."

23    Q.    CW-1:  "And who needs to be dropped off?"

24    A.    Crazy:  "A dude."

25    Q.    Okay.  That's fine for now.  Trooper Estevez, during the

1    investigation, did CW-1 have a job?

2    A.    Yes.

3    Q.    What was that job?

4    A.    He was a cab driver.  I'm sorry.  He used his own personal

5    car for cab driving.

6    Q.    And did he routinely take people on rides?

7    A.    Yes.

8    Q.    And he was paid to do that?

9    A.    Correct.

10:26AM 10        MS. LAWRENCE:  Can we turn Exhibit 44.2, please.  It's

11    also been admitted.

12    Q.    Okay.  Trooper Estevez, this is a transcript of a

13    recording made on December 16, 2014 at approximately 5:17 p.m.

14    So that's how much longer after the call we just heard?

15    A.    17 minutes.  17 minutes.

16    Q.    17 minutes later?

17    A.    Yeah.

18    Q.    Have you reviewed this transcript?

19    A.    Yes.

10:26AM 20    Q.    Okay.  I'm going to show you quickly before we talk about

21    this Exhibit 44.3.  Okay.  This is a transcript of a call

22    between CW-1 and Crazy, also on December 16, and this is

23    5:42 p.m.  Have you reviewed this transcript?

24    A.    Yes.

25    Q.    Okay.  Having reviewed these transcripts, I'm not going to

1    read them directly right now.  What do you understand the

2    content of this conversation to be between Crazy and CW-1?

3    A.    That he wanted CW-1 to pick him up and another individual

4    to drive him to New York.

5    Q.    Okay.  And from reviewing the transcripts, do you know

6    what time Crazy wanted CW-1 to pick up the person?

7    A.    He wanted to do it immediately.

8    Q.    Okay.  After you received this information from CW-1, what

9    did you do next in the investigation?

10:27AM 10    A.    I contacted the task force members and advised them that

11    Crazy wanted to move somebody out of Boston to New York and

12    advised them that we should start surveillance.

13    Q.    Where did you start that surveillance?

14    A.    I started that surveillance at Breman Street.

15    Q.    And were you familiar with Breman Street?

16    A.    Yes.

17    Q.    From the investigation?

18    A.    Yes.

19    Q.    And how were you familiar with it?

10:27AM 20    A.    It was an address known to us as a destroyer house, an

21    MS-13 gang house.

22    Q.    Did you conduct surveillance yourself on Breman Street

23    that night?

24    A.    I did.

25    Q.    What did you see during your surveillance?

1    A.   I saw CW-1's car pull up and three individuals enter the

2    car.

3    Q.   Could you recognize the individuals then?

4    A.   No.

5    Q.   What happened after the individuals got in the car?

6    A.   As the car moved on, we knew he was transferring Hector

7    Enamorado, Vida Loca, out of the state because of the

8    information that he was involved in a homicide.  And knowing

9    that Hector Enamorado already had a state warrant that was

10:28AM 10   applied for by the troopers at the Suffolk District Attorney's

11   Office, we contacted other members of the task force, and we

12   made a plan to allow the car to drive onto the Mass. Pike and

13   then we would conduct a motor vehicle stop of the vehicle.

14   Q.   Before we get to that stop, I'd like to turn to

15   Exhibit 44.4, please.  This is a transcript of a recording made

16   on the same night, December 16, 2014, and this appears to have

17   been made at 6:42 p.m., so approximately an hour after the last

18   call between Crazy and CW-1.  Who is this call between?

19   A.   CW-1 and a.k.a Anderson Chacon, a.k.a Scooby.

10:29AM 20   Q.   Okay.  And I'd like, if you would, to read the part where

21   Scooby starts talking, "Tell that dude" and I'll read CW-1.

22   A.   Scooby:  "Tell that dude to be careful right now when he

23   goes because I just got a call from Vampy from the clique

24   saying that the dude was even on Google because he's the most

25   wanted man in Chelsea, man."

1    Q.    CW-1:  "Oh, that's what I just heard."

2    A.    Scooby:  "Yes, man.  I just got a call from the dude that

3    it is on the news and that he's the most wanted.  Be careful

4    right now when you go so that the police doesn't stop you,

5    man."

6    Q.    CW-1:  "I heard that shit, but I don't believe the woman.

7    She told me that there was a photo of this guy on the news with

8    the license, bro."

9    A.    Scoopy:  "Well, it's like I'm telling you, that dude

10:30AM 10    called me and yes, he says that they have photos even on Google

11    and all.  It's on the news, just turn on Chelsea news and the

12    dude comes up there and the whole thing, man."

13    Q.    Okay.  We'll stop there.  Do you know who Scooby was --

14    is?

15    A.    Yes.

16    Q.    Who is he?

17    A.    He's a member of the TLS clique.

18    Q.    And in your own words, what do you understand Scooby to be

19    talking to CW-1 about?

10:30AM 20    A.    Vida Loca, Hector Enamorado.

21    Q.    Okay.  Let's continue back to you were just saying that

22    you were making a plan to stop the car?

23    A.    Yes.

24    Q.    On the Mass Pike?

25    A.    Yes.

1    Q.   Okay.  Tell us a little more about how that plan was going

2    to be carried out?

3    A.   So we would allow the car to enter the Mass. Pike.  By

4    that time, we had plenty of surveillance teams following the

5    vehicle and monitoring its progress.  We were going to have my

6    supervisor, Sergeant Mario Millett, put his uniform, State

7    Police uniform on, and on top of that, we were going to have

8    two CAT teams, it's an abbreviation for Community Action Team,

9    troopers that patrol the Mass Pike help with the motor vehicle

10:31AM 10   stop as well.

11   Q.   So, Trooper Estevez, let me ask you this.  You said

12   earlier Vida Loca -- there was an arrest for Vida Loca or

13   Hector Enamorado.  Why are you creating this somewhat elaborate

14   seeming plan to stop him instead of just having a regular

15   trooper arrest him on the warrant?

16   A.   So what we would -- this is what we call a wall-off stop

17   where we attempt to allow the vehicle to drive in this case

18   about an hour away from where he had initially started in order

19   to -- and then conduct a motor vehicle stop of the vehicle,

10:32AM 20   make it look routine in order not to alert anybody inside the

21   vehicle that the real reason that the car is being stopped is

22   for the wanted individual inside the car and make it look like

23   it was more of an accident than that we knew he was in there,

24   and the reason we do that is to protect the confidential

25   witness in the vehicle so it doesn't get back to him.

77

1   Q.   Okay.  And did you execute the wall-off stop in this case?

2   A.   Yes.

3   Q.   Okay.  What was the result of that?

4   A.   The result was the arrest of Hector Enamorado, a.k.a

5   Vida Loca.

6   Q.   And did anything else happen to your knowledge after the

7   wall-off stop with respect to CW-1's car?

8   A.   Yes.  So CW-1's car had a defective tail light, and that

9   was essentially the reason for the motor vehicle stop.  After

10:32AM 10   the arrest of Enamorado, Crazy made CW-1 pull over on the

11   highway and verified and made him check that the tail light was

12   out.

13           THE COURT:  Why don't we take our break.

14           MS. LAWRENCE:  Okay.  Thank you.

15           THE CLERK:  All rise.

16           (JURORS EXITED THE COURTROOM.)

17           (A recess was taken.)

18           THE CLERK:  All rise for the jury.

19           (JURORS ENTERED THE COURTROOM.)

10:50AM 20           THE CLERK:  Thank you.  You may be seated.  Court is

21   now back in session.

22           THE COURT:  Ms. Lawrence.

23           MS. LAWRENCE:  Thank you, your Honor.

24   Q.   Trooper Estevez, right before we broke, you said that

25   Vida Loca was arrested that night, on December 16, 2014?

```
 1   A.   Yes.

 2   Q.   How long after the murder of Javier Ortiz was Vida Loca

 3   arrested and charged with that murder?

 4   A.   Two days.

 5   Q.   Two days.

 6        MS. LAWRENCE:   Could I have admitted Exhibit 8 again,

 7   please.

 8   Q.   Trooper Estevez, you testified earlier that you recognized

 9   this individual?

10   A.   Yes.

11   Q.   What was his name again?

12   A.   Brujo.

13   Q.   How do you recognize him?

14   A.   I took that picture.

15   Q.   Okay.  And did you talk to him when you took that picture?

16   A.   I did.

17   Q.   And did you learn anything from him about who he was or

18   how he's related to this investigation?

19   A.   He's known to me as --

20        MR. MURPHY:   Objection.

21        THE COURT:   Hold on.  Sustained.

22        MS. LAWRENCE:   Can I have admitted Exhibit 14, again,

23   please.

24   Q.   Earlier you testified or you identified this individual as

25   Innocente?
```

10:50AM (line 10)
10:51AM (line 20)

```
 1    A.    Yes.

 2    Q.    Who's a member of the Everett?

 3    A.    Everett Loco Salvatrucha.

 4    Q.    Do you know him by another gang name?

 5    A.    Yes.

 6    Q.    What is that?

 7    A.    Triste.

 8    Q.    I'm going to switch gears and talk about a different topic

 9          right now, Trooper Estevez.  Are you familiar with an

10:51AM 10    investigative technique called a drug protection detail?

11    A.    I am.

12    Q.    Could you explain what that is for the jury, please.

13    A.    Essentially it's a -- a drug protection detail technique

14          is when one undercover officer provides a significant amount of

15          narcotics to a CW and that drug -- those drugs are escorted and

16          protected by gang members and brought to another undercover

17          officer while being surveilled the entire time by law

18          enforcement officers.

19    Q.    Okay.  Do you use real drugs when you conduct a drug

10:52AM 20    protection detail?

21    A.    Yes.

22    Q.    Was this investigative technique used in this case?

23    A.    Yes.

24    Q.    How many times?

25    A.    Three times.
```

1    Q.   Were you personally involved in all three of those times?

2    A.   Yes.

3    Q.   Okay.  Do you remember when they occurred?

4    A.   February, October and December of 2014.

5    Q.   And what was your role in the investigation on those days?

6    A.   Surveillance officer and I also debriefed the CW.

7    Q.   And when you conduct surveillance, can you just describe a

8    little bit about what you do, how the surveillance teams

9    operate during the drug protection detail?

10:52AM 10   A.   We attempt to use as many vehicles as possible.  We call

11   them soft vehicles.  They're vehicles that -- not your typical

12   police car with lights and markings, they're undercover cars,

13   regular cars, using mixed bags of different cars.  We try to

14   set up at locations prior to the arrival of the person that

15   we're surveilling if we know in advance, otherwise we just try

16   to tail the vehicles at a safe distance but keeping them within

17   our eye at all times.

18   Q.   What kind of drug did you use for the investigative, I'm

19   sorry, the drug protection details in this case?

10:53AM 20   A.   Cocaine.

21   Q.   How did -- you said you set up this drug protection

22   detail.  How do you know -- who are you surveilling when this

23   is happening?

24   A.   We were surveilling the CW, the narcotics, and the

25   individuals involved.

1    Q.    Did you direct the CW-1 to do anything before the drug

2    protection detail took place?

3    A.    I don't understand the question.

4    Q.    Did he ask anyone to participate with him?

5    A.    He did.

6    Q.    Okay.  And did you tell him to ask different members of

7    MS-13 to participate in these details with him?

8    A.    I did not personally, no.

9    Q.    Did someone from law enforcement?

10   A.    The task force.

11   Q.    Okay.  I'd like to focus on the February protection

12   detail, February 14, 2014.  Who from MS-13 was involved in that

13   drug protection detail?

14   A.    Muerto.

15          MR. NORKUNAS:  Objection, Judge, characterization.

16          THE COURT:  All right.  How about who was involved in

17   that drug protection detail?

18   Q.    Who was involved in that drug protection detail, please?

19   A.    CW-1, Muerto and Checha.

20          MS. LAWRENCE:  Could I have admitted Exhibit 6,

21   please.

22   Q.    Who is this, Trooper Estevez?

23   A.    Muerto.

24   Q.    And who is he?

25   A.    He is a member of the Eastside Loco Salvatrucha clique.

1    Q.    And could I -- sorry.  Who else was involved that day,

2    CW-1 and who else?

3    A.    Checha.

4    Q.    And who is Checha?

5    A.    He's also a member of the Eastside Locos Salvatrucha

6    clique.

7    Q.    Do you recognize Checha here in the courtroom today?

8    A.    I do.

9    Q.    Can you point him out for the jury, please?

10:55AM 10    A.    Yes, right over there.

11    Q.    Can you describe what he's wearing?

12    A.    He has a beard, he has a green shirt, green striped shirt

13    and a black and green and white tie, striped tie.

14          MS. LAWRENCE:  May the record reflect the

15    identification of the defendant, Cesar Martinez, please?

16          THE COURT:  Yes.

17    Q.    On February 14, 2014, what was the quantity of cocaine

18    that was being protected during the detail?

19    A.    One kilogram.

10:55AM 20    Q.    And, again, did you provide a real kilogram of cocaine for

21    this detail?

22    A.    The task force did, yes.

23    Q.    Okay.  Did Muerto and Checha get paid for protecting this

24    one kilogram of cocaine shipment?

25    A.    They did.

1          MR. NORKUNAS:  Objection, Judge.

2          THE COURT:  Overruled.

3     Q.   How much did they get paid?

4     A.   $500.

5     Q.   Each or together?

6     A.   I'm sorry, each.

7     Q.   Okay.  Let's turn to the October drug protection detail.

8     On October 17th, who was involved in that drug protection

9     detail?

