1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2


3
      UNITED STATES OF AMERICA            )
4                                         )
      vs.                                 )  Criminal Action
5                                         )
      HERZZON SANDOVAL,                   )  No. 15-10338-FDS
6     EDWIN GUZMAN,                        )
      CESAR MARTINEZ,                     )
7     ERICK ARGUETA LARIOS,               )
                       Defendants         )
8


9

      BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
10


11
                        JURY TRIAL DAY 15
12


13                       TESTIMONY ONLY


14
            John Joseph Moakley United States Courthouse
15                        Courtroom No. 2
                          1 Courthouse Way
16                        Boston, MA 02210

17                 20th day of February, 2018

18

19

20

21

22

23                      Valerie A. O'Hara
                       Official Court Reporter
24       John Joseph Moakley United States Courthouse
                    1 Courthouse Way, Room 3204
25                       Boston, MA 02210
                    E-mail: vaohara@gmail.com

APPEARANCES:

For The United States:

    United States Attorney's Office, by CHRISTOPHER J. POHL, ASSISTANT UNITED STATES ATTORNEY, and KELLY BEGG LAWRENCE, ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston, Massachusetts 02110;

For the Defendant Herzzon Sandoval:

    Foley Hoag LLP, by MARTIN F. MURPHY, ESQ. and MADELEINE K. RODRIGUEZ, ATTORNEY, 155 Seaport Boulevard, Boston, Massachusetts 02210;

For the Defendant Edwin Guzman:

    Lawson & Weitzen, by SCOTT P. LOPEZ, ESQ., 88 Black Falcon Avenue, Suite 345, Boston, Massachusetts 02210

For the Defendant Erick Arueta Larios:

    THOMAS J. IOVIENO, ESQ., 345 Neponset Street Canton, MA 02021;

For the Defendant Cesar Martinez:

    Stanley W. Norkunas, 11 Kearney Square, Howe Building, Suite 202, Lowell, Massachusetts 01852.

    ROBERT M. SALTZMAN, ESQ., 1 Central Street, Suite 5, Stoneham, Massachusetts 02180.

1                          I N D E X

2   WITNESS                        DIRECT   CROSS   REDIRECT  RECROSS

3   EVELYN TORRES
       By Mr. Lopez                  4
4      By Ms. Lawrence                        16

5   STEPHANIE AMADOR
       By Mr. Lopez                 17
6      By Mr. Pohl                            24

7

8   EXHIBITS                                 FOR I.D.   IN EVIDENCE

9     31.1                                                  20
      234                                                    8
10    236 through 240                                       32
      241.1                                                 11
11    241.2                                                 12
      241.3                                                 13
12    242                                                   23

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>TESTIMONY ONLY</u>

THE COURT:  Welcome back, ladies and gentlemen.  I hope you enjoyed your three-day weekend.  As I indicated, we have some evidence that needs to be completed before we get into the closing arguments.

Mr. Lopez.

MR. LOPEZ:  Yes, your Honor.  Thank you.  The defense calls Evelyn Torres.

EVELYN  TORRES, having been duly sworn by the Clerk, testified as follows:

<u>DIRECT EXAMINATION</u>

BY MR. LOPEZ:

