UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____ )
                                      )
UNITED STATES OF AMERICA              )
                                      )
VS.                                   )          Criminal Action No. 15-10338-FDS
                                      )
CESAR MARTINEZ                        )
_____)

**CESAR MARTINEZ SENTENCING MEMORANDUM**

The current defendant, Cesar Martinez was found not guilty of conspiracy to

conduct enterprise affairs through a pattern of racketeering activity while convicted of

conspiracy to possess with intent to distribute cocaine of five hundred grams or more

following a month long trial.  The advisory sentencing guidelines set the base offense

level for that crime at Level 24.  The Probation Department concluded that the

defendant meets the first four criteria of U.S.S.G. §5C1.2, but would need to satisfy

criterion 5[1] to qualify for a two level reduction under U.S.S.G. §2D1.1(b)(17).

## A.    ADVISORY SENTENCING GUIDELINE APPLICATION

The Probation Department sets out in the Presentence Report, 25 pages related

to the activities for which the jury returned a verdict of not guilty in this case. There are

two paragraphs in those 25 pages  (¶ 37 &38) directly related to the count of conviction

on the drug charge. The defendant has objected to the inclusion of these activities in

his report and renews that objection here again to the Court.

_____

[1] This criteria requires the defendant to submit to a proffer session with the prosecution prior to the date of the sentencing giving a truthful and full account concerning the offense of conviction. The defendant will address this aspect more fully under his presentation relative to 18 U.S.C. §3553(a) later in this memorandum.

The Probation Report does not attempt to assert that any of the racketeering conduct contained in those 25 pages, constitutes relevant conduct for this defendant as set out under U.S.S.G. §1B1.3.  Nor could there be as there is no (1) reasonably foreseeable acts and omissions of others (2) in furtherance of (3) the jointly undertaken criminal activity for which the defendant was convicted.

The conspiracy of which the defendant was convicted, dealt with an FBI "sting" operation[2] in February 2014, called a "protection detail".  (See trial transcript day 4, page 23, **Exhibit 1**).  Cesar Martinez was charged with a conspiracy involving the individuals associated with the planned FBI "details" done in October and December 2014, not the persons set out as participating with him in February 2014.[3]

The conduct forming the February, October and December 2014 "protections details" was unrelated to the Racketeering Conspiracy as the trial testimony showed this was entered into and committed by the individuals for their own personal gain. It had no involvement with any MS-13 or ESLS enterprise.  The participants were instructed not to mention this conduct to the clique leadership. Trial exhibits of consensual recorded conversations supports the lack of any related activity.  A synopsis of the December 8, 2014 consensual recording clearly demonstrates this:

-2-

---

[2]  The FBI directed the cooperating witness in this case (CW-1) to ask people that he knew in the clique if they wanted to help him (CW-1) protect a drug shipment being transported by car from Massachusetts to New Hampshire. (See Trial Transcript day 4 page 26 **Exhibit 2**).

[3]  The FBI was required to seek separate authorization , as a new enterprise, in order to be able to operate the "protection details" in October and December 2014. (See trial day 4, page 30 **Exhibit 3** and the internal request for approval **Exhibit 4**).

CW-1: Fine, but don't tell Casper about this thing, or anything because last time I told the dudes and they told me some shit that they were going for sure, and at the last minute they cancelled on me.

CW-1: ... The Mara is one thing and this business is another. (**Exhibit 5**)

Further substantiation of this being an independent activity, was that no part of the fee for the "protection detail" was given or paid to the clique. The participants were told they would be paid the fee upon completion splitting up the amount given by the person accepting delivery in New Hampshire.