10:56AM 10    A.   CW-1, Muerto and Chucho.

11    Q.   Just three individuals?

12    A.   And Caballo.

13    Q.   Okay.  Who is Caballo?

14    A.   Caballo is also a member of the Eastside Locos Salvatrucha

15    gang.

16         MS. LAWRENCE:  Could I have admitted Exhibit 11,

17    please.

18    Q.   Do you recognize this person?

19    A.   Yes.

10:56AM 20    Q.   Who is it?

21    A.   Caballo.

22    Q.   Who is Chucho?

23    A.   He's also an MS-13 member.

24    Q.   Of the same clique, or a different clique?

25    A.   Of the same clique.

1    Q.    Okay.  Who -- what quantity of cocaine was being protected

2    during the October protection detail?

3    A.    One kilogram.

4    Q.    And was one real kilogram of cocaine provided for that

5    detail?

6    A.    Yes.

7    Q.    Did the participants, Muerto, Caballo, and Chucho get paid

8    for protecting that one kilogram detail?

9    A.    Yes.

10:56AM 10    Q.    How much did they get paid?

11    A.    $500 each.

12    Q.    Let's turn to the December 8, 2014 detail.  Who was

13    involved in that one?

14    A.    CW-1, Muerto, Lobo, Caballo, Crazy.

15    Q.    Five persons that time?

16    A.    Yes.  And Danger/Smiley.

17    Q.    Lobo?

18             THE COURT:  Danger/Smiley is one person?

19             THE WITNESS:  One person, yes.

10:57AM 20    Q.    Who's Lobo?

21    A.    Eric Argueta.  He's an MS-13 member, Eastside

22    Locos Salvatrucha gang.

23    Q.    Do you recognize him here in the courtroom today?

24    A.    I do.

25    Q.    Can you point him out, please?

1   A.   He's sitting right there.  He's got a black blazer with a

2   white shirt, no tie.

3          MS. LAWRENCE:  May the record reflect the

4   identification of defendant Eric Argueta Larios?

5          THE COURT:  Yes.

6   Q.   Thank you.  Okay.  You said Muerto, Lobo, Caballo -- we

7   just saw a picture of Caballo.  Crazy?

8   A.   Yes.

9          MS. LAWRENCE:  Could I have admitted Exhibit 13 again,

10:58AM 10   please.

11   Q.   Is this the same Crazy we looked at before?

12   A.   Yes.

13   Q.   The same individual?

14   A.   Yes.

15          MS. LAWRENCE:  Okay.  And admitted Exhibit 12, please.

16   Q.   And who's this?

17   A.   Smiley or Danger.

18   Q.   And this person you said was involved in the drug

19   protection detail?

10:58AM 20   A.   Correct.

21   Q.   Okay.  And you conducted surveillance that day of the

22   detail?

23   A.   Correct.

24   Q.   Did you see him during your surveillance?

25   A.   Yes.

1    Q.    And who is he?

2    A.    He's also an MS-13 gang member.

3    Q.    Do you know if he's related to another MS-13 member that

4    you investigated?

5    A.    Yes.

6    Q.    Who's that?

7    A.    Muerto.  He's Muerto brother.

8    Q.    Where is Smiley/Danger now, if you know?

9    A.    In El Salvador, I believe.

10:58AM 10    Q.    Was he charged in this case?

11    A.    Yes.

12    Q.    When did you learn that he was -- sorry, do you know how

13    he got to El Salvador?

14    A.    He was deported by Homeland Security.

15    Q.    And when did you learn that he was deported?

16    A.    During the investigation.

17    Q.    Did you know he would be deported?  Did you know before he

18    was deported that he was going to be?

19    A.    We had no idea.

10:59AM 20    Q.    All right.  So what was the quantity of cocaine that was

21    being protected during the December 8, 2014 protection detail?

22    A.    5 kilograms of cocaine.

23    Q.    And did you provide 5 real kilograms of cocaine for that

24    protection detail?

25              MR. MURPHY:  Objection, your Honor.

1          THE COURT:  Overruled.

2    A.    Yes.

3    Q.    Did Crazy, Danger, Lobo, Caballo and Muerto get paid for

4    protecting this 5 kilogram shipment of cocaine?

5    A.    Yes.

6    Q.    How much did they get paid?

7    A.    $500.

8    Q.    Okay.  Trooper Estevez, I'd like you to watch what has

9    been admitted as Exhibit 64.4, please.

10:59AM 10          THE CLERK:  What is this?

11          MS. LAWRENCE:  64.4.

12          THE COURT:  It's not admitted.

13          MS. LAWRENCE:  Okay.  May I just have it for the

14    witness, please then.

15    Q.    I'm going to play a short clip of this.  It's not very

16    long in its entirety, but I ask you to watch it before I ask

17    you questions.

18          (Video played.)

19    Q.    Trooper Estevez, do you recognize this recording?

11:00AM 20    A.    Yes.

21    Q.    Have you seen it before?

22    A.    Yes.

23    Q.    What is it?

24    A.    It's a recording of the day of the protection detail on

25    December 8, 2014.

1    Q.   And you've watched this recording, this clip in its

2    entirety; is that correct?

3    A.   Yes.

4    Q.   And does it accurately reflect what you know to have

5    happened on December 14, 2014?

6    A.   Yes.

7         MS. LAWRENCE:  Okay.  I'd move to admit Exhibit 64.4

8    into evidence, your Honor.

9         THE COURT:  It's admitted, 64.4.

11:00AM 10        (Exhibit No. 64.4 received into evidence.)

11         MS. LAWRENCE:  Can we start over and publish for the

12    jury, too, please.

13         (Video played)

14    Q.   Trooper Estevez, you testified earlier that you speak

15    Spanish, correct?

16    A.   Yes.

17    Q.   So could you understand what was being spoken on that

18    recording?

19    A.   Yes.

11:03AM 20    Q.   And what did you hear people saying, in particular, the

21    person -- oh, did you see the person handling money?

22    A.   Yes.

23    Q.   Who was that?

24    A.   CW-1.

25    Q.   And what was he saying as he was handling the money?

1    A.    He was counting the money and paying everybody in the car.

2    Q.    Did he say different people's names as he was counting?

3    A.    He did.

4    Q.    Who did you hear him say?

5    A.    At the end he said, he counted 1, 2, 3, 4, 5, and he said

6    for Lobo.

7    Q.    During the video at some points he reached back into the

8    back seat of the car?

9    A.    Yes.

11:03AM 10    Q.    At that time when he said for Lobo --

11    A.    Yes.

12    Q.    -- he seemed to put the money and set it aside?

13    A.    Yes.

14    Q.    Why did he do that?

15    A.    Because he wasn't there.  He had left.

16    Q.    Okay.  Did you hear any talk of that on the recording?

17    A.    Yes.  He said this money is for Lobo and, you know, I want

18    to give it to him because I don't want him to think that we got

19    more money, that I paid anybody more money.

11:03AM 20    Q.    Trooper Estevez --

21          MS. LAWRENCE:  Could I have 64.5 for the witness.

22    Q.    I'll play just a short part of this for you to see if you

23    recognize it.

24          (Video played.)

25    Q.    Do you recognize this recording?

1    A.    Yes.

2    Q.    What is it, please?

3    A.    A recording from the same date, 12-8-14, drug protection

4    detail.

5          MS. LAWRENCE:  Okay.  Your Honor, I move to admit

6    64.5, please.

7          THE COURT:  It's admitted, 64.5.

8          (Exhibit No. 64.5 received into evidence.)

9          MS. LAWRENCE:  Let's play this in its entirety.

11:04AM 10   Thank you.

11         (Video played.)

12   Q.    Okay.  Trooper Estevez, what did we just see there and

13   hear?

14   A.    Hear the door open and closing, somebody gets in the

15   vehicle, CW-1 passes cigarettes, and he says, "These are for

16   you, Lobo," and then he gets the money from the center console

17   again, counts it and hands it back to him.

18   Q.    Okay.  Thank you.

19         MS. LAWRENCE:  I'd like to show the witness, please,

11:05AM 20   Exhibits 118.1 through 30.

21   Q.    We can just click through them as I'm talking.

22   Trooper Estevez, I want you to just take a look at these

23   photographs.  There are about 20 some of them.  We'll go

24   through them as we talk.  Do you recognize these photographs?

25   A.    Yes.

1   Q.   What are they?

2   A.   These were photographs taken during the 12-8-14 drug

3   protection detail.

4   Q.   Did you personally take these photographs?

5   A.   I did not.

6   Q.   Were you present when the photographs were taken?

7   A.   Yes.

8   Q.   And do the photos accurately reflect what you saw on

9   surveillance that day?

11:05AM 10   A.   Yes.

11        MS. LAWRENCE:   Okay.   Your Honor, I'd move to admit

12   all of the -- Exhibits 118.1 through 118.3 -- 30.   Sorry, 30,

13   not 2.

14        THE COURT:   All right.   They're admitted, 118.1

15   through 118.30.

16        (Exhibit No. 118.1 through 118.30 received into

17   evidence.)

18   Q.   Okay.   I'd like to start and show you Exhibit 118.20.

19   Trooper Estevez, what are we looking at in this photograph?

11:06AM 20   A.   It's a photograph of the vehicle, the white Ultima which

21   was used in the drug protection detail and an individual on a

22   phone known to me as Lobo with a blue coat.

23   Q.   Do you see -- so is it the white Ultima that's in the

24   foreground of the photograph?

25   A.   The one closest to us.

1    Q.    And do you see any figures in that car?

2    A.    Yes.

3    Q.    Can you count -- maybe you can't, but how many can you see

4    if you can?

5    A.    I see about three.

6    Q.    Okay.  And we just watched a video of individuals in a

7    car --

8    A.    Yes.

9    Q.    -- passing out money?

11:07AM 10    A.    Yes.

11    Q.    Was that car they were sitting in the white Ultima that

12    you just referenced and pointed out on the photograph?

13    A.    Yes.

14          118.1 through 118.30, so 118.21, please.

15    Q.    And what do we see here?

16    A.    Again, I can see four individuals in a car now and a white

17    Ultima, and, again, a head shot of Lobo walking in the

18    background.

19    Q.    Okay.  And then 118.22, what is that?

11:07AM 20    A.    Again, the same vehicle, one individual with his back to

21    us and again Lobo going towards the individual.

22    Q.    And 118.23.  What's he doing there?

23    A.    The same Ultima, Lobo in the blue coat and the other

24    individual I believe is Caballo opening the rear door of the

25    Ultima.

```
 1   Q.   Okay.  I'd like to show you 118.27, please.  What do we
 2   see here?
 3   A.   It looks like they've all exited the vehicle.  There's
 4   Crazy on the left with the black jacket, Muerto in the blue
 5   short sleeve shirt, Smiley/Danger in the middle with his back
 6   towards us and Lobo in the blue coat leaning on the white
 7   Ultima.
 8   Q.   And Exhibit 118.28.
 9   A.   That's Lobo walking away, Crazy looking back in the
10   middle, Smiley looking back to his right and Muerto next to the
11   Ultima.
12   Q.   And finally 118.29.  Do you recognize that vehicle?
13   A.   Yes.
14   Q.   What is it, please?
15   A.   That's CW-1's vehicle, personal vehicle.
16   Q.   Okay.  All right.  Thank you very much.  Different topic
17   now, Trooper Estevez.  During the MS-13 investigation, were you
18   involved in a gun seizure on January 28, 2015?
19   A.   Yes.
20   Q.   How did you get involved?
21   A.   On that evening, I received a phone call from CW-1 that he
22   had just been inside a restaurant in Chelsea, Casa Mariachi,
23   and that he had run into Lobo at this restaurant.  While there
24   at the restaurant, Lobo asked him to go inside the bathroom.
25              MR. IOVIENO:  Objection, your Honor.
```

11:08AM (line 10)

11:09AM (line 20)

1          THE COURT:  Overruled.  This is part of the

2    *Petroziello*?

3          MR. IOVIENO:  Yes, and also 403, your Honor.

4          THE COURT:  But is it part of the *Petroziello*

5    disclosures?

6          MS. LAWRENCE:  It's really more just to say what he

7    did next.  I think it's both, but I think it's fine to put

8    another question.

9          THE COURT:  Let's stop there for now.

11:10AM 10    Q.    After you received this call from CW-1, what did you do?

11    A.    I called my partners, I called my supervisor,

12    Sergeant Millett, and advised him that I just received a phone

13    call from CW-1 that Lobo was at Casa Mariachi and he was in

14    possession of a handgun.

15          THE COURT:  Just to be clear, I'm going to admit that,

16    for -- again, for the fact that that statement was made to the

17    officer, not for the truth of the matter.

18    Q.    So what did they do?

19    A.    I was on my way in, my partners were already in Chelsea,

11:10AM 20    and they had set up surveillance outside of the restaurant to

21    observe if Lobo came out of the restaurant.

22    Q.    Did he come out of the restaurant?

23    A.    He did.

24    Q.    And what did they do?

25    A.    They approached him, had a conversation with him, and made

1    an arrest for the firearm.

2    Q.    Was it your plan to approach Lobo right outside the

3    restaurant?

4    A.    No, it was not.

5    Q.    What was the plan?

6    A.    My plan was that I wanted surveillance to surveil the

7    restaurant.  As I was on my way in, we were going to wait for

8    Lobo to drive away in his vehicle and conduct a wall-off stop

9    at that point, a motor vehicle stop of his vehicle and attempt

11:11AM 10    to recover the firearm that way.