Q.   Good morning.

A.   Good morning.

Q.   I'm going to ask you to speak up and speak into that microphone.

A.   Absolutely.

Q.   Can you please tell the jury your name?

A.   Good morning.  My name is Evelyn Torres.

Q.   Please try to speak up.  Can you spell your last name?

A.   T-o-r-r-e-s.

Q.   What is your relationship to Edwin Guzman?

A.   He's my husband.

Q.   How long have you been married to Edwin?

A.   Thirteen years.

|      |    |                                                    |
|------|----|----------------------------------------------------|
| 1    | Q. | Since 2005?                                         |
| 2    | A. | 2005, yes.                                          |
| 3    | Q. | Do you and Edwin have any children?                |
| 4    | A. | We have two children.                              |
| 5    | Q. | And how old is your first child?                   |
| 6    | A. | Twelve years old.                                  |
| 7    | Q. | And is it a boy or a girl?                         |
| 8    | A. | Two girls.                                          |
| 9    | Q. | And how old is your second child?                 |
| 09:25AM 10 | A. | Four years old.                               |
| 11   | Q. | What city or town do you live in?                 |
| 12   | A. | Revere.                                            |
| 13   | Q. | On what street?                                    |
| 14   | A. | Barrett Street.                                    |
| 15   | Q. | And how long have you lived on Barrett Street?    |
| 16   | A. | Five years.                                        |
| 17   | Q. | And where did you live before Barrett Street?     |
| 18   | A. | Pratt Street.                                      |
| 19   | Q. | Who owns Pratt Street?                             |
| 09:26AM 20 | A. | My husband.                                   |
| 21   | Q. | Do you know when he bought Pratt Street?          |
| 22   | A. | 2010.                                              |
| 23   | Q. | And how long did you live on Pratt Street?        |
| 24   | A. | We lived there like five years.                   |
| 25   | Q. | So from 2010 to 2015?                             |

```
 1    A.    Yes.

 2    Q.    And since 2015?

 3    A.    Until now, I still lived there.

 4    Q.    You've lived at Barrett Street?

 5    A.    Barrett Street, yes.

 6    Q.    Now, how far is the Pratt Street home from the Revere

 7    Police Station?

 8    A.    Like two blocks.

 9    Q.    Who currently lives at the Pratt Street house?

10    A.    The previous owners and our son with his mother.

11    Q.    And does Edwin also own -- does Edwin also own the Barrett

12    Street residence?

13    A.    Yes, sir.

14    Q.    And who else owns it?

15    A.    His mother.

16    Q.    And who currently lives at the Barrett Street residence?

17    A.    His mother, my two girls, I do, and a couple with two

18    children.

19    Q.    Now, directing your attention to June of 2012, was Edwin

20    employed?

21    A.    Yes, sir.

22    Q.    Where?

23    A.    He was working at Aramark -- Amtrak.

24    Q.    And how long did he work there for?

25    A.    He worked there a long time, like until he got employed in
```

1    2015.  He was like long.

2    Q.    Okay.  And did he work anywhere before FW Russell?

3    A.    Yeah, same, Amtrak.  The same, until he got employed at

4    FW Russell, yeah.

5    Q.    Now, directing your attention to 2010, did you say

6    something to Edwin about him going out to bars?

7    A.    Those are kind of big arguable time, in bars and drinking,

8    yeah.

9    Q.    And what did you tell him?

09:27AM 10    A.    That we could ended up.  He stop drinking.

11    Q.    And did you tell him -- what else did you tell him about

12    going to bars?

13    A.    That he have to get his mind together and all this stuff,

14    like we have get time for our family, and he did listen.

15    Q.    And so did he stop going to bars?

16    A.    Uh-huh.

17    Q.    Now, is Edwin an American citizen?

18    A.    He is.

19         MR. LOPEZ:  Your Honor, can I just show the Elmo for

09:28AM 20    the witness?

21         THE COURT:  Yes.

22    Q.    Do you know what this is?

23    A.    My husband.

24    Q.    And it looks like it's some type of certificate?

25    A.    His naturalization, yes.

1    Q.    His certificate of citizenship?

2    A.    Yes, sir.

3    Q.    And is this the original?

4    A.    Yes.

5            MR. LOPEZ:  Your Honor, I would move to admit it --

6            MS. LAWRENCE:  Objection, relevance, your Honor.

7            MR. LOPEZ:  -- as Exhibit 234.

8            THE COURT:  I'll allow it.  Admitted, 234.

9            (Exhibit No. 234 received into evidence.)

09:29AM 10            MR. LOPEZ:  Can I show it to the jury?

11            THE COURT:  Yes.

12    Q.    Now, when did Edwin become an American citizen?

13    A.    2001.

14    Q.    Do you remember the month?

15    A.    No, I'm not quite sure about the month.

16    Q.    Does it say November 16, 2001 at the bottom there?

17    A.    Yes.  I know it was in 2001.

18    Q.    Now, at some point, did Edwin receive a commercial

19    driver's license?

09:29AM 20    A.    He did, yeah.

21    Q.    And do you know why he -- why he wanted a commercial

22    driver's license?

23            MS. LAWRENCE:  Objection.

24            THE COURT:  Sustained.  Sustained in that form.

25    Q.    At some point, did he get a commercial driver's license?

1    A.    He did.

2    Q.    And do you know the reason he obtained that license?

3    A.    For a better life, for a better job, for a better --

4          MS. LAWRENCE:  Objection.

5          THE COURT:  Overruled.

6    Q.    Did he need a license in order to work for FW Russell?

7    A.    He did, he drives trucks.  Yes, sir.

8    Q.    And do you recall when he received that license?

9    A.    I'm sorry?

09:30AM 10    Q.    Do you recall when he received that license?