## B.    CONSIDERATIONS IN IMPOSING A PARTICULAR SENTENCE

In imposing a sentence, a District Court, should "impose a sentence sufficient, but not greater than necessary" to accomplish the sentencing goals advanced in §3553(a)(2) including just punishment, deterrence, recidivism and rehabilitation. See *Rita v. United States*, 551 U.S. 338, 347-48 (2007).  In crafting an appropriate sentence, the Court should make sure that the sentence fits not only the offense but the offender and should "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." See *Gall v. United States,* 552 U.S. 38, 52 (2007). "[A] sentencing judge should engage in a ...holistic inquiry,'by considering' a tapestry of factors, through which runs the thread of [the] overarching principle' of parsimony."  *United States v. Russell*, 537 F.3d 221, 228 (1st Cir. 2008) (quoting *United States v. Rodriguez*, 731 F.3d 20, 28 (1st Cir. 2008)).

-3-

"Consistent with the principle that "the punishment should fit the offender and not merely the crime, this Court has observed a consistent and uniform policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within the limits fixed by law, particularly the fullest information possible concerning the defendant's life and characteristics. That principle is codified at 18 U.S.C. §3661, which provides that "[n]o limitation shall be placed on the information" a sentencing court may consider "concerning the [defendant's] background, character and conduct," and at §3553(a), which specifies that sentencing courts must consider, among other things, a defendant's "history and characteristics," §3553(a)(1)." *Pepper v. United States*, 561 U.S. 476, 477 (2011)(citations omitted).

### Government's Recommended Sentence

The government in its sentencing memorandum of November 26, 2018 asks the court to impose a ten year sentence and three years of supervised release on Mr. Martinez. In arguing for a significant upward departure the government asks that the court adopt, as aggravating factors, the very evidence which the jury explicitly rejected in returning a verdict of not guilty on the racketeering indictment.

In its argument in support of an upward departure, the government appears to have abandoned its long held position throughout the trial of Mr. Martinez which is that the credibility of its immunized witnesses should be approached with great caution. Indeed, FBI Special Agent Jeffrey Wood insisted to jurors that he would not credit an uncorroborated statement of such an individual.  Special Agent Jeffrey Wood

-4-

testified on Day Four of the trial to this aspect of relying upon certain witnesses during

cross examination as follows:

> **A.** ...I would say that we listen to what the cooperating witnesses
> and confidential informants tell us, and then we corroborate what
> they tell us through recordings and the gathering of evidence. We
> just don't take their word for it.
>
> **Q.**   Because you don't trust the cooperating witnesses, correct?
>
> **A.**   I guess that would be somewhat of a fair type explanation, but
> I just don't listen to one person and just say , okay, you said
> that, and that's true. I hav e to have evidence to say it's true.
>
> **Q.**   Well you testified at a prior hearing, correct?
>
> **A.**   Yes
>
> **Q.**   And you testified that you don't trust your cooperating
> witnesses ; do you recall testifying to that?
>
> **A.**   Yes, I mean, that's a fair thing that, yes, my witnesses are
> criminals, so I have to go and prove what they tell me so that I
> know what they're telling is the truth when they tell me.
>
> **Q.**   And you have to corroborate what they tell you, and you do
> that by gathering other evidence, such as recordings?
>
> **A.**   Yes **(Exhibit 6)**

Throughout the trial, the government to sought bolster its

witnesses's credibility by introducing both videotaped recordings as well as audio

recordings of purported gang members in its case-in-chief. In both its opening and

closing arguments the government emphasized the strength of its corroborated witness

testimony. At no point did the government appear to vouch for the independent validity

of its immunized witnesses. In the case of Mr. Martinez, however, there were several

instances were the government's evidence failed to meet its own stated test for

credibility as expressed by Special Agent Wood.

Now, at sentencing,  the government simply reargues the same

uncorroborated assertions of Jose Hernandez-Miguel, "Muerto", which the jury has

already rejected at trial.  In assessing the totality of testimony at trial, Muerto

was a credible witness in the instances where his testimony was corroborated through

recordings, law enforcement testimony, observation, and police reports. However, in the

testimony cited by the government in its memorandum none of  Muerto's testimony

regarding alleged prior bad acts by Cesar Martinez were corroborated.