11    Q.    And why were you -- was a wall-off stop, that's what you

12    used in connection with the Vida Loca arrest, correct?

13    A.    Correct.

14    Q.    And why did you want to use a wall-off stop to question

15    Lobo in this case?

16            MR. IOVIENO:  Objection, your Honor.

17            THE COURT:  It doesn't seem relevant.  Sustained.

18            MS. LAWRENCE:  Okay.

19    Q.    So the officers did make an arrest of Lobo that night?

11:11AM 20    A.    Yes.

21    Q.    And why did they arrest him?

22    A.    Illegal possession of a firearm.

23    Q.    Did you respond to Casa Mariachi, that location, that

24    evening?

25    A.    I was on my way.  Once the arrest was made, it wasn't -- I

1    turned around and went to the State Police barracks in Revere

2    and I waited for them there.

3    Q.    Okay.  Did you look for anything that night?

4    A.    Yes, we -- after the -- after he was brought to Revere and

5    I found out that the firearm was missing the clip or the

6    magazine that carries the bullets, myself and Trooper

7    Shawn Riley went back and searched the area of Casa Mariachi

8    and his vehicle for the magazine.

9    Q.    Did you find it?

11:12AM 10    A.    No.

11    Q.    Okay.  After the arrest of Lobo, did you learn anything

12    about the gun that was taken from him?

13    A.    Yes.

14    Q.    What did you learn?

15    A.    During the recorded clique meeting from CW-1, we were made

16    aware that the gun was actually a clique gun.

17    Q.    What is a clique gun in your understanding?

18    A.    My understanding --

19           MR. IOVIENO:  Objection.

11:13AM 20           MR. MURPHY:  Objection.

21           THE COURT:  Sustained.

22    Q.    Have you heard the term "clique gun" before?

23    A.    Yes.

24    Q.    And when have you heard it?

25    A.    Through the investigation.

1    Q.    What part of the investigation?

2    A.    Throughout the investigation, we've known about clique

3    guns, not just in this particular event.

4          MS. LAWRENCE:  May I have admitted Exhibit 23, please.

5    Q.    Trooper Estevez, this is a transcript of part of a

6    recording made on February 8, 2015, which is about 10 days

7    after Lobo's arrest and gun seizure.  Is this the clique

8    meeting that you were referring to when you said you learned

9    that the gun that was seized was a clique gun?

11:14AM 10   A.    Yes.

11   Q.    I'd like to read a bit of this starting on page 2.

12         MR. IOVIENO:  Objection.  It's 403.

13         THE COURT:  Overruled.

14   Q.    If you could read the "Lobo" starting in the middle of the

15   page where -- sorry, hold on one second.  I'm sorry.  At the

16   very bottom of 2 where Lobo starts to say, "That was later,"

17   can you read that and continuing onto the first paragraph of

18   the other page?

19   A.    I have the transcript here.  Can I read it from here?

11:14AM 20   Q.    Yes, that's fine.

21   A.    Lobo:  "That was later.  When they took me away, they

22   opened the car.  So when I went back, there was a man shoveling

23   snow digging out a car.  When I saw that one was coming towards

24   me and one from the other side, I did this with the magazine.

25   I did this with it and it fell like this to the side in the

1    snow.  I bent over to look for the gun like this and the old

2    man told me where the gun had fallen, otherwise they wouldn't

3    have gotten that gun."

4    Q.    What do you understand Lobo to be talking about when they

5    said, "I did like this" with the magazine?

6    A.    I released the magazine.

7              MR. MURPHY:  Objection.

8              THE COURT:  Overruled.

9    Q.    Can we turn to page 7, now, please.  Toward the top of the

11:15AM 10    page, the third time down where Lobo starts speaking?

11    A.    Yes.

12    Q.    I wanted to talk about that, too.  I'll read the CW-1 part

13    in the middle, just -- so I want you to read that starting

14    there.

15    A.    Okay.

16    Q.    Thank you.

17    A.    Lobo:  "I wanted to talk about that, too.  I was talking

18    with the compadre from whom it was bought, and if I can recover

19    this, I will replace it because I have to get a gun so I will

11:15AM 20    recover it and turn over to the MS-13."

21    Q.    CW-1:  "That's good."

22    A.    Lobo:  "So I was talking to the compadre, and I met with

23    him and told him and he told me he was going to do everything

24    he could.  I can't say an exact date, but perhaps it won't be

25    the same kind, but he did tell me he's going to give me a gun.

1    I will buy it and turn over to you guys."

2    Q.   Okay.  That's fine there.  And what do you understand Lobo

3    to be saying?

4    A.   That he was going to buy a replacement gun.

5    Q.   For the clique?

6    A.   For the clique.

7          MS. LAWRENCE:  One moment, please.  Nothing further,

8    your Honor.

9          THE COURT:  Cross, Mr. Iovieno.

11:16AM 10                    CROSS-EXAMINATION

11   BY MR. IOVIENO:

12   Q.   Good morning, sir.

13   A.   Good morning, sir.

14   Q.   My name is Thomas Iovieno.  I represent Mr. Larios.  You

15   were involved in this investigation for approximately three

16   years?

17   A.   Yes.

18   Q.   And, in fact, I think you testified you had picked up

19   Pelon at the airport when he first arrived in the

11:17AM 20   United States?

21   A.   Yes, sir.

22   Q.   And you speak fluent Spanish, correct?

23   A.   I do.

24   Q.   And I think you testified there was only two, you and

25   another officer spoke Spanish as part of this investigation?

1   A.   Correct.

2   Q.   And it's fair to say that you've listened to hundreds of

3   hours of tapes?

4   A.   I've listened to hours and hours of tapes, yes.

5   Q.   And you were able to identify voices and conversations and

6   then relay that to the other members of the investigation,

7   right?

8   A.   Correct.

9   Q.   And I think you said you spoke to CW-1, Pelon, almost

11:17AM 10   daily, but on -- certainly several times a week, right?

11   A.   Yes.

12   Q.   And it's fair to say that you were aware that certain

13   members would commit illegal activity that was not something

14   that benefited MS-13 all the time, correct?

15   A.   Correct.

16   Q.   And you called that "freelancing," is that a term that

17   you're familiar with?

18   A.   I'm familiar with the term, yes.

19   Q.   And that involved drug dealing, correct?

11:18AM 20   A.   Yeah.

21   Q.   Okay.  And certain members did certain drug deals for

22   their own personal benefit, right?

23   A.   I don't know many that did, but yes.

24   Q.   But you're familiar with that during the investigation?

25   A.   Yes.

1    Q.    And directing your attention, you talked about the

2    December 8, 2014 drug protection detail.  And just so we're

3    clear, that was the only drug protection detail that involved

4    Mr. Larios, correct?

5    A.    Yes.

6    Q.    Okay.  And you're familiar with a report that was written

7    about this December 14, 2014 protection detail, right?

8    A.    Correct.

9          THE COURT:  I'm sorry.  You may have misspoken the

11:19AM 10    date.

11    Q.    December 8, 2014 drug protection detail.

12    A.    Yes.

13    Q.    And you're familiar that the investigation, someone wrote

14    a report about this?

15    A.    Okay.

16    Q.    And did you write it?

17    A.    I did not.

18    Q.    Okay.  Have you seen it before?

19    A.    Yes.

11:19AM 20    Q.    Okay.  And are you aware that the target of that

21    investigation, the person identified as Lobo was Jose Argueta

22    Rodriguez?

23    A.    Okay.

24    Q.    Are you familiar with that?

25    A.    Not necessarily, but I can see that happening.

1      MR. IOVIENO:  This is just for the witness, your

2  Honor.

3  A.   I see it.

4  Q.   I'd ask you to read the top portion to yourself.

5  A.   Yes.

6  Q.   So does that refresh your recollection whether or not the

7  investigation into the December 8, 2014 had targeted Jose

8  Argueta Rodriguez as Lobo?

9  A.   Yes.

11:20AM 10  Q.   And I think you indicated that -- well, you identified

11  some videos, correct?

12  A.   Yes.

13  Q.   And those are just excerpts of the entire videos, right?

14  A.   Correct.

15  Q.   And it's a pretty lengthy video.  There's different parts

16  of it, but it's pretty long?

17  A.   Yes.

18  Q.   And it was the video depicting what was occurring inside

19  CW-1's motor vehicle, right?

11:20AM 20  A.   Yes.

21  Q.   And you also had cameras -- well, the officers had

22  stationary cameras that could take pictures?

23  A.   The surveillance pictures at the end?

24  Q.   Yes.

25  A.   Yes.

1    Q.    And, in fact, those are photographs taken by the

2    investigating team, right?

3    A.    Correct.

4    Q.    And you also had an audio -- CW-1 was equipped with an

5    audio recorder?

6    A.    The vehicle was.

7    Q.    And the entire conversations that were inside the motor

8    vehicle were recorded, right?

9    A.    As far as I know, yes.

11:21AM 10    Q.    And you've identified a portion of them, a snippet of

11    them, right?

12    A.    Yes.

13    Q.    Okay.  And there's an English translation of the entire

14    transaction, right?

15    A.    Correct.

16    Q.    And you've seen that?

17    A.    Yes.

18    Q.    And you've read that?

19    A.    I have.

11:21AM 20    Q.    And you understand that Lobo, as you refer to him, arrived

21    at the location of the parking lot on his own in another

22    vehicle, right?

23    A.    Yes.

24    Q.    And he was then called over to the vehicle that CW-1 was

25    in, right?

1   A.   Correct.

2   Q.   And that's the photographs that you identified of him

3   walking over early on in the blue jacket?

4   A.   Yes.

5   Q.   And he -- then at some point -- so it's fair to say he

6   wasn't inside the car with CW-1 through the entire transaction,

7   right?

8   A.   Right.

9   Q.   In fact, he was only in the car with CW-1 for a brief

11:22AM 10   period of time, correct?

11   A.   As far as I know, yes.

12   Q.   Prior to the vehicles taking off, right?

13   A.   Yes.

14   Q.   Okay.  And have you reviewed the transcript of the portion

15   where Lobo was inside the motor vehicle?

16   A.   Yes.

17   Q.   And are you aware of the substance of the conversations

18   that CW-1 had with Lobo and the other people inside that motor

19   vehicle?

11:22AM 20   A.   Yes.

21   Q.   Okay.  And it's fair to say at no time during that

22   conversation did CW-1 tell Lobo that he was carrying or picking

23   up 5 kilos of cocaine?

24   A.   No.

25   Q.   And then Lobo got out of the car, right?

1   A.   Yes.

2   Q.   And he got into another car?

3   A.   Yes.

4   Q.   And then the investigation followed the vehicles as they

5   left the parking lot, right?

6   A.   Correct.

7   Q.   And you had cameras with you, right?

8   A.   Yes.

9   Q.   And you followed the vehicles to Saugus?

11:22AM 10  A.   Yes.

11  Q.   And then the vehicles left Saugus and proceeded down I

12  think it was 95 to 93?

13  A.   Yeah.

14  Q.   And then the vehicles -- well, you claim the vehicles went

15  up to New Hampshire, all three vehicles?

16  A.   Correct.

17  Q.   And did you take a photograph of the vehicle you say

18  Mr. Larios was in in New Hampshire?

19  A.   I don't have that photograph, no.

11:23AM 20  Q.   Have you seen a photograph of his vehicle in

21  New Hampshire?

22  A.   No.

23  Q.   And you testified when you came back, do you remember the

24  testimony of the counting of the money?

25  A.   Yes.

1   Q.   And that CW-1 was counting the money inside a car?

2   A.   Yes.

3   Q.   And, in fact, you identified just a snippet of that

4   transaction, right?

5   A.   Correct.

6   Q.   And, in fact, isn't it true, sir, that there's another

7   portion of that video that was not shown to you that shows CW-1

8   calling Lobo, right, on his telephone?

9   A.   Okay.

11:23AM 10   Q.   Because -- have you seen that?

11   A.   Yes.

12   Q.   Okay.  And, in fact, in this video you see him putting the

13   phone down in the center console, right?

14   A.   Uh-huh.

15   Q.   And he had actually called Lobo because he didn't know

16   where he was, right?

17   A.   Yes.  This is at the end?

18   Q.   Yes.

19   A.   Yes.

11:24AM 20   Q.   And he wanted to know where are you?

21   A.   Right.

22   Q.   And you heard that in Spanish, right?

23   A.   I believe so, yeah.

24   Q.   Okay.  Come over to the car?

25   A.   This is at the end?  Yeah.

1    Q.    Do you remember, could you hear what the speaker on the

2    other end of the telephone call was saying?

3    A.    I don't recall by memory exactly.

4    Q.    But it was difficult to hear because it was not picked up

5    by the recorder; is that fair to say?

6    A.    Yes.

7    Q.    So Lobo was not around at the end when they were counting

8    the money until later on, right?

9    A.    Correct.

11:24AM 10        MR. IOVIENO:    One moment, your Honor.

11   Q.    Now, you testified that when you went back and searched

12   the area where Mr. Larios was arrested with the firearm, you

13   found no ammunition and no clip?

14   A.    Correct.

15   Q.    And you went back that night?

16   A.    Yes.

17   Q.    And the information you got about the gun came directly

18   from CW-1, right?

19   A.    Yes.

11:25AM 20   Q.    And did you learn in your investigation that throughout

21   the course of your interactions with CW-1 that he was truthful

22   and honest with you on all occasions?

23   A.    Did I?

24   Q.    Yes.

25   A.    Yeah, I mean I --

1   Q.   You never learned any information that he had committed

2   any illegal acts?