11    A.    Yes.

12    Q.    When?

13    A.    That was in 2012.

14    Q.    Now, directing your attention to the early morning hours

15    of July 26, 2015, do you recall something happening that

16    evening?

17    A.    Yes.

18    Q.    What happened?

19    A.    2015?

09:30AM 20    Q.    Yes, July 26, 2015.

21    A.    That's when he got his car vandalized.  I was sleeping,

22    and we heard this big bomb in our window.

23    Q.    Let me step back a second.  Do you recall something

24    happening on July 26, 2015?

25    A.    Yes, sir.

1  Q.   And you mentioned something about a car.  What I want you

2  to do is tell the jury what happened that night before you saw

3  the car.

4  A.   Oh, I was sleeping and I hear this big bang in our window.

5  I get up.  I quickly went to my daughter's room, and I see

6  everything was fine with them, and then my car alarm went on

7  very hard and very noisy, and then he told me to stay in the

8  living room, and then he opened the door, and it was the big

9  sign of two numbers in our door, the 1 and 8.  He said, "Call

09:31AM 10  the police."  I did call the police, and police came.  He came

11  outside, and he -- we noticed his car was painted, also, too.

12         MR. LOPEZ:  Now, for the witness only, your Honor.

13  Q.   Do you recognize what's been marked as Exhibit 241.1?

14  A.   Yes, sir.  I took that picture.

15  Q.   Is this a photograph?

16  A.   It's a photograph, yes.

17  Q.   And did you take this photograph?

18  A.   Yeah, I have it on my phone.

19  Q.   And do you remember what time you took this photograph?

09:32AM 20  A.   It was around 2:16, 2:18.  It was very early in the

21  morning.

22  Q.   And how do you know that?

23  A.   Because it's etched in my phone.  When you take a picture,

24  it says the time and date.

25         MR. LOPEZ:  Your Honor, can I move to admit this?

1      THE COURT:  All right, it's admitted, 241.1.

2      (Exhibit No. 241.1 received into evidence.)

3      MR. LOPEZ:  Show it to the jury?

4      THE COURT:  Yes.

5  Q.    Now, can you tell the jury what's in this photo?

6  A.    Two numbers.  I start erasing it, but he says take a

7  picture of it because I wanted to clean it up.  I was just

8  scared, and it's 1 and 8.

9  Q.    And do you see the word "Escalade" in that photo?

09:33AM 10  A.    Yes.

11  Q.    And what kind of car did Edwin own in July of 2015?

12  A.    The black car, Escalade, Cadillac, yes.

13      MR. LOPEZ:  Just for the witness, your Honor.

14  Q.    I'm going to show you another photo that's been marked as

15  Exhibit 241.2.  Do you recognize that?

16  A.    Yes, sir.

17  Q.    And do you recognize the car in that photo?

18  A.    Yes, that's his car.

19  Q.    And do you recognize the person standing next to the car?

09:33AM 20  A.    No, sir.

21  Q.    Do you know how this photo was taken?

22  A.    He got cameras for --

23      MS. LAWRENCE:  Objection, your Honor.

24      THE COURT:  Sustained.

25  Q.    Let me step back.  Is your home, is the Barrett Street

1    home equipped with outside cameras?

2    A.    Yes.

3    Q.    How many outside cameras?

4    A.    There's four.

5    Q.    Do you know whether or not this photo came from one of

6    those outside cameras?

7    A.    Yes.

8    Q.    How do you know that?

9    A.    Because after he got his car like that, we went over the

09:34AM 10   cameras, and we see the tapes that this guy was doing that that

11   night.

12   Q.    And did someone take a photo of what was being shown on

13   the cameras?

14   A.    He did with his phone and I was next to him.

15   Q.    Okay.  And what did you do with that phone?

16   A.    I took his phone to Walgreens and I revealed them.

17   Q.    And is this one of the photos that you had made at

18   Walgreens?

19   A.    Yes, sir.

09:34AM 20         MR. LOPEZ:  Your Honor, at this point, I'd move to

21   admit Exhibit 241.2.

22         THE COURT:  All right.  It's admitted, 241.2.

23         (Exhibit No. 241.2 received into evidence.)

24         MR. LOPEZ:  And show it to the jury?

25         THE COURT:  Yes.

1    Q.    And, again, this photo shows Edwin's car?

2    A.    Yes.

3    Q.    And it shows a individual in what appears to be white

4    clothing standing next to it?