The government first relies upon the accusation, by Muerto, that Mr. Martinez

was involved in a violent altercation on a summer day in 2008  in Maverick Square in

East Boston. According to Muerto members of the 18th Street gang were viciously

stabbed with machetes and beaten with a bat and other weapons. This testimony about

such a violent attack was unsupported by medical records, police accounts, or any

testimony of eye witnesses.

It would have reasonably been expected that victims of such a violent attack would

have been hospitalized, that police officers who investigated the attack would have

written reports, and that residents of a busy neighborhood on a summer day would

have witnessed some aspect of such an attack.  Further, the testimony regrading the

size of the weapons shrunk considerably under cross examination and government

documents introduced by the defendant, showed Mr Martinez not to live in that section

of the city.                                      -6-

The government recycles Muerto's testimony concerning another attack in which Muerto alleged that Mr. Martinez provided transportation for Crazy from Everett to obtain a gun that was used by Vida Loca to murder Javier Ortiz in Chelsea on December 14, 2014. Muerto, however, was not a percipient witness to these events, a fact that was not lost on the jury. Muerto claimed to have learned this information after the fact but Muerto had no personal knowledge of whether or not it was true. Perhaps more revealing is Muerto's statement that he would not go along in violation of clique rules which would result in a beating. Also his denial of having his own transportation and riding a bus were refuted by the testimony of Tigre regarding ownership of a motor vehicle by Muerto[4].

In the same vein, the government includes Muerto's story that Lobo had requested a "green light" from gang leaders to murder CW-1 whom Lobo suspected of informing on him to Chelsea Police. Mr. Martinez was said to have offered to provide Lobo with a weapon to carry out the attack. Muerto claimed to have heard this story from an unnamed gang member at Wyatt Detention Center during 2016. Even if one were inclined to believe Muerto, it is impossible here to credit the veracity of the unnamed gang member who was his purported source.

The government directs the court to the January 8, clique meeting in Everett. There are quotations in the government from gang members which are disturbing in

---

[4] In a recorded conversation between CW-1 and Muerto , not introduced at trial but produced by the government (Bated # USA-GD-00012344) has Muerto speaking about setting up a surveillance camera at his home to protect his car.

their subject matter. Here, however, to the government's credit, the government includes Mr. Martinez's objections to the inclusion of Animal as a member of the clique. Mr. Martinez warned the group that the inclusion of younger violent members will result in members going to jail and he expressed his opposition to doing so. This meeting was both videotaped and audio taped and was shown several times to the jury. Mr Martinez is ridiculed by the government's informant, CW-1, for not wanting more violence at that time.

### C.     CONSIDERATION OF THE FACTORS SET OUT IN 18U.S.C. §3553(a)

#### 1.     Personal History and Characteristics of the Defendant

As acknowledged by the Probation Department, Cesar Martinez was is 38 years old, having been born on May 12, 1980 in Metapan, El Salvador. Cesar Martinez is one of seven children born to Rosa and Rigoberto Martinez. (See **Exhibits 7 & 8**)  Before coming to the United States at age 19, the defendant attended school in El Salvador. The enclosed certificates (**Exhibits 9-12**) demonstrate that he was a conscientious student who was well liked. He came to the United States fleeing the hostilities on-going at that time in El Salvador. There are two letter of character reference from El Salvador submitted herewith for Mr Martinez. (**Exhibits 13 & 14**)

The defendant has acknowledged entry into the United States without inspection at age 19, but sought and was granted temporary protective status by the Department of Homeland Security ever year thereafter up until his arrest and confinement on this case. The defendant was also granted a employment authorization by Homeland Security. (See **Exhibit 15** as a representative example).

-8-

The defendant was gainfully employed and filed federal and state income taxes each year. (See **Exhibit 16** as a representative example). All during the FBI investigation in this case, Cesar Martinez was operating a towing business from the garage in Everett. He had purchased and owned his own tow truck. (**Exhibit 17**) He was also helping with mechanical work in the garage as well. (**Exhibit 18** Trial Transcript Day 14 page 19).