3   A.   Yes.

4   Q.   And so he never told you that during your conversations,

5   did he?

6   A.   Correct.

7           MR. IOVIENO:  Thank you.

8           MR. MURPHY:  Your Honor, may we approach?

9           THE COURT:  Yes.

11:25AM 10           (THE FOLLOWING OCCURRED AT SIDEBAR:)

11           MR. MURPHY:  If I understand correctly, the

12   government --

13           THE COURT:  Hold on.

14           MR. MURPHY:  Sorry.  The government intends to call

15   this witness later as well.

16           MS. LAWRENCE:  Yes, exactly.

17           MR. MURPHY:  So I just want to make sure.  I don't

18   have many questions anyway, but I'd just like to ask them all

19   once after his second round of testimony, if that's consistent

11:26AM 20   with the Court's wishes.

21           THE COURT:  That's fine.

22           MR. IOVIENO:  My understanding is he's coming back up.

23           MR. LOPEZ:  When he comes back, is he going to testify

24   about the May 12th Highland Park stabbing?

25           MR. POHL:  No.

1      MR. MURPHY:  That's my point is that I should be able

2  to ask about on either round.

3      THE COURT:  In other words, let's say he testifies A,

4  B today, comes back in a couple days, testifies C, D.  You can

5  defer and cross-examine him on A, B, C, D on the second day.

6      MR. MURPHY:  Exactly, your Honor.

7      MR. LOPEZ:  I believe he had a very important

8  conversation with CW-1 the evening of May 12, 2015 that I want

9  to inquire into.

11:26AM 10      THE COURT:  You don't have to defer, you can ask now.

11      MR. LOPEZ:  I'll defer, but I just want to be able to

12  be sure that I can inquire about that.

13      MR. POHL:  We've represented that we will call him

14  twice, so you're not going to miss having a chance to ask him

15  questions if you don't ask them now.

16      THE COURT:  If for some reason they don't, you can

17  call him as your own witness if something happens.

18      MR. POHL:  Our next, when we're done with that --

19      MR. LOPEZ:  I don't have much.

11:27AM 20      THE COURT:  Are you going to cross him now?

21      MR. LOPEZ:  Just a couple of questions.

22      THE COURT:  All right.  Let's get it done and let's --

23  we're losing all kind of time on these breaks, so let's just

24  keeping pressing forward.

25      MR. POHL:  Okay.  Thank you.

110

1              (SIDEBAR CONFERENCE WAS CONCLUDED)

2              THE COURT:  All right.  Mr. Norkunas.

3                        CROSS-EXAMINATION

4    BY MR. NORKUNAS:

5    Q.   Good morning, Trooper.  I had to check to make sure it's

6    still morning.

7    A.   Good morning, sir.

8    Q.   In relation to the February, 2014, what you called a

9    protection detail, you were present during that detail,

11:28AM 10   correct?

11   A.   Yes.

12   Q.   And you've had an opportunity prior to coming in here

13   today to refresh your memory or to look at reports that were

14   done from that era; would that be fair to say?

15   A.   Yes.

16   Q.   Granted, they're four years ago, everybody would need to

17   refresh their memory --

18   A.   Of course.

19   Q.   -- of what had taken place.  And one of the reports was

11:28AM 20   done also by a -- if I can have the right name, David

21   Cedarleaf -- Cedarleaf?

22   A.   Yes.

23   Q.   Is he a trooper that was working with you?

24   A.   No, he's an FBI agent.

25   Q.   Okay.  And would it be fair to say that when you were

1    taking your observations of the activities that were going to

2    take place on that day that initially Cesar Martinez shows up

3    in what turns out to be a rental car with another individual to

4    meet with CW-1 and Muerto?

5    A.    Correct.

6    Q.    And either in reviewing the tapes -- let me strike that.

7    Were you contemporaneously able to hear the conversations of

8    CW-1 and Muerto that day as they were taking place?

9    A.    I don't believe that day, no.  I don't remember that.

11:30AM 10    Q.    So, when you heard conversations, they would have been

11    from the recordings afterwards?

12    A.    Yes.  I know on one of the protection details we did have

13    an active listening device, but I don't remember which one it

14    was.

15    Q.    Okay.  If I showed you a report from that date, might that

16    refresh your memory of whether that was the incident -- that

17    was the event?

18    A.    Sure.

19    Q.    February 14th?

11:30AM 20          MR. NORKUNAS:  May I approach briefly?

21          THE COURT:  Yes.

22    A.    Yes.

23    Q.    Having looked at that, would that refresh your memory of

24    whether it was the February 14th event?

25    A.    Yes.

1    Q.    Where you were able, that time, to --

2    A.    Yes.

3    Q.    -- contemporaneously hear what was being said?

4    A.    Correct.

5    Q.    And actually that report reflects someone was writing down

6    times with events as well, correct?

7    A.    Yes.

8    Q.    In relation to that event, it was clear that CW-1 and

9    Muerto, as you were listening to it, were having some problems

11:31AM 10    with Mr. Martinez and his performance, right?

11    A.    Correct.

12    Q.    They wanted him to do something different than he was

13    doing, correct?

14    A.    Yes.

15    Q.    And when the two cars arrived -- it was Derry,

16    New Hampshire you went to, right?

17    A.    I believe so, yes.

18    Q.    When you arrived there, Mr. Martinez parks in a completely

19    different area than where CW-1 and Muerto went to meet your

11:31AM 20    other agent, correct?

21    A.    Correct.

22    Q.    And, again, the transaction starts in Saugus where there

23    is an undercover agent giving a package to CW-1, correct?

24    A.    Correct.

25    Q.    And then when you get to Derry, New Hampshire, there's

1    another undercover officer receiving that package and giving

2    money to -- I believe it was CW-1, correct?

3    A.    Correct.

4    Q.    Okay.  Relative to that incident, were there either a

5    video or any photographs showing either CW-1 or Mr. Muerto

6    actually handing cash to Cesar Martinez?

7    A.    No, I don't think so.

8    Q.    Now, in fact, after the cash comes into the car with

9    Muerto and CW-1, Mr. Martinez leaves the parking lot on his

11:32AM 10    own, correct?

11    A.    Yes.

12    Q.    He ends up you have some sort of -- the person that

13    receives the package from you, he starts tailing that person,

14    right?

15    A.    Correct.

16    Q.    Which is -- again, is an undercover officer, correct?

17    A.    Yes.

18    Q.    Now, prior to that incident taking place, you gave some

19    instructions to CW-1 the night before in regard to Muerto,

11:33AM 20    correct?

21    A.    I don't recall that.

22          MR. NORKUNAS:  If I may approach again?

23          THE COURT:  Yes.

24    Q.    I'm going to use the camera, it might be easier.  When the

25    event was over, do you hand CW-1 something?  Do you give him

1    back a knife?

2    A.    I didn't personally, no.

3    Q.    Did you know that that had occurred?

4    A.    Yes.

5    Q.    And whose knife was it?

6    A.    I don't recall.

7    Q.    Was it Muerto's knife?

8    A.    I don't recall.

9         MR. NORKUNAS:  If we could just have this for the

11:34AM 10    witness.

11    Q.    I'd ask you, sir, if you look at the time that's reflected

12    there is 3:22 p.m.?

13    A.    I see it.

14    Q.    If you would read that to yourself for a moment.

15    A.    Yes.

16    Q.    Would that refresh your memory as to whose knife was given

17    to CW-1?

18    A.    Correct.

19    Q.    It would have been Muerto's, right?

11:34AM 20    A.    Correct.

21    Q.    And had you, in fact, given instructions to CW-1 the night

22    before to make sure that he was able to get Muerto's knife from

23    him?

24    A.    I don't recall that either.

25         MR. NORKUNAS:  Again, just for the witness.

1    Q.    If you look at the top -- and at some point in time if you

2    read that to yourself beginning with CHS.  CHS is CW-1,

3    correct?

4    A.    Correct.  I see that.

5    Q.    And it's fair to say -- does that refresh your memory that

6    CW-1 obtained Muerto's knife the night before and gave it to

7    your task force?

8    A.    Correct.

9    Q.    Do you recall what type of knife it would have been?

11:35AM 10    A.    I never handled the knife.

11    Q.    And would that have been because you were concerned for

12    the safety of CW-1?

13    A.    The knife?

14    Q.    By Muerto, right?

15    A.    Correct.

16    Q.    Now, when this -- you indicated also that when the

17    incident was over, there was then a debriefing of CW-1,

18    correct?

19    A.    Yes.

11:36AM 20    Q.    And as part of that, do you remember or do you recall that

21    CW-1 told you that Muerto had called him and said that Checha

22    was out and that we won't be using him anymore?

23    A.    Yes.

24    Q.    And, in fact, on the two subsequent protection details,

25    Mr. Martinez is not involved at all, right?

1    A.    Correct.

2    Q.    Now, in terms of your involvement within the task force,

3    do you have a recollection that Mr. Muerto was an individual

4    that, in fact, sold crack cocaine to undercover agents?

5    A.    Yes.

6    Q.    I'm sorry.

7    A.    Yes.

8    Q.    And that that sale of his by Muerto to undercover agents

9    been taking place for several years?

11:37AM 10    A.    I don't remember exactly how long it was taking place, but

11    I do remember him being involved in that.

12    Q.    And if I showed you another document, see if this

13    refreshes your recollection, excuse me.  I'll get the word out

14    eventually.  Looking at that, particularly the date on the top,

15    would that refresh your memory as to -- at least from 2014 on?

16    A.    Yes.

17    Q.    And those were direct sales by Mr. Muerto to undercover

18    operatives, correct?

19    A.    I don't believe they were direct sales.

11:38AM 20    Q.    Pardon me?

21    A.    I don't believe they were direct sales.  I believe he

22    bought it from somebody else or middled it is my recollection

23    of it.

24    Q.    If -- the highlighted portion here, if you could read that

25    to yourself.

1    A.    Yes.  I see that.

2    Q.    Okay.  And UCE would have been your undercover officer,

3    correct?

4    A.    Correct.

5    Q.    And he was buying directly from Mr. Muerto, correct?

6    A.    Correct.

7    Q.    And that was at least in 2014 and you have no basis to

8    know it did not discontinue after that, correct?

9    A.    I know it stopped at some point.  I don't know how long it

11:38AM 10    went for.

11    Q.    Now, as part of the investigation that you had ongoing,

12    did you ever determine whether Cesar Martinez had any tattoos?

13    A.    Tattoos?

14    Q.    Tattoos.

15    A.    I did not personally, no.

16    Q.    Did you ever come to find out if he had any tattoos?

17    A.    Maybe other agents on the task force, but not myself

18    personally.

19    Q.    And, again, this was an investigation that began in 2012,

11:39AM 20    right?

21    A.    2014.

22    Q.    Did it begin in December of 2012 initially?

23    A.    I don't believe so.

24    Q.    Did Sergeant Millett began an investigation in

25    September of 2012?  You don't have a memory of that, correct?

1    A.    No.

2    Q.    Okay.  But as the investigation began, did you look into

3    who these people were that you were investigating?  Can you

4    tell us the individuals, did you make a determination who

5    Cesar Martinez was?

6    A.    I didn't personally.  I mean, we tried.  Yeah, we tried to

7    get as much information as we can.

8    Q.    Okay.  And did you receive any type of --

9          MR. NORKUNAS:  For the witness only again, please.

11:40AM 10    Q.    Did you receive any type of documentation as to where

11    Cesar Martinez had been living from 2008 forward?

12    A.    I have never seen that document before.

13    Q.    I'm sorry.

14    A.    I've never seen that document before.

15    Q.    I'm just asking if that would refresh your memory, if you

16    had seen such a document.

17    A.    I have not.

18    Q.    Did you make any -- were you able to make any

19    determination as to where he had been living say in 2008?

11:40AM 20    A.    I have not.

21    Q.    And, again, you had a comprehensive North Shore Gang Task

22    Force, correct?

23    A.    Correct.

24    Q.    Within that you had representatives from Homeland

25    Security, correct?

1    A.    Yes.

2    Q.    Carolyn Scott, was she Homeland Security?

3    A.    I don't know who that is.

4    Q.    Okay.  And if you needed documents relative to any

5    individuals from Homeland Security, you asked that person, can

6    you get us these documents, correct?

7    A.    We had a representative, yeah.  We would ask.  Yeah.

8    Q.    Right.  And if you wanted to know if there was

9    documentation on a particular person either as to their

11:41AM 10  immigration status or where they were living or had reported

11   living in a particular year, you could obtain that, correct?

12   A.    Yes.

13          MR. NORKUNAS:  Judge, may I be seen for a moment at

14   sidebar?

15          THE COURT:  Okay.

16          (THE FOLLOWING OCCURRED AT SIDEBAR:)

17          THE COURT:  Yes.

18          MR. NORKUNAS:  Judge, this is a copy of a form for a

19   work authorization that was filed in 2008 by Mr. Martinez which

11:42AM 20  shows that he was living in Revere.  I don't believe the

21   government is contesting the validity of the document, and what

22   I would be seeking to do at this point in time, although he

23   cannot specifically identify it, the government is not

24   challenging the validity, I offer this.

25          MR. POHL:  Mr. Norkunas and I conferenced this issue

1    prior to today, and I advised him and he's represented

2    correctly that we certainly weren't going to ask for a Keeper

3    of the Records or something to authenticate the document, that

4    I'm sure it's authentic.  We told him then and I would say

5    again now that I don't see the relevance of the document, and

6    we'd object on those grounds for it to be admitted.

7        THE COURT:  I guess I don't see the relevance unless

8    it's tied into something.