5    A.    Yes.

6    Q.    And that was taken the evening of July 25th -- 26, 2015?

7    A.    Yes.

8          MR. LOPEZ:  Your Honor, I have one more photo just for

9    the witness.

09:35AM 10    Q.    I show you what's been marked as Exhibit 241.3.  Do you

11    recognize this photo?

12    A.    Yes.

13    Q.    And was this photo created in the same way as the previous

14    photo?

15    A.    The same way, yes.

16    Q.    You took his phone to Walgreens and had it developed?

17    A.    Yeah.

18          MR. LOPEZ:  Your Honor, I'd move to admit this photo.

19          THE COURT:  All right.  It's admitted, 241.3.

09:36AM 20          (Exhibit No. 241.3 received into evidence.)

21          MR. LOPEZ:  Show it to the jury, please.

22    Q.    And is that a closer picture of the person that was at

23    your house that evening?

24    A.    Yes.

25    Q.    And, again, is that Mr. Guzman's car?

```
 1   A.    It is his car, yes.
 2   Q.    And can you tell what, if anything, the person is holding
 3   in his hands?
 4   A.    It was a paint bottle.
 5   Q.    Okay.  And do you -- I take it -- well, strike that.  Was
 6   there any other damage done to your home that evening?
 7   A.    Just all the car when the guy throwed the brick on the
 8   window, it banged my small car, my Honda, and that's it.
 9   Q.    Just to be clear, you did not see anyone throw a brick,
10   correct?
11   A.    No.
12   Q.    What did you see when you went outside and looked at your
13   car?
14   A.    The two signs, the two paints, one in the door and the
15   other one was on the car.
16   Q.    So, are you saying that the door to your house was also
17   painted in a manner similar to Exhibit 241.1?
18   A.    Exactly the same.
19   Q.    And what about damage to your car?
20   A.    It was just a small dent.
21   Q.    Did you take photos of the damage to the house?
22   A.    No.  There was no damage to the house.
23   Q.    Did you take photos of the damage to your car?
24   A.    No, I didn't.
25   Q.    Were you able to clean off the "18" that was spray painted
```

1    onto Mr. Guzman's vehicle?

2    A.    Yes, with --

3    Q.    And after it was removed could you still see that it was

4    there?

5    A.    Yeah, it was damaged.  It was trash.

6    Q.    Now, I show you what's been marked as Exhibit 16.  Do you

7    see that tattoo?

8    A.    Yes.

9    Q.    Do you know how long Edwin has had this tattoo?

09:38AM 10    A.    When I got married with him, he had it already.

11    Q.    And how old was he when you were married?

12    A.    Nineteen years old.

13          MS. LAWRENCE:  Objection.

14          THE COURT:  Overruled.

15    Q.    So he's had it since at least the time he was married at

16    age 19?

17    A.    No, when he was with me, he had it before.  I don't know

18    when before.

19    Q.    Okay, but prior to him getting married?

09:38AM 20    A.    Yeah, he had it.

21    Q.    Now, do you recognize the name on that tattoo?

22    A.    Yes.

23    Q.    And what name is depicted in that tattoo?

24    A.    Marcelina.

25    Q.    And who is Marcelina?

1    A.    It's his grandmother.

2    Q.    And do you see a date -- I realize it's hard in this

3    picture, but do you see a date in this photo?

4    A.    5-3-92.

5    Q.    And what is the significance of 5-3-1992?

6    A.    It's the day that she died.

7    Q.    The day that Edwin --

8    A.    His grandmother died.

9          MR. LOPEZ:  I have no further questions, your Honor.

09:39AM 10          THE COURT:  Cross.

11                    CROSS-EXAMINATION

12   BY MS. LAWRENCE:

13   Q.    Ms. Torres, you testified that you were scared when you

14   saw the 1 and the 8 painted on your house and on the car; is

15   that correct?

16   A.    Yes, ma'am.

17   Q.    And you were scared because you knew what the 1 and 8

18   stood for, right?

19   A.    I was just scared because my kids.

09:40AM 20   Q.    Because you knew that 1 and 8 symbolized something that

21   was scary, correct?

22   A.    Correct.

23   Q.    Okay.  And you said that Mr. Guzman stopped going to bars

24   after you told him to, correct?

25   A.    Correct.

1    Q.    But he didn't stop going to the garage in Everett, did he?

2    A.    I never know where he go out when he go out, I just know

3    he got out to relieve stress.