Cesar Martinez has, contrary to the government's attempts to characterize him as a person of violence, clearly not a person participating in some of the violent physical acts. As previously stated,  the testimony of two cooperating witnesses, "Muerto" and "Tigre" failed in that attempt.  Muerto it can be said self destructed with his attempt. Tigre, through his testimony, made no such attempt and actually became a supporter of the true character of Cesar Martinez.

There is an old saying,  "character is what you are in the dark" which here can be applied to Cesar Martinez.  Tigre was asked directly by the government in a proffer session about this issue and then again at trial by defense counsel. Each time the response was the same, that Cesar Martinez was known for not showing up for any fights or other gang activity. (**Exhibit 19** Trial Transcript Day 14 page 20). Cesar was busy working and trying to raise his daughter Samantha. (See PSR §122-123).

When an older county inmate at Plymouth was being harassed and his meals taken by younger inmates, Cesar Martinez stepped in to aid the man. Cesar was taken to the hole initially as a disturbance had occurred and he was part of it. However he was quickly released when the full story was known.

In the present case Cesar Martinez had the opportunity to speak with the government and become eligible for application of a two level drop under the "safety valve" for the Sentencing Guidelines. He chose not to do so out of a real concern for the well being of his family here in the United States and those back in El Salvador. He believed that he  would be viewed as a cooperator for which retaliation would occur. So, rather than gain a lower sentence he chose safety for himself and his family and in so doing he accepts that he will get a higher sentence.

In the same context, he has had to endure threats in the Dedham jail due to the fact he was found not guilty of the racketeering count.  He has not sought any retaliation but accepted such actions now as part of the course his life has taken. He also recognizes the potential for retribution upon deportation. A nephew, living with his family in El Salvador was brutally killed and left in a ditch on his way home from work. The nephew was not in any way associated with any gang in El Salvador.

In assessing the character of the individual now before the court, Cesar Martinez suffered a serious injury when arrested. The handcuffs were placed so tightly on him that he suffered a permanent injury to his left wrist. He has had surgery upon his wrist while incarcerated. This was not done at one of the world's finest hospitals in Boston but rather at the Lemuel Shattuck Hospital in Franklin Park.  This is an injury which will be with him for the rest of his life. An added punishment. (See **Exhibit 20**).

10

### 2.     The Need for the Sentence Imposed

Certainly there is a need to a period of incarceration as the transport of cocaine is a serious offense. Here the current statute caries a minimum mandatory term of five years. Congress is currently debating the future need for such minimum mandatory sentences.  If the safety valve came into operation here the court would have complete discretion as to the applicable sentence.

Perhaps the larger issue here is the need to assess how a defined period of incarceration prevents Recidivism. The Guideline offense level is not intended or designed to predict recidivism.[5]  An older first time inmate such as Cesar Martinez is substantially less likely to reoffend.  Additional studies have shown that any increases in the severity of the sentence do not yield any significant effects.

### 3.     Post Arrest Rehabilitation

Although it would be a consideration fora variant sentence if a mandatory minimum were not applicable, it is still a matter for the court to consider in fashioning the appropriate length of incarceration.  While housed initially at Plymouth, Mr Martinez was limited in his efforts to improve himself by the absence of programs.

 Once Mr Martinez was placed at Dedham, a plethora of opportunities were place before him.  He has sought to apply himself diligently at Dedham to become a better person.  He is trying to obtain a high school equivalency certificate. The current grades for the courses taken are presented herein as **Exhibits 21-27.**   He has also has completed a course of motivation called "TruThought."  It deals with being positive

---

[5] See "Recidivism Among Federal Offender: A Comprehensive Overview". United States Sentencing Commission March 2016.

in reflections on difficult times in life.  Most recently, Mr Martinez completed a course on "Parents Helping Parents" His aspiration is to have skills at parenting when he will again have the opportunity to be with both of his daughters.