9        MR. NORKUNAS:  May I address that?

11:43AM 10        THE COURT:  Yes.

11        MR. NORKUNAS:  The relevance would be that it would

12    come in as a business record, and it shows that he is

13    representing to a government agency that he lived in Revere,

14    when Mr. Muerto in 2008 was contending that he lived in East

15    Boston, and, therefore, was able to do some sort of violent act

16    at Maverick Street Station.

17        THE COURT:  But you didn't use it with Muerto, you're

18    using with this guy who said he's never seen it before, so

19    let's do this.  Asking this witness about it isn't going to do

11:43AM 20    any good.  He's said he's never seen it before.  Let's talk

21    about this later.

22        And I'm seeing you every morning at 8:30 not to get

23    you out of bed early but because I want to minimize sidebars,

24    and we keep having sidebar conferences about things that we

25    could take up in the morning, okay, and this is a good example

1    of it.  We're bogging down in the conferences, but I'm not

2    excluding it.  It just it seems to me that it certainly isn't

3    relevant to this witness, and so let's take it up at the break.

4              (SIDEBAR CONFERENCE WAS CONCLUDED)

5              THE COURT:  Go ahead, Mr. Norkunas.

6              MR. NORKUNAS:  Thank you, Judge.

7    Q.   Now, you've indicated that you had listened to a number of

8    the CDs in this case; is that correct?

9    A.   Yes.

11:44AM 10   Q.   Did you listen to or can you recall if you had listened

11   to --

12             MR. NORKUNAS:  If I could see 207, please, for the

13   witness.

14   Q.   Do you recall if you had listened to a CD involving an

15   ESLS meeting on January 8, 2016?  That was the Animal beating

16   as it's being referred to.

17   A.   Yes.

18   Q.   And did you have an opportunity to initially listen to

19   that in Spanish?

11:45AM 20   A.   Correct.

21   Q.   And then had you had an opportunity to consider -- and you

22   were able to identify speakers within that from your

23   familiarity with different people?

24   A.   Yes.

25   Q.   And if I may show the witness.  Sir, do you recall from

1   your -- excuse my voice.  Can you recall, sir, that there had

2   been a discussion in that meeting in which CW-1 was attempting

3   to chastise Mr. Martinez?

4          MS. LAWRENCE:  Objection, your Honor.  I don't believe

5   he established a foundation that this witness has read that

6   transcript as opposed to listening to the recording.

7          THE COURT:  Well, I didn't quite hear all that, but he

8   did say that he listened to the recording, so he's asking a

9   question about a subject matter.  I'll allow that.  Go ahead.

11:46AM 10   Q.   Do you recall part of that recording you had listened to,

11   Trooper, in which CW-1 was having a conversation and citing

12   specifics to Mr. Martinez and chastising him?

13   A.   Yes.

14   Q.   And is it fair to say that he was chastising him about

15   Mr. Martinez having openly spoken to he, CW-1, several days

16   before that he was tired of the young people coming in and

17   causing problems for the shop, he said, right?

18   A.   I don't remember the details.  I remember the incident.

19   Q.   Well, again, does that -- the page I've put in front of

11:47AM 20   you, does that refresh your memory if you read the bottom

21   portion, CW-1?

22   A.   Yes.

23   Q.   And showing you again another portion from CW-1 of that

24   same transcript, the ensuing page, if you read that to yourself

25   beginning here --

1          THE COURT:  Is this Exhibit 122 or is this not in

2    evidence?

3          MR. NORKUNAS:  This portion of it is not, Judge.  I

4    could move these two pages into evidence.  It would perhaps

5    save some time.

6          MS. LAWRENCE:  We would object as far as CW-1's

7    statements don't come in for the truth, so I'm not sure what

8    the point of admitting it in substantive evidence would be.

9          THE COURT:  Let's just do it this way for now.

11:48AM 10   Q.   Does that refresh your memory that Mr. Martinez had spoken

11   up to the group about bringing in the young kids who were

12   causing problems for his shop?

13   A.   Yes.

14   Q.   And when he says his shop, did you come to know that he

15   was running some sort of mechanical tow business out of

16   Mr. Gonzalez' shop?

17   A.   I didn't personally know that, no.

18   Q.   And had CW-1 come and debriefed you on that at all prior

19   to the meeting with Animal in the shop that there were

11:49AM 20   problems?

21   A.   No.

22          MR. NORKUNAS:  Judge, at this point in time I would

23   have no further questions.

24          THE COURT:  Okay.  All right.  Mr. Murphy.

25          MR. MURPHY:  No questions at this time, your Honor.

1    THE COURT:  Mr. Lopez.

2    MR. LOPEZ:  Your Honor, just a few questions.

3                    CROSS-EXAMINATION

4  BY MR. LOPEZ:

5  Q.    Good morning, Trooper Estevez.

6  A.    Good morning, sir.

7  Q.    My name is Scott Lopez, I represent Mr. Guzman.  You

8  earlier in your testimony made a distinction between a

9  confidential informant and a cooperating witness?

11:50AM 10  A.    Correct.

11  Q.    And a confidential informant is someone that you use after

12  a crime has been committed?

13  A.    It's a person that gives information.

14  Q.    But usually it's someone --

15  A.    It could be before, it could be after, it could be during.

16  Q.    Whereas a cooperating witness is someone who proactively

17  goes out and gathers evidence for you?  Yes?

18  A.    Yes.

19  Q.    Okay.  Now, you talked about the arrest of Vida Loca and

11:50AM 20  you spoke about a procedure you use which you called a

21  wall-off?

22  A.    Yes.

23  Q.    And the shooting occurred on December 14th, right?

24  A.    Yes.

25  Q.    The arrest occurred on December 16th?

1    A.    Correct.

2    Q.    And you didn't write any reports about that arrest, did

3    you?

4    A.    No.  I did not arrest him.

5    Q.    But a Benjamin Wallace did?

6    A.    Okay.

7    Q.    And who's Benjamin Wallace?

8    A.    He's an FBI agent.

9    Q.    And did he talk to you about the information he was

11:51AM 10    gathering before writing his report?

11    A.    No.

12    Q.    And do you recall an interview in February of 2015 with

13    the confidential witness we've heard in this case was called

14    Mako or Pelon?

15    A.    You'd have to be more specific.

16    Q.    Okay.  Well, do you know whether or not there was an

17    interview of the confidential informant where Assistant U.S.

18    Attorney Peter Levitt was present, Special Agent Benjamin

19    Wallace was present, Massachusetts State Police Trooper Mario

11:52AM 20    Millet, who I believe you said is your supervisor --

21    A.    Yes.

22    Q.    - was present, And the linguist Deborah Huacuja was

23    present, as well as the confidential informant?

24    A.    I wasn't there though, right?

25    Q.    Now, I think you testified that the confidential informant

1    contacted you upon learning from Crazy that he wanted -- that

2    Crazy wanted to move Vida Loca out of the state?

3    A.    Yes.

4    Q.    Right?  And you decided that a wall-off was the best way

5    to accomplish that?

6    A.    The task force did.

7    Q.    What's that?

8    A.    The task force.

9    Q.    The task force.  Well, were you involved in that decision

11:53AM 10    making?

11    A.    Yes.

12    Q.    And that was your preferred approach because you wanted to

13    stop the car for a legitimate reason to protect CW-1?

14    A.    Right, MS-13 is known for killing their informants, so we

15    wanted to make sure that didn't come back to him.

16          MR. MURPHY:  Objection, your Honor, motion to strike.

17          THE COURT:  Well, I'll let it stand.  Overruled.

18    Q.    The pretext was that there was going to be a broken tail

19    light or a tail light that wasn't working?

11:53AM 20    A.    Right, a tail light wasn't working.

21    Q.    A tail light, in fact, wasn't working?

22    A.    Correct.

23    Q.    And did you later learn that it was the confidential

24    informant Pelon or Mako who actually unscrewed the brake light

25    on his vehicle prior to the stop?

1    A.    So I heard about that, but I don't believe that to be

2    true.

3    Q.    So what CW-1 told Special Agent Wallace you don't believe

4    to be true?

5    A.    I don't know what he told him or not.

6    Q.    Well, do you know that he also told him that prior to

7    the -- prior to the traffic stop and Vida Loca's arrest in this

8    investigation, CS1 or CW-1 did tell Trooper Estevez that his

9    brake light was not working?

11:54AM 10    A.    Can you repeat that?

11         MS. LAWRENCE:  Objection, your Honor.

12         THE COURT:  Sustained.

13    Q.    Do you recall CW-1 telling you before the wall-off stop

14    that his brake light was not working?

15    A.    I made the observation of his brake light not working

16    prior to anybody telling me, or any bulbs being taken out.  I

17    don't know anything about that, but I made the observation that

18    his brake light wasn't working, and I relayed that information

19    to surveillance.

11:55AM 20    Q.    And did you know that CW-1 stated that he unscrewed the

21    brake light so that, in CSI's mind or CW-1's mind, law

22    enforcement would have a legitimate reason to stop his vehicle

23    if Vida Loca was in the car?

24         MS. LAWRENCE:  Objection.

25         THE COURT:  Sustained.  You already asked him that.

1    Q.    Did anyone ever tell you that that's what CW-1 told

2    Special Agent Wallace after the fact?

3              MS. LAWRENCE:  Objection.

4              THE COURT:  Sustained.

5              MR. LOPEZ:  Well, can I have the document camera.

6              THE COURT:  You're asking this witness about something

7    CW-1 said to someone else when he wasn't there, so I don't see

8    how you're going to get there.

9    Q.    Well, you have reviewed all the reports that have been

11:56AM 10    written in this case, right?

11    A.    Not all of them.

12    Q.    You haven't?

13    A.    Not every report, no.

14    Q.    No?  And I take it that you haven't actually reviewed the

15    report that detailed the arrest of Vida Loca that you just

16    testified about?

17    A.    I didn't write that report.

18    Q.    But did you review the report, sir?

19    A.    I did not, sir.

11:56AM 20    Q.    So it's your testimony here today that you came in to

21    testify about an event that happened in December of 2014 and

22    you didn't review every report written about that event?

23    A.    I'm only talking about what I know and what I did, so I

24    don't know why I would need to read somebody else's report.

25    Q.    Sir, the question is did you review all of the reports

1    related to Vida Loca's arrest on December 16, 2014?

2    A.    No.

3            MR. LOPEZ:  No further questions, your Honor.

4            THE COURT:  Redirect.

5            MS. LAWRENCE:  Yes, please.

6                    REDIRECT EXAMINATION

7    BY MS. LAWRENCE:

8    Q.    Trooper Estevez, you were asked a question or two on

9    cross-examination and were shown a report about the December 8,

11:57AM 10   2014 drug protection detail and an individual was listed there

11   by the name of Jose Argueta Larios, a.k.a Lobo?

12   A.    Correct.

13   Q.    Was the Lobo that you saw when you were conducting

14   surveillance of the December 8, 2014 drug protection detail the

15   same Lobo you've identified here in court today?

16   A.    Yes.

17   Q.    Okay.  You also were asked some questions about where Lobo

18   was located at the end -- toward the end of the drug protection

19   detail, that you had seen him outside the car?

11:57AM 20   A.    Yes.

21   Q.    And that you saw him on the video inside CW-1's car for a

22   short period of time?

23   A.    Right.

24   Q.    What happened while Lobo was in the car with CW-1 at the

25   end of the drug protection detail?

1    A.    He was paid.

2    Q.    And why did he get paid?

3    A.    For being present for the drug protection detail.

4    Q.    Okay.  You were also asked a question or two about the

5    February 14, 2014 protection detail and specifically about a

6    statement that Muerto might have made about not inviting Checha

7    back to do another drug protection detail?

8    A.    Correct.

9    Q.    To your knowledge, did Checha ever say that he did not

11:58AM 10    want to participate in another protection detail?

11    A.    No.

12    Q.    Okay.  And also in that February 14 protection detail, you

13    were on surveillance, yes?

14    A.    Yes.

15    Q.    Okay.  And you were asked some questions about how

16    Checha's car pulled off and followed a different car on the

17    return trip to Massachusetts; is that right?

18    A.    Correct.

19    Q.    Okay.  Did you in the course of surveillance see what

11:58AM 20    happened to Checha's car after it left trailing CW-1's car?

21    Did he rejoin the group, is my question?

22    A.    Yes.

23    Q.    Okay.  And did he arrive back in Massachusetts together

24    with CW-1?

25    A.    Yes.

1        MS. LAWRENCE:  Okay.  Nothing further, your Honor.

2        THE COURT:  Any recross?

3        MR. NORKUNAS:  Very brief, Judge.  If I may do it from

4   here?

5        THE COURT:  Yes.

6                   RECROSS-EXAMINATION

7   BY MR. NORKUNAS:

8   Q.   Trooper, you never had any conversation with Mr. Martinez

9   after February 14, 2014, correct?

11:59AM 10   A.   Correct.

11   Q.   And to your knowledge CW-1 never had any conversation with

12   him in terms of participating in a protection detail that you

13   were aware of or heard recorded, correct, after February 14,

14   2014, correct?

15   A.   Correct.

16   Q.   And nor did you ever hear any recorded conversations with

17   Mr. Muerto after he had told CW-1 that Checha is fired about

18   Mr. Martinez participating in any further protection details,

19   correct?

11:59AM 20   A.   Correct.

21        MR. NORKUNAS:  Thank you, Judge.

22        THE COURT:  All right.  Thank you, you may step down.

23   We'll take a break.

24        THE CLERK:  All rise.

25             (A recess was taken.)