4    Q.    And he did go out on the weekends and late at nights,

5    correct?

6    A.    Not as much often.

7            MS. LAWRENCE:  No further questions, your Honor.

8            THE COURT:  Mr. Lopez, anything further?

9            MR. LOPEZ:  Yes, at this time, I would call --

09:41AM 10            THE COURT:  I'm sorry.  You may step down.

11            MR. LOPEZ:  -- Stephanie Amador, who I believe is just

12    outside the door, your Honor.

13            THE COURT:  All right.

14            STEPHANIE AMADOR, having been duly sworn by the Clerk,

15    testified as follows:

16                    DIRECT EXAMINATION

17    BY MR. LOPEZ:

18    Q.    Good morning.

19    A.    Good morning.

09:42AM 20    Q.    Could you please state your name for the record?

21    A.    Stephanie Amador.

22    Q.    And can you spell your last name?

23    A.    A-m-a-d-o-r.

24    Q.    Directing your attention to the summer of 2017, did you

25    have a job that summer?

1    A.    Yes, I did.

2    Q.    And who did you work for?

3    A.    Lawson & Weitzen.

4    Q.    And what were you doing for Lawson & Weitzen?

5    A.    I was reviewing discovery for a case.  I speak Spanish,

6    and I was reviewing and helping to translate some of the

7    discovery.

8    Q.    And to be -- full disclosure, you were working with me?

9    A.    Yes.

09:42AM 10    Q.    And over the course of the summer, approximately how many

11    hours of audio and video recording did you listen to?

12    A.    It's hard to tell.  I was working from about April till

13    the end of August, at least 40 hours listening to audios and

14    videotapes.

15    Q.    So, fair to say hundreds of hours of audios and

16    videotapes?

17              MR. POHL:  Objection.

18              THE COURT:  Overruled.

19    A.    Yes.

09:43AM 20    Q.    And during that time, did you become familiar with the

21    voices of the individuals on the videotapes?

22    A.    Yes, I did.

23    Q.    And audiotapes?

24    A.    Yes.

25    Q.    And just to be clear, videotapes and audiotapes in this

1    case, correct?

2    A.    Yes.

3    Q.    Now, did I ask you to do something on Sunday?

4    A.    Yes.

5    Q.    What did I ask you to do?

6    A.    To review an audio and video recording and to review who

7    was speaking on that.

8    Q.    And was it a particular date that I asked you to review?

9    A.    Yes, I believe it was January 8, 2016.

09:43AM 10   Q.    And specifically the government's excerpt of that

11   particular recording?

12   A.    Yes.

13   Q.    And were you familiar with the people speaking on that

14   video or audiotape?

15   A.    Yes.

16   Q.    And you became familiar based on your prior review?

17   A.    Yes.

18   Q.    And did you identify any errors in the identification of

19   the speakers on that videotape?

09:44AM 20   A.    I did.

21            MR. LOPEZ:  Your Honor, I'd like to show the witness

22   an exhibit.

23            THE COURT:  All right.

24            THE CLERK:  Document camera.

25   Q.    I show you the transcript.

1    A.   Yes.

2    Q.   And going to page 5, do you see on the bottom of that

3    page?

4    A.   Yes.

5    Q.   The original transcript had the name Playa?

6    A.   Yes.

7    Q.   And who did you believe in your opinion the speaker was?

8    A.   Caballo.

9    Q.   And on the next page, do you see the corrections you made

09:45AM 10   on the next page?

11   A.   Yes.

12   Q.   And was that throughout the transcript that you made those

13   corrections?

14   A.   Yes, I did.

15   Q.   And that was based on your familiarity with the speakers?

16   A.   Correct.

17        MR. LOPEZ:  Your Honor, at this point in time I'd like

18   to introduce this as Exhibit 31A.

19        THE COURT:  Let's not make numbers and letters, how

09:45AM 20   about --

21        MR. LOPEZ:  This is the government's Exhibit 31, so

22   31.1 perhaps.

23        THE COURT:  Let's call it 31.1.

24        (Exhibit No. 31.1 received into evidence.)

25        THE COURT:  Ladies and gentlemen, let me again remind

1    you these are English language translations of Spanish language

2    recordings.  They've been translated for your ease of

3    understanding.  You'll recall I permitted the government to

4    give you transcripts that had the speakers identified.  This is

5    now a defense.  Their contentions as to the correct speakers

6    and what they say are the correct speakers are indicated on the

7    transcript.  Go ahead, Mr. Lopez.