### 4. Promoting Respect for the Law and Providing Just Punishment

A sentence of 60 months committed in this case is sufficient to satisfy the ends of punishment in all of the circumstances presented here regarding Cesar Martinez. Such a sentence takes into account the totality of the actions for which the defendant is responsible.  Where he to be sentenced in consideration of the allegation of Muerto and the 25 pages of the PSR included in what is sent to the Bureau of Prisons, Mt Martinez facing a significant higher security level and possible incarceration in a "gang unit". He would face possible physical retribution due to the not guilty finding on the racketeering count in his case.

Such a sentence (60 months) t would also encompass principles derived from cases describing what the First Circuit has called "sentencing factor manipulation" See *United States v. Montoya*, 62 F.3d 1 (1st Cir. 1995).   The government brought CW-1 up to Massachusetts and encouraged his actions in being part of ESLS.  The "beating in" of Animal came about through CW-1 with government aid. Cesar Martinez tried to resist this action and was soundly chastised by CW-1 in front of others. Now the government wants him held accountable.  Even the "protection details" for which Cesar Martinez is accountable,  were an FBI created process.  The testimony of Muerto, concerning allegations of prior bad acts by Cesar Martinez, seemed to have evolved upon reflection after he became a government witness seeking to further buttress his

value.   The defendant submits that all of these factors are intertwined with the

sentencing recommendation of the government and therefore would make any

sentence over 60 months substantively unreasonable.


**CONCLUSION.**

For the reasons states above, Cesar Martinez, requests that the Court

determine that a sentence of 60 months committed be sufficient and impose such here.


Respectfully submitted
CESAR MARTINEZ
by his attorney,

/s/ Stanley W. Norkunas
Stanley W. Norkunas
11 Kearney Sq
Lowell, MA. 01852
(978) 454-7465
attyswn@msn.com


CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the enclosed Defendant's
Sentencing memorandum on all counsel of record and the clerk's office by filing same
this 17th day of November 2018 using the court's ECF system.

/s/ Stanley W. Norkunas
Stanley W. Norkunas

**LIST OF EXHIBITS**
**(Filed as a Separate Document)**

**Exhibit 1.   Trial Transcript Day 4, Page 23**

**Exhibit 2       Trial Transcript Day 4, Page 26**

**Exhibit 3       Trial transcript Day 4, Page 30**

**Exhibit 4       Internal FBI Memorandum**

**Exhibit 5       Recording of CW-1 from December 8, 2014**

**Exhibit 6       Trial Transcript Day 4, Pages 98-99**

**Exhibit 7       Photograph of Martinez Family in El Salvador**

**Exhibit 8       Photograph of Martinez Family in El Salvador**

**Exhibit 9       Certificate of Achievement from El Salvador**

**Exhibit 10     Certificate of Achievement from El Salvador**

**Exhibit 11     Certificate of Achievement from El Salvador**

**Exhibit 12     Certificate of Achievement from El Salvador**

**Exhibit 13     Character Reference Letter**

**Exhibit 14     Character Reference Letter**

**Exhibit 15     Homeland Security Forms Filed By Defendant**

**Exhibit 16     Federal Income Tax 1040 Filed by Defendant**

**Exhibit 17     Photograph of Tow Truck owned by Defendant**

**Exhibit 18     Trial Transcript Day 14, Page 19**

**Exhibit 19**    **Trail Transcript Day 14, Page 20**

**Exhibit 20**    **Medical Forms for Injury of Defendant**

**Exhibit 21**    **Certificate of Program Attended**

**Exhibit 22**    **Certificate of Program Attended**

**Exhibit 23**    **Certificate of Program Attended**

**Exhibit 24**    **Certificate of Program Attended**

**Exhibit 25**    **Certificate of Program Attended**

**Exhibit 26**    **Certificate of Program Attended**

**Exhibit 27**    **Certificate of Program Attended**