1        THE CLERK:  All rise for the jury.

2        (JURORS ENTERED THE COURTROOM.)

3        THE CLERK:  Thank you.

4        THE COURT:  Mr. Pohl.

5        MR. POHL:  Thank you, your Honor.  The government

6    calls Scott Conley.

7        SCOTT CONLEY, having been duly sworn by the Clerk,

8    testified as follows:

9                        DIRECT EXAMINATION

10   BY MR. POHL:

11   Q.    Good afternoon, sir.

12   A.    Good afternoon.

13   Q.    Could you please introduce yourself to the ladies and

14   gentlemen of the jury.

15   A.    My name is Scott Conley, C-o-n-l-e-y.

16   Q.    Where do you work?

17   A.    In the Chelsea Police Department.

18   Q.    How long have you worked for the Chelsea Police

19   Department?

12:15PM 20   A.    Approximately 23 years.

21   Q.    And what's your rank?

22   A.    I'm a detective.

23   Q.    In addition to your work with the Chelsea Police

24   Department, do you work on a federal task force?

25   A.    Yes, I do.

1    Q.    And what is that?

2    A.    I'm a task force officer with the Federal Bureau of

3    Investigation Gang Task Force here in Boston.

4    Q.    How long have you been a member of the FBI Gang Task

5    Force?

6    A.    Approximately 14 years.

7    Q.    Detective Conley, you participated, through the task

8    force, in an investigation into MS-13; is that correct?

9    A.    Yes, I did.

12:15PM 10    Q.    All right.  And I'd like to ask you a few questions about

11    a particular day, which is February 14, 2014.  Do you remember

12    if you were working on that day?

13    A.    Yes, I do.

14    Q.    All right.  And do you remember what you and the task

15    force -- what investigative technique you and the task force

16    utilized that day?

17    A.    Yes, we were conducting an operation, a surveillance

18    operation that involved what we called a protection detail

19    doing the surveillance on the transport of narcotics.

12:16PM 20    Q.    Okay.  And to be clear, the task force utilized this on I

21    think three different occasions; is that correct?

22    A.    Yes, it is.

23    Q.    All right.  And did you participate in all three?

24    A.    Yes, I did.

25    Q.    All right.  I'm just going to ask you about the

1    February 14th, 2014 protection detail here.  What was your job

2    that day?

3    A.   I was one of the surveillance vehicles.

4    Q.   And do you recall, Detective Conley, sort of how the

5    protection detail unfolded on February 14, 2014?

6    A.   I do.

7    Q.   All right.  What can you tell the jury?

8    A.   The cooperating witness would meet task force officers at

9    a predetermined location.  There would be some administrative

12:16PM 10   things that would take place then to include the searching of

11   the vehicle and searching of the cooperating witness.  Contact

12   would be made and sometimes prearranged on which individuals

13   were going to be participating in the protection detail.

14        On this day, I believe, there were two additional

15   individuals.  We would have -- we would have an operations

16   order kind of given out at that time at the predetermined

17   location and then surveillance vehicles would then be

18   dispatched to specific locations.

19   Q.   Okay.  And that happened that day, correct?

12:17PM 20   A.   Yes, it did.

21   Q.   And where did you go sort of at the beginning of the

22   investigation -- at the beginning of the protection detail,

23   what was your -- where did you travel to?

24   A.   I was one of the surveillance vehicles that traveled in

25   the area of Central Ave. in Chelsea, Massachusetts.

1    Q.    Okay.  And did you identify the parties that were going

2    with CW-1 on the February 14, 2014 protection detail?

3    A.    Yes.

4    Q.    Who were they?

5    A.    Muerto and Checha.

6    Q.    Do you see Checha in court today?

7    A.    I do.

8    Q.    All right.  Could you point him out to the ladies and

9    gentlemen of the jury?

12:18PM 10    A.    Yes, he's the gentleman sitting at the table.  He has

11    black hair, looks like a checkered shirt and a tie.

12    Q.    All right.  Thank you.

13            MR. POHL:  I'd ask that the record reflect that

14    Detective Conley has identified Mr. Martinez.

15            THE COURT:  Yes.

16            MR. POHL:  Thank you.

17    Q.    All right.  So, do you remember where the first

18    time -- well, did you see Cesar Martinez on February 14, 2014?

19    A.    I did.

12:18PM 20    Q.    When was the first time you remember seeing him?

21    A.    I believe it was 118 Central Ave. in front of a house on

22    Central Ave.

23    Q.    Okay.  And walk the jury through what you did next that

24    day.  Where did you go once you saw Cesar Martinez?

25    A.    I continued to do the surveillance along with other task

1    force agents.  The surveillance brought us through Chelsea up

2    Route 1, north towards the Kowloon Restaurant on Route 1 in

3    Saugus.

4          There was a brief stop there where surveillance

5    continued.  Vehicles then left that location and headed up

6    towards Salem, New Hampshire where the surveillance again

7    continued.  They met additional parties, narcotics were

8    exchanged, and then we headed back down 93 south towards I

9    believe Somerville.

12:19PM 10    Q.   And how many cars were you surveilling on that day?

11    A.   I was surveilling two.

12    Q.   All right.  And one of them involved the car driven by

13    CW-1?

14    A.   That's correct.

15    Q.   What about the second car?

16    A.   The second car was operated by Checha, Cesar Martinez.   I

17    believe it was a blue Honda.

18    Q.   And sort of where was that car during your surveillance

19    activities that day as it followed, starting in Saugus, heading

12:20PM 20    up to New Hampshire and then on the way back?

21    A.   The second car was conducting surveillance for the first

22    car, so the blue Honda that was operated by Checha was

23    conducting surveillance for the second car, which was operated

24    by the cooperating witness.

25    Q.   And inside that car with the cooperating witness was who?

1    A.    Muerto.

2    Q.    All right.  So, Detective Conley, what kind of car were

3    you driving that day on February 14, 2014.  Do you remember?

4    A.    I do.

5    Q.    What was it?

6    A.    It was a dark-colored Ford F150 pickup truck.

7    Q.    Okay.  And when you're conducting a surveillance on an

8    operation like this, is it fair to say that you want -- you're

9    not using a marked police car; is that correct?

12:20PM 10   A.    That's correct.  We use unmarked police vehicles.

11   Q.    And do you recall, Detective Conley, whether the Ford

12   pickup truck that you were operating that day, whether it did

13   or did not have a front license plate?

14   A.    I do.

15   Q.    What do you remember about the license plate?

16   A.    I did not have a front license plate.

17         MR. POHL:  Can I have Exhibit 56.3, which is in

18   evidence.

19         Your Honor, ladies and gentlemen of the jury, that's a

12:21PM 20   transcript.  If you want to pull that out of your binders.  And

21   your Honor, at this time -- I think we discussed this earlier

22   this week, but I'd like to just notice a stipulation of the

23   parties concerning this particular page.  And that is that

24   while the content of this call, I think, has been the subject

25   of earlier testimony, that the top section concerning times and

1    the phone numbers, during the course of the trial, the parties

2    noted a typographical error.

3           I don't think there's been any testimony about the top

4    of the page, but to the extent the jurors may have made a note

5    about the top of the page before today that the parties

6    stipulate and agree that that page was swapped out.  This page

7    is correct and the parties have entered this as an amended

8    exhibit.

9           THE COURT:  All right.

12:22PM 10           MR. POHL:  Thank you.

11           THE COURT:  And that went to one of the phone numbers?

12           MR. POHL:  That's correct.

13           THE COURT:  Okay.  Go ahead.

14    Q.   All right.  So, Detective Conley, can you see that?

15           MR. POHL:  Can I have the document camera for the

16    witness.

17           THE CLERK:  Just the witness?

18           MR. POHL:  No, this is in evidence.  Thank you.

19    Q.   Can you see that, Detective?

12:22PM 20    A.   Yes, I can.  Thank you.

21    Q.   All right.  So, first of all, let me ask you a couple

22    questions about the top of the page, all right.  Are you aware

23    during the course of this investigation whether the cooperating

24    witness had something called a consensual T3 or Title III on

25    his phone?

```
 1    A.   Yes, I am aware of that.

 2    Q.   And in layman's terms, what does that mean?

 3    A.   We are monitoring his phone calls.

 4    Q.   So all the calls that came into that phone were recorded?

 5    A.   That's correct.

 6    Q.   And it recorded the phone numbers that came in, correct?

 7    A.   Yes.

 8    Q.   And the phone numbers that CW-1 called out on?

 9    A.   That's correct.

10    Q.   And so on the top of this page is an incoming telephone

11    number.  Do you recognize that?

12    A.   I do.

13    Q.   And so incoming would be from another phone number coming

14    into CW-1's phone?

15    A.   That's correct.

16    Q.   All right.  And the incoming telephone number on this page

17    is 781-521-8365; is that correct?

18    A.   Yes, sir.

19    Q.   All right.  And the telephone number to the right of that

20    target, is that CW-1's phone, or the one that was used in this

21    case?

22    A.   Yes, it is.

23    Q.   All right.  That has a date, correct, February 14, 2014?

24    A.   That's correct.

25    Q.   And a time of -- a military time of 15:01:33 which is just
```

12:23PM 10

12:23PM 20

1    after 3:00, correct?

2    A.   That's correct.

3    Q.   All right.  I'm going to read CW-1.  Detective Conley, I'd

4    ask you to read the portion that's been previously identified

5    as the voice of Cesar Martinez, Checha.

6         CW-1: "What's up?  What's up, Checha, Checha.  What's

7    going on?"

8    A.   "There goes the truck and the -- again along Central

9    Street, man."

12:24PM 10    Q.   CW-1: "Don't fuck with me.  Where is the truck?"

11    A.   "It's on Central Street right now.  I'm telling you, I

12    just saw it.  As I was coming down, it's on Central Street

13    right now, dude."

14    Q.   CW-1:  "Well I'm here already on Central Street, dude."

15    A.   "Well, there goes the son of a bitch right now, right here

16    at the light by the car wash.  It went up the -- it went up

17    that way right now, the son of a bitch, watch out for it."

18    Q.   CW-1:  "Don't fuck with me.  Here, by the car wash?"

19    A.   "No, on Central Street, Central.  It's going up the

12:25PM 20    truck."

21    Q.   "Oh, on Central?"

22    A.   "It's on Central, look for it."

23    Q.   CW-1:  "Check the plate or something.  Tell me what you

24    see."

25    A.   Can you just slide it up a little bit?

1    Q.    Yeah, apologies.

2    A.    "The whore doesn't have a front plate."

3    Q.    CW-1:  "It has no plate, all right."

4          Do you recall, Detective Conley, while you were

5    conducting the surveillance on the way back from New Hampshire

6    whether you observed Mr. Martinez in the area of Central Street

7    in Chelsea?

8    A.    Yes, I do.

9    Q.    Detective, I'm going to jump to January 29, 2016 and ask

12:26PM 10    if you recall whether that was a significant date in the course

11    of this investigation?

12    A.    Yes, it was.

13    Q.    All right.  And would it be fair to say that that was the

14    date that a series of arrest warrants were executed in

15    connection with a number of defendants charged in this case?

16    A.    That's correct.

17    Q.    All right.  Now, were you present on a -- did you

18    participate in those arrests?

19    A.    Yes.

12:26PM 20    Q.    All right.  To be clear, you did not participate in the

21    arrest of Cesar Martinez, correct?

22    A.    That's correct.

23    Q.    All right.  Were you aware, through your work on the

24    investigation, that a number of the targets in the

25    investigation were arrested in or around the City of Chelsea?

1    A.    That's correct.

2    Q.    All right.  And was there a plan in place to sort of help

3    process defendants that were arrested in that vicinity prior to

4    being taken to federal court?

5    A.    Yes.

6    Q.    What can you tell the jury about that?

7    A.    We call it --

8          MR. MURPHY:  Objection, your Honor.  Relevance.

9          THE COURT:  Well, I assume it's a lead in to something

12:27PM 10   else.  Overruled.

11         MR. POHL:  It is, thank you.

12   Q.    Detective.

13   A.    We call it a courtesy booking procedure where we would

14   assist with taking down the vital information of the individual

15   that was in custody.  We would take that information down.  We

16   would create a booking page and then we'd pass that booking

17   page onto federal partners when we conducted the transport over

18   to a federal facility.

19   Q.    All right.  So Detective Conley in the course of your

12:27PM 20   duties as a police officer, have you been asked to book persons

21   that have been placed under arrest?

22   A.    Yes, I have.

23   Q.    And are you familiar with whether or not the Chelsea

24   Police Department has a standard practice or procedures

25   concerning how individuals that are placed under arrest are to

1    be booked?

2    A.    Yes.

3    Q.    And what kind of questions are typically asked of persons

4    that are booked in the Chelsea Police Department booking

5    process?

6    A.    Name, date of birth, home address, phone number, married,

7    questions like that.

8            MR. POHL:  Okay.  Can I have Exhibit 59 for the

9    witness.

12:28PM 10    Q.    Can you see that, Detective Conley?

11    A.    I can.

12    Q.    And what is it?

13    A.    It's a Chelsea Police cover sheet of an arrest number

14    16111.  It would be the document that would be produced during

15    and at the time of booking.

16    Q.    Okay.  And this booking sheet was dated January 29, 2016?

17    A.    That's correct.

18    Q.    And the individual listed on the booking sheet is who?

19    A.    Cesar Antonio Martinez.

12:28PM 20            MR. NORKUNAS:  Objection, Judge.