8    Q.   And just going through this, the jury can review it, but

9    there were -- you made changes on page 5?

09:46AM 10    A.   Yes.

11    Q.   Page 6?

12    A.   Yes.

13    Q.   Page 7?

14    A.   Yes.

15    Q.   Page 8?

16    A.   Yes.

17    Q.   Page 9?

18    A.   Yes.

19    Q.   Page 10?

09:47AM 20    A.   Yes.

21    Q.   Page 11?

22    A.   Yes.

23    Q.   And so on?

24    A.   Yes.

25    Q.   And in your opinion the identities of the speakers that

1    you've identified are, in fact, those speakers?

2    A.    Yes.

3    Q.    Now, I also asked you to listen to another tape.  Do you

4    remember that?

5    A.    Yes.

6          MR. LOPEZ:  Your Honor this is a brief tape, if I

7    could just play it.

8          (Video played.)

9          THE COURT:  Anyway, the tape is in Spanish?

09:48AM 10          MR. LOPEZ:  Yes, that's correct.

11    Q.    Well, in any event, did you recognize the voice on that

12    tape?

13    A.    Yes.

14    Q.    And did you prepare a translation?

15    A.    I did.

16    Q.    And --

17          MR. LOPEZ:  For the witness only.

18    Q.    I show you what's been marked as Exhibit 242.

19    A.    Yes.

09:49AM 20    Q.    Do you recognize that?

21    A.    I do.

22    Q.    And that's a translation that you prepared?

23    A.    Yes.

24    Q.    Turning over to the second page, there's a speaker

25    identified there?

1    A.    Yes.

2    Q.    And that is Muerto?

3    A.    Correct.

4          MR. POHL:  Objection.

5          THE COURT:  Well, before you get into the content

6    let's admit it.  All right.

7    Q.    And there's other speakers?

8    A.    Correct.

9    Q.    And you recognize those speakers from your familiarity

09:49AM 10    with listening to their voices, correct?

11    A.    Yes, I did.

12          MR. LOPEZ:  Your Honor, at this point I would move to

13    admit Exhibit 242.

14          THE COURT:  All right.  I'm going to admit it for a

15    limited purpose.  I will admit it, ladies and gentlemen, for

16    the purpose of whatever weight you choose to assign it in

17    determining the credibility of the witness identified as

18    Muerto.  In other words, as I understand, the defendant is

19    offering this to impeach Muerto and to say that he was not

09:50AM 20    credible.  You may consider it for that purpose and no other

21    purpose, and you may not consider it for the truth of anything

22    set forth in this excerpt, and my prior instructions concerning

23    the accuracy of the translations and so forth remains.

24          All right.  With that, it's admitted.

25          (Exhibit No. 242 received into evidence.)

24

1        MR. LOPEZ:  May I now read it to the jury?

2        THE COURT:  Yes.

3        MR. LOPEZ:  Muerto:  "That's why I'm telling you,

4   dude, I would like that.  That would be cool.  You see it was

5   pretty when we went to do that thing to Playa that day and the

6   motherfucker seemed to be distrusting of me.  Casper called me

7   and told me Playa wants to talk to you.  Oh, really?  Yeah.

8   There are some photos there, and it appears to you.  I said oh,

9   really?  Tell him to call me then, and I said what's up with

09:50AM 10   those photos?  And he said oh, no, something there and the

11   motherfucker did not want to tell me anything else.

12        I said that's cool then, tell him to call me, and he

13   better not try to accuse me of things, because then you guys

14   will see what's up.  No, man, he did not call me.  Nothing has

15   been heard about that.  We took that young kid, we gave him a

16   royal red hat, we gave him a spray so that he would go and put

17   the chavala 18 street sign, and he broke the glass from the

18   front windows, it was a huge rock.  And that dude still lives

19   at that house down the street.  Didn't he live in Revere?

09:51AM 20   Yeah, he lives in Revere."

21        No further questions, your Honor.

22        THE COURT:  Cross.

23                    <u>CROSS-EXAMINATION</u>

24   BY MR. POHL:

25   Q.   Good morning.

1    A.    Good morning.

2    Q.    I'm Chris Pohl.  I'm one of the prosecutors in the case.

3    I don't think you and I have met before.  Are you a law student

4    still, or are you a practicing attorney now?

5    A.    I'm a practicing attorney.

6    Q.    Okay.  You're not a linguist?

7    A.    No.

8    Q.    Okay.  And your testimony, as I understand it, is that

9    when you worked in the summer for Mr. Lopez, he had you listen

09:52AM 10    to some of the recordings in this case; is that correct?