21            THE COURT:  I'll allow that, but go ahead.

22    Q.    And pursuant to the sort of policies and practices of the

23    Chelsea Police Department that you described before, we don't

24    need to get into all of the information, but it's fair to say

25    that the types of questions that you talked about earlier are

1    answered on this page?

2    A.    Yes.

3    Q.    Name, height, weight, biographical information, correct?

4    A.    That's correct.

5    Q.    What about the phone number?

6    A.    That's correct.  It does appear on this booking sheet.

7    Q.    Okay.  What phone number is listed on the booking sheet?

8              MR. NORKUNAS:  Objection, Judge.

9              THE COURT:  Sustained.

12:29PM 10              MR. POHL:  I'd offer the document, your Honor.

11              MR. NORKUNAS:  I'd object, Judge.

12              THE COURT:  The objection is overruled.  It's admitted

13    59.

14              (Exhibit No. 59 received into evidence.)

15              MR. POHL:  For the jury.

16              THE CLERK:  Yes.

17    Q.    Detective, there's a phone number listed on the booking

18    sheet; is that correct?

19    A.    Yes, sir.

12:30PM 20    Q.    All right.  And what phone number is that?

21    A.    781-521-8365.

22    Q.    Okay.  And the information that is provided on the booking

23    sheet, okay.  Where does -- when you conducted a booking, where

24    do you get that information from?

25    A.    From the individual that is in custody.

1          MR. POHL:  And if I could again have the document

2     camera for the witness and for the jury, 56.3 in evidence.

3     Q.   Again, the telephone number for the February 14, 2014 call

4     from -- to CW-1 was 781-521-8635?

5     A.   Yes, sir.  That's correct.

6     Q.   Same phone number as on the booking sheet?

7     A.   Yes, it is.

8          MR. POHL:  Thank you very much.

9          THE WITNESS:  Thank you.

12:31PM 10          THE COURT:  Cross.

11                      CROSS-EXAMINATION

12     BY MR. NORKUNAS:

13     Q.   Detective, did you participate in activities other than

14     doing a surveillance on February 14, 2014?

15     A.   I was primarily just doing surveillance that day.

16     Q.   So you were to be a follow-on vehicle that day was your

17     function; is that correct?

18     A.   A surveillance vehicle, that's correct.

19     Q.   So you weren't having any contemporaneous monitoring of

12:31PM 20     conversation between any parties present, and you ended when it

21     appears from the Exhibit 56.3 that you're on Central Street,

22     you're home, right?

23     A.   That's correct, doing surveillance.

24     Q.   The day is done at that point in time, right?

25     A.   I'm sorry.

1   Q.   And the day is done at that point, you're home.  Once the

2   surveillance came down to Central Street in Chelsea, that ends

3   for you, right?

4   A.   No, I continued the surveillance up to Saugus and then up

5   towards New Hampshire and then back down again on Route 93.

6   Q.   Okay.  So this is on the way up, not on the way back.  The

7   transcript that you read 56.3, the observations of seeing you

8   on Central Street is beginning.  That's at the end, correct?

9   A.   I believe that is at the end, yes.

12:32PM 10   Q.   Which would have ended your function as a surveillance

11   officer at about that time as well, correct?

12   A.   Once that surveillance was done that day, I ended my

13   participation, I'm done.

14        THE COURT:  Any redirect?

15        MR. POHL:  No.

16        THE COURT:  I'm sorry, Mr. Murphy.

17                    CROSS-EXAMINATION

18   BY MR. MURPHY:

19   Q.   Good afternoon, Officer -- Detective.  My name is Marty

12:33PM 20   Murphy, and I represent Mr. Sandoval.  You had worked on this

21   investigation from the very start, correct?

22   A.   Yes.

23   Q.   As a matter of fact, you were one of the folks who went to

24   El Salvador to meet the person who later became known as Pelon

25   in the first instance, correct?

1    A.    Yes.

2    Q.    And that was in 2012, correct?

3    A.    That sounds correct, yes.

4    Q.    And eventually he was brought back here to Massachusetts

5    and set up in business, correct?

6    A.    He was brought back to Massachusetts.

7    Q.    And did there come a time when he began to operate as a

8    gypsy cab driver?

9    A.    There was a time that he was operating, giving rides, in

12:33PM 10    that capacity, correct.

11    Q.    And when was that, sir?

12    A.    During the investigation.  I really can't be sure when

13    that started or when that ended.

14    Q.    Now, as part of the investigation there was an agent from

15    Homeland Security assigned, correct?

16    A.    I'm not sure.

17    Q.    Did you ever interact with an agent from Homeland Security

18    during the course of this investigation?

19    A.    I'm really not sure if I had a name.

12:34PM 20    Q.    As a member of the Chelsea Police Department, do you have

21    occasion from time to time to deal with folks from Homeland

22    Security?

23    A.    Yes.

24    Q.    And do you have occasion from time to time to check on the

25    immigration status of individuals that you come into contact

1    with in your job?

2    A.    Yes.

3    Q.    And sometimes it's important for you to know whether an

4    individual is in the United States legally or is in the

5    United States illegally, correct?

6    A.    Yes.

7    Q.    Now, are you aware from your participation in this

8    investigation that in late October 2015, an individual named

9    Irvin De Paz was stabbed in East Boston?

12:34PM 10   A.    Yes.

11   Q.    And are you aware from your participation in this

12   investigation that in early October, on October 2, 2015, an

13   individual named Joel Martinez confessed to the confidential

14   informant that he had committed that murder, correct?  Are you

15   aware of that?

16   A.    No, not firsthand.  I'm not aware of that.

17   Q.    Did anybody tell you in October 2015 that Mr. Martinez had

18   confessed to the murder of Irvin De Paz?

19   A.    No.

12:35PM 20   Q.    In 2015, in October 2015, did anyone tell you that

21   Mr. Martinez -- and he's known as Animal; is that correct?

22   A.    Yes.

23   Q.    That he had been taken to New Jersey?

24   A.    I don't know about that.

25   Q.    And in October 2015 or November 2015, did anyone tell you

1    that Cooperating Witness Number 1, Pelon, and a fellow by the

2    name of Muerto had driven him from New Jersey back to the

3    Boston area?  Did anyone tell you that?

4    A.    Yes.

5    Q.    Okay.  Now, when did you learn that, sir?

6    A.    I can't remember exactly, but probably during that same

7    week.

8    Q.    Before his arrest, correct?

9    A.    Yes.

12:36PM 10    Q.    And he was not arrested until January of 2016, correct?

11    A.    Yeah.  I'm not really sure of the dates where different

12    individuals were placed in custody.

13    Q.    Mr. Martinez, we can agree, was arrested as part of the

14    big take-down, correct?

15    A.    I believe so.  I'm just not sure exactly what date.

16    Q.    Now, did you know where Mr. Martinez was living after he

17    returned from New Jersey in late 2016?

18    A.    I do not.

19    Q.    Did you have occasion as a part of your work on this case

12:37PM 20    to learn of an event that took place in Chelsea on December 27,

21    2015, pardon me?

22    A.    There were many events.  I just don't know specifically on

23    that day.

24    Q.    Did you learn of a stabbing involving a person -- where a

25    person named William Calderon was stabbed on December 2016?

1    A.    Yes, I am aware of that.

2    Q.    And to your knowledge was that after Mr. Martinez was

3    brought back by Pelon and Muerto to Chelsea?

4    A.    I really don't remember the time frame, but I do remember

5    the stabbing.

6    Q.    And do you also remember a stabbing that took place around

7    January 1st or January 2nd, 2016 on Chestnut Street in Chelsea?

8    A.    Again, you'd have to be more specific about the stabbing

9    just because there were multiple incidents like that in

12:37PM 10    Chelsea.

11    Q.    Is it fair to say that sometimes assaults in Chelsea go

12    unreported by the victims?

13    A.    Yes.

14    Q.    And that's because oftentimes the victims themselves may

15    have immigration problems, correct?

16    A.    That could be one of the reasons, sure.

17    Q.    And so is it fair to say that if you were to learn that

18    someone had been hit by a baseball bat, for example, you

19    wouldn't conclude simply from the fact that the police had no

12:38PM 20    report of that baseball bat attack that nothing had actually

21    happened, correct?

22    A.    I'd probably conduct a further investigation.

23    Q.    And the fact that no one had reported being hit by a

24    baseball bat wouldn't lead you to believe that someone hadn't

25    actually been hit by a baseball bat, correct?

1   A.   Again, I would continue my investigation, but it's

2   possible.

3   Q.   And it's particularly possible for those folks who are

4   members of the immigrant community, correct?

5   A.   We do know that that has happened, yes.

6   Q.   Now, let me ask you.  Sir, to your knowledge after

7   the -- after Animal, Mr. Martinez, came back to the Boston

8   area, did you or any of the other task force agents check to

9   see whether he was in the country legally?

12:39PM 10   A.   I did not, but I can't answer for the entire task force.

11   Q.   And to this day, sir, do you know whether or not, as of

12   November 2016, Mr. Martinez was in the country legally?

13   A.   I do not know for sure, no.

14   Q.   Well, do you have any information about that subject?

15   A.   Mr. Martinez?

16   Q.   Yes.  And whether he's in the country legally or not?

17   A.   I do not know.

18   Q.   Now, you said that you were monitoring CW-1's phone calls,

19   or I should say the task force was, correct?

12:40PM 20   A.   That's correct.

21   Q.   And did you know, in fact, during the investigation, sir,

22   that he had two phones?

23   A.   I do remember that at one point he had two phones.

24   Q.   And it's fair to say, sir, that you were only listening to

25   the recordings he was making on one of those phones, correct?

1    A.    I'm not really sure.  I couldn't be sure if they were

2    monitoring both or just one.

3    Q.    Do you know, sir, whether anyone from the task force

4    reviewed the records of Mr. Martinez' phone call use on

5    May 12, 2015?

6    A.    Again, I don't know what other task force agents did.

7    Q.    And you're familiar, sir, that there was a stabbing that

8    took place in Highland Park in Chelsea on May 12, 2015?

9    A.    That I do remember, yes.

12:40PM 10    Q.    And, sir, were any arrests made in connection with that

11    stabbing before January 2016?

12    A.    I don't believe so.

13    Q.    And it's fair to say, sir, however, that the members of

14    the task force knew exactly who had committed that stabbing

15    shortly after May 2015, correct?

16    A.    I'm not sure how long after, but I do know that members of

17    the task force did receive information which led them to

18    believe that they knew who was responsible for the stabbing.

19    Q.    And that was -- if you're not sure when, sir, that was

12:41PM 20    well before January, 2016?

21    A.    Yes.

22         MR. MURPHY:  May I have a moment, your Honor.  Thank

23    you, your Honor.

24         MR. LOPEZ:  No questions, your Honor.

25         THE COURT:  Redirect.

```
 1              MR. POHL:  No, thank you.  Thank you, again.

 2              THE WITNESS:  Thank you.

 3              MR. POHL:  Will Brizuela.

 4              WILLIAM BRIZUELA, having been duly sworn by the Clerk,

 5      testified as follows:

 6                        DIRECT EXAMINATION

 7      BY MR. POHL:

 8              MR. POHL:  May I, your Honor?

 9              THE COURT:  Yes.

12:42PM 10      Q.   Good afternoon, sir.

11      A.   Good afternoon.

12      Q.   Thank you for your patience.  I know you've been here more

13      than one day.

14      A.   Not a problem.

15      Q.   Can you please introduce yourself to the ladies and

16      gentlemen of the jury?

17      A.   My name is William Brizuela.

18      Q.   Would you spell your last name, sir?

19      A.   B-r-i-z-u-e-l-a.

12:42PM 20      Q.   Where do you work?

21      A.   The Chelsea Police.

22      Q.   How long have you been a Chelsea police officer?

23      A.   I'm in my 22nd year now.

24      Q.   What's your current assignment, Detective?

25      A.   I am the sergeant in charge of the drug unit.
```

1    Q.   Okay.  And would it be fair to say that in the course of

2    your duties as a Chelsea police officer that you've responded

3    to a number of different types of reports of crimes including

4    stabbings?

5    A.   Yes.

6    Q.   All right.  Do you remember whether you were --

7    participated in an investigation into an incident that took

8    place on December 27, 2015?

9    A.   I do.

12:43PM 10   Q.   What can you tell the jury about what you remember about

11   that day?

12   A.   That day I was a patrol supervisor working from 3 p.m. to

13   11 p.m.  One of the patrol officers called off with a --

14   somebody had flagged them down, that there was a fight in the

15   area of 4th and Pearl Street.

16        MR. POHL:  Can I have Exhibit 111 for the witness.

17   Q.   All right.  Can you see that on your screen?

18   A.   Yes.

19   Q.   And have you seen that before your testimony here today?

12:44PM 20   A.   Yes.

21   Q.   What are we looking at?

22   A.   A map of Chelsea.

23   Q.   And you said something about an area where there had been

24   a radio call for a fight in progress?

25   A.   Yes.

1    Q.    Where was that?

2    A.    By the corner of 4th and Pearl.

3    Q.    And do you see that on this map?

4    A.    I do.

5    Q.    You patrol Chelsea regularly.  Does this aerial photograph

6    look like an accurate representation of this section of Chelsea

7    to you?

8    A.    Yes.

9          MR. POHL:  Your Honor, I'd offer Exhibit 111.

12:44PM 10          THE COURT:  All right.  It's admitted, 111.

11          (Exhibit No. 111 received into evidence.)

12    Q.    All right.  So, Detective, I believe that with your finger

13    you can actually press on the screen and tell, show the jury

14    sort of the area, once you got that radio call, where you

15    responded to?