11    A.    Correct.

12    Q.    And so after the summer, I think you said about August,

13    you stopped this project, correct?

14    A.    Correct.

15    Q.    And as I understood your testimony on direct, you haven't

16    listened to anything else since then until this past Sunday?

17    Is that right?

18    A.    Correct.

19    Q.    And one of the things that Mr. Lopez had you listen to was

09:52AM 20    this recording that he just played of a couple different

21    people, who you say Muerto and Caballo and Pelon, or a person

22    we've called CW-1.  Just so that we're clear, the date of this

23    recording, right, the recording was something that the

24    government produced to the defendants and that's one of the

25    things you listened to, right?

26

1     A.    Correct.

2     Q.    And the date was December 8, 2015, right?  That was the

3     date of the recording?

4     A.    I can't recall if it was January 8th or December 8th.

5           MR. POHL:  Can I have it for the witness.

6     Q.    It's not a trick question.  That's the date on it.  Does

7     that look right to you, December 8, 2015?

8     A.    Yes.

9     Q.    Okay.  All right.  So this recording was of a recording on

09:53AM 10    December 8, 2015, right?

11    A.    Yes.

12    Q.    Okay.  Have you ever met Muerto?

13    A.    No.

14    Q.    Have you ever met Caballo?

15    A.    No.

16    Q.    Have you ever met Pelon?

17    A.    No.

18    Q.    Are you a linguist?

19    A.    No.

09:53AM 20    Q.    Okay.  The last time you listened to any of these

21    recordings at all was the summer?

22    A.    Yes.

23    Q.    Until Mr. Lopez called you to come in on Sunday?

24    A.    Well, we've been going through some of the information

25    over there --

1    Q.    Not this one, right?

2    A.    Correct.

3    Q.    This one was Sunday?

4    A.    Yes.

5    Q.    And also just so I'm clear, this is an audio recording,

6    right?  There's no people in this, right?

7    A.    Yes, that's just an audio recording.

8    Q.    So you'd have to know Muerto and Caballo and Pelon's voice

9    to be able to get this, right?

09:54AM 10    A.    Yes.

11    Q.    Okay.  The last time you listened to any of these.  I

12    mean, I understand you may have been talking to Mr. Lopez, but

13    the last time you listened to any of these was the summer,

14    right?

15    A.    Yes.

16    Q.    And even when you listened them, right -- let me ask you

17    this.  When you listened to them, it was often the case that

18    many of the recordings at least back then didn't have

19    transcripts, right?

09:54AM 20    A.    Correct.

21    Q.    So you didn't know even from the government's perspective

22    who these people were that were talking?

23    A.    I recognized their voices.

24    Q.    You recognized Muerto and Caballo and Pelon and Casper and

25    Playa?

1    A.    I did.

2    Q.    Well, Playa, I get.  I mean, is it fair to say that the

3    only person in this case that you met personally would be

4    Playa?

5    A.    Yes.

6    Q.    Okay.  And on Sunday when Mr. Lopez had you come into his

7    office, one of the things that you reviewed was the -- I guess

8    what we've been calling the jump-in video from January 8, 2016.

9    And that was one of the videos you reviewed over the summer,

09:55AM 10  right?

11   A.    Correct.

12   Q.    But you didn't produce a transcript of that then, right?

13   A.    No.

14   Q.    And the recordings really long.  Would you agree with me

15   about that?

16   A.    Yes.

17   Q.    It's like an hour and a half?

18   A.    Yes.

19   Q.    And you know, we've produced an excerpt here, but the full

09:55AM 20  transcript of everything that gets said in that recording runs

21   for like 70 or 80 pages.  Would you agree with me about that?

22   A.    I didn't -- yes.

23   Q.    Okay.  All right.  And would you agree with me that it's

24   hard to tell who's speaking sometimes in that recording?

25   A.    At times, it is, yes.

1    Q.    Yeah.  A lot of times there's a video recorder on CW-1,

2    right?

3    A.    Yes.

4    Q.    And it moves up and down, it captures people speaking, but

5    you can't always see them speaking when they are speaking.

6    Would you agree with me about that?

7    A.    That's correct.

8    Q.    And would you agree with me that there are times when many

9    people are speaking at once?

09:56AM 10    A.    Correct.