16    A.    The call was related to a stabbing, so therefore I

17    responded and when I got to the area the officers were at, it

18    was right around here.  Sorry.  I think right here, in this

19    area.

12:45PM 20    Q.    All right.  And that is sort of you said 4th Street and

21    Pearl Street?

22    A.    They were actually on Pearl Street, somewhere over here

23    where the arrow is now.  This general area here.

24    Q.    Okay.  And what did you see when you got there?

25    A.    When I got there, there was some people standing around.

1    I'm assuming it was the victim, they put him into the ambulance

2    and the ambulance had taken off.

3    Q.    And what's the next thing that you did?

4    A.    While we were there -- well, I asked Officer Rosetti what

5    happened.

6    Q.    And you asked an officer named Rosetti?

7    A.    Rosetti.

8    Q.    Why?

9    A.    He was the responding officer, to see if he learned any

12:45PM 10    information.

11    Q.    Okay.  So you spoke to Officer Rosetti?

12    A.    Yes.

13    Q.    And after you spoke to Office Rosetti, what did you do

14    next?

15    A.    Officer Leon had informed us that people had informed him

16    that they saw a group of males, five or six males run into a

17    building at 141 Hawthorn Street leaving the scene of the

18    stabbing.

19    Q.    Okay.  And from the map at 111, how sort of -- can you

12:46PM 20    tell the jury sort of where that is and how close it is to the

21    intersection of 4th and Pearl?

22    A.    It's very close, about a block and a half away, something

23    like that.

24    Q.    Can you point it out on the map?

25    A.    Yes, sorry.  Right here.

1    Q.    So what's that building?  What does it look like?

2    A.    It's a multi-dwelling building.  It's like -- I think

3    three or six apartments, I forget, but it's right on the corner

4    of Hawthorn and Chester Avenue.

5    Q.    And when you got that information that there might be some

6    people in the building who were involved in the stabbing, what

7    did you do?

8    A.    We set up a perimeter around the building, and then we

9    entered the building.  There was an open -- there was a door in

12:46PM 10  the back that was open that led down to the basement area.

11   Q.    Did you go down to the basement yourself?

12   A.    Yes.

13   Q.    What happened when you got to the basement?

14   A.    We found three males hiding in the basement.

15   Q.    Did you see anything else in the basement?

16   A.    There were some clothes, like they had taken off and

17   thrown about in the basement, set of keys as well, I believe.

18   Q.    What did you do once you found those three men in the

19   basement?

12:47PM 20  A.    I asked them what they were doing down there and one of

21   them said they were smoking.

22   Q.    What ultimately did you do with all three of them?

23   A.    They were placed under arrest for trespassing.

24   Q.    And when they were placed in the -- for trespassing.  When

25   they were placed under arrest for trespassing, excuse me, what

1  did you do with them?

2  A.   They were transported to the station where they were

3  booked and placed into cells.

4       MR. POHL:  Okay.  And can I have 117.1 - .3 for the

5  witness.

6  Q.   I'm going to show you a series of three pictures,

7  Detective.  Ask you if you recognize those pictures?

8  A.   Yes, those were the males that were arrested for

9  trespassing that day in the basement.

12:48PM 10  Q.   And during the booking procedure, were you able to

11  identify the three persons that were arrested for trespassing?

12  A.   Yes.

13  Q.   All right.

14       MR. POHL:  Your Honor, could I offer 117.1 - .3 into

15  evidence, and I'd ask for permission to publish it to the jury.

16       THE COURT:  I'm sorry.  117.1, 117.2, 117.3?

17       MR. POHL:  Correct.  Thank you very much, your Honor.

18       (Exhibit Nos. 117.1, 117.2 and 117.3 received into

19  evidence.)

12:48PM 20  Q.   Let's look at 117.1.  Do you recognize this individual?

21  A.   Yes, that person was identified later as David Moratia

22  (ph).  I don't know if I'm saying it right.

23  Q.   All right.  And 117.2.  Who is that?

24  A.   That would be Luis Cruz.

25  Q.   And 117.3.

1    A.    That would be Sergio, I want to say Atavalo Hernandez.

2    Artavalo Hernandez (ph).

3         MR. POHL:  Can I have one moment, your Honor.

4    Thank you, sir.

5         THE WITNESS:  Thank you.

6         THE COURT:  Cross-examination.  Mr. Murphy.

7                     CROSS-EXAMINATION

8    BY MR. MURPHY:

9    Q.    Good afternoon, Officer.

12:49PM 10   A.    Good afternoon.

11   Q.    My name is Marty Murphy, I represent Herzzon Sandoval.  Is

12   the area that we just saw on that map -- I don't know if you

13   could put the map back up, please.  Is there a restaurant

14   called the Santo Negro Restaurant near there, do you know, sir?

15   A.    There is, yes.  I believe, yes.

16   Q.    And do you know where on the map that would be located?

17   A.    If I'm not mistaken, I believe it's on the corner of 5th

18   and Chestnut Street, if I'm thinking of the right restaurant.

19   Q.    Thank you, sir.  Now, sir, you're a sergeant in the drug

12:50PM 20   unit?

21   A.    Yes.

22   Q.    And in the course of your career in the Chelsea Police

23   Department, you also served as a patrol officer?

24   A.    Yes.

25   Q.    And does the Chelsea Police Department have roll calls at

1    the beginning of shifts?

2    A.    Yes.

3    Q.    And what happens at a roll call at the beginning of a

4    shift in the Chelsea Police Department in let's say December of

5    2015.  What would happen?

6    A.    Typically, we might go over what happened the previous

7    shift, things the officers need to know about.  Assignments are

8    given out, cruiser assignments are given out.  Certain areas

9    they're assigned to do like impact patrols type of thing.

12:50PM 10    Q.    And if there was a person who was viewed as being a person

11    of particular danger in the area, sometimes they'd be a

12    briefing about that, correct?

13    A.    Yes, if we were aware of it.  Yeah.

14    Q.    Right.  So on the day that you talked about, on

15    December 27, 2015, was there any briefing about the person

16    named Joel Martinez?

17    A.    Not that I'm aware of, sir.  No.

18    Q.    And do you know who Joel Martinez is?

19    A.    No.

12:51PM 20    Q.    And had anybody told you that as of December 27, 2015 that

21    there was a person named Joel Martinez who confessed to the

22    commission of a murder in Chelsea?

23            MR. POHL:  Objection.

24            THE COURT:  Overruled.

25    A.    No, sir.

1          MR. MURPHY:  Thank you, your Honor.

2          THE COURT:  Redirect.

3          MR. POHL:  No, thank you.

4          THE COURT:  You may step down.

5          MR. POHL:  May we approach?

6          THE COURT:  Is the question whether to start a new

7    witness?

8          MR. POHL:  Yes.

9          THE COURT:  I want to make use of the ten minutes.  I

12:51PM 10   know it's not ideal, but --

11         MR. POHL:  We just wanted to make sure that's what you

12   wanted to do.  Thank you.

13         MAURICIO SANCHEZ, having been duly sworn by the Clerk,

14   testified as follows:

15                        DIRECT EXAMINATION

16   BY MS. LAWRENCE:

17   Q.   Good afternoon.

18   A.   Good afternoon.

19   Q.   Can you please say your name for the jury, please.

12:53PM 20   A.   Mauricio Sanchez.

21   Q.   Mr. Sanchez, are you currently in prison?

22   A.   Yes.

23   Q.   Why?

24   A.   For being affiliated with a gang.

25   Q.   Which gang?

1    A.    MS-13.

2    Q.    When you -- did you plead guilty before you entered prison

3    in this case?

4    A.    Yes.

5    Q.    When you pled guilty, did you have an agreement with the

6    government?

7    A.    Yes.

8    Q.    Okay.

9          MS. LAWRENCE:  May I have Exhibit 110.1 for the

12:54PM 10   witness, please.

11   Q.    Mr. Sanchez, on the screen, is this your plea agreement

12   with the government?

13   A.    Yes.

14   Q.    Is this your signature on the page?

15   A.    Yes.

16         MS. LAWRENCE:  Okay.  Can I have Exhibit 110.2 for the

17   witness.

18   Q.    Is this your cooperation agreement with the government?

19   A.    Yes.

12:54PM 20   Q.    Is this your signature on the page?

21   A.    Yes.

22         MS. LAWRENCE:  Your Honor, I'd move to admit Exhibits

23   110.1 and 110.2.

24         THE COURT:  All right.  They're admitted.  110.1 and

25   110.2.

1          MS. LAWRENCE:  Can you go back to 110.1, please?

2          (Exhibit No. 110.1 and 110.2 received into evidence.)

3     Q.   Mr. Sanchez, you said you pled guilty to being affiliated

4     with a gang.  I'm just going to read a part of your plea

5     agreement for you.  This page says that you are charged with

6     conspiracy to conduct enterprise affairs through a pattern of

7     racketeering activity and that you expressly and unequivocally

8     admit that you committed that crime.  Okay.  And on the bottom

9     of the page it says that you may be incarcerated for up to 20

12:55PM 10  years and on the following page, please, and that you may be

11    deported from the United States as a result of this crime.

12         Do you understand that to be what the plea agreement

13    says?

14    A.   Yes.

15         MS. LAWRENCE:  Can we have 110.2, please.

16    Q.   Mr. Sanchez, this is your cooperation agreement with the

17    government.  In your own words, what does this agreement

18    require you to do to get the benefits of this agreement?

19    A.   Tell the truth.

12:56PM 20  Q.   And what benefits do you expect to get or hope to get if

21    you do that in this case?

22    A.   A lower sentence and not to be deported.

23    Q.   Have you been sentenced yet?

24    A.   No.

25    Q.   Do you know what sentence you will get?

1  A.   No.

2  Q.   Do you know who will decide what sentence you will get?

3  A.   The Judge.

4  Q.   Okay.  All right.  Mr. Sanchez, how old are you?

5  A.   30.

6  Q.   Where were you born?

7  A.   Honduras.

8  Q.   When you were in Honduras, did you learn anything about

9  MS-13?

12:57PM 10  A.   Yes.

11  Q.   Were you a member of MS-13 in Honduras?

12  A.   No.

13  Q.   Did you come to the United States at some point?

14  A.   Yes.

15  Q.   When was that?

16  A.   December of 2008.

17  Q.   How old were you then?

18  A.   20.

19  Q.   How did you get here to the United States from Honduras?

12:58PM 20  A.   I walked and I walked across the border.

21  Q.   Did you have help from anyone to do that?

22  A.   A coyote.

23  Q.   What's a coyote, please?

24  A.   A person that guides people to cross the border more

25  quickly.

1   Q.   Okay.  And did you have to pay that person, the coyote?

2   A.   Yes.

3   Q.   How much did you pay the coyote?

4   A.   $5,000.

5   Q.   Was that your own money?

6   A.   My mother paid for it.

7   Q.   Okay.  Why did you leave Honduras?

8   A.   Over an incident that happened with my mother.

9   Q.   What kind of incident?

12:59PM 10   A.   She was attacked.

11   Q.   Why did that cause you to leave?

12   A.   She recommended that I come so as to not get myself into

13   trouble.

14   Q.   Okay.  She was attacked.  Did anything specific happen to

15   her?

16   A.   Yes, she was shot at.

17   Q.   Is she still alive?

18   A.   Yes.

19   Q.   Do you know who shot at her?

12:59PM 20   A.   I saw the guys, but I did not recognize them actually.

21   Q.   Did you ever at some later time tell anyone that you had

22   shot your mother?

23   A.   Yes.

24   Q.   Who did you tell?

25   A.   The first person I told was Lobo.

1    Q.    Do you see Lobo in the courtroom here today?

2    A.    Yes.

3    Q.    Can you point him out, please?

4    A.    Right there.

5         MS. LAWRENCE:  Can the record reflect that the witness

6    has identified the defendant Argueta Larios?

7         THE COURT:  Yes.

8    Q.    Did you tell anyone other than Lobo?

9         MR. MURPHY:  Objection, your Honor, relevance and

01:00PM 10    hearsay.

11         THE COURT:  I'll allow it.  Overruled.

12    Q.    Why did you tell Lobo that you had shot your mother?

13    A.    I made it up while I was drunk.

14    Q.    And was there a reason why you made it up?

15         MR. MURPHY:  Objection, your Honor.

16         THE COURT:  Overruled.

17    A.    Yes.

18    Q.    What was that reason?

19    A.    To make myself appear worse, because not just anyone will

01:01PM 20    shoot his mother.

21    Q.    Okay.  All right.  So when you crossed the border into the

22    United States, where did you go?

23    A.    To Boston.

24    Q.    Why did you go to Boston?

25    A.    Part of my family is here.

1    Q.    Okay.  You testified that you're a member of MS-13?

2              THE COURT:  Actually, are you changing subjects now?

3              MR. POHL:  Yes, I am.

4              THE COURT:  All right.  Why don't we break there for

5    the day.  Let me see lawyers at sidebar to talk about the

6    schedule.  The jury can leave.

7                                    - - - -

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7            I do hereby certify that the foregoing transcript was

8    recorded by me stenographically at the time and place aforesaid

9    in Criminal Action No. 15-10338-FDS, UNITED STATES vs. HERZZON

10   SANDOVAL, et al., and thereafter by me reduced to typewriting

11   and is a true and accurate record of the proceedings.

12           Dated this 14th day of February, 2018.

13                        s/s Valerie A. O'Hara

14           _____

15                    VALERIE A. O'HARA

16                    OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25