11    Q.    All right.  And it's your testimony that on Sunday, you

12    had the opportunity to review that full recording, right, and

13    that you were able to make these changes on the fly and produce

14    this transcript?

15            MR. LOPEZ:  Objection.  Argumentative.

16            THE COURT:  I'll sustain it in that form.

17    Q.    It's your testimony that you were able, in a day, to

18    review that hour and a half long transcript with all of those

19    people talking and make the changes that you've made here

09:56AM 20    today?  Is that really your testimony?

21    A.    Yes.

22    Q.    Well, let me ask you this.  Did anybody help you make

23    those changes?

24    A.    No.

25    Q.    Did Mr. Guzman suggest to you what those changes should

1    be?

2    A.    No, he had --

3    Q.    Did Mr. Lopez tell you --

4          THE COURT:  Hold on.

5    Q.    Did Mr. Guzman -- did you have an understanding from

6    Mr. Lopez where to look on this transcript?

7    A.    He told me where to start looking.

8    Q.    Right.  He told you where to look, right?

9    A.    Yes, in terms of the time stamp.

09:57AM 10    Q.    And even then, right, even then when Mr. Lopez told you

11    where to look and you changed some of the things in the

12    transcript, there's an awful lot in this transcript where even

13    you have Mr. Guzman speaking, right?

14    A.    Correct.

15    Q.    Like the very end.  For instance, page 24, where you have

16    Mr. Guzman, Playa, actually doing the counting of beating in

17    Animal into MS-13; is that correct?

18    A.    I did not type that.  That was provided already.

19    Q.    Well, I don't understand what that means.  Does that mean

09:58AM 20    it's right or it's not right?

21    A.    I believe that that's correct.

22    Q.    Well, how do you know if it's right or not right?

23    A.    Just based on listening to the audios.

24    Q.    So which ones -- well, if you didn't confirm the whole

25    transcript, then what did you do?

1          MR. LOPEZ:  Objection, your Honor.  That's not what

2     she testified.

3          THE COURT:  Sustained.

4     Q.   So even in this transcript, the one that was printed --

5     that was reviewed by you, right, you have Playa counting "1, 2,

6     3, hold him, 3, 4, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13," right?

7     A.   Correct.

8     Q.   And then right after that someone says, "Welcome to

9     La Mara," right?

09:58AM 10    A.   Correct.

11         THE COURT:  Anything else?

12         MR. POHL:  No, thank you.

13         THE COURT:  Any redirect?

14         MR. LOPEZ:  No, your Honor.

15         THE COURT:  All right.  Thank you.  You may step down.

16    Is there any other evidence?

17         MR. LOPEZ:  Your Honor, I just have some other records

18    to submit that I've had premarked.  Exhibit 236, which is a

19    declaration from the custodian of the Massachusetts Registry of

09:59AM 20    Motor Vehicles detailing the cars that Mr. Guzman had

21    registered; a second declaration wherein a search was done by

22    the Registry of Motor Vehicles, and they could not locate any

23    Toyota registered in his name; a declaration of the custodian

24    of his employer with various W-2s for year -- for years 2012

25    through 2016; a certified copy of a quitclaim deed for

1    44 Barrett Street in Revere and a quitclaim deed certified

2    record for 15 Pratt Street in Revere.  I move that they be

3    admitted, your Honor.

4              THE COURT:  All right.  They're admitted.  So 236 and

5    237 are RMV records, right?

6              MR. LOPEZ:  Yes, your Honor.

7              THE COURT:  238 is the W-2s?

8              MR. LOPEZ:  Yes, your Honor.

9              THE COURT:  And 239 and 240 are the deeds?

10:00AM 10            MR. LOPEZ:  Yes, 239 and 240 are the -- yes, the

11   quitclaim deeds.

12             THE COURT:  All right.  They're admitted.

13             (Exhibit Nos. 236 through 240 received into evidence.)

14             Anything else, Mr. Lopez?

15             MR. LOPEZ:  No, your Honor.  Mr. Guzman rests.

16                                    -  -  -  -

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7            I do hereby certify that the foregoing transcript was

8    recorded by me stenographically at the time and place aforesaid

9    in Criminal Action No. 15-10338-FDS, UNITED STATES vs. HERZZON

10   SANDOVAL, et al., and thereafter by me reduced to typewriting

11   and is a true and accurate record of the proceedings.

12           Dated this 20th day of February, 2018.

13                    s/s Valerie A. O'Hara

14           _____

15                    VALERIE A. O'HARA

16                    OